**ROCHE FREEDMAN LLP**
Kyle W. Roche (admitted *pro hac vice*)
Edward Normand (admitted *pro hac vice*)
Richard Cipolla (admitted *pro hac vice*)
Stephen Lagos (admitted *pro hac vice*)
Ivy T. Ngo (SBN 249860)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Facsimile: (646) 392-8842
Email: kyle@rochefreedmanrochefreedman.com
Email: tnormand@rochefreedman.com
Email: rcipolla@rochefreedman.com
Email: slagos@rochefreedman.com
Email: ingo@rochefreedman.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DANIEL VALENTI, Individually and On Behalf of All Others Similarly Situated, | Case No.: 3:21-cv-06118-JD |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| DFINITY USA RESEARCH LLC, DFINITY FOUNDATION, and DOMINIC WILLIAMS, | JURY TRIAL DEMANDED |
| Defendants. | |

Lead Plaintiff Henry Rodriguez and Plaintiff Daniel Valenti, individually and on behalf of all others similarly situated, bring this action against Defendants, DFINITY USA Research LLC ("Dfinity USA"), DFINITY Foundation (the "Foundation", and with Dfinity USA, "Dfinity"), and Dominic Williams. Plaintiffs base their allegations as to their own acts upon personal knowledge, and upon information and belief as to the matters based on their attorneys' investigation. Plaintiffs believe that discovery will reveal substantial additional evidence for the allegations herein. Plaintiffs hereby allege as follows:

## I. INTRODUCTION

1. Within the Class Period, from May 10, 2021, through the present, Defendants have promoted, offered, and sold throughout the United States unregistered securities called "ICP tokens," and have engaged in insider trading of such securities, in violation of federal law.[1]

2. Defendants did not register ICP as a security with the Securities Exchange Commission ("SEC"); did not qualify for an exemption from the registration requirements; materially defrauded investors in connection with the promotion, offering, and sale of ICP; and have transacted in ICP in the Class Period while in possession of material, non-public information.

3. On behalf of investors who have purchased ICP in the United States, and who have done so contemporaneously with Defendants' insider trading, Plaintiffs bring suit to recover from Defendants the consideration paid for the ICP tokens, together with interest thereon; and to recover from Defendants their profits resulting from Defendants' fraudulent conduct and insider trading.

4. Dfinity was required to file registration statements with the SEC for its sale of ICP, but failed to do so. By selling and promoting these unregistered security tokens to investors, and by transacting in them while in possession of material, non-public information, Defendants have reaped billions of dollars in profits.

---

[1] ICP was formerly referred to as "DFN." For clarity, the Complaint refers to the token as ICP throughout the relevant time period, but the two terms refer to the same digital token.

**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

5. Starting in early 2017, Williams, the founder of Dfinity, began promoting his "Internet Computer" blockchain. Along with other employees of the Foundation and Dfinity USA, Williams wrote about the Internet Computer's promise in various internet posts, aimed at investors, that described the supposed utility of Dfinity's eventual network. The main purpose of these posts was to drum up demand for an ICO in 2018.

6. Understanding the legal repercussions for selling unregistered securities as SEC crackdowns began during this period, Defendants delayed their 2018 ICO, bided their time, and continued to drum up demand and hype for ICP through posts. These posts, however, omitted the disclosures that securities laws and the SEC have deemed essential to investor protections in initial public offerings, including use of "plain English" to describe the offering; a required list of key risk factors; a description of key information and incentives concerning management; an explanation of how the proceeds from the offering would be used; and a standardized format that investors could readily follow. Without these critical risk disclosures, investors in ICP tokens were thus left to fend for themselves—precisely the opposite of what the securities laws require.

7. After thus generating hype regarding the ICP tokens for years, Defendants finally sold ICP tokens to retail investors beginning on May 10, 2021. Defendants thereby promoted, offered, and sold ICP through generalized solicitations using statements posted on the Internet and distributed throughout the United States and the rest of the world, such that Defendants offered and sold the securities to Plaintiffs and the general public in the United States.

8. Defendants kept for themselves and sold into the market billions of dollars' worth of ICP tokens. After insiders began to sell massive quantities of these ICP tokens, and while Plaintiffs and the other Class members were transacting in ICP tokens, the price of ICP tokens fell from a high of over $730 after issuance to around $20 today. Even by the volatile standards of the crypto-asset market, this constituted an astonishing collapse in value.

9. Defendants and related insiders had kept approximately 50% of the ICP tokens for themselves and solicited online exchanges of digital assets (known as "crypto-asset exchanges") to

list ICP tokens on their platforms and encourage purchases by a wide universe of investors. Defendants thus dumped massive amounts of ICP tokens on the open market, securing billions of dollars of profits for themselves and driving the price down—all without any disclosure to the market of their intent to do so.

10.    Although ICP is a security, Dfinity did not register it as a security with the SEC and did not qualify for an exemption from registration requirements. The SEC's detailed "Framework" for analyzing digital assets, issued on April 3, 2019, indicates that ICP and other similar digital tokens are "investment contracts" and therefore securities under Section 2 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(1).[2] Indeed, since the release of the Framework, the SEC has found the sale of comparable crypto-assets violated the Securities Act prohibition against the sale of unregistered securities.

11.    Defendants thus engaged in transactions that consisted of the solicitation, offer, and sale of securities without registering them as federal laws require for the protection of investors; and they transacted in these securities while in possession of material, non-public information while Plaintiffs and the other Class members contemporaneously transacted in ICP.

12.    Plaintiffs and the other Class members are entitled to recover the consideration they paid for the ICP tokens with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate, or else for their net losses. Plaintiffs and the other Class members are further entitled to recover Defendants' ill-gotten gain from their misconduct.

## II.    PARTIES

13.    Plaintiff Daniel Valenti is a resident of Tampa, Florida. Plaintiff purchased ICP tokens, on Coinbase, beginning on May 10, 2021. Valenti purchased 45.2504 ICP tokens on May 10, 2021, and thereafter regularly transacted in ICP tokens through August 3, 2021. For example, in addition to purchasing ICP on May 10, 2021, Valenti also purchased ICP on May 12, May 15,

---

[2] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1.

May 16, May 17, May 18, May 19, May 20, May 21, May 22, May 24, May 27, May 30, May 31, June 4, June 11, June 12, June 15, June 16, June 17, June 18, June 20, and June 21, among other dates. On his transactions in ICP tokens through August 3, 2021, Valenti suffered substantial loss.

14.     Lead Plaintiff Henry Rodriguez is a resident of New Jersey. Rodriguez purchased ICP tokens, on Coinbase, beginning on May 18, 2021. In addition to purchasing ICP on that date, Lead Plaintiff also purchased ICP on May 28, June 2, June 5, June 8, June 10, and June 11, among other dates. On his transactions in ICP tokens through October 7, 2021, Rodriguez suffered substantial loss.

15.     Defendant DFINITY USA Research, LLC is a Delaware company headquartered in Palo Alto, California, at 411 Acacia Avenue. Based on a sworn declaration filed by Defendant Williams in another matter, Dfinity USA is a wholly owned subsidiary of the Foundation.

16.     Defendant DFINITY Foundation is a Switzerland-based not-for-profit organization, with operations and employees in Palo Alto and San Francisco, California, in Zurich, Switzerland, and in Tokyo, Japan.

17.     Although the Foundation is nominally based in Switzerland, Dfinity's operations are largely located in Palo Alto. For example, when asked on Dfinity's Telegram page where the team was based, Dfinity representatives informed investors that "the operations are based in Palo Alto (California, USA)" and that the "core team is based in Palo Alto." Consistent with that, data from LinkedIn shows that Dfinity has nearly sixty current employees located in California, and Defendant Williams has referred to Dfinity's Palo Alto "research center" as the "flagship."

18.     Defendant Dominic Williams is the founder, President, and Chief Scientist (and also a director) of the Foundation. As President, he casts the deciding vote about the Foundation's operations in the event of a tie vote among the Foundation's "council members," which appear to only have consisted of just Williams and Gian Bochsler for much, if not all, of the Class Period.

19.     Williams is also the CEO of Dfinity USA. Williams has resided in Palo Alto, California, since 2012. In an August 2020 court filing, he explained that he earned $300,000 per

year in connection with his role at Dfinity USA in Palo Alto. He likewise stated in a November 2019 California state court filing that he was an "employee" of Dfinity USA in Palo Alto (and provided pay stubs to support that assertion).

20.     Williams founded Dfinity in California, where has lived and worked for several years. He has a California driver's license issued in April 2020. His LinkedIn page indicates that he is located in Palo Alto, California. He has appeared as a defendant in cases in California state court, including litigation over his divorce, where he filed documents as recently as January 13, 2022.

21.     In the weeks that followed the events described below, however, Williams left Palo Alto and, upon information and belief, has not returned. Indeed, in early August 2021, in the face of existing and prospective litigation, Williams has purportedly moved to Switzerland. He has thus far succeeded in evading service in this action, as well as in a matter filed against him by his son for conversion.

### III.     JURISDICTION AND VENUE

22.     The Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs bring claims under Sections 5, 12(a)(1), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o, and under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934, *id*. §§ 78j, 78t(a), 78t-1. This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of that Act, *id*. § 77v, and over the Exchange Act claims pursuant to Section 27 of that Act, *id*. § 78aa.

23.     The Court has personal jurisdiction over Defendants as a result of their acts occurring in or aimed at California in connection with the offer or sale of unregistered securities and Defendants' materially false and misleading statements and omissions regarding such securities.

24.     Venue is proper pursuant to 15 U.S.C. §§ 77v(a), 78aa(a), and 28 U.S.C. § 1391(b), in that this is a district wherein one or more Defendants is found or transacts business, where the offer or sale of ICP took place, and where a substantial part of the events or omissions giving rise to the claims occurred. Dfinity has operations and employees in San Francisco and Palo Alto, California; at least as of the filing of the complaint in this action, Williams resided in Palo Alto;

Defendants sold ICP to persons in this district, made materially false and misleading statements and omissions regarding securities in this district, and transacted in ICO tokens in this district.

## IV.   FACTUAL ALLEGATIONS

### A.   Background of Crypto-Assets and ICP's Initial Coin Offering

25.   A crypto-asset is a digital asset designed to work as a medium of exchange or a store of value or both. Crypto-assets leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

26.   Created in 2009, Bitcoin was the world's first decentralized crypto-asset.[3] With a current market capitalization of approximately $700 billion, Bitcoin is also the largest and most popular crypto-asset. Bitcoin spawned a market of other crypto-assets that, together with Bitcoin, have a current market capitalization of $1.7 trillion.

27.   One of the main features that Bitcoin popularized was the use of a distributed ledger to track the ownership and transfer of every bitcoin in existence. This distributed ledger is known as a blockchain. Blockchains are a central technical commonality across most crypto-assets. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve a form of decentralization.

28.   There are two main ways to obtain crypto-assets. One way is to be part of the framework of incentives to validate the transactions on the blockchain, under either a "Proof of Work" or "Proof of Stake" scheme. Users who expend resources to validate the blockchain get rewarded with newly minted tokens. This process is colloquially referred to as "mining" for Proof of Work blockchains or "validating" for Proof of Stake blockchains.

29.   A second and typically more common way to obtain crypto-assets is to acquire them from someone else. This often involves acquiring them through online crypto-asset exchanges. These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies.

---

[3] Bitcoin and other crypto-assets are also commonly referred to as "cryptocurrencies" regardless of whether they are commodities (as the term implies) or securities.

**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

30.   Bitcoin, for a time, was the only crypto-asset available on exchanges. As crypto-assets grew in popularity, however, exchanges began listing other crypto-assets as well and trading volumes expanded. In early 2013, daily Bitcoin trading volumes hovered between $1 million and $25 million. By the end of 2017, daily Bitcoin trading volumes ranged between $200 million and $3.8 billion.

31.   Ethereum is the second-most popular crypto-asset, with a market capitalization of approximately $313 billion. Ethereum was designed to enable "smart contract" functionality. A smart contract is a program that verifies and enforces the negotiation or performance of a contract. Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.

32.   For example, a smart contract enables two parties to submit ether to a secure destination and automatically distribute the ether at the end of the month without any third-party action. The smart contract self-executes with instructions written in its code which get executed when the specified conditions are met. Since Ethereum first introduced the concept of smart contracts, many other companies have sought to create crypto-assets that improve on and compete with Ethereum in the smart contract ecosystem.

33.   Interest in crypto-assets began to accelerate towards the end of 2016, with prices growing at a rate historically unprecedented for any asset class. Over the course of 2017 alone, bitcoin's price increased from approximately $1,000 to approximately $20,000. On January 1, 2017, Ethereum was trading at approximately $8 per ether. Approximately one year later, it was trading at over $1,400 per ether—a return of approximately 17,000 percent over that period.

34.   This enthusiasm for crypto-assets prompted many entrepreneurs to raise funds through initial coin offerings, or ICOs. Often, as with ICP, these entrepreneurs would promise investors that the funds raised during the ICO would go to fund a new blockchain—commonly touted as revolutionary in some way—and that the tokens obtained at the ICO could be used on that

new blockchain. Between 2017 and 2018, ICOs raised nearly $20 billion. None of these ICOs was registered with the SEC.

35.    On May 10, 2021, Dfinity "launched" the "Internet Computer" network and simultaneously listed ICP tokens for sale to the public (including U.S. investors) through Coinbase, a California-based crypto-asset exchange, and other exchanges. Defendants have sold billions of dollars in ICP tokens to retail investors since that date.

### B.    Defendants Solicit ICP Tokens Sales

#### a.    Early ICP Fundraising

36.    Williams has been touting the revolutionary functionality of the Internet Computer and the utility of ICP for several years. The first sale occurred in February 2017, when Williams announced that "a not-for-profit foundation in Zug called DFINITY Stiftung" would be conducting a "crowdsale" of future ICP tokens to fund the blockchain's development. This crowdsale was to be followed by a "main" round soon thereafter which would mimic the ICOs launching at that time. Williams also explained that 78% of the ICP created for the network would be earmarked for investors in the crowdsale (or "seed round") and main round.

37.    The main round never happened. Clearly recognizing that the ICP tokens are securities (indeed, according to Williams, the 2017 crowdsale was nominally blocked in the United States "due to regulatory uncertainties"), Dfinity eschewed using an ICO to raise funds in part because of, in Williams' words, the "regulatory hornets' nest" that surrounded ICOs at the time.

38.    Williams later admitted that Dfinity considered the "possibility of running an ICO," but the "regulatory environment" made it "impractical" because "ICO fundraising" is "generally still [a] grey legal territory." Williams acknowledged that a "securities regulator might well argue that [ICP tokens] are in fact investment contracts that investors are buying because they expect them to have value once the network has launched."

39.    Williams also backtracked, around this time, on the expectation that the vast majority of ICP would be reserved for early investors, and instead explained that approximately 50% of ICP

**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

tokens would be earmarked for Defendants, including Dfinity's team. Williams explained that these ICP tokens would be given to insiders such as Dfinity employees "to help attract and motivate the world's best talent."

40.     In early 2018, Dfinity raised, in Williams' estimation, the "relatively small" amount of $61 million from "well-respected investors Andreessen Horowitz and Polychain" (Andreessen Horowitz is also known as "a16z"). Dfinity dubbed this the "Strategic Round." After this round, Dfinity promised that ICP tokens would be available to retail investors at a sale "run by regulated traditional exchanges" after its "network goes live."

### b.  Defendants Tout the May 2021 ICP Token Launch

41.     In the period leading up to the May 2021 offering, Dfinity and Williams began to describe the network in increasingly laudatory terms, which became amplified in publications such as *Forbes*, *Business Insider*, and *Bloomberg*. As the *New York Times* would later explain, these efforts worked and "generated a lot of buzz" ahead of Dfinity's ICO, "the crypto equivalent to a company going public and listing shares for investors to buy."

42.     **May 2019**: Williams publicly states that the Dfinity network "reimagines software" and would be "incredible."

43.     **June / July 2020:** Dfinity's Twitter account promotes that "Billions of dollars are waiting to invest in the open web." A few days later, Dfinity published an article promoting investment in the "Internet Computer" project, noting that "Financial backers see tremendous upside in the open web's ability to create financial opportunities for innovation that previously didn't exist. . . . VCs are eager to deploy billions in capital to foster the decentralized web[.]"

44.     **February 2021**: Dfinity "convene[s] top investors and entrepreneurs" for an event entitled "Trillion Dollar Opportunity: How a New Internet Will Completely Reimagine Your Business Model" which addresses how "businesses can seize this opportunity."

45.     **March 2021**: Dfinity promotes the "Genesis Event," when ICP tokens would become available to retail investors, on various internet and social medial channels.

46.    **April 2021**: Dfinity called the prospective ICP Genesis Event "the most anticipated event in blockchain."

47.    **May 2021**: To promote Dfinity and ICP, Williams participates in interviews with journalists from several different outlets, including *Bloomberg* and *Decrypt*.

48.    **May 4, 2021**: Williams states that Dfinity "represents the product of an unprecedented multi-year R&D effort, orchestrated by the DFINITY Foundation from research and development centers in Zurich, Palo Alto, San Francisco and Tokyo."

49.    **May 7, 2021**: Dfinity holds the Genesis Event, an hours-long, road-show type presentation in which Williams plays a prominent role. He explains that Dfinity's blockchain represents "a giant leap forward" allowing the running of smart contracts at web speed, that can serve web directly to users, that can increase its capacity with demand as needed, that is efficient, that governs itself, and that can provide better usability than those systems built on traditional technology." Williams went to so far as to say that the network using ICP will be "humanity's primary compute platform for building software" in 20 years. Dfinity employee Liz Yang (who is based in the San Francisco Bay Area) instructed the public that they could "begin acquiring the ICP utility token through approved channels such as exchanges very soon." Dfinity employee Michael Hunte (also based in the San Francisco Bay Area) described the launch of Dfinity network as "the dawn of the new open and free internet."

### c.    Defendants Seek to Monetize Dfinity's Buzz by Offering ICP Tokens on Major Crypto-Asset Exchanges

50.    On May 10, 2021, ICP was listed on multiple cryptocurrency exchanges, including Coinbase, Binance, Huobi, OKEx, Kucoin, CoinList, CoinEx, FTX, and others. ICP immediately catapulted to the upper echelon of crypto-assets, quickly peaking at a market capitalization of over $45 billion, which placed it within the top-10 crypto-assets in the world.

51.    As one Twitter observer commented, this was uncommon in crypto-asset listings: "Major exchanges listing $ICP all at once, never happened before." Not only would Dfinity have to take affirmative steps to list ICP with any given exchange (including by applying to be listed, paying

listing fees, and paying transaction fees incurred selling ICP on those exchanges), this simultaneous listing, as *Coin Telegraph* reported, "reflected a carefully structured strategy by Dfinity, the Zurich-based nonprofit backing Internet Computer, that landed ICP tokens right into the conscience of everyday traders."

52.     Defendants planned these listings in advance to create secondary trading markets, especially in the United States, in which to dump their ICP tokens. Indeed, Dfinity insiders ultimately deposited at least 2 million ICP tokens with Coinbase on May 10. Listing with the California-based Coinbase was a wise strategic choice because it is the largest and most well-established crypto-asset exchange in the United States with more than 50 million users.

53.     At the same time, during this period, Dfinity promoted investment research reports from well-known sources in the crypto space. For example, on May 10, Yang tweeted: "Messari wrote an in-depth report on the Internet Computer." As described by *Coindesk*, "Messari is an online database for the crypto industry that provides data insights, pricing, and research on crypto-assets through an open-source library of information. It seeks to be the crypto industry's equivalent of Crunchbase and the US Security and Exchange Commission's EDGAR database, which contains company registration statements and reports among other documents, all of which are publicly available."

54.     The report that Yang referenced, which was linked in her tweet, indicated that ICP tokens had a "fully diluted market cap" of $85 million. The report explained that "Dfinity is one of crypto's most well-funded and publicized projects." The report also provided information for investors regarding how tokens were to be allocated among different groups of investors and outlined restrictions to be imposed on those investors' tokens. The report included the table copied below to summarize the allocation of ICP tokens:

11
**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

**║║MESSARI**

## Genesis Token Allocation
Total token distribution on May 10 2021

| | Genesis Initial State Allocations | % | Number of Participants |
|---|---|---|---|
| Early Contributors | 44,575,228 | 9.50% | <50 |
| Seed | 115,986,694 | 24.72% | 370 |
| Strategic Partnerships | 32,845,140 | 7.00% | <50 |
| Presale | 23,295,828 | 4.96% | 110 |
| Strategic Partnerships | 17,795,770 | 3.79% | <50 |
| Community Airdrop | 3,763,448 | 0.80% | 50,000+ |
| Initial Community and Developer | 2,242,179 | 0.48% | <50 |
| Node Operators | 1,050,000 | 0.22% | 57 |
| Internet Computer Association | 20,000,000 | 4.26% | 1 |
| Team Members | 84,480,829 | 18.00% | 200 |
| Advisors and Other Third-parties | 11,239,705 | 2.40% | <50 |
| DFINITY Foundation | 111,938,888 | 23.86% | 1 |
| **Total** | **469,213,709** | **100.0%** | |

Data as of: May 10, 2021
Source: Dfinity, Messari

55.  As the table above demonstrates, the Foundation itself owns nearly 25% of ICP tokens, Dfinity's team members own 18%, and Dfinity's advisors own 2.4%. The Internet Computer Association, another Williams-run organization, owns 4%.

56.  The Messari report also explained that "[t]here will be 469,213,710 ICP tokens at genesis" and noted that (i) tokens allocated to "Strategic" investors (like Andreessen and Polychain) would be subject to a three-year vesting period and (ii) tokens allocated to "Presale" investors would be subject to a one-year vesting period. Those vesting periods, according to Messari, would start "from mainnet launch (May 2021)." A spreadsheet included in Messari's report demonstrated that neither "Strategic" investors nor "Presale" investors would have access to their ICP until May 30, 2021, at which point they would receive 912,365 and 1,941,319 ICP respectively each month for the remainder of their vesting periods. Yang has referred to Messari as her "favorite" crypto-asset research firm and noted that it "has some of the finest crypto research in the space." On the same day, and as explained in greater detail below, Dfinity (through Williams) also announced that "Seed" investors' ICP would be subject to a four-year vesting period, and that "Community Airdrop" investors' ICP would be subject to a one-year vesting period.

57.     On May 11, Dfinity tweeted: "New research profile from @BinanceResearch: The #InternetComputer is a layer-1 protocol to become a blockchain network that evolves the internet. As of May 10, 2021, total supply of ICP is 469,213,710 and current circulating supply is 125,067,597 (~26.65%)." Dfinity's tweet linked to the report from Binance, one of the world's largest crypto-asset exchanges. That report included, on a panel on the left-hand side, an icon indicating the current price of ICP with a button stating: "Trade now."

58.     In further promoting ICP, Dfinity has built and touted its relationships with crypto investing companies. In a *Medium* post from June 2021, Williams noted that there was a "boost of institutional demand" for ICP and linked to a press release from Crypto Finance. That press release explains that the "Crypto Finance Group provides institutional and professional investors a full suite of crypto asset products and services." The press release announced that Crypto Finance "now enables trading and secure storage for the Internet Computer Protocol (ICP)."

**C.     Defendants Prepare to Dump ICP Tokens By Transferring Tokens to the Internet Computer Association, Buying Up Employee Tokens, and Imposing Last-Minute Lockups on Seed Investors**

59.     Having generated considerable public interest in ICP and secured ICP's place on the world's most popular crypto-asset exchanges, Defendants took three steps in the week that preceded the launch to ensure that they could profitably dump ICP on investors. The steps were (1) transferring ICP to a related entity which could sell ICP without restrictions, (2) buying employee's ICP to restrict supply, and (3) restricting outside investors' access to their ICP to further restrict supply.

60.     **Step One.** The Foundation transferred 20 million ICP to a related entity, the Internet Computer Association ("ICA"). This transfer enabled Defendants to dump the Foundation's ICP on the market while later claiming that the Foundation made no sales and was locked up for a week.

61.     The ICA was formed around January 2021. Like the Foundation, Williams and Bochsler run it. Indeed, Williams is the President of both the Foundation and the ICA.

62.     The plan to sell ICP through the ICA coalesced at least one week before the May 10, 2021 launch. On May 3, 2021, according to a group of Dfinity's high-level engineering employees in Switzerland (the "Swiss Engineers"), Williams, Bochsler, and Paul Meeusen, the VP of Finance, met as an "emergency committee" to strategize the Foundation's sale of ICP at launch. Around that same day, the Foundation transferred the 20 million ICP to the ICA, enabling the Foundation to circumvent regulations that prohibited it from selling ICP in the days immediately following the launch.

63.     As planned, the ICA did sell ICP in the period immediately following the launch. Data from the website ic.rocks, which tracks ICP transactions, demonstrates that "neurons" associated with the ICA—including Neurons 3005 and 3006—transferred ICP to crypto-asset exchanges throughout May 2021.[4]

64.     **Step Two.** Defendants secured greater control over the supply of ICP by secretly purchasing ICP directly from employees with vested tokens. Around the same time that the Foundation transferred ICP to the ICA, and in advance of the May 10 launch, Dfinity—through Meeuren, Nicholas Cooper (the Head of Finance), and two other employees—began internally advertising a program to employees called the "Cash-in-Lieu-of-Tokens Program."

65.     Pursuant to that program, Dfinity offered to buy tokens directly from employees (thus preventing those employees from selling their tokens on the market). The materials circulated to employees advised: "If you are planning to sell Tokens immediately upon receipt, this Program will allow you to receive the cash-equivalent of your Tokens and minimize trading fees imposed by your trading institution." The material further explained that the program would provide a "[c]ollective employee benefit" because "DFINITY is able to time the aggregate employee token sales (to cover the cash payments)." Defendants thus urged their employees to sell their ICP to Dfinity, instead of

---

[4] Dfinity has described "neurons" as "accounts" on the ICP network that hold ICP. *See* Dfinity, "Understanding the Internet Computer's Network Nervous System, Neurons, and ICP Utility Tokens," Medium (May 6, 2021), available at https://medium.com/dfinity/understanding-the-internet-computers-network-nervous-system-neurons-and-icp-utility-tokens-730dab65cae8.

selling it on the open market, because doing so would yield the "[c]ollective employee benefit" of higher ICP prices. According to the Swiss Engineers, "many" employees took advantage of this program in May and June 2021, until it was abruptly cancelled on June 18, 2021, after which one of the employees responsible for it, the then-Head of Finance, was terminated.

66.    Confirming that employees in fact opted to use the "Cash-in-Lieu-of-Tokens Program," Williams admitted that Dfinity sold ICP on the market to cover the costs of paying cash to those employees. One of the purported benefits to employees of the "Cash-in-Lieu-of-Tokens Program" was that employees could reduce the risk that they would be unable to pay the tax liability associated with their receipt of ICP tokens. The materials for the program explained: "Your first taxable event is the day you have the ability to liquidate your Tokens, which is the receipt date. There is a risk that the token value may decrease from your first taxable event. You may choose to receive a portion in cash on the taxable event day to ensure you have enough cash on hand for the tax liability should there be additional taxes owed for your unique tax situation." In a September 25, 2021, interview with *CryptoSlate*, Williams explained that, beginning in June 2021, the Foundation sold ICP "to cover tax liabilities created by vesting RTUs paid to staff (Restricted Token Units)."

67.    **Step Three.** On launch day, Defendants imposed last-minute restrictions on ICP held by outside investors, and thus reduced the total supply of available ICP and increased their own share of that ICP. As noted above, nearly 25% of ICP was to be allocated to so-called "seed" investors who purchased their ICP in February 2017. These investors transferred crypto-assets to Defendants in exchange for ICP, pursuant to written agreements that did not impose any vesting restrictions on their ICP.

68.    Indeed, in the years that followed February 2017, Defendants and their representatives repeatedly stated that seed investors' ICP would not be subject to vesting restrictions. For example, in April 2018, a Dfinity representative named Dukakis Tejada told investors on Telegram that seed investors' tokens "would be immediately available once [the launch] takes place." The next month, Mr. Tejada told investors on Telegram that seed investors' tokens were "not lo[ck]ed" and that seed

investors "can use their tokens as they please once the [launch] takes place." An hour later, another representative, Moritz Fuller, told investors that "[s]eed round tokens will be unlocked when mainnet launches" and that "[t]here is no locking/vesting for them." Mr. Fuller reiterated to investors in December 2018 that "seed round investors aren't vested, so they can sell as soon as the network goes live."

69. Investors understood Defendants' need to allow seed investors to sell their ICP at launch. One investor observed on Telegram in June 2019: "You can't lock something if you didn't agree to lock it before the sale." Defendants, through Fuller, likewise recognized in May 2018 that imposing restrictions on seed investors' ICP would be unfair, given that they made their investment in 2017: "[T]hey have been waiting for more than a year for their tokens and is not fair to set a lock-up period for them."

70. Nevertheless, on May 10, Defendants announced for the first time that seed investors' tokens would be subject to vesting restrictions. In a *Medium* post that day, Williams explained that seed investors "will receive all of their ICP tokens at [launch], *but* these will be staked inside 49 voting neurons within the NNS," such that only 1/49th of each seed investor's ICP tokens would be "immediately" available "if desired (subject to applicable AML/KYC verification)." The remaining 98% of these investors' ICP would be unlocked in 1/49th increments over the succeeding 48 months. In other words, until mid-June 2021, seed investors would only have—at most—access to approximately 2% of their tokens.

71. But many seed investors were unable to even access the small slice of their tokens that Defendants made available to them in May 2021. As part of the same *Medium* post that announced that seed investors' tokens would be subject to restrictions, Williams included a link to instructions (which had not previously been made available) describing to seed investors how they could obtain the few ICP tokens to which Defendants decided to give them access. As explained by Arkham Intelligence in a June 28, 2021, report: "Seed supporters who viewed [the instructions] eager to claim their tokens were confronted with pages of complicated technical steps that many say

they weren't able to complete. The process couldn't even be done on a Windows computer or newer Macs built with Apple M1 chips." Indeed, the instructions stated: "You can only install the DFINITY Canister SDK dfx and the Candid compiler didc on Intel-based macOS and Linux computers." One user on Dfinity's forum reported that he "bought a macbook" so that he could access his ICP, while another asked Dfinity to "create an interface so that users without a technical profile can claim the seed tokens without problems."

72.     Arkham further explained: "Besides being highly technical, the process appears to have been buggy. Many seed supporters who could decipher the steps say they ran into errors." Defendants acknowledged some of these errors on Dfinity's forums, and investors reported many others, including numerous problems relating to Dfinity's KYC/AML compliance process.

73.     Defendants, however, were unhelpful in resolving these many issues. For example, when seed investors sought assistance on the Dfinity forum, they were informed that the process was "highly technical" and were instructed to "submit a ticket." But when seed investors did that, they were told to ask for help on the forum—where they started.

74.     Investors accurately concluded that Defendants were intentionally trying to prevent them from accessing their ICP. On Dfinity's forum, one investor observed: "*They're making it as difficult as possible for seed investors to claim their tokens, so they won't dump the price.*" Consistent with that observation, even though seed investors made their investments in February 2017, Defendants did not make available to them Dfinity's KYC/AML compliance process until May 10, 2021—the day of the launch. This reality was not lost on investors, with one stating on Dfinity's forum: "Come on Dfinity, you had almost 4.5 years to ask seed investors to do KYC. Are you really going to launch first and only then start asking them for information and start providing documentation for those who financed and enabled you in the first place?"

75.     It is inconceivable that Defendants merely overlooked the process by which they would distribute digital assets worth hundreds of millions of dollars or inadvertently precluded seed investors from accessing millions of ICP tokens at launch. As Messari explained, "Dfinity is one of

17

**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

the most tenured and well-funded smart contract platforms in crypto." It received tens of millions of dollars from some of the most well-known Silicon Valley venture capital firms, including Andreessen Horowitz. As of May 10, 2021, it had a 200-person team that included the former head of privacy and cryptography research at IBM Research, the co-creator of WebAssembly, a former mathematics and cryptography professor, and ex-Google engineers. Indeed, to this day, Dfinity's website touts Dfinity's "team of world-class researchers and engineers."

76.     Defendants' efforts to make it difficult for seed investors to claim their ICP were successful. A research report from Cycle Dao, published at the end of June 2021, shows that "Seed" and "Early Contributor" investors *combined* were successfully able to access only 1,660 ICP on May 10, 2021. Even with the last-minute vesting restrictions that Defendants imposed on seed investors' ICP, seed investors had the right to 2.4 million ICP on May 10. Without those vesting restrictions, seed investors would have had the right to approximately 116 million ICP.

77.     Moreover, and as explained below, other outside investors—including "Community Airdrop" investors—did not have access to any ICP on May 10. The upshot, based on available data and as shown in the table, was that Defendants and their insiders controlled approximately 98.6% of the ICP supply on May 10 (and potentially more, given that "Initial Community and Developer" and "Node Operators" are categories that likely refer to, or at least include, insiders).

| Group | Disclosed Allocation | ICP Available on May 10, 2021 | Share of ICP Available on May 10, 2021 |
|---|---|---|---|
| *Outside Investors* | | | |
| Early Contributor and Seed Investors | 160,561,922 | 1,660 | 0.00% |
| Airdrop Investors | 3,763,448 | 0 | 0.00% |
| Strategic Investors | 50,640,910 | 0 | 0.00% |
| Presale Investors | 23,295,828 | 0 | 0.00% |
| Subtotal | 238,262,108 | 1,660 | 0.00% |
| *Likely Insiders* | | | |
| Initial Community and Developer | 2,242,179 | 2,249,179 | 0.97% |
| Node Operators | 1,050,000 | 1,050,000 | 0.45% |
| Subtotal | 3,292,179 | 3,292,179 | 1.43% |
| *Insiders* | | | |
| Internet Computer Association | 20,000,000 | 20,000,000 | 8.66% |
| Team Members and Dfinity | 196,419,717 | 196,419,717 | 85.05% |
| Advisors and Other Third Parties | 11,239,705 | 11,239,705 | 4.87% |
| Subtotal | 227,659,422 | 227,659,422 | 98.57% |
| *Total* | 469,213,709 | 230,953,261 | 100.00% |

19

**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

78.     Critically, in addition to securing for themselves a greater *share* of the ICP supply (and thus greater control over the price of ICP), Defendants also reduced the *total supply* of ICP available on May 10. As a result, the prices on the launch date at which Defendants and their insiders were able to sell their ICP were significantly higher than they would have been otherwise.

### D.     May 10, 2021 – Defendants Dump ICP Tokens

79.     Defendants' solicitation, promotion, and manipulation worked: ICP opened up as one of the mostly highly anticipated ICOs of all time, and the price of ICP quickly rose to $731 per token, repeatedly reaching over $600 per token. Within hours, however, the price had begun to fall.

80.     ICP's volatile first day of trading attracted significant media attention. *Coin Telegraph* marveled that "dollar bids for the token surged to as high as $3,093" on Binance, a major crypto-asset exchange, and observed that "a berserk trading sentiment" landed "ICP on the list of the top 10 cryptocurrencies by market capitalization, surpassing even veterans such as XRP, Dogecoin (DOGE), and Cardano (ADA), and reaching as high as the fourth spot." *Decrypt* observed that ICP "immediately leaped into the top 10 cryptocurrencies on CoinMarket Cap."

81.     Within the next few weeks, the price continued to drop. By the end of May, ICP was trading at $110 per token, and by late June ICP hit the $45 mark. By early 2022, the price of ICP fell below $20.

82.     Public reporting and other available data explain the reason for this volatility: dumping of ICP tokens by Defendants and their affiliates and/or insiders. Arkham Intelligence published a report on June 28, 2021, concluding that Dfinity and its insiders deposited at least 18.9 million ICP, worth approximately $3.6 billion at the time of deposits, to four exchanges, with Coinbase receiving at least 2 million ICP on May 10 from Dfinity, and another 4.7 million ICP from Dfinity on June 15. Arkham reported that, from May 10 to June 28, Dfinity directly deposited 8.3 million ICP on exchanges, Dfinity transferred 34.1 million ICP to insiders, and those insiders deposited 10.7 million of that ICP on exchanges.

83.     Data from the website ic.rocks, which tracks ICP transactions, corroborates Arkham's analysis. That data shows that, on May 10, approximately 4 million ICP tokens were sold on Coinbase. Nearly all of those tokens were sold by just twenty different accounts, which received their ICP directly from Dfinity around that time. A research report from Cycle Dao, published at the end of June 2021, shows that "Seed" and "Early Contributor" investors had access to only 1,660 ICP on May 10. Statements from "Community Airdrop" and "Presale" investors, described below, show that they did not have access to any ICP on May 10. And Messari's report, endorsed by Dfinity, in addition to confirming that "Presale" investors did not have access to their tokens as of May 10, also indicates that "Strategic" investors did not have access to any tokens until May 30. Dfinity and its insiders were therefore responsible for the substantial majority of sales on that date. Indeed, a single Dfinity-controlled "neuron," Neuron 4000, was responsible for transferring over 4.4 million ICP, including 3.2 million ICP directly, to crypto exchanges on May 10-12, 2021. In fact, approximately 1.6 million ICP was transferred directly from Neuron 4000 to Coinbase alone on May 10, 2021.

84.     In addition, on May 24, a single account sold 2 million ICP on Coinbase; on June 15, another account sold approximately 5.2 million ICP on Coinbase; and from May 16 to July 28, another account sold approximately 6.5 million ICP on Coinbase. Each of these accounts received its ICP from Dfinity, and from no other source. These three sellers were responsible for selling nearly 14 million ICP between May 10 and July 28 on Coinbase.

85.     Data from ic.rocks shows that, as of August 2021, "Seed" and "Early Contributor" investors had access to only 3.25 million ICP total (and would have had access to even fewer tokens in May and June, due to the vesting requirements described below). And data from Messari, in the report endorsed by Dfinity, shows that "Strategic" and "Presale" investors would only have access to less than 3 million ICP until June 30. Dfinity and its insiders were therefore responsible for these large sales, in addition to many smaller sales that occurred over the same period. Upon information and belief, the Foundation was responsible for the sale of 2 million ICP on May 24, because, as

21

**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

explained below, Williams implicitly admitted that the Foundation sold ICP on that date and because the Foundation was one of the few stakeholders that owned and controlled such a large amount of ICP as of that date.

86. As further confirmation that Defendants sold ICP in the days and weeks that followed the launch, the Swiss Engineers report that Dfinity initially designated two employees, the VP of Finance and the Head of Finance, to sell ICP on behalf of Dfinity and the ICA. Employees were later told by Bochsler that those individuals failed to use "floors" for their ICP sales, and were subsequently replaced by a "professional trader" that Bochsler did not identify.

87. This dumping was possible only because, unlike other investors, Dfinity did not impose any vesting requirements or other sales restriction on itself or its insiders. That is, even after imposing restrictions on certain pre-ICO investors (including "Seed," "Strategic," "Presale," and "Community Airdrop" investors) and stating that there would be restrictions on Dfinity and its insiders, Dfinity left itself and its insiders free to dump ICP as it wished. To put it differently, Dfinity and its insiders were able to sell ICP on the open market to unsuspecting retail investors while outside investors were prohibited from selling their ICP.

88. The purpose of the vesting restrictions that Dfinity imposed on outside investors was to ensure that Dfinity and its insiders could sell their ICP at the highest price possible. As the Messari report tweeted by Yang observed: "The higher the amount locked, the lower the circulating the supply, the more favorable price action is."

89. Dfinity and its team dumped their ICP, moreover, while in possession of material, nonpublic information, including regarding (i) vesting restrictions imposed on the majority of ICP tokens owned by Dfinity and its current and former team members and (ii) their intention to sell those tokens on the open market in volumes amounting to dumping. And notwithstanding that Dfinity and its team sold considerable amounts of ICP beginning on May 10, they did not disclose these facts to the retail investors like Plaintiffs who purchased that ICP.

### E. Defendants' Cover-Up of Their ICP Token Dumping

90. This sequence of events came as a complete surprise to the market in general and to ICP's retail investors in particular. Indeed, Williams had repeatedly stated that insiders would not and could not dump tokens after the launch of Dfinity's blockchain, as summarized here:

- "Anyone imagining that Polychain and a16z are whales looking to flip their positions for a quick profit should consider this: tokens granted in exchange for 'strategic' round contributions came with a 3 year vesting schedule. Just like team members whose incentive tokens are bound by even longer vesting schedules, they too are laser focused on building the future." (February 7, 2018, on Reddit).

- "To be clear, we remain totally committed to enabling as wide as participation as possible. We believe in a holistic approach that engages participation both from the wider community and specialists who add value through their special resources and skills, while also ensuring all participants are treated fairly (the idea of doing whale/insider sweetheart deals simply to benefit friends and associates is an anathema to us)." (February 7, 2018, on Reddit).

- "Hey just to be clear, the team does not own the endowment. We have salaries, offices, lawyers, acquisitions etc to pay down for years. We have employee incentive plans but currently minority. Decisions are made with respect to helping the foundation achieve its goals rather than personal desires for more tokens i.e. it's not like a startup where founders often own outsized chunks. We are a long term operation, which is why we did not dump all our tokens." (April 6, 2018, on Reddit).

91. Williams had likewise represented that Dfinity and insiders would control roughly 50% of ICP at launch—not over 98%. In a *Medium* article dated April 4, 2018, he stated:

At network launch the breakdown of the distribution [of ICP] is expected to be:

- **9.5% Early Contributor Tokens**
  Allocated to numerous parties in respect of earlier works and investments made before the foundation was formed

23

**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

- **24.72% Seed fundraise contributors**
  Allocated to a large number of contributors in the Seed round

- **6.85% Strategic fundraise contributors**
  Allocated to strategic contributors in the Strategic round

- **4.75% Presale fundraise contributors**
  These will be allocated to contributors in the forthcoming Presale round

- **1.25% Community airdrop**
  These will be allocated to select community members with a preference for long time supporters of the project

- **52.93% Foundation Endowment, Team and Partnership Tokens**
  Tokens held or already deployed by the foundation in pursuit of its competitive goals (for funding R&D and operations, offices, technology acquisitions, community programs, employee incentives, partner incentives and other *long term* needs)

92.     On the morning of May 10, 2021, moreover, the date of the ICO, Williams emphasized how important vesting schedules were to Dfinity's network. Indeed, in explaining why both "Seed" investors' and "Community Airdrop" investors' tokens would be subject to vesting requirements, he stated: "It is very important that the flow of liquid ICP tokens around the network is released on a schedule for the safety and security of ICP holders, the network, and its users while the underlying technology is being fettled and its ecosystem is being established."

93.     Based on the forgoing representations, and the material omissions associated with them, as discussed further below, investors reasonably believed on May 10 that (i) Dfinity's team members' tokens were subject to vesting periods that exceeded three years from May 10 and thus would not be able "to flip their positions for a quick profit"; (ii) Dfinity and its team were opposed to "insider sweetheart deals simply to benefit friends and associates"; (iii) Dfinity was a "long term operation" and it and its team therefore would not "dump" their tokens; (iv) Dfinity and its insiders would not control substantially all of the available ICP at launch; and (v) Dfinity and its team regarded vesting schedules as "very important" to "the safety and security of ICP holders, the network, and its users" and thus would presumably subject themselves, like outside investors, to vesting requirements.

94.     In the ensuing months, however, it became clear that Dfinity did not impose on itself or its team any vesting requirements that prevented them from dumping their tokens on the open market, and making billions of dollars, while the price of ICP collapsed and retail investors were left with substantial losses.

95.     After May 10, 2021, as the price of ICP dropped, investors began asking questions. On May 18, a twitter user, after observing that Dfinity had "built a community of bagholders," asked Williams: "who supplied liquidity at launch?" Williams responded that day: "For regulatory reasons, the foundation and key early team members were locked up at launch for a week (it's the reverse of what people think)." Williams's statement was misleading or false because it suggested that neither Dfinity nor team members sold ICP at launch, when, in reality, they did (including by selling through the ICA). His statement was also misleading or false because it omitted that the ICA was not, in Dfinity's view, precluded by regulations from selling ICP at launch. Williams' statement also served as partial disclosure because it suggested that Dfinity and team members' tokens were *not* subject to any vesting requirements (but were instead only restricted for "regulatory reasons" for a one-week period). The price of ICP fell by nearly 16% that day.

96.     On May 26, 2021, a twitter user asked Williams: "What's a source/summary for token allocation, lock-in periods, & other guidelines, including for the foundation's tokens?" Williams responded that night via twitter: "Foundation didn't vest itself but plans on putting most of its ICP into neurons. It is doing this carefully to make sure foundation+team members don't control the network." In response to Williams's tweet, another user asked: "so you vested all of your investors, and even delayed the private round an extra month, while not vesting yourself at all… do you think that is fair? What about the vesting of the early contributors, the team, and Internet Computer Association?" Williams did not respond. In response to Williams's disclosure that the Foundation did not subject itself to any vesting requirements, the price of ICP fell by 9% the following day.

97.     On June 11, 2021, in response to a now-deleted Reddit post accusing Dfinity and its team of engaging in improper conduct, Williams stated:

25
**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

This is me, Dominic Williams. Whoever wrote this is just some slimy moron looking to exploit people's angst about the current market situation. Obviously, not one single team profile is fake. People also work full time, rather than being associates or advisers, as is so often the case in blockchain. The technical achievements of the project are manifest and towering, and would not have been possible without the organisation [sic] that exists. Meanwhile, the foundation, founders and directors weren't even able to sell initially because of regulatory lockups. The price drop was largely (it seems) due to people who have very low basis selling to lock in huge gains. But regardless about the reasons for what happened in this market, whoever wrote this piece is deliberately lying in order to exploit people's pain and it's disgusting. Moreover, it's slanderous and the false claims are prosecutable by law. I personally offer a reward of 100 ICP for whoever provides the identity of this individual so that we can consider prosecuting them for slander. You know where to find me.

98. The same day, in a *Medium* post, Williams reiterated: "[T]he Foundation did NOT sell ICP tokens from its endowment at or soon after Genesis launch."

99. In that post, Williams casted blame on two groups for collapsing the price of ICP. Williams first blamed "Seed" investors:

Despite Seed Donors divesting their ICP tokens, it's important to note this community of early supporters helped bootstrap the Internet Computer project. Moreover, many Seed Donors were also early supporters of Ethereum, and contributed to the Internet Computer project in February 2017 using ETH, which at the time was between $6-10. After patiently waiting nearly five years, we are now seeing token diversification from Seed Donors, who had a very low basis, to the broader community. DFINITY is grateful to our Seed Donors for their initial faith in Dominic Williams and early team members, and look forward to seeing them contribute to early Internet Computer ecosystem projects.

100. Williams then blamed former employees: "Unfortunately, a significant portion of the irresponsible token divesting stemmed from former employees. The silver lining is that these tokens are now spread across supporters that continue to strengthen the Internet Computer community."

101. Williams's statement that "the foundation, founders and directors weren't able to sell initially" was misleading or false because Dfinity and its team did in fact sell ICP on the ICO date,

26

**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

as well as in the days that followed (including through the ICA). Williams's attempt to blame "Seed" investors and former employees for ICP's price collapse was likewise misleading, because Dfinity and its team sold ICP over the same period (including through the ICA). Indeed, "Seed" investors were only able to access 1,660 ICP on May 10.

102.   Williams's statement that former employees had sold ICP was nevertheless a partial disclosure because it further suggested that Dfinity's team members were not subject to any vesting restrictions. Indeed, in response to that disclosure, the price of ICP fell by another 12% that day.

103.   Starting around this time, investors became increasingly skeptical of Defendants' claims that Dfinity and its team members had not sold ICP and that team members' tokens were subject to vesting restrictions that precluded such sales. This is reflected in Reddit comments during mid-to-late June 2021. On June 14, for example, one user asked: "Is it true that ICP creators dumped on launch and made a fortune before crashing the market?" On June 22, an investor asserted that "Dfinity foundation should buy back some of the icp it dumped." The same day, another user posited that "Dfinity and team sold 90 million tokens since Genesis." In response, one user noted: "I know for sure of 2 former team members who have sold at launch, they would be dumb not to, those are life-changing sums." Former Dfinity employees agreed. For example, one former employee explained, "you can add me to the list, so you know of 3. I left Dfinity in Jan of last year and sold a fair chunk of what I'd been holding." Another former employee similarly stated: "You can make that tally 5 if you are keeping track."

104.   By June 22, 2021, the price of ICP had dropped 40% from where it ended on June 11, the day where Williams claimed that Dfinity and its team were not selling ICP. This decrease reflected the market's realization that Dfinity and its team, who held approximately 50% of ICP tokens as of May 10, were not subject to any vesting requirements that prevented them from dumping their ICP on the market and were in fact dumping their ICP on the market.

105.   Defendants nonetheless continued to misrepresent critical facts to investors. On June 26, 2021, Yang doubled down on Dfinity's claims that team members were not responsible for

selling ICP. That day, a twitter user asked: "the team of 200 got 84 million at Genesis, if that's not true can anyone verify maybe?" In response, Yang stated: "This narrative is absolutely untrue. The team, including myself, is on a vesting schedule. I know it's much more interesting and scandalous to believe otherwise. As the saying goes, why let the truth get in the way of a good story? However, the facts speak for themselves."

106.   Yang's statement that team members were "on a vesting schedule" was misleading or false because it suggested that team members were unable to sell their ICP tokens when, in reality, they were able to sell their tokens and did in fact sell their tokens.

107.   That fact was further demonstrated on June 28, 2021, when Arkham Intelligence released its "Report on the Internet Computer Token." The report summarized:

> As of this writing, the Internet Computer token (ICP) has lost 95% of its value from its launch event in May, dropping from $730 to $30, and wiping out over $300 billion dollars of value based on ICP's total supply. These are astounding numbers in the crypto and financial world overall, even with the current market's volatile prices and soaring valuations. At its peak, ICP was the third most valuable crypto-asset, behind Bitcoin and Ethereum, and was worth as much by market cap as Mastercard, Bank of America, and PayPal. In its first month, ICP's price decreased more than any other top 100 token by a good margin. Altogether retail investors who bought ICP on Coinbase or other major crypto exchanges have lost millions if not billions of dollars.

108.   The Arkham report then summarized its findings:

- Addresses we suspect belong to the Dfinity treasury and project insiders have deposited 18.9 million ICP, worth ~$3.6 billion at the time of deposit, to exchanges.

  - The Treasury has directly deposited 8.3 million ICP, worth ~$2 billion at time of deposit, 94% of which was on two days: listing day of May 10th (3.1mm) and June 15 (4.7mm).

  - The Treasury sent 34.1 million ICP to 34 suspected insider addresses. These addresses have deposited 10.7 million ICP, also worth ~$1.6 billion at time of deposit, intermittently over the weeks since listing.

28

**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

o   Deposits from the Treasury plus suspected insiders account for approximately 75% of total ICP deposits to exchanges.

- Based on a review of their public materials, Dfinity has not followed industry practices meant to demonstrate good faith and assure investors that project insiders won't trigger a price collapse through massive selling.

o   Dfinity has not been transparent about token allocation and unlocking, unlike other major projects.

o   It has nonetheless come out that Dfinity imposed 4-year vesting on small seed supporters, who collectively own about 25% of the ICP supply, while having no vesting for the Dfinity foundation, which also reportedly owns about 25% of the ICP supply.

o   Many of these small seed supporters say they have found it extremely difficult, if not effectively impossible, to access their tokens.

109.   The following day, the *New York Times* picked up on the story, in an article written by Ephrat Livni and Andrew Ross Sorkin:

> Miguel Morel, the founder of Arkham Intelligence, a crypto analysis firm that followed the movements of ICP tokens on the blockchain, said that the price action and flaws in the coin offering process suggested "something went wrong." In an analysis that Arkham first shared with the DealBook newsletter, the firm noted that "a token dropping over 90 percent in the first month after launch is highly unusual for a project of this scale."

> The process for claiming ICP tokens stands out, because "Dfinity did not follow the playbook of other successful projects," Arkham said. "Instead, it appears they quietly allowed the treasury and insiders to send billions of dollars of ICP to exchanges, while making it extremely difficult for their longtime supporters to access the tokens they were promised."

110.   On that day, June 29, 2021, a Reddit user, in a detailed post, claimed that Dfinity "lied to investors, intentionally withheld important information, and may have committed fraud." On July 2, Williams responded:

29
**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

This post is a classic example of FUD and misinformation so I will respond for instructive purposes. The author sounds genuine, so they may just have lost themselves in conspiracy theories, but most authors of material like this turn out to be shills or sponsored by projects (or their investors) who are scared of the Internet Computer.

Before illustrating the problem with the above post, I will repeat the following: Yes, the DFINITY Foundation and its founders and directors were locked up for the first week for regulatory and legal reasons. Yes, the DFINITY Foundation did not sell for the first couple of weeks (i.e. didn't sell even when it could and perhaps should have).

Where did the mysterious supply come from? This is not difficult. There are probably 250 former and current team members that had accumulated vested tokens, there are investors from the Strategic and Presale rounds, there are ECT/Seed contributors, Airdrop participants etc etc so of course ICP were available . . . .

111.   Investors—at this point aware that Dfinity and its team were not subject to vesting requirements that precluded them from dumping their ICP on the market, and that Dfinity and its team had in fact dumped their ICP on the market—were unpersuaded. One "Presale" investor explained: "Pre-sale didn't get our tokens until after a month, so don't fucking blame us. Most seed-investors are still trying to figure out how your CLI works. Pre-sale got doubly fucked over, paying 70x more than seed because everything was 'so close to launch.' Also, in what universe does the team vest before investors?" A "Community Airdrop" investor expressed a similar view: "Airdrop participants didn't get their tokens at launch either. They had to wait until the price was around 100$ if I'm not mistaken. I remember it was two or three days after the Coinbase / Binance launch."

112.   By this point, the price of ICP had fallen by over 94% from its May 10 high. Defendants *still* have not revealed additional material information, including the vesting restrictions imposed on their and their team's tokens or fully disclosed the amount of tokens that they and their team have sold and intend to sell. They have, however, continued to sell ICP. That includes Williams, who admitted in a September 25, 2021, interview with *CryptoSlate* that he had in fact sold ICP.

113.   Although Defendants have avoided publicly disclosing the exact nature of the vesting restrictions imposed on their employees' tokens, the Swiss Engineers report that Dfinity employees typically receive vested tokens one year after beginning their employment, provided that the trading volume of ICP exceeds $20 million. Given that the trading volume of ICP for each day beginning on May 10, 2021, has easily exceeded that $20 million threshold, Dfinity employees hired prior to May 11, 2020, have had the unrestricted right to sell their tokens from day one of the ICP launch. In other words, contrary to Defendants' representations, Dfinity employees were not "bound by even longer vesting schedules" than "Strategic" investors, who did not have access to any ICP on May 10, 2021.

114.   In August 2021, in the aftermath of the events described above, Williams purportedly left the country, and, around the same time, Dfinity's General Counsel, Jennifer Sum, resigned after only 8 months on the job.

**F.    The ICP Tokens Are Securities**

115.   On April 3, 2019, the SEC published a "Framework for 'Investment Contract' Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions." Among the most significant statements therein is the SEC's description of how to analyze the various facts surrounding ICOs in determining whether a given digital asset, like ICP, is a security. Under application of the Framework, ICP tokens are securities.

116.   In the Framework, the SEC cautioned potential issuers: "If you are considering an Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale, or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply." The SEC explained the basics of the *Howey* test:

> The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless

31
**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

> of whether it has any of the characteristics of typical securities. The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

Investors who bought ICP tokens invested money or other valuable consideration, such as bitcoin and ether, in a common enterprise—Dfinity. Investors had a reasonable expectation of profit based upon the efforts of Dfinity, including, among other things, Dfinity building a successful network that achieved widespread use.

### a. ICP Investors Invested Money

117.   Investors in Dfinity made an investment of money or other valuable consideration for purposes of *Howey*. The Framework states: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency, another digital asset, or other type of consideration."

118.   ICP tokens have been listed on many crypto-asset exchanges, and those crypto-asset exchanges permit investors to purchase ICP with bitcoin and ether and other digital assets.

### b. ICP Investors Participated in a Common Enterprise

119.   The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists." This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

120.   The ICP tokens are no different. Investors are passive participants, and the profits of each investor are intertwined with those of both Defendants and of other investors. Defendants are responsible for supporting and building ICP, pooled investors' assets, and effectively controlled those assets. Defendants also retained a significant stake in ICP, approximately 50%, thus sharing in the profits and risk of the venture.

### c. Investors Purchased the ICP Tokens with a Reasonable Expectation of Profit from Owning Them

121. As to "reasonable expectation of profits," the SEC Framework states: "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

122. Investors in the ICP tokens, including Plaintiffs and the other Class members, made their investment with a reasonable expectation of profits.

123. Alluding to the "AP" (the "Active Participant"), which is the promoter, sponsor, or other third party that "provides essential managerial efforts that affect the success of the enterprise," the Framework identifies a series of factually intense questions underscoring both the time the SEC had spent considering these issues and the challenges a layperson would face in analyzing whether a digital asset constitutes a security.

124. The Framework lays out a number of characteristics to assess whether the "reasonable expectation of profits" element is met with respect to whether digital assets (such as ICP) thereby satisfy the *Howey* test. These include factors such as whether the asset is tradable on an exchange, whether investors can buy more assets than they would individually need to use the technology, if it is marketed as an investment, and the lack of an existing product with which to use the assets.

125. The SEC Framework clarifies that investors purchased the ICP tokens with a reasonable expectation of profits. Indeed, Defendants touted the potential for ICP tokens to increase in value, with Williams stating on February 1, 2017, that the tokens may "gain value" and that it will be "useful for the network" if they do. Defendants ensured that ICP tokens were listed on every major crypto-asset exchange and engaged in a multi-month campaign to generate interest in those tokens.

### d. ICP Investors Expected Profits from ICP to Be Derived from Defendants' Managerial Efforts

126. The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the

33
**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

efforts of an [Active Participant]? Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?" The more of the following characteristics (among others) that are present, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others'":

- An ["Active Participant" or "AP"] is responsible for the development, improvement (or enhancement), operation, or promotion of the network.
- The AP is expected to perform essentials tasks.
- The AP controls the market for the digital asset, such as by limiting supply.
- The AP has a lead role in the development of the network or role of the digital asset.
- The AP decides who receives digital assets and under what conditions.
- The AP distributes the digital asset to internal team members as compensation.

127.    Shifting its focus to the numerous facts bearing on the nature of the digital asset at issue, the SEC explained still further that the greater the presence of the following factors (among others), the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.
- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.
- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network.  For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.
- Prospects for appreciation in the value of the digital asset are limited.
- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

128. Investors' profits in ICP tokens were to be derived from the managerial efforts of others—specifically, Dfinity and its founders, including Williams, and development teams. ICP token investors rely on the managerial and entrepreneurial efforts of Dfinity and their executive and development teams to manage and develop Dfinity's network, as well as projects funded by Defendants' sales of ICP to the public.

129. Under the SEC's Framework, ICP tokens satisfy most if not all of the relevant SEC factors as to whether a digital asset is a security. Dfinity created ICP tokens from thin air. Dfinity represented that it would develop an ecosystem (*i.e.*, the overall network of individuals using ICP or participating in the development of its network) that would increase the value of ICP tokens. Plaintiffs and the other Class members reasonably expected Dfinity to provide significant managerial efforts, to develop and improve the ICP ecosystem, to develop and sustain a supportive network, and to secure listings at exchanges through which ICP tokens could be traded or liquidated. And Dfinity represented that it would provide significant managerial efforts to achieve these objectives.

130. Indeed, Dfinity has acknowledged that their "mission is to build, promote, and maintain [Dfinity's network]." Williams's statements, as well as those made by Dfinity, demonstrate that the price of ICP tokens is dependent on whether Dfinity's network succeeds. In a February 2017 *Medium* post, for example, Williams explained how ICP tokens would become "valueless" if Dfinity's mission failed and how "markets will react very swiftly to punish" the price of ICP if its stakeholders made poor decisions with respect to the development of the network. Dfinity's website similarly states that ICP "[t]okens reflect the value of the [network] and can

fluctuate." The price of ICP tokens thus depends on whether Defendants succeed in their "mission" to make their product a success.

131.   In a further demonstration that investors' profits were dependent on Defendants' efforts, Defendants represented that Dfinity would use the proceeds of ICP token sales to help develop Dfinity's network. In *Medium* posts, for example, Williams stated that such tokens could be "sold to raise funds for salaries and offices, granted to team members to help attract and motivate the world's best talent, for acquisitions of technology and teams, and many other potential purposes." He further stated that such tokens could be used "to fund aggressive operations for years in the mode of an agile Silicon Valley startup (which is the best way to make the Internet Computer a mass market phenomenon)."

### G.   The SEC Has Concluded That Tokens Such As ICP Are Securities

132.   The SEC has found that several tokens very similar to ICP, issued between 2017 and the present, are securities.

133.   On September 30, 2019, for example, the SEC found that Block.one had violated the Securities Act through its unregistered sale to U.S. investors of its EOS token.

134.   In arriving at its determination that the EOS token is a security, the SEC reached the following conclusions:

- "A number of US investors participated in Block.one's ICO."

- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."

- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."

- "[EOS] Tokens were securities under the federal securities laws"

- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the

adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."

- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

As a result of the SEC's enforcement action, Block.one consented to a settlement whereby it would pay $24 million to the SEC.

135.   In December 2020, the SEC sued Ripple Labs Inc. and its executives for conducting a $1.3 billion unregistered, ongoing digital asset securities offering of its token, "XRP," several years after its offering and after millions of users used it. The SEC alleged that because Ripple held so much XRP itself, XRP holders necessarily depended on the efforts of Ripple to maintain the value of XRP. Ripple itself promoted XRP and touted its ability to create demand for XRP.

**H.     Plaintiffs and the Other Class Members Have Suffered Significant Damages from  Defendants' Actions**

136.   As a direct result of Defendants' misconduct, Plaintiffs and the other Class members—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in the ICP token—have suffered significant damages, in an amount to be proven at trial. The ICP tokens today are worth far less than the price the Class members paid for them. Inasmuch as Plaintiffs and the other Class members still hold ICP tokens, they demand rescission and make any necessary tender of the ICP tokens.

**V.     CLASS ALLEGATIONS**

137.   Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 and seek certification of the following Class: All persons who purchased ICP tokens from May 10, 2021, to the present. In addition, Plaintiffs seek certification of two subclasses: all persons who purchased ICP tokens from May 10, 2021, to June 22, 2021 (the "Securities Fraud Subclass") and all persons who purchased ICP tokens from May 10, 2021, to June 18, 2021 (the "Market Manipulation Subclass").

**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

138.   The Class, the Securities Fraud Subclass, and the Market Manipulation Subclass include individuals who purchased ICP tokens in the ICO and individuals who purchased ICP tokens in sales made through online crypto-asset exchanges.

139.   The Class, the Securities Fraud Subclass, and the Market Manipulation Subclass exclude Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. The Class, the Securities Fraud Subclass, and the Market Manipulation Subclass also exclude individuals subject to any enforceable arbitration clause contained in any of the purchase agreements executed in connection with the ICP ICO.

140.   In addition, the Class excludes individuals who, during the Class Period, sold all of their ICP tokens at a price higher than the price at which they purchased them; the Securities Fraud Subclass excludes individuals who, during the Securities Fraud Subclass Period (*i.e.*, May 10, 2021, to June 22, 2021), sold all their ICP tokens at a price higher than the price at which they purchased them; and the Market Manipulation Subclass excludes individuals who, during the Market Manipulation Subclass Period (*i.e.*, May 10, 2021, to June 18, 2021), sold all their ICP tokens at a price higher than the price at which they purchased them.

141.   Plaintiffs reserve the right to amend the Class, Securities Fraud Subclass, and Market Manipulation Subclass definitions if investigation or discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

142.   The Class members are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands. The Securities Fraud Subclass members are so numerous that joinder of all of them is impracticable. The precise number of Securities Fraud Subclass members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands. The Market Manipulation Subclass members are so numerous that joinder of all of them is impracticable. The precise number

of Market Manipulation Subclass members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands.

143.   The Class members, Securities Fraud Subclass members, and Market Manipulation Subclass members are readily ascertainable and identifiable. Class members, Securities Fraud Subclass members, and Market Manipulation Subclass members may be identified by publicly accessible blockchain ledger information and records maintained by Defendants, crypto-asset exchanges, or their agents. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

144.   Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein. Plaintiffs' claims are typical of the claims of the Securities Fraud Subclass members as all Securities Fraud Subclass members are similarly affected by Defendants' wrongful conduct in violation of the laws complained of herein. Plaintiffs' claims are typical of the claims of the Market Manipulation Subclass members as all Market Manipulation Subclass members are similarly affected by Defendants' wrongful conduct in violation of the laws complained of herein. Plaintiffs do not have any interests that are in conflict with the interests of the Class members, the Securities Fraud Subclass members, or the Market Manipulation Subclass members.

145.   Plaintiffs and the other Class, Securities Fraud Subclass, and Market Manipulation Subclass members sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the ICP token.

146.   Plaintiffs have fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the other Class members, Securities Fraud Subclass members, and Market Manipulation Subclass members, and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to those of the Class members, the Securities Fraud Subclass members, or the Market Manipulation Subclass members.

147.   Common questions and answers of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including, but not limited to, the following:

- Whether an ICP token is a security under federal law;

- Whether Defendants unlawfully failed to register ICP tokens as a security under federal law;

- Whether Defendants offered or sold ICP tokens to Class members;

- Whether Defendants promoted or solicited the sale of ICP tokens to Class members;

- Whether Defendants engaged in insider trading of ICP tokens, and whether they did so contemporaneously with Plaintiffs' and the other Class members' transactions in ICP tokens;

- Whether the Class members suffered damages as a result of Defendants' conduct in violation of federal law;

- Whether the Class members are entitled to recover the monies they paid for their purchases of ICP; and

- Whether the Class members are entitled to recover from Defendants some or all of their ill-gotten gain as a result of their violation of federal law.

148.   Common questions and answers of law and fact exist as to all Securities Fraud Subclass members and predominate over any questions solely affecting individual Securities Fraud Subclass members, including, but not limited to, the following:

- Whether an ICP token is a security under federal law;

- Whether Defendants unlawfully failed to register ICP tokens as a security under federal law;

- Whether Defendants made false or misleading statements regarding restrictions imposed, or not imposed, on their and their insiders' ICP;

- Whether Defendants made false or misleading statements regarding their sales or other insiders' sales of ICP;

40

**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

- Whether Defendants made such statements recklessly or knowing that such statements were false or misleading; and

- Whether the Securities Fraud Class members suffered damages as a result of Defendants' conduct in violation of federal law.

149. Common questions and answers of law and fact exist as to all Market Manipulation Subclass members and predominate over any questions solely affecting individual Market Manipulation Subclass members, including, but not limited to, the following:

- Whether an ICP token is a security under federal law;

- Whether Defendants engaged in manipulative or deceptive acts that artificially affected the price of ICP;

- Whether, in engaging in such acts, Defendants intended to deceive investors;

- Whether Market Manipulation Subclass members relied on the market price as reflecting an efficient market free from manipulation; and

- Whether Market Manipulation Subclass members suffered damages as a result of artificial ICP prices.

150. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members, Securities Fraud Subclass members, or Market Manipulation Subclass members is impracticable. In addition, as the damages suffered by some of the individual Class members, Securities Fraud Subclass members, and Market Manipulation Subclass members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members, Securities Fraud Subclass members, and Market Manipulation Subclass members to individually redress the wrongs done to them.

151. There will be no difficulty in the management of this action as a class action.

**FIRST CAUSE OF ACTION**
**Sections 5 and 12(a)(1) of the Securities Act**
**(On Behalf of the Class Against Defendants)**

152. Plaintiffs incorporate the allegations above.

41
**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

153. Plaintiffs bring this claim for violations of Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e, 77l(a)(1).

154. Plaintiffs bring this claim on behalf of all Class members who purchased ICP tokens from May 10, 2021, to the present.

155. Section 5(a) states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." *Id*. § 77e(a).

156. Section 5(c) makes in unlawful "for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e(c).

157. When sold and issued, in May 2021, the ICP tokens were securities within the meaning of Section 2(a)(1) of the Securities Act, *id*. § 77b(a)(1), and Dfinity is an issuer of the ICP that Plaintiffs and the other Class members have purchased, *id*. § 77b(a)(4).

158. Defendants promoted, solicited, or sold purchases of ICP tokens from Plaintiffs and other Class members with the motivation to serve their own financial interest.

159. Defendants directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

160.   Section 12(a)(1) provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* § 77*l*(a)(1).

161.   Accordingly, Defendants have violated Sections 5(a) and 5(c) of the Securities Act, *id*. §§ 77e(a), 77e(c), and are liable under Section 12(a)(1), *id*. § 77*l*(a)(1).

162.   Plaintiffs and the other Class members seek rescissory damages with respect to their purchases of ICP tokens in the May 2021 offering.

## SECOND CAUSE OF ACTION
### Section 15 of the Securities Act
### (On Behalf of the Class Against Williams)

163.   Plaintiffs incorporates the allegations above.

164.   Plaintiffs bring this claim under Section 15 of the Securities Act, 15 U.S.C. § 77o.

165.   Plaintiffs bring this claim on behalf of all Class members who purchased ICP tokens from May 10, 2021, to the present.

166.   Section 15(a) states: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." *Id*. § 77o(a).

167.   Williams, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of Dfinity and its employees,

43
**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

and to cause Dfinity to engage in the wrongful conduct complained of herein, in connection with the May 2021 offering of ICP tokens.

168. As the founder and Chief Scientist at the Foundation, and the CEO at Dfinity USA, Williams had and exercised the power and influence to cause the unlawful solicitation of purchases of ICP tokens in connection with the May 2021 offering of ICP tokens, with the power to direct or cause the direction of the management and policies of Dfinity.

169. Williams had sufficient influence to have caused Dfinity to solicit transactions of securities in connection with the May 2021 offering of ICP tokens, and he himself participated in the solicitation of such transactions.

170. By virtue of the conduct alleged herein, Williams is liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the other Class members for rescission and/or damages suffered.

**THIRD CAUSE OF ACTION**
**Section 10(b) and Rule 10b-5**
**False and Misleading Statements**
**(On Behalf of the Securities Fraud Subclass Against Defendants)**

171. Plaintiffs incorporate the allegations above.

172. Plaintiffs bring this claim for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b).

173. Plaintiffs bring this claim on behalf of all Securities Fraud Subclass members who purchased ICP tokens from May 10, 2021, to June 22, 2021.

174. The ICP tokens are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1). Defendants sold ICP tokens to Plaintiffs and the other Securities Fraud Subclass members in connection with the May 2021 offering.

175. Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities

exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

176.   Defendants carried out a plan, scheme, and course of conduct that Dfinity intended to and did deceive the retail investors—Plaintiffs and the other Securities Fraud Subclass members—who acquired ICP tokens in the May 2021 offering and thereby caused them to purchase ICP tokens at artificially inflated prices.

177.   In connection with the May 2021 offering of ICP tokens, Defendants disseminated and approved the false statements described herein, which these Defendants knew or recklessly should have known were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

178.   Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Securities Fraud Subclass members that resulted in artificially high market prices for ICP tokens in connection with the May 2021 offering, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

<u>Misrepresentations and Omissions</u>

179.   Defendants' untrue statements and omissions of material facts in connection with the May 2021 offering of ICP tokens include at least the following:

(a) On February 7, 2018, speaking for and on behalf of Dfinity, Williams publicly stated on Reddit: "Anyone imagining that Polychain and a16z are whales looking to flip their positions for a quick profit should consider this: tokens granted in exchange for 'strategic' round contributions come with a 3 year vesting schedule. Just like team members whose incentive tokens are bound by even longer vesting

schedules, they too are laser focused on building the future." In this statement and thereafter, however, Dfinity has never disclosed the details of any such vesting schedules, which was material information. In addition, in order to make this statement not misleading, in connection with the May 2021 offering, Defendants were obligated to (but did not) disclose that (i) the Foundation was not subject to any vesting schedule, (ii) any applicable vesting periods would nevertheless allow Dfinity insiders (including Dfinity USA and Dfinity's current and former team members) to immediately sell substantial amounts of ICP on crypto-asset exchanges like Coinbase, (iii) Dfinity and its insiders intended to deposit tens of millions of these tokens on such exchanges, and (iv) thus that Dfinity and its insiders intended to profit massively from the offering. If Williams was referring to vesting periods that began prior to May 10, 2021, his statement was further misleading because he had previously indicated that ICP tokens would not even be allocated until the network was launched. Investors thus reasonably understood Williams to be referring to vesting periods that began on the launch date, as reflected by Messari's report, which noted that vesting would not begin until launch and which was retweeted by Dfinity representative Liz Yang. With that reasonable understanding, the statement was false because team members hired on or before May 11, 2020, had access to ICP at launch, whereas "Strategic" investors, who were purportedly subject to shorter vesting periods, did not have access to ICP at launch.

(b) On February 7, 2018, speaking for and on behalf of Dfinity, Williams publicly stated: "We believe in a holistic approach that engaged participation from the wider community and specialists who add value through their special resources and skills, while also ensuring all participants are treated fairly (the idea of doing whale/insider sweetheart deals simply to benefit friends and associates is an

anathema to us).” In order to make this statement not misleading, in connection with the May 2021 offering, Defendants were obligated to (but did not) disclose that (i) the Foundation was not subject to any vesting schedule, (ii) any applicable vesting periods would nevertheless allow Dfinity insiders (including Dfinity USA and Dfinity’s current and former team members) to immediately sell substantial amounts of ICP on crypto-asset exchanges, (iii) the ICP tokens of outside investors (including “Seed,” “Strategic,” “Presale,” and “Community Airdrop” investors) were subject to vesting requirements that would prevent such investors from similarly selling ICP on crypto-asset exchanges, (iv) Dfinity and its insiders intended to deposit tens of millions of these tokens on such exchanges, and (v) thus that Dfinity and its insiders intended to profit massively from the offering while at the same time restricting the ability of outside investors to profit from that same offering.

(c) On April 4, 2018, speaking for and on behalf of Dfinity, and addressing the expected “breakdown of the distribution” of ICP at “network launch,” Williams publicly stated: “52.93% Foundation Endowment, Team and Partnership Tokens.” In order to make this statement not misleading, in connection with the May 2021 offering, Defendants were obligated to (but did not) disclose that, at launch, they and their insiders controlled approximately 98% of ICP available to the market.

(d) On April 6, 2018, speaking for and on behalf of Dfinity, and addressing whether the tokens allocated to Dfinity and its insiders would be locked up, Williams publicly stated: “Hey just to be clear, the team does not own the endowment. We have salaries, offices, lawyers, acquisitions etc to pay down for years. We have employee incentive plans but currently minority. Decisions are made with respect to helping the foundation achieve its goals rather than personal desires for more tokens i.e. it’s not like a startup where founders often own outsized chunks. We

1   are a long term operation, which is why we did not dump all our tokens." In order

2   to make these statements not misleading, in connection with the May 2021

3   offering, Defendants were obligated to (but did not) disclose that (i) the

4   Foundation was not subject to any vesting schedule, (ii) any applicable vesting

5   periods would nevertheless allow Dfinity insiders (including Dfinity USA and

6   Dfinity's current and former team members) to immediately sell substantial

7   amounts of ICP on crypto-asset exchanges like Coinbase, (iii) Dfinity and its

8   insiders reserved the right to liquidate their tokens far more than necessary to pay

9   expenses, (iv) Dfinity and its insiders intended to deposit tens of millions of these

10  tokens on such exchanges, and (v) thus that Dfinity and its insiders intended to

11  profit massively from the offering in furtherance of their "personal desires" as

12  opposed to "helping the foundation achieve its goals."

13  (e)  On May 10, 2021, speaking for and on behalf of Dfinity, addressing the vesting

14  restrictions on "Seed" and "Airdrop" ICP tokens, which had been announced

15  without any notice prior to the offering, Williams publicly stated: "It is very

16  important that the flow of liquid ICP tokens around the network is released on a

17  schedule for the safety and security of ICP holders, the network, and its users

18  while the underlying technology is being fettled and its ecosystem is being

19  established." This statement indicated that Dfinity viewed it as important that "the

20  flow of liquid ICP tokens around the network" be "released on a schedule," and

21  thus implied that Dfinity and its team's tokens were subject to vesting

22  requirements. In order to make this statement not misleading, in connection with

23  the May 2021 offering, Defendants were obligated to (but did not) disclose that

24  (i) the Foundation was not subject to any vesting schedule, (ii) any applicable

25  vesting periods would nevertheless allow Dfinity insiders (including Dfinity USA

26  and Dfinity's current and former team members) to immediately sell substantial

27  48

28  **AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

amounts of ICP on crypto-asset exchanges like Coinbase, (iii) Dfinity had in fact transferred ICP to the ICA, for purposes of dumping ICP; (iv) Dfinity and its insiders intended to deposit tens of millions of these tokens on such exchanges, and (v) thus that Dfinity and its insiders intended to profit massively from the offering.

(f) On May 18, 2021, speaking for and on behalf of Dfinity, Williams publicly stated: "For regulatory reasons, the foundation and key early team members were locked up at launch for a week." In order to make this statement not misleading, Defendants were obligated to (but did not) disclose that Dfinity USA and Dfinity insiders (apart from the unidentified "key early team members") were not locked up at launch for a week and were not subject to vesting schedules that precluded them dumping, as they had done, a substantial portion of their ICP tokens on the market over the prior week or that precluded them from continuing to trade in the tokens at such volumes going forward. Defendants were likewise obligated to disclose (but did not disclose) that they had transferred ICP to the ICA, which sold ICP, for purposes of circumventing regulations.

(g) On May 26, 2021, speaking for and on behalf of Dfinity, Williams publicly stated: "Foundation didn't vest itself but plans on putting most of its ICP into neurons. It is doing this carefully to make sure foundation+team members don't control the network." In addition to confirming that the Foundation had not been subject to any vesting requirements, in order to make this statement not misleading, Defendants were obligated to (but did not) disclose that Williams was referring only to those ICP tokens that the Foundation had retained and that the Foundation had already sold a substantial portion of its tokens into the market for substantial profit. Defendants were likewise obligated to (but did not) disclose that they and

their insiders did in fact control the vast majority of available ICP and that they had transferred ICP to the ICA, for purposes of selling that ICP.

(h) On June 11, 2021, speaking for and on behalf of Dfinity, Williams stated: "[T]he Foundation did NOT sell ICP tokens from its endowment at or soon after Genesis launch. As previously stated, DFINITY is committed to responsibly divesting its token allocation over time to reinvest back into the Internet Computer and community." In order to make this statement not misleading, Defendants were obligated to (but did not) disclose that (i) Dfinity insiders (including Dfinity USA and current and former Dfinity team members) had sold ICP "at or soon after Genesis launch," (ii) such sales were so large in magnitude that they contributed to the price of ICP collapsing, and (iii) the Foundation had begun selling ICP on exchanges no later than May 24, 2021. Defendants were likewise obligated to (but did not) disclose that they had transferred ICP to the ICA prior to launch, for purposes of selling that ICP on and immediately following the launch date, and that the ICA did in fact sell ICP during that period.

(i) On June 11, 2021, speaking for and on behalf of Dfinity, Williams stated: "Meanwhile, the foundation, founders and directors weren't even able to sell initially because of regulatory lockups." In order to make this statement not misleading, Defendants were obligated to (but did not) disclose that Dfinity insiders (including Dfinity USA and current and former Dfinity team members) were not subject to such regulatory lockups and therefore were able to, and did in fact, sell substantial amounts of ICP during that period. Defendants were likewise obligated to (but did not) disclose that they had transferred ICP to the ICA prior to launch, for purposes of selling that ICP on and immediately following the launch date, and that the ICA did in fact sell ICP during that period, in circumvention of the relevant regulatory lockups.

(j) On June 11, 2021, speaking for and on behalf of Dfinity, in discussing who was responsible for selling ICP, Williams stated: "Despite Seed Donors divesting their ICP tokens, it's important to note this community of early supporters helped bootstrap the Internet Computer project," and that: "Unfortunately, as significant portion of the irresponsible token divesting stemmed from former employees." In order to make this statement not misleading, Defendants were obligated to (but did not) disclose that Dfinity insiders (including Dfinity USA, current Dfinity team members, and the ICA) had in fact sold substantial amounts of ICP over that period, and that seed investors were not permitted to access, or sell, the vast majority of their ICP.

<u>Materiality</u>

180. The forgoing misrepresentations and omissions were each material. These misrepresentations and omissions related to (i) the extent to which vesting restrictions precluded Dfinity and its insiders, who collectively held approximately 50% of ICP as of May 10, 2021, from selling substantial amounts of their ICP on crypto-asset exchanges in the weeks immediately following May 10, 2021, (ii) the extent to which Dfinity and its insiders intended to sell their ICP on crypto-asset exchanges over that same period, and (iii) the extent to which Dfinity and its insiders did in fact sell substantial amounts of their ICP on crypto-asset exchanges over that same period. Information regarding whether approximately 50% of tokenholders could, intended to, and did sell their ICP, as Defendants' own public statements illustrate, are material—and they had a significant impact on the market price of ICP.

181. If a reasonable investor knew that Dfinity and its insiders collectively could and intended to sell a substantial percentage of the ICP that had been issued on and immediately following May 10, 2021, then that investor would reasonably expect the price of ICP to be significantly lower than if Dfinity and its insiders could not or did not intend to sell their ICP on and immediately following the launch date. Indeed, Defendants' assurances made on Reddit on

February 7, 2018, in the face of exactly these concerns, reflect these Defendants' own admission of their materiality. Accordingly, there is a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

182.   Williams has acknowledged that information regarding his own sales of ICP would be material to investors. For example, in a sworn declaration filed in connection with another matter, Williams asserted that he had "substantial pressure to hold and not sell [ICP tokens], since they were granted to incentivize me as a leader to make DFINITY a success, *and given the potential impact on outside investor confidence if I were to sell.*"

Scienter

183.   Defendants acted with scienter in engaging in the forgoing misconduct, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

184.   Defendants knew before the May 2021 offering that any applicable vesting periods would not preclude Dfinity USA and Dfinity insiders from dumping massive quantities of ICP tokens on the market and Dfinity intended to transfer tens of millions of the newly issued ICP tokens to project insiders, and that it, along with those insiders, intended to dump tens of millions of these tokens on crypto-asset exchanges, such that Dfinity and its insiders intended to profit massively from the offering, while outside investors would be precluded from doing so.

185.   Indeed, Defendants necessarily knew what restrictions were imposed on their own tokens, as well as the tokens that they issued and allocated to current and former team members, and to outside investors. These Defendants likewise knew that they, along with current and former team members, held approximately 50% of ICP tokens (Williams wrote about the allocation in an April 4, 2018 post on *Medium*), and that if half of those tokens were sold, the price of ICP would likely collapse. This is demonstrated by a February 23, 2021 tweet, where Williams, in discussing

a potential vesting restriction on "Seed" investors (who collectively held 25% of ICP): "A price collapse would be bad for security." It was thus highly unreasonable for Defendants to conceal information relating to vesting restrictions imposed on their and their insiders' tokens.

186.   Defendants' failure to disclose such information, coupled with their imposition of vesting restrictions on outside investors but not on themselves, demonstrates that these Defendants intended that they and their insiders would sell substantial amounts of ICP at significant profits on and during the weeks that followed May 10, 2021. These Defendants executed on that plan, too, by (along with current and former team members) selling tens of millions of ICP tokens on the market during that period.

187.   Defendants knew that they had sold ICP on the market on and in the weeks that followed May 10, 2021. They likewise know that their current and former team members sold ICP: in addition to stating that such individuals had sold ICP, these Defendants know which ICP they allocated to team members and can therefore track the transaction history of that ICP on the blockchain.

188.   Williams in particular was aware of the foregoing facts, including that (i) Defendants and their insiders were not subject to vesting restrictions that would preclude them from dumping ICP, (ii) Defendants had transferred ICP to the ICA for purposes of selling that ICP in circumvention of regulatory restrictions, and (iii) Defendants did in fact dump ICP on and in the days following May 10, 2021. That Williams had knowledge of such matters is demonstrated by direct evidence— including that Williams himself authorized the transfer of ICP to the ICA, that Williams ran the ICA, and that Williams admitted that he sold ICP—as well as by the fact that Williams, as the founder and Chief Scientist at the Foundation and CEO of Dfinity USA, would necessarily have knowledge of facts concerning Dfinity's core operations, such as Dfinity's decisions regarding the issuance and sale of billions of dollars in ICP.

189.   Defendants had the motive not to disclose these facts because such disclosure would have been self-defeating—it would have massively lowered the offering price of the ICP tokens and

thus effectively precluded Dfinity and its insiders from generating the profit they subsequently made. Defendants had the opportunity thus to generate ill-gotten gains because they controlled the distribution of the ICP tokens to themselves and their insiders and the extent to which any restrictions would be placed on such tokens.

190.   Defendants likewise had the motive not to disclose these facts *after* May 10, 2021, because they still hold significant amounts of ICP. If Dfinity and its insiders sold 100 million ICP, for example, they would still have over 100 million ICP remaining. These Defendants therefore had an incentive to ensure that the price of ICP remained artificially inflated.

Reliance, Economic Loss, and Loss Causation

191.   As a result of the publication and dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of the ICP tokens upon issuance in May 2021, and for a period of time thereafter, was artificially inflated.

192.   In ignorance of the fact that the price of ICP tokens was artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements that Defendants made and approved, or upon the integrity of the market in which the ICP tokens were sold, or on the absence of material adverse information that these Defendants knew or recklessly should have known of but failed to disclose in public statement, Plaintiffs and the other Securities Fraud Subclass members acquired ICP tokens at artificially high prices and were damaged thereby.

193.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Securities Fraud Subclass members suffered damages in connection with the respective purchases of ICP tokens and are entitled to an award compensating them for such damages.

194.   Indeed, the price of ICP dropped significantly as Defendants disclosed, and the market discovered, that (i) any vesting restrictions imposed on these Defendants and their insiders did not prevent them from selling substantial amounts of ICP starting on May 10, 2021, (ii) these Defendants and their insiders intended to sell substantial amounts of ICP starting on the launch date, and (iii) these Defendants did in fact sell substantial amounts of ICP starting on the launch date:

(a) The price of ICP dropped by 16% when Williams disclosed, on May 18, 2021, that "*for regulatory reasons*, the foundation and key early team members were locked up at launch for a week."

(b) The price of ICP dropped by an additional 9% when Williams disclosed, on May 26, 2021, that "Foundation didn't vest itself."

(c) The price of ICP dropped by an additional 12% when Williams disclosed, on June 11, 2021, that "former employees" had been able to sell a significant amount of ICP tokens.

(d) The price of ICP dropped by an additional 40% between June 11 and June 22, 2021, by which point investors had realized that Dfinity and its team had sold a significant amount of ICP on the market since May 10, 2021, as demonstrated by discussions on Reddit from June 11 to June 22.

195.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Securities Fraud Subclass members have suffered damages in connection with their purchase or acquisition of ICP during the Securities Fraud Subclass Period.

196.   In addition, as a direct and proximate result of Defendants' wrongful conduct, Dfinity has generated and retained ill-gotten in connection with the May 2021 offering of ICP tokens, such that Plaintiffs and the other Securities Fraud Subclass members are entitled to the disgorgement of Dfinity's ill-gotten gain from such misconduct.

**FOURTH CAUSE OF ACTION**
**Section 20(a) of the Exchange Act**
**For Violation of Section 10(b) and Rule 10b-5**
**(On Behalf of the Securities Fraud Subclass Against Williams)**

197.   Plaintiffs incorporate the allegations above.

198.   Plaintiffs bring this claim against Defendant Williams for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

199.   Plaintiffs bring this claim on behalf of all Securities Fraud Subclass members who purchased ICP tokens from May 10, 2021, to June 22, 2021.

200.   Section 20(a) states in relevant part: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *Id.*

201.   Williams, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, in connection with the May 2021 offering of ICP tokens, had the power and authority to direct the management and activities of Dfinity and its employees, and to cause Dfinity to engage in the wrongful conduct complained of herein.

202.   Williams was provided with or had unlimited access to the information underlying his and Dfinity's public statements in connection with the May 2021 offering and had the ability to prevent the issuance of those statements and to disclose the information necessary to make statements not misleading under the circumstances in which they were made.

203.   As a direct and proximate result of Williams's wrongful conduct, Plaintiffs and the other Securities Fraud Subclass members suffered damages in connection with the respective purchases of ICP tokens and are entitled to an award compensating them for such damages.

**FIFTH CAUSE OF ACTION**
**Section 20A of the Exchange Act**
**(On Behalf of the Class Against Defendants)**

204.   Plaintiffs incorporate the allegations above.

205.   Plaintiffs bring this claim under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, against Defendants on behalf of Class members who transacted in ICP tokens contemporaneously with Defendants' transactions in ICP tokens.

206.   Plaintiffs bring this claim on behalf of all Class members who purchased ICP tokens from May 10, 2021, to the present.

207.   Since May 10, 2021, Defendants have been in possession of material, non-public information about Dfinity and its insiders, as set forth above with respect to these Defendants' violation of Section 10(b) and Rule 10b-5, while these Defendants have been transacting in ICP tokens. Defendants have thus engaged in insider trading through which they have received at least hundreds of millions of dollars in profits.

208.   The material, non-public information about Dfinity and its insiders that Defendants have failed to disclose, during some or all of the time in which they have been transacting in ICP tokens since May 10, 2021, includes the details of any applicable vesting schedules for Dfinity and Dfinity insiders; that the Foundation was not subject to any vesting schedule; that any applicable vesting periods would allow Dfinity USA and Dfinity insiders (including current and former team members) to transfer tens of millions of the newly issued ICP tokens to crypto-asset exchanges; that Dfinity and its insiders intended to deposit tens of millions of these tokens on crypto-asset exchanges; that Dfinity transferred ICP to the ICA for the purpose of having the ICA sell that ICP at and immediately following launch; that Dfinity and its insiders intended to profit massively from the offering; that Dfinity and its insiders controlled substantially all of the ICP that was tradeable as of the date of the launch; that Dfinity had entered into nonpublic agreements to purchase ICP from its employees pursuant to the "Cash-in-Lieu-of-Tokens Program"; that Dfinity and its insiders reserved the right to liquidate their tokens far more than necessary to pay expenses; and that Dfinity and its insiders dumped massive amounts of ICP tokens on the market beginning on May 10, 2021.

209.   Defendants had and have a duty to disclose such information because disclosure was necessary to make their previous statements not materially misleading. These Defendants further had a duty to disclose because, like a corporation and its officers, they owed Plaintiffs and others who purchased ICP tokens a fiduciary duty. Indeed, just like a share in a corporation's stock, ICP

tokens entitled holders to vote on decisions relating to the network and fluctuate in value based on the network's success.

210.   Defendants' sales of ICP tokens while in possession of such material non-public information violated the Exchange Act and the applicable rules and regulations thereunder precluding such insider trading.

211.   Plaintiffs and the other Class members, all of whom have purchased their ICP tokens since May 10, 2021, have made those purchases contemporaneously with Defendants' transactions in ICP tokens since that time, such that all of these purchases and transactions have occurred contemporaneously with these Defendants' transactions in ICP tokens during the time period in which they have been in possession of material, non-public information.

212.   Defendants are required to account for all of their sales of ICP tokens and to disgorge their profits and ill-gotten gains as a result of their trading of ICP tokens contemporaneously with Plaintiffs' and the other Class members' trading in those tokens.

**SIXTH CAUSE OF ACTION**
**Section 20(a) of the Exchange Act**
**For Violation of Section 20A of the Exchange Act**
**(On Behalf of the Class Against Williams)**

213.   Plaintiffs incorporate the allegations above.

214.   Plaintiffs bring this claim against Defendant Williams for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

215.   Plaintiffs bring this claim on behalf of all Class members who purchased ICP tokens from May 10, 2021, to the present.

216.   Section 20(a) states in relevant part: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good

1   faith and did not directly or indirectly induce the act or acts constituting the violation or cause of

2   action." *Id.*

3   217.   Williams, by virtue of his offices, stock ownership, agency, agreements or

4   understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein,

5   in connection with the May 2021 offering of ICP tokens, had the power and authority to direct the

6   management and activities of Dfinity and its employees, and to cause Dfinity to engage in the

7   wrongful conduct complained of herein.

8   218.   As the founder and Chief Scientist at the Foundation, and the CEO of Dfinity USA,

9   Williams had and exercised the power and influence to cause the insider trading of ICP tokens after

10   the May 2021 offering of ICP tokens, with the power to direct or cause the direction of the

11   management and policies of Dfinity. In addition, Williams was indisputably aware of such trading,

12   as demonstrated by his *Medium*, *Reddit*, and *Twitter* posts described above.

13   219.   Williams had sufficient influence to have caused Dfinity to trade the ICP tokens after

14   the May 2021 offering of ICO tokens, and, on information and belief, he himself participated in

15   Dfinity's trading.

16   220.   As a direct and proximate result of Williams's wrongful conduct, Plaintiffs and the

17   other Class members suffered damages in connection with their contemporaneous purchase and sale

18   of ICP tokens and are entitled to an award compensating them for such damages.

19   **SEVENTH CAUSE OF ACTION**
20   **Section 10(b) and Rule 10b-5**
     **Market Manipulation**
21   **(On Behalf of the Market Manipulation Subclass Against Defendants)**

22   221.   Plaintiffs incorporate the allegations above.

23   222.   Plaintiffs bring this claim for violations of Section 10(b) of the Exchange Act, 15

24   U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b).

25   223.   Plaintiffs bring this claim on behalf of all Market Manipulation Subclass members

26   who purchased ICP tokens from May 10, 2021, to June 18, 2021.

27   59

28   **AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

224.   The ICP tokens are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1). Defendants sold ICP tokens to Plaintiffs and the other Market Manipulation Subclass members in connection with the May 2021 offering.

225.   Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to employ any device, scheme or artifice to defraud, . . . or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

226.   Defendants carried out a plan, scheme, and course of conduct that they intended to and that did deceive the retail investors—Plaintiffs and the other Market Manipulation Subclass members—who acquired ICP tokens in the May 2021 offering and thereby caused them to purchase ICP tokens at artificially inflated prices. In particular, in the days leading up to the launch, Defendants engaged in a series of actions designed to, and that did in fact, give them near-total control over the supply of ICP.

Deceptive and Manipulative Acts

227.   As explained above, in the week preceding the May 10, 2021, launch, Defendants announced the "Cash-in-Lieu-of-Tokens Program." Pursuant to that program, and from on or about May 3, 2021, to June 18, 2021, Dfinity purchased ICP from many employees who would have otherwise sold their ICP on the market during that period. These transactions were not disclosed to the public. The effect of these off-market sales was to (i) reduce the amount of ICP available on the market during this period (and thus increase the price of ICP) and (ii) give Defendants greater control over the supply of ICP (and thus the ability to exercise greater control over the price of ICP).

228.   In addition, and as also explained above, on the date of the launch, Defendants imposed last-minute vesting restrictions on seed investors' ICP tokens, which reduced the amount of ICP that such investors could sell on the market from approximately 116 million ICP to

approximately 2.4 million ICP. Further, on the date of the launch, Defendants required seed investors to complete a highly complex set of instructions in order to claim their ICP; the difficulty and complexity of that process largely precluded seed investors from accessing any of their ICP on that date. Indeed, available evidence indicates that seed investors were only able to access no more than 1,660 ICP on May 10. The effect of Defendants' conduct, which amounted to withholding ICP from outside investors, was to (i) reduce the amount of ICP available on the market on May 10 and in the days that followed (and thus increase the price of ICP) and (ii) give Defendants greater control over the supply of ICP (and thus the ability to exercise greater control over the price of ICP).

229.   Moreover, upon information and belief, Defendants imposed further restrictions on other outside investors that were not disclosed and that precluded those investors from accessing their ICP at launch and in the days that immediately followed the launch. For example, although Defendants did not publicly disclose information regarding any such restrictions, airdrop investors were unable to access their ICP at launch, and were therefore unable to sell ICP on May 10, 2021.

230.   As a result of Defendants' conduct, they were able to reduce the supply of ICP available on the market by at least 115 million ICP and secure for themselves and their insiders control over more than 98% of available ICP.

Scienter

231.   In engaging in the foregoing conduct, Defendants intended to deceive investors by artificially affecting the market price of ICP.

232.   *First*, Defendants had a substantial interest in ICP, and thus had a motive to inflate the price of ICP. As explained above, more than 50% of ICP was allocated to Defendants and their insiders, including almost all of the ICP that was available for trading on May 10, 2021. As a result, Defendants would benefit substantially if ICP prices were inflated (and did benefit substantially because ICP prices were inflated).

233.   *Second*, Defendants had the opportunity to produce such inflated prices, because they controlled the issuance of ICP. Indeed, May 10, 2021, was the first day on which ICP would actually

be allocated by Dfinity to investors. Outside investors, including seed investors (who were entitled to 25% of the total supply of ICP), were therefore wholly dependent on Defendants to make ICP available to them on that day, and in the days that followed. Defendants thus had the *power* to restrict the supply of ICP, which they abused.

234.   *Third*, Defendants understood that they could inflate the price of ICP by reducing the available supply of ICP. The Messari report tweeted by Yang explained: "The higher the amount locked, the lower the circulating the supply, the more favorable price action is." Moreover, when Williams was asked whether seed investors' tokens would be subject to restrictions, he referenced a potential "price collapse."

235.   *Fourth*, Defendants understood that they could preserve inflated prices caused by a restricted supply of ICP, and sought to do so, by obtaining greater control over the supply of ICP. The materials circulated in connection with the "Cash-in-Lieu-of-Tokens Program" (which was specifically advertised to employees that were "planning to sell Tokens immediately upon receipt") explained that the "benefit" of the program was that if employees transferred their tokens to Dfinity, Dfinity could "time the aggregate employee token sales." Defendants thus sought to preserve inflated ICP prices by eliminating competing sellers from the marketplace and controlling the timing of sales.

236.   *Fifth*, there is no legitimate explanation for Defendants' conduct. They reduced the supply of ICP, and increased their control of the supply of ICP to more than 98%, by imposing last-minute (and previously undisclosed) vesting and other restrictions on outside investors' ICP, and by buying up employees' ICP. At the same time, benefiting from inflated prices, they dumped ICP on the market.

Reliance and Damages

237.   The foregoing manipulative and deceptive conduct caused the price of ICP to be higher than it would have been otherwise. Plaintiffs and the other Market Manipulation Subclass

members paid such inflated prices and thus suffered damages as a direct and proximate result of Defendants' conduct.

238.   Moreover, Plaintiffs and other Market Manipulation Subclass members purchased ICP in reliance on the assumption that the market was efficient and free of manipulation. Although the market was not free from manipulation, it was and is efficient. Indeed, as explained above, Coinbase is among the most popular crypto-asset exchanges in the world, with over 50 million users. Data from CoinMarketCap indicates that trading volumes for ICP have never fallen below $100 million in a single day since May 10, 2021. The market for ICP is regularly covered by industry outlets, including *CoinDesk*, *Coin Telegraph*, and *FX Empire*. And, as also explained above, the price of ICP was responsive to disclosures made by Defendants.

**EIGHTH CAUSE OF ACTION**
**Section 20(a) of the Exchange Act**
**For Violation of Section 10(b) and Rule 10b-5**
**Market Manipulation**
**(On Behalf of the Market Manipulation Subclass Against Williams)**

239.   Plaintiffs incorporate the allegations above.

240.   Plaintiffs bring this claim against Defendant Williams for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

241.   Plaintiffs bring this claim on behalf of all Market Manipulation Subclass members who purchased ICP tokens from May 10, 2021, to June 18, 2021.

242.   Section 20(a) states in relevant part: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *Id*.

243.   Williams, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein,

63
**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**

in connection with the May 2021 offering of ICP tokens, had the power and authority to direct the management and activities of Dfinity and its employees, and to cause Dfinity to engage in the wrongful conduct complained of herein.

244.   As the founder and Chief Scientist at the Foundation, and the CEO of Dfinity USA, Williams had and exercised the power and influence to cause the manipulative and deceptive actions alleged herein, with the power to direct or cause the direction of the management and policies of Dfinity. Williams had sufficient influence to have caused Dfinity to engage in the foregoing manipulative and deceptive acts.

245.   As a direct and proximate result of Williams's wrongful conduct, Plaintiffs and the other Market Manipulation Subclass members suffered damages in connection with the respective purchases of ICP tokens and are entitled to an award compensating them for such damages.

## PRAYER FOR RELIEF

On behalf of themselves and the Class, the Securities Fraud Subclass, and the Market Manipulation Subclass, Plaintiffs request relief as follows:

(a) That the Court determines that this action may be maintained as a class action, that Plaintiffs be named as Class Representative of the Class, the Securities Fraud Subclass, and the Market Manipulation Subclass, that the undersigned be named as Lead Class Counsel of the Class, Securities Fraud Subclass, and Market Manipulation Subclass, and direct that notice of this action be given to Class members, Securities Fraud Subclass members, and Market Manipulation Subclass members;

(b) That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal laws set forth above;

(c) That the Court award Plaintiffs and the other Class members, Securities Fraud Subclass members, and Market Manipulation Subclass members damages in an amount to be determined at trial;

(d) That the Court award Plaintiffs and the other Class members who traded contemporaneously with Defendants' insider trading these Defendants' ill-gotten gains from such trading;

(e) That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiffs and the other Class members, Securities Fraud Subclass members, and Market Manipulation Subclass members are entitled;

(f) That the Court award Plaintiffs and the other Class members, Securities Fraud Subclass members, and Market Manipulation Subclass members pre- and post-judgment interest (including pursuant to applicable statutory rates of interest);

(g) That the Court award Plaintiffs and the other Class members, Securities Fraud Subclass members, and Market Manipulation Subclass members their reasonable attorneys' fees and costs of suit; and

(h) That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

1

## JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury for all claims.

Dated: February 3, 2022                    Respectfully Submitted,

**ROCHE FREEDMAN LLP**

*/s/ Kyle W. Roche*
Kyle W. Roche (admitted *pro hac vice*)
Edward Normand (admitted *pro hac vice*)
Richard Cipolla (admitted *pro hac vice*)
Stephen Lagos (admitted *pro hac vice*)
Ivy T. Ngo (SBN 249860)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Facsimile: (646) 392-8842
Email: kyle@rochefreedman.com
Email: tnormand@rochefreedman.com
Email: rcipolla@rochefreedman.com
Email: slagos@rochefreedman.com
Email: ingo@rochefreedman.com

*Counsel for Plaintiffs and the Class*

**AMENDED CLASS ACTION COMPLAINT – No. 3:21-cv-06118-JD**