**ROCHE FREEDMAN LLP**
Kyle W. Roche (admitted *pro hac vice*)
Edward Normand (admitted *pro hac vice*)
Richard Cipolla (admitted *pro hac vice*)
Stephen Lagos (admitted *pro hac vice*)
Ivy T. Ngo (SBN 249860)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Facsimile: (646) 392-8842
Email: kyle@rochefreedman.com
Email: tnormand@rochefreedman.com
Email: rcipolla@rochefreedman.com
Email: slagos@rochefreedman.com
Email: ingo@rochefreedman.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

DANIEL VALENTI, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

DFINITY USA RESEARCH LLC, DFINITY FOUNDATION, and DOMINIC WILLIAMS,

Defendants.

Case No.: 3:21-cv-06118-JD

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
Date:      July 14, 2022
Time:      10:00 a.m.
Courtroom: 11, 19th Floor
Judge:     Hon. James Donato

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... iii

PRELIMINARY STATEMENT................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

ARGUMENT ............................................................................................................................... 3

I.    DEFENDANTS DO NOT MEET THEIR BURDEN ON THIS AFFIRMATIVE ................
      DEFENSE BECAUSE PLAINTIFFS DO NOT ALLEGE FACTS UNDER
      WHICH THE STATUTE OF REPOSE APPLIES AS A MATTER OF LAW .................... 3

II.   PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANTS ARE
      STATUTORY SELLERS UNDER § 12(A)(1)................................................................... 6

      A.    The Dfinity Defendants Passed Title to the ICP Tokens to Plaintiffs ....................... 6

      B.    Defendants' Promotions Solicited the Sale of the Token They Controlled............... 7

III.  PLAINTIFFS STATE CLAIMS FOR MATERIAL MISREPRESENTATIONS
      AND OMISSIONS UNDER § 10(B) OF THE EXCHANGE ACT ..................................... 9

      A.    Defendants Acted with Scienter................................................................. 12

      B.    Plaintiffs Sufficiently Allege Loss Causation........................................................... 15

IV.   PLAINTIFFS STATE A CLAIM FOR MARKET MANIPULATION BECAUSE
      DEFENDANTS DOMINATED AND MANIPULATED THE SUPPLY OF ICP ............. 16

      A.    Plaintiffs Sufficiently Allege Actionable Conduct .................................................. 16

      B.    Defendants Acted with Scienter Because They Took Active Steps That Had
            No Innocent Explanation to Raise Prices................................................................. 18

V.    PLAINTIFFS STATE A CLAIM FOR INSIDER TRADING ........................................... 19

      A.    Plaintiffs Sufficiently Allege a Predicate Violation................................................. 19

      B.    Plaintiffs Sufficiently Allege Contemporaneous Trading......................................... 20

VI.   PLAINTIFFS STATE CONTROL PERSON CLAIMS AGAINST WILLIAMS.............. 20

CONCLUSION ........................................................................................................................... 20

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Abdo v. Fitzsimmons*,
  2021 WL 616324 (N.D. Cal. Feb. 17, 2021) ............................................................... 14

4

5

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ....................................................................................................... 5

6

7

*Anschutz Corp. v. Merrill Lynch & Co.*,
  785 F. Supp. 2d 799 (N.D. Cal. 2011) ................................................................... 18, 19

8

*Balestra v. ATBCOIN LLC*,
  380 F. Supp. 3d 340 (S.D.N.Y. 2019) ..................................................................... 7, 8

9

10

*Bradford v. Moench*,
  809 F. Supp. 1473 (D. Utah 1992) ................................................................................ 6

11

12

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ......................................................................................... 9

13

*City of Providence v. BATS Global Mkts., Inc.*,
  878 F.3d 36 (2d Cir. 2017) ........................................................................................... 18

14

15

*Cohen v. ConAgra Brands, Inc.*,
  16 F.4th 1283 (9th Cir. 2021) ........................................................................................ 4

16

17

*Crane Co. v. Westinghouse Air Brake Co.*,
  419 F.2d 787 (2d Cir. 1969) ............................................................................. 17, 18, 19

18

*Crowe v. Oregon State Bar*,
  989 F.3d 714 (9th Cir. 2021) ......................................................................................... 8

19

20

*Elec. Workers Pension Fund, Local 103, IBEW v. HP Inc.*,
  2021 WL 1056549 (N.D. Cal. Mar. 19, 2021) ............................................................. 20

21

22

*Evanston Police Pension Fund v. McKesson Corp.*,
  411 F. Supp. 3d 580 (N.D. Cal. 2019) ................................................................... 19, 20

23

*Galena Biopharma, Inc. Secs. Litig.*,
  117 F. Supp. 3d 1145 (D. Or. 2015) ........................................................................... 16

24

25

*GFL Advantage Fund, Ltd. v. Colkitt*,
  272 F.3d 189 (3d Cir. 2001) ........................................................................................ 18

26

*Herrera v. Zumiez, Inc.*,
  953 F.3d 1063 (9th Cir. 2020) ....................................................................................... 5

27

28

*In re Alphabet, Inc. Securities Litig.*,
  1 F.4th 687 (9th Cir. 2021) .......................................................................................... 12

*In re Amgen Inc. Secs. Litig.*,
  544 F. Supp. 2d 1009 (C.D. Cal. 2008) .................................................................. 11

*In re Apollo Grp. Inc. Secs. Litig.*,
  509 F. Supp. 2d 837 (D. Ariz. 2007) ..................................................................... 10

*In re Blech Secs. Litig.*,
  2002 WL 31356498 (S.D.N.Y. Oct. 17, 2002) ....................................................... 17

*In re Bofl Holding, Inc. Secs. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ......................................................................... 15, 16

*In re Capacitors Antitrust Litig.*,
  2017 WL 897340 (N.D. Cal. Mar. 7, 2017) ............................................................ 20

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009) ............................................................................ 9

*In re En Pointe Techs., Inc. Secs. Litig.*,
  2003 WL 27392762 (S.D. Cal. Aug. 25, 2003) ................................................ 16, 19

*In re Interlink Elecs., Inc. Secs. Litig.*,
  2007 WL 9857528 (C.D. Cal. Sept. 26, 2007) ....................................................... 10

*In re Longfin Corp. Sec. Class Action Litig.*,
  2019 WL 1569792 (S.D.N.Y. Apr. 11, 2019) .......................................................... 9

*In re Metro. Secs. Litig.*,
  532 F. Supp. 2d 1260 (E.D. Wash. 2007) ............................................................. 12

*In re Proxima Corp. Sec. Litig.*,
  1994 WL 374306 (S.D. Cal. May 3, 1994) ............................................................. 9

*In re Ramtek Secs. Litig.*,
  1990 WL 32071 (N.D. Cal. Jan. 29, 1990) ............................................................ 12

*In re Signet Jewelers Ltd. Sec. Litig.*,
  389 F. Supp. 2d 221 (S.D.N.Y. 2019) .................................................................... 11

*In re Tezos Secs. Litig.*,
  2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) ........................................................... 7

*In re VeriFone Holdings, Inc. Secs. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ............................................................................... 12

*In re Vivendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) ..................................................................... 8

*Jensen v. iShares Tr.*,
  44 Cal. App. 5th 618 (Cal. App. Div. 2020) ............................................................ 8

*Kui Zhu v. Taronis Techs. Inc.*,
   2020 WL 1703680 (D. Ariz. Apr. 8, 2020) ................................................................. 15

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) .......................................................................... 10, 15

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
   2011 WL 4389689 (C.D. Cal. May 5, 2011) ............................................................ 6, 8

*Mandalevy v. Bofl Holding, Inc.*,
   2021 WL 794275 (S.D. Cal. Mar. 2, 2021) ............................................................. 13

*McCormick v. Fund Am. Cos., Inc.*,
   26 F.3d 869 (9th Cir. 1994) ............................................................................. 20

*McGuire v. Dendreon Corp.*,
   2008 WL 5130042 (W.D. Wash. Dec. 5, 2008) ........................................................ 13

*Middlesex Ret. Sys. v. Quest Software Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) ................................................................ 13

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................... 13

*Neuwirth Inv. Fund Ltd. v. Swanton*,
   422 F. Supp. 1187 (S.D.N.Y. 1975) ...................................................................... 5

*No. 84 Emp'r-Teamster Join Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ........................................................................... 14

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ....................................................................................... 11

*Pino v. Cardone Cap., LLC*,
   2021 WL 3502493 (C.D. Cal. Apr. 27, 2021) ........................................................... 9

*Pinter v. Dahl*,
   486 U.S. 622 (1988) ................................................................................. passim

*Pirani v. Slack Techs., Inc.*,
   445 F. Supp. 3d 367 (N.D. Cal. 2020), *aff'd* 13 F.4th 940 (9th Cir. 2021) ..................... 9

*Plotkin v. IP Axess Inc.*,
   407 F.3d 690 (5th Cir. 2005) ............................................................................ 11

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) .............................................................................. 12

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) .............................................................................. 9

*Santa Fe Indus. v. Green*,
    430 U.S. 462 (1977) ................................................................................. 16

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
    485 F. Supp. 3d 1113 (N.D. Cal. 2020) ................................................. 13

*SEC v. Drucker*,
    1983 WL 1369 (S.D.N.Y. Sept. 26, 1983) ............................................. 17

*SEC v. Lek Secs. Corp.*,
    276 F. Supp. 3d 49 (S.D.N.Y. 2017) ..................................................... 16

*SEC v. Martino*,
    255 F. Supp. 2d 268 (S.D.N.Y. 2003) ............................................. 16, 18

*SEC v. Murphy*,
    626 F.2d 633 (9th Cir. 1980) ................................................................... 4

*SEC v. Nat'l Bankers Life Ins. Co.*,
    334 F. Supp. 444 (N.D. Tex. 1971) ................................................. 17, 18

*SEC v. Ralston Purina Co.*,
    346 U.S. 119 (1953) ................................................................................. 5

*SEC v. Rose*,
    2007 WL 9826042 (S.D. Tex. Sept. 5, 2007) ....................................... 17

*SEC v. Sierra Brokerage Servs. Co.*,
    608 F. Supp. 2d 923 (S.D. Ohio 2009) ................................................. 16

*Stephenson v. Deutsche Bank AG*,
    282 F. Supp. 2d 1032 (D. Minn. 2003) ................................................... 8

*Welgus v. TriNet Grp., Inc.*,
    2017 WL 167708 (N.D. Cal. Jan. 17, 2017) ........................................... 8

*Youngers v. Virtus Inv. Partners, Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016) ..................................................... 8

*Zakinov v. Ripple Labs, Inc.*,
    2020 WL 922815 (N.D. Cal. Feb. 26, 2020) .................................. passim

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) ................................................. 12

**Other Authorities**

15 U.S.C. § 77m ................................................................................................ 3

15 U.S.C. § 78p ........................................................................................ 13, 14

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – No. 3:21-cv-06118

Lead Plaintiff Henry Rodriguez and named plaintiff Daniel Valenti, on behalf of themselves and all others similarly situated, respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss (ECF No. 62) the Amended Complaint ("AC") (ECF No. 45).

**PRELIMINARY STATEMENT**

This case arises out of Defendants' multi-billion-dollar pump-and-dump scheme, also known as a "rugpull." Defendants hyped their May 10, 2021, initial coin offering ("ICO") of ICP tokens—tokens that Defendants promised would power a "new, decentralized internet"—in advertisements and promotions throughout the United States, bombarding investors with repeated solicitations to induce purchases in "the most anticipated event in crypto." Defendants misrepresented that they were "a long term operation" whose founders would not dump their own tokens, assuring investors that they were "bound by even longer vesting schedules" than three years.

Defendants' representations were knowingly false, and the purported new internet never materialized. On the morning of the ICO, Defendants imposed surprise lock-ups on all but insiders, who then surreptitiously dumped their ICP on the unsuspecting retail market. Defendants' rugpull worked: the hype leading up to the ICO caused the ICP to sell at a peak of $730, but by dumping their billions—contrary to their promises of "vesting schedules"—Defendants caused the price to crash. ICP lost over 90% of its value in just a few weeks.  As the *New York Times* reported, the "climb and crash" was "stunning" even by crypto standards.

Defendants' motion to dismiss Plaintiffs' claims to redress this misconduct relies on mischaracterizing Plaintiffs' allegations and repeatedly misapplying the controlling law.

The Securities Act Claims. Dfinity's "seed round" in February 2017 was not a "bona fide offering of ICP tokens," based on Plaintiffs' allegations. Whether such an offering occurred is a question of fact, *see Zakinov v. Ripple Labs, Inc.*, 2020 WL 922815, at *9-10 (N.D. Cal. Feb. 26, 2020) (rejecting statute of repose defense), and Plaintiffs' allegations compel the inference that no such offering occurred—for example, the seed round involved different securities (ICP tokens did not even exist yet) and was offered *only* to foreign residents.

In addition, Plaintiffs adequately allege that Defendants are statutory sellers, whether because they directly passed title or solicited purchases. It is reasonable to infer that defendants

1

directly pass title where they sell less than 1% of the available tokens in the market at the same time as the plaintiff buys just over 100 tokens. *See id.* at *16. It follows *a fortiori* from Plaintiffs' allegations that Defendants, who sold *over 98%* of the available tokens on the market during the class period, transferred title to Plaintiffs and proposed class members, who purchased tens of thousands of tokens. Plaintiffs also purchased tokens as a result of Defendants' numerous solicitations, including widespread advertising of the tokens, which independently confirms that Defendants were statutory sellers. It is well-settled that indirect solicitations suffice, and it is immaterial if the solicitations were "direct," *see id.*, as Defendants incorrectly claim they must be.

The Exchange Act Claims. Defendants falsely claimed they were subject to lockups, which deceived investors into believing Defendants were a legitimate "long-term operation" rather than a pump-and-dump scheme. Defendants argue that when they said they were "bound by even longer vesting schedules" than three years, they meant they *were subject to no vesting restrictions at all*. This is preposterous. Instead, Defendants' statement compels the opposite inference, in Plaintiffs' favor. As to scienter, Plaintiffs include allegations, derived from Dfinity whistleblowers, about how Defendants created a sham entity, the Internet Computer Association (the "ICA"), to conceal hundreds of millions (if not billions) of dollars in surreptitious sales for their own benefit. Defendants' contentions that their misrepresentations were "true when made" and that "any allegedly concealed facts were disclosed" are simply false on the face of the Amended Complaint; Defendants can make these arguments to a jury. Their remaining arguments on, for example, loss causation (a classic question of fact) and market manipulation (when they dominated the market and prevented outside investors from selling) are makeweight.

## **BACKGROUND**

Defendants built market fervor regarding their "Internet Computer" blockchain, and the accompanying ICP token, for more than four years ahead of its launch. AC ¶¶ 41-58. This included coordinated interviews, social media campaigns, and conferences, where Defendant Williams promised, among other things, that Defendants' network would be "humanity's primary compute platform for building software" within twenty years. *Id.* To further build trust, and investor interest,

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – No. 3:21-cv-06118

Defendants repeatedly promised that, consistent with industry practices, they and other insiders would not and could not sell ICP at or shortly after launch. *Id.* ¶¶ 56, 87, 90-93, 100.

As the *New York Times* later acknowledged in an article about Defendants' misconduct, these promotions worked: when ICP launched on May 10, 2021, its price skyrocketed past $700 per token, giving it a market capitalization exceeding $45 billion. *Id.* ¶¶ 50, 79, 109. But in the days and weeks that followed, as Defendants and their insiders dumped their ICP on the market, and as investors slowly discovered that Defendants *could* and *did* sell ICP at and shortly after launch, the price of ICP collapsed, ultimately falling more than 90% by the end of June 2021. *Id.* ¶¶ 109, 112.

Plaintiffs have spelled out the scheme in detail, but in short, Defendants (1) lied about their own and other insiders' vesting and lockup restrictions, *id.* ¶¶ 56, 87, 90-93; (2) restricted the supply of ICP by secretly buying employees' ICP in off-market transactions and adding last-minute lock-ups that blocked outside investors from selling their ICP, *id.* ¶¶ 64-78; (3) exploited the inflated prices caused by this misconduct by selling billions in ICP to retail investors, *id.* ¶¶ 79-89; and (4) attempted to avoid detection by secretly selling their ICP through another entity that they controlled, the ICA, and by falsely claiming that outside investors (who could not even access their ICP) were responsible for the price collapse, *id.* ¶¶ 60-63, 90-114. These particularized allegations are backed up by, among other sources, Defendants' statements, information from Dfinity's whistleblower employees, and analysis of public blockchain transactions. *Id.* ¶¶ 62, 63, 66. These allegations show a concerted effort to pump and sell ICP tokens in a manner that could only have been done knowingly and deliberately.

## ARGUMENT

## I.   DEFENDANTS DO NOT MEET THEIR BURDEN ON THIS AFFIRMATIVE DEFENSE BECAUSE PLAINTIFFS DO NOT ALLEGE FACTS UNDER WHICH THE STATUTE OF REPOSE APPLIES AS A MATTER OF LAW

Plaintiffs' Securities Act claims are subject to a statute of repose prohibiting suits brought "more than three years after the security was bona fide offered to the public." 15 U.S.C. § 77m. This creates an affirmative defense to issuers that can show that more than three years ago, the issuer's offer of the relevant security was both (1) bona fide and (2) to the public. *See Zakinov*, 2020 WL 922815, at *9. As an affirmative defense, Defendants "bear[] the burden of pleading and supporting"

3

its argument. *Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1289 (9th Cir. 2021). The statute of repose does not bar Plaintiffs' claims, because under their allegations, the first bona fide offer to the public of ICP tokens did not occur until May 10, 2021, when Defendants first "launched the Internet Computer network and simultaneously listed ICP tokens for sale to the public (including U.S. investors) through Coinbase . . . and other exchanges." AC ¶ 35.

Whether an offering was "bona fide" and "public" are fact-intensive questions.[1] In addition, there is no clear standard for "what sort of offers may qualify as 'bona fide' public offers." *Zakinov*, 2020 WL 922815, at *9. The analysis in *Zakinov*, however, is instructive. This Court held that, despite generic allegations that the defendant previously sold over a million dollars of the XRP crypto-asset to the "general public," there were insufficient "allegations and judicially noticeable facts properly before this court" to grant the affirmative defense. *Id.* at *3, *10. In particular, the Court differentiated the defendant's prior sales from the "substantial volume" of sales that occurred after listing "on a cryptocurrency exchange," which "support[ed] the inference that the defendants did not make their first genuine attempt to sell to the public until 2017." *Id.* at *10.[2]

With the burden of pleading and proving this affirmative defense, Defendants never even explain what constitutes a "bona fide" or "public" offering, let alone how they meet that standard. Nor could they, because under Plaintiffs' allegations, the 2017 ICP crowdsale was not bona fide and public as a matter of law. Plaintiffs allege only these four facts about it:

- In "February 2017 . . . Williams announced that [the Foundation] would be conducting a 'crowdsale of *future* ICP tokens to fund the blockchain's development.'" AC ¶ 36 (emphasis added)

- "[A]ccording to Williams, the 2017 crowdsale was nominally blocked in the United States 'due to regulatory uncertainties.'" *Id.* ¶ 37.

---

[1] Indeed, one court has already rejected Defendants' premature assertion of this defense at the pleading stage. *Ocampo vs. Dfinity USA Research LLC et al.*, 21-Civ-03843 at pp. 3-4, (Cal. Sup. Ct. Apr. 7, 2022) (attached at Roche Decl. Ex. A.)

[2] The Court thus considered similar factors as used for determining whether an offer was private and therefore exempt from certain rules. *See, e.g., SEC v. Murphy*, 626 F.2d 633, 644-45 (9th Cir. 1980) (considering fact-heavy factors such as the number of offerees, the sophistication of the offerees, the size and manner of the offering, and the relationship of the offerees to the issuer).

- The allocation of tokens to seed investors changed between the February 2017 sale and the launch of ICP in May 2021. *Compare id.* ¶ 36 *with id.* ¶ 39 *and id.* ¶ 54.

- Seed investors did not take control of their tokens until the May 2021 genesis event, and had last-minute restrictions placed on them limiting the amount of tokens they could control. *Id.* ¶¶ 67-76.

These facts do not remotely establish (1) the terms of the February 2017 crowdsale; (2) whether it was offered pursuant to an exemption (*e.g.*, only accredited investors); (3) whether the instrument sold constitutes the same security that Plaintiffs purchased; (4) how many purchasers bought during this crowdsale; and (5) what relationship the purchasers had with Defendants. These are all critical questions to determine the nature of Defendants' 2017 offering.

Plaintiffs *do allege*, moreover, that U.S. individuals were blocked from participating in the 2017 crowdsale. *Id.* ¶ 37. Defendants thus have to argue that a securities offering could trigger the statute of the repose *even if* it was offered only in a jurisdiction that did not require any form of registration. This would enable a savvy issuer to issue unregulated securities in a friendly jurisdiction, wait three years, and then offer those same unregulated securities to U.S. investors to shield itself from any liability under § 12(a)(1). Such a rule would eviscerate the registration requirement and undermine the well-established policy by which the federal securities laws "embrace a fundamental purpose to substitute a philosophy of full disclosure for the philosophy of caveat emptor." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972).[3]

Defendants also manufacture inferences in their favor, where the law requires the opposite. *See Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1068 (9th Cir. 2020). They misleadingly characterize a quote from Williams, for example, about the "large number of contributors" as Plaintiffs' own allegation. Mot. at 6 (quoting AC ¶ 91)). And ambiguous statements about the number of contributors leave too many unanswered questions about the nature of the offer. Williams' use of

---

[3] These laws' purpose is "to protect investors by promoting full disclosure of information thought necessary to make informed investment decisions." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 125-26 (1953). With respect to § 12(a)(1) in particular, a statutory purpose is to give sellers a "strong incentive to comply with the registration disclosure provisions," *Pinter v. Dahl*, 486 U.S. 622, 637 (1988), and the federal courts have long recognized that the "purpose of that section has generally been construed to be the discouragement of the sale of unregistered securities." *Neuwirth Inv. Fund Ltd. v. Swanton*, 422 F. Supp. 1187, 1193 (S.D.N.Y. 1975).

the term "contributors" to describe participants in the February 2017 crowdsale, for instance, raises questions about the relationship between Defendants and the "contributors."

Other unresolved facts preclude the application of the statute of repose on Defendants' motion, where "significant changes in the rights of a security holder" between offerings can constitute new securities. *Bradford v. Moench*, 809 F. Supp. 1473, 1490 (D. Utah 1992). Courts thus routinely consider whether investments arising from the same asset constitute the same security for standing purposes. *See, e.g.*, *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *5 (C.D. Cal. May 5, 2011) (different tranches of mortgage-backed securities are different securities). Defendants cannot establish now that the 2017 crowdsale involved the same security as the May 2021 offering, even if it involved a similar asset, where the ICP tokens *did not even exist* until May 2021. AC ¶ 36. The allegations, in fact, imply that they were different securities offered *only* to non-U.S. residents. Such an offer does not implicate the statute of repose.

## II.   PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANTS ARE STATUTORY SELLERS UNDER § 12(A)(1)

Section 12(a)(1) liability exists for two types of sellers: (1) those who "pass title" of the security, and (2) those who "solicit" the sale of the security. *Pinter*, 486 U.S. at 647. Defendants fall into both categories because (1) there is a strong inference that Plaintiff bought directly from Defendants and (2) Defendants' promotional efforts suffice for solicitation.

### A.    The Dfinity Defendants Passed Title to the ICP Tokens to Plaintiffs

The Dfinity Defendants ("Dfinity") both (1) controlled more than 98% of all the available ICP token supply on the date of launch and (2) sold an incredible sum of ICP in the days and weeks following the launch of the network. AC ¶¶ 77, 83-89. These facts give rise to a strong inference that the class members bought directly from Defendants via Coinbase, the cryptocurrency exchange that Defendants and the class members both used for transactions. *Id.* ¶¶ 13-14, 52; *see also Zakinov*, 2020 WL 922815, at *16 (comparing the timing of defendants' exchange sales to plaintiff's purchase "supports the inference that plaintiff purchased approximately 122 XRP units from defendant"). Plaintiffs bought ICP on Coinbase on several days, including, between them, in and around May 10 and June 15, 2021. AC ¶¶ 13, 14, 35. Dfinity transferred 6.7 million ICP to Coinbase for retailer

6

investors to buy those days. *Id.* ¶ 82. Indeed, on May 10 alone, Dfinity transferred at least 2 million of the 4 million ICP, or 50%, sold on Coinbase. *Id.* ¶¶ 82, 83, 85. The natural conclusion is that the class members purchased at least some of the ICP directly from Dfinity. *See Zakinov*, 2020 WL 922815, at *16 (allegations plaintiff bought when defendant sold 0.095% of all XRP traded during particular period provided sufficient inference of a direct sale at pleading stage).

### B.   Defendants' Promotions Solicited the Sale of the Token They Controlled

Section 12(a) liability extends to anyone that "successfully solicits [a] purchase [of securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 647. Defendants are liable for their aggressive solicitation of ICP because they both relentlessly advertised ICP and had complete control of the entire ICP distribution, from which they financially benefitted. AC ¶¶ 41-49, 53, 57-58, 90, 92. This conduct is directly analogous to a number of recent cases brought against defendant crypto-asset issuers and promoters. *See Zakinov,* 2020 WL; *In re Tezos Secs. Litig.*, 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019).

In these cases, the courts found allegations nearly identical to Plaintiffs' sufficient to state claims against issuers of digital assets. In *Zakinov*, large sales, conferences, tweets, interviews, and articles were "more than sufficient to establish their status as sellers under a solicitation theory." 2020 WL 922815, at *12.[4] In *Tezos*, the court upheld similar claims against the Dfinity USA analogue in that case, and the token's founders, based on allegations of their "comprehensive involvement with the ICO's planning and execution." 2018 WL 4293341, *8–9 (finding that allegations of defendant's involvement in the "creation of the Tezos technology, establishment of a legal entity to monetize [defendant's] interest in that technology, development of a platform to facilitate said monetization, and minute-to-minute oversight of the monetization process itself" were sufficient to withstand a motion to dismiss).[5] And in *Balestra*, based on the allegations, defendants who were "the sole members" of ATBCOIN LLC were liable for their personal involvement in

---

[4] *Compare with* AC ¶¶ 43, 44, 49, 82 (describing Dfinity's tweets, investor conference, and sale of billions worth of ICP to exchanges).

[5] *Compare with* AC ¶¶ 5, 18, 35, 36, 130, 131 (describing Williams' role in creating ICP technology and the ecosystem).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – No. 3:21-cv-06118

"publicizing the [unregistered] ATB ICO," including issuing press releases and giving promotional interviews. 380 F. Supp. 3d at 358–59.[6] These efforts to publicize and promote the token sale showed that the defendants had "engaged in steps necessary to the distribution of" the tokens and fell within the scope of § 12(a). *Id.* at 358 (internal quotation marks omitted).

Defendants rely (at 7-9) on cases alleging promoter liability under § 12(a)(2) where the alleged solicitation concerned signing a registration statement or prospectus. For example, in *Maine State Ret. Sys.,* plaintiffs relied primarily on the allegation that "the Issuer Defendants issued the registration statements" without explaining "how" those defendants "solicited their sale." 2011 WL 4389689, at *10 (C.D. Cal. May 5, 2011); *see also Welgus v. TriNet Grp., Inc.*, 2017 WL 167708, at *23 (N.D. Cal. Jan. 17, 2017) ("Generally, . . . underwriters are not sellers within the meaning of Section 12" and "conclusory allegations" of solicitation "are inadequate to state a claim.") (internal quotation marks omitted).[7]

Defendants rely on this precedent to propose (at 7-8) a new rule that to plead solicitations, plaintiffs must allege "personal[] or direct[]" contact with Defendants. *Pinter* requires no such allegations. *Pinter* cautioned against interpreting solicitation to include "securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services," 486 U.S. at 651, but that caution does not extend so far as to *require* direct contact with issuers promoting their securities. Courts routinely hold "the seller need not have 'personal' contact with the purchaser" to be held liable under § 12. *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003); *see also Youngers v. Virtus Inv. Partners, Inc.*, 195 F. Supp. 3d 499, 522 (S.D.N.Y. 2016) (holding that "indirect solicitation can suffice"); *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1063–64 (D. Minn. 2003) (defendants qualified as sellers at the

---

[6] *Compare with* AC ¶¶ 41, 45, 47 (describing how Defendants, per the *New York Times*, "generated a lot of buzz" ahead of the ICO).

[7] The intermediate state court that rejected Defendants' repose arguments ultimately dismissed plaintiff's claims in part because it identified "binding" state court precedent on this issue. *Ocampo*, *supra*, at 5 (citing *Jensen v. iShares Tr.*, 44 Cal. App. 5th 618, 646 (Cal. App. Div. 2020)). That precedent, which involved a § 12(a)(2) claim against an asset manager (rather than an issuer) and depends on distinguishable cases such as *Maine State Retirement System*, discussed above, is not binding. *Crowe v. Oregon State Bar*, 989 F.3d 714, 730 (9th Cir. 2021).

motion to dismiss stage despite no allegations of direct contact); *In re Proxima Corp. Sec. Litig.*, 1994 WL 374306, at *5 (S.D. Cal. May 3, 1994) (allegations of direct solicitations not required).[8]

It is enough, as here, that Defendants "systematically marketed [the security] and financially benefited from such efforts." *Zakinov*, 2020 WL 922815, at *12. In fact, it is more than enough: courts have found far less extensive allegations sufficient. *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549–50 (N.D. Cal. 2009) (plaintiffs alleged that defendants "actively solicited the sale of the fund's shares' and that certain defendants were involved in marketing the fund"). If signing a registration statement is "at least suggestive of solicitation activity," *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 384 (N.D. Cal. 2020), *aff'd* 13 F.4th 940 (9th Cir. 2021), then directing all the steps required to launch and issue a new a token tradable on multiple U.S.-based exchanges is more than sufficient.

At bottom, Defendants' causation arguments reflect an attempt to import a reliance requirement into § 12. But a § 12(a)(1) plaintiff "need not plead scienter, reliance, or fraud." *In re Longfin Corp. Sec. Class Action Litig.*, 2019 WL 1569792, at *5 (S.D.N.Y. Apr. 11, 2019) (citing *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004)); *see also Pinter*, 486 U.S. at 652 (there is "no congressional intent to incorporate tort law doctrines of reliance and causation into" § 12(a)(1) and "the strict liability nature of the statutory cause of action suggests the opposite"). In sum, the Court should reject Defendants' proposed new test, which would insulate token issuers from liability arising from their unlawful promotion of and profiting from the sale of unregistered securities.

## III.   PLAINTIFFS STATE CLAIMS FOR MATERIAL MISREPRESENTATIONS AND OMISSIONS UNDER § 10(B) OF THE EXCHANGE ACT

### A.   Defendants Made Material, Misleading Statements

Defendants focus on the supposed literal truth of their statements (at 9-12), ignoring that literally true statements "can be misleading and thus actionable under the securities laws." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also Lloyd v. CVB Fin. Corp.*,

---

[8] Defendants rely heavily on *Pino v. Cardone Cap., LLC*, 2021 WL 3502493, at *16 (C.D. Cal. Apr. 27, 2021), which is an aberrational case citing 30-year-old out-of-circuit precedent that *Vivendi Universal* and *Youngers* make clear is no longer good law. Moreover, the generic descriptions of "using social media" to solicit, *id.* at *2, pales in contrast to Defendants' efforts.

811 F.3d 1200, 1209 (9th Cir. 2016) (internal quotation marks omitted) (the "veracity" of a statement depends not on "its literal truth, but by its ability to accurately inform rather than mislead"). Defendants' statements regarding their sales and vesting were misleading because they omitted critical context and qualification.

After the launch, for example, Williams stated: "For regulatory reasons, the foundation and key early team members were locked up at launch for a week." AC ¶ 179(f). He similarly stated that "the Foundation did NOT sell ICP tokens from its endowment at or soon after Genesis launch" and that "the foundation, founders and directors weren't even able to sell initially because of regulatory lockups." *Id.* ¶¶ 179(h)-(i). These statements created the impression that the Foundation did not sell ICP—either directly or through its affiliates—immediately following the launch.

But that is just what the Foundation did. A week before launch, the Foundation transferred 20 million ICP to its affiliate, the ICA, so that—in circumvention of "regulatory" restrictions—the ICA could sell ICP on the market.[9] *Id.* ¶ 62. And "[a]s planned, the ICA did sell ICP in the period immediately following the launch," as did "Dfinity and its team." *Id.* ¶¶ 63, 81–83, 85, 101, 107. The omission of these facts rendered Defendants' statements misleading. *See Lloyd*, 811 F.3d at 1209 (March 2010 statement that there were "no serious doubts" about matter "as of December 31, 2009," was misleading, where doubts arose in January 2010); *In re Apollo Grp. Inc. Secs. Litig.*, 509 F. Supp. 2d 837, 841-42 (D. Ariz. 2007) (statement that "[t]he government declined to intervene" in *qui tam* action was misleading, where government had made similar allegations against defendant in Department of Education report).

Defendants also made misleading statements implying that Dfinity's team members were subject to more onerous vesting restrictions than Dfinity's VC investors (who could not sell ICP at launch), AC ¶¶ 56, 90; that Dfinity's team members would not "flip their position for a quick profit,"

---

[9] Contrary to Defendants' arguments (at 12 n.8), the Court may consider information from confidential witnesses with the hallmarks of credibility. The Swiss Engineers' statements include specific details, including the date and attendees of the "emergency committee" meeting regarding the transfer of ICP to the ICA, AC ¶ 62, Defendants' trading strategies at launch, *id.* ¶ 86, and how the engineers learned the relevant information, *id.*; and they are corroborated by other evidence that the Foundation transferred ICP to the ICA and that the ICA promptly sold that ICP (*id.* ¶¶ 54, 63); *see, e.g.*, *In re Interlink Elecs., Inc. Secs. Litig.*, 2007 WL 9857528, at *3-4 (C.D. Cal. Sept. 26, 2007) (identifying "corroborative nature" of facts alleged as relevant factor).

*id.*; that Dfinity regarded vesting restrictions as "very important" to the network and would presumably subject themselves and other insiders to such restrictions, *id.* ¶¶ 92-93; and that seed investors—not Dfinity and its insiders—dumped ICP in May 2021, *id.* ¶¶ 99-100.[10] Defendants thus implied that, consistent with "industry practices," they had taken measures to ensure "that project insiders won't trigger a price collapse through massive selling." *Id.* ¶ 100; *cf. Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) (investors "take into account the customs and practices of the relevant industry").

But in contrast to the impression created by Defendants' statements, (i) Dfinity's team members were free to sell ICP at launch and were thus subject to *less onerous* vesting restrictions, AC ¶¶ 83, 113; (ii) the Foundation did not impose *any* vesting restrictions on itself, *id.* ¶ 96; and (iii) Dfinity, its team members, and other insiders—not seed investors—*were* responsible for dumping ICP for a "quick profit", *id.* ¶¶ 76, 82–87, 110. Confirming that Defendants' statements were misleading, contemporaneous statements from investors indicate that they *were in fact misled*: investors expressed surprise and outrage when they learned what Defendants had done. *Id.* ¶¶ 90, 110–11; *see Plotkin v. IP Axess Inc.*, 407 F.3d 690, 695-06 (5th Cir. 2005) (statement misleading where average investor would "be surprised to learn" the truth).

Defendants argue (at 11) they did disclose information that Plaintiffs say was undisclosed, but their truth-on-the-market defense is both premature, *see In re Amgen Inc. Secs. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008), and meritless. The Messari report's disclosure that the ICA would receive ICP does not establish that the market knew that the Foundation transferred ICP to the ICA, *so that the ICA could sell ICP in circumvention of regulatory restrictions imposed on the Foundation*, or that the ICA did in fact sell ICP. Nor does Defendants' last-minute disclosure that they would impose vesting restrictions on *outside* investors (like seed and airdrop investors) somehow establish the market's awareness of the lack of restrictions imposed on *insiders*.

---

[10] Defendants also assert (at 10 n.6), without specifying exactly where, that they engaged in mere "inactional puffery." Each paragraph Defendants cite contains misleading reassuring statements that Defendants were not unfairly favoring insiders, which is actionable. *Compare* AC ¶¶ 179(b), (d), (e), (h), (j), *with In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 2d 221, 230-31 (S.D.N.Y. 2019) (statement that senior executives "held themselves to the highest standards of all" were actionable, where they were made "to reassure" investors).

And Defendants' argument (at 12) to categorically excuse their 2018 misstatements because they occurred before the Class Period "make[s] no sense" where, as here, misrepresentations are made *before* the securities become available. *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 965-67 (N.D. Cal. 2005). Defendants' related assertion that the statements were "too old" likewise fails; the sole case on which Defendants rely makes clear that whether statements are "stale" is a fact-specific inquiry that depends on circumstances such as "the intervening load of information on the subject, and on other developments affecting the market and the enterprise." *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 102 (2d Cir. 2021); *In re Metro. Secs. Litig.*, 532 F. Supp. 2d 1260, 1290 (E.D. Wash. 2007) (whether statements were "stale" was "inappropriate for resolution as a matter of law"). Defendants point to no factual evidence to support their argument, let alone the kind of "conclusive evidence" required at this pleadings stage. *In re Ramtek Secs. Litig.*, 1990 WL 32071, at *2-3 (N.D. Cal. Jan. 29, 1990).

## A.   **Defendants Acted with Scienter**

Defendants wrongly argue (at 12-14) that Plaintiffs did not sufficiently allege that Defendants' omissions rose above mere negligence. Courts "assess 'all the allegations holistically' to determine whether the inference of scienter is 'cogent and compelling.'" *In re Alphabet, Inc. Securities Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). Allegations are sufficient as long as "a reasonable person" would find the inference of scienter "at least as compelling as any opposing inference." *In re VeriFone Holdings, Inc. Secs. Litig.*, 704 F.3d 694, 701-02 (9th Cir. 2012) (quoting *Tellabs*, 551 U.S. at 324).

*First*, Defendants' omissions were one piece of a broader strategy to inflate the price of ICP. Defendants (i) engaged in an aggressive marketing campaign leading up to launch to boost demand for ICP among retail investors (which included statements and interviews from Williams), *see* AC ¶¶ 41-58; (ii) imposed and implemented last-minute restrictions that precluded outside investors from selling ICP at launch and in the weeks that followed (announced by Williams, for the stated purpose of preventing a "price collapse" that "would be bad for [network] security"), *id.* ¶¶ 67-78, 185; (iii) imposed no such restrictions on themselves (which surprised investors and was inconsistent with industry practice), *id.* ¶¶ 87, 96, 108; (iv) bought up team member' ICP pursuant

12

to the Cash-in-Lieu-of-Tokens program (and thus reduced the supply of ICP available on the market), *id.* ¶¶ 64-66; and (v) capitalized on the dynamic that they created by dumping ICP at inflated prices (and thereby reaped billions in profits at the expense of retail investors), *id.* ¶¶ 79-88. Defendants' concealment of critical information furthered this strategy, by ensuring that demand for ICP among retail investors like Plaintiffs did not evaporate and that Defendants could sell ICP at artificially inflated prices. *See Mandalevy v. Bofl Holding, Inc.*, 2021 WL 794275, at *5 (S.D. Cal. Mar. 2, 2021) (scienter sufficiently pleaded, where "false statements would ward off a drop in stock prices and prevent" an investigation).

> *Second*, Defendants do not—and cannot—dispute that Plaintiffs have sufficiently alleged that Defendants, including Williams,[11] had *knowledge* of the facts omitted from their statements. AC ¶¶ 184–88; *see SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1133-34 (N.D. Cal. 2020) ("[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate is classic evidence of scienter.") (quotations omitted)). Nor can Defendants dispute the fundamental importance of the information that they concealed: Williams has admitted that this information was important to investors and would have had a significant impact on the price of ICP if disclosed. AC ¶¶ 90, 181–82; *see* 15 U.S.C. § 78p(a) (requiring disclosure of insider trades); *McGuire v. Dendreon Corp.*, 2008 WL 5130042, at *7 (W.D. Wash. Dec. 5, 2008) ("The concealment of material information from investors is probative of a 'deliberate recklessness.'"). Defendants, moreover, offer no innocent explanation for why, shortly after their misconduct came to light, Williams fled to Switzerland, Dfinity's General Counsel resigned, and the executive responsible for the Cash-in-Lieu-of-Tokens program was terminated. AC ¶¶ 21, 65, 114; *see also Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1187-88 (C.D. Cal. 2007) (executive departures can support inference of scienter). And Defendants likewise do not, and

---

[11] *First*, Williams participated in the meeting where ICP was transferred to the ICA to be sold. AC ¶ 188. *Second*, it is implausible that Williams—who ran the Foundation, Dfinity USA, and the ICA—would be unaware (i) that those entities had sold billions of dollars of ICP, or (ii) of applicable vesting restrictions, especially given his numerous public statements on such matters. *Id.* ¶¶ 8-9, 18-19, 61, 90, 92, 96; *see Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014) (it would be "'absurd' to think that the CEO and CFO . . . would be unaware of the alleged substandard, non-compliant conditions pervading their company's manufacturing and quality control divisions—the heart" of the business).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – No. 3:21-cv-06118

cannot, dispute that Plaintiffs sufficiently alleged that Defendants had both the motive and the opportunity to defraud ICP investors. AC ¶¶ 189-90; *see Abdo v. Fitzsimmons*, 2021 WL 616324, at *13 (N.D. Cal. Feb. 17, 2021) (holding that "a motive to commit fraud and opportunity to do so provide some reasonable inference of intent") (internal quotation marks omitted).

Defendants nevertheless insist (at 13) that Plaintiffs' allegations of Williams' ICP sales are insufficiently detailed to show scienter. Because Williams illegally failed to submit a Form 4 to the SEC in connection with his sales, 15 U.S.C. § 78p, it is more difficult than in the typical securities case for Plaintiffs to obtain the relevant details. But any such lack of detail would not mean, as Defendants insist, that there was a "complete absence of any ICP token sales by Mr. Williams during the Class Period." To the contrary, evidence uncovered after the Amended Complaint was filed indicates that Williams sold ICP in his son's name, and kept the proceeds to himself, during the week of May 10, 2021. (Roche Decl. Ex. B.) In addition, allegations of an executive's sales are unnecessary to plead scienter, *see No. 84 Emp'r-Teamster Join Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003), especially where, as here, Plaintiffs alleged that the Dfinity Defendants sold billions of dollars in ICP during the Class Period at Williams' direction, AC ¶¶ 79–86, 188, 201.

Defendants further and incorrectly argue (at 14) that Plaintiffs' allegations are "illogical" because Plaintiffs "concede" that Williams "disclosed all of the allegedly concealed facts after May 10, 2021." Nowhere do Plaintiffs allege that Williams, or any other Defendant, disclosed "all of the allegedly concealed facts." *See* AC ¶ 112 (alleging that Defendants "*still* have not revealed" certain material information). Williams' disclosure of *some* information during the Class Period (after investors began to realize what happened) or Defendants' retention of *some* of their ICP does not undermine Plaintiffs' allegations. Williams could have reasonably calculated that remaining silent in the face of questions regarding insider vesting and sales would have harmed ICP prices *even more*, *id.* ¶¶ 90, 95–96, and Defendants were focused not just on dumping their ICP, but instead on dumping it at the *best price*, *id.* ¶ 86.

**B.** **Plaintiffs Sufficiently Allege Loss Causation**

Defendants argue (at 15-16) that "Plaintiffs cannot plead loss causation, because they fail to adequately allege *any* corrective disclosure."[12] "[T]o be corrective, a disclosure need not precisely mirror the earlier misrepresentation." *Bofl Holding*, 977 F.3d at 790 (quotations omitted). Instead, it need only "reveal new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *Id.* Plaintiffs point to several disclosures that did just that.

Defendants' statements created the impression that (i) the Foundation did not sell ICP (either directly or through its affiliates), (ii) Dfinity's team members would not "flip their position for a quick profit," and (iii) seed investors sold a significant amount of ICP in May 2021. But between June 11 to June 22, 2021, investors slowly discovered that, in contrast to the impression created by Defendants' statements, Defendants and other insiders sold millions of ICP tokens in May 2021. AC ¶¶ 103-04. That discovery, which prompted the price of ICP to fall by 40%, is reflected in communications among investors on Reddit over that period, starting with speculation before culminating in an investor's disclosure on June 22 that Dfinity and its team "sold 90 million tokens since Genesis." *Id.*; *see Kui Zhu v. Taronis Techs. Inc.*, 2020 WL 1703680, at *5-6 (D. Ariz. Apr. 8, 2020) ("Plaintiff's theory of a 'slow leak' revelation is nuanced, but . . . there are an infinite number of ways to allege loss causation."). By June 28, when Arkham confirmed the crux of the investor's findings, investors understood that Dfinity insiders "were in fact dumping their ICP on the market." AC ¶¶ 104, 107-12; *see Lloyd*, 811 F.3d at 1210-11 (loss causation adequately pleaded from earlier price drops even though subsequent confirmatory disclosure had minimal impact on price). Defendants' argument (at 15) that no "defendant participated" in the Reddit discussions overlooks that a "corrective disclosure can come from any source." *Bofl Holding*, 977 F.3d at 790.

Defendants' statements further created the impression that they and other insiders were subject to vesting restrictions that would preclude them from dumping ICP at launch. AC ¶¶ 90, 92-93. The misleading nature of these statements became apparent when Williams disclosed that the

---

[12] At the pleading stage, the plaintiff need only "plausibly allege a causal connection between the defendant's misstatements and the plaintiff's economic loss." *In re Bofl Holding, Inc. Secs. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). "[E]ven under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant notice of plaintiffs' loss causation theory and provide the court some assurance that the theory has a basis in fact." *Id.* (internal quotation marks omitted).

"Foundation didn't vest itself" and that Dfinity's "former employees" sold a "significant portion" of the ICP that hit the market in May 2021 (which they would not have been able to do if they were bound by more onerous vesting restrictions than VC investors). *Id.* ¶ 194. Defendants claim they never said that "the Foundation *did* vest itself" or that "former employees were *not* able to sell ICP tokens," but that argument disregards the fact that Williams' statements affirmatively created that impression, *id.* ¶¶ 90, 92-93, and the law that a corrective disclosure "need not precisely mirror the earlier misrepresentation." *Bofl Holding*, 977 F.3d at 790.

## IV.    PLAINTIFFS STATE A CLAIM FOR MARKET MANIPULATION BECAUSE DEFENDANTS DOMINATED AND MANIPULATED THE SUPPLY OF ICP

### A.    <u>Plaintiffs Sufficiently Allege Actionable Conduct</u>

In arguing (at 16-19) that Plaintiffs did not allege any "manipulative acts," Defendants incorrectly suggest that manipulative acts are limited to "practices such as wash sales, matched orders, rigged prices, or pump and dump schemes." The law, including Defendants' own cases, is to the contrary: "Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." *Santa Fe Indus. v. Green*, 430 U.S. 462, 477 (1977); *see also Galena Biopharma, Inc. Secs. Litig.*, 117 F. Supp. 3d 1145, 1195 (D. Or. 2015) (concluding that "manipulative conduct includes more than only wash sales, matched orders, or rigged prices"); *SEC v. Lek Secs. Corp.*, 276 F. Supp. 3d 49, 59 (S.D.N.Y. 2017) (same). Market manipulation includes any "conduct 'designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'" *In re En Pointe Techs., Inc. Secs. Litig.*, 2003 WL 27392762, at *5 (S.D. Cal. Aug. 25, 2003) (quoting *Ernst v. Hochfelder*, 425 U.S. 185, 198-99 (1976)).

Within this broad range of conduct, courts routinely find conduct designed to artificially restrict the supply of a security available on the market to be actionable—especially when the defendant already holds a significant amount of that supply. *See, e.g.*, *SEC v. Sierra Brokerage Servs. Co.*, 608 F. Supp. 2d 923, 962-68 (S.D. Ohio 2009) (defendants, who controlled "approximately 83% of the float," "attempted to control the supply of Bluepoint's shares by preventing mass sell-offs" through agreements with other shareholders*); SEC v. Martino*, 255 F. Supp. 2d 268, 275-78, 286-88 (S.D.N.Y. 2003) (defendants "employed several classic manipulative

devices," where they obtained a "controlling block" of stock and then "actively sought to control the supply of [] stock entering the marketplace" by adopting "self-imposed sales restrictions"); *SEC v. Nat'l Bankers Life Ins. Co.*, 334 F. Supp. 444, 446 (N.D. Tex. 1971) (defendants "accomplished the manipulation of the stock . . . by causing selective purchases calculated to decrease the 'floating' supply"). Courts have similarly found that when combined with "large secret sales off the market," market purchases "inevitably distort[] the market picture" and thus constitute market manipulation. *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 792-94 (2d Cir. 1969); *see also SEC v. Rose*, 2007 WL 9826042, at *13-14 (S.D. Tex. Sept. 5, 2007) (similar facts).

Defendants engaged in conduct through which "they were able to reduce the supply of ICP available on the market by at least 115 million ICP and secure for themselves and their insiders control over more than 98% of available ICP." AC ¶ 230. That conduct included secret off-market transactions, like those in *Crane*, through which Defendants purchased ICP from employees who would have otherwise sold that ICP on the open market (and thus would have caused the price of ICP to drop). *Id.* ¶¶ 64-66, 227; *cf. SEC v. Drucker*, 1983 WL 1369, at *22 (S.D.N.Y. Sept. 26, 1983) (defendants obtained "control over the supply of available stock" by orchestrating transfers from independent third parties to parties that they "could control"). Defendants similarly prevented outside seed investors from receiving, and therefore from selling, their ICP at or shortly after launch. AC ¶¶ 67-76, 228; *cf. In re Blech Secs. Litig.*, 2002 WL 31356498, at *16-17 (S.D.N.Y. Oct. 17, 2002) (denying summary judgment, where defendant allegedly "artificially withheld from the market substantial quantities of Blech securities"). This conduct, contrary to Defendants' argument (at 17), provided a "false pricing signal" to the market by creating the *appearance* that the supply of ICP for sale was lower than it actually was. Plaintiffs have thus alleged manipulative conduct.

Defendants' argument (at 17) that Plaintiffs merely alleged "arm's-length transactions with independent third-party purchasers" misunderstands Plaintiffs' allegations. Plaintiffs do not allege that Defendants' *open-market* transactions were manipulative by themselves; instead, Plaintiffs allege that Defendants' secret *off-market transactions* and other conduct designed to prevent others from selling ICP on the public markets was manipulative. AC ¶¶ 227-30. Defendants' own case makes clear that this distinction is critical. *See GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189,

17

207 (3d Cir. 2001) (distinguishing cases involving only open-market transactions from those also involving "some other deceptive practice," including *Crane*).[13]

Defendants' backup argument (at 17-18) that Plaintiffs were not deceived likewise fails. Defendants' belated statements about vesting restrictions on seed investors and the instructions for seed investors to access their ICP were misleading because Defendants never disclosed that the instructions were so complex and difficult to follow that seed investors were effectively precluded from accessing or selling their ICP at launch and in the days that followed. AC ¶¶ 70-71, 228; *see Anschutz*, 785 F. Supp. 2d at 813-14 (denying motion to dismiss, where a "reasonable juror" could find that conduct was not disclosed); *City of Providence v. BATS Global Mkts., Inc.*, 878 F.3d 36, 50 (2d Cir. 2017) (same result, where plaintiff alleged that defendants "did not disclose the full range or cumulative effect" of disclosed conduct). Nor did Defendants disclose that Dfinity was purchasing ICP from employees who would have otherwise sold that ICP on the market. AC ¶ 227.

Defendants nevertheless argue (at 18-19) that Plaintiffs were not deceived with respect to those off-market transactions because they did not allege "that the market was led to believe that employees' tokens would be available in the open market during the Class Period." That misses the point. By secretly buying up supply that would otherwise reach the market, Defendants "inevitably distorted the market picture." *Crane*, 419 F.2d at 793. And by reducing the "float," Defendants caused a "corresponding rise" in ICP prices and thus harmed Plaintiffs. *Nat'l Bankers Life*, 334 F. Supp. at 446; *see also Martino*, 255 F. Supp. 2d at 287-88 (agreement to "control the flow of Titanic stock trading, to maintain Titanic's stock price").

### B.   Defendants Acted with Scienter Because They Took Active Steps That Had No Innocent Explanation to Raise Prices

As issuers of ICP and to raise prices, as noted, Defendants performed secret off-market transactions and imposed last-minute restrictions on outside investors' sales of ICP. That is enough for scienter: "a finding of manipulative purpose is prima facie established" where "a person who

---

[13] Defendants' argument (at 17 n.11) that Plaintiffs failed to sufficiently allege that Defendants transacted in ICP in the Class Period is simply wrong, AC ¶¶ 82-86, especially given the "relaxed" pleading standard that applies to market manipulation claims, *Anschutz Corp. v. Merrill Lynch & Co.*, 785 F. Supp. 2d 799, 811 (N.D. Cal. 2011).

has a substantial, direct pecuniary interest in the success of a proposed offering takes active steps to effect a rise in the market in the security." *Crane*, 419 F.2d at 795 (internal quotation marks omitted)

There is, moreover, no innocent explanation for Defendants' transactions and restrictions—especially after Defendants dumped ICP on the market at launch and in the weeks that followed. *See Anschutz*, 785 F. Supp. 2d at 816 (allegations of scienter sufficient, where conduct could not "be explained by any 'legitimate' investment aim"). Defendants' intent is confirmed by their *own statements*, which indicate (i) that they regarded restrictions on outside investors as a mechanism for inflating ICP prices and (ii) that they believed that their secret off-market transactions would better enable them to control the price of ICP (and thus sell at higher prices). AC ¶¶ 234-35.

Defendants insist (at 19) that Plaintiffs do not allege "that Defendants *sold* ICP tokens at artificially inflated price." That argument ignores Plaintiffs' repeated allegations that Defendants sold ICP during the relevant period and profited handsomely from those sales. AC ¶¶ 4, 8-9, 35, 60-63, 66, 82-86, 89, 94-95, 107-09, 207, 210-11. Defendants' assertion that "Plaintiffs concede that the Foundation and key team members (including Williams) could *not* sell during the first week of trading, when the price of ICP tokens was at its peak," similarly misrepresents Plaintiffs' allegations: Defendants *said* that regulatory restrictions prohibited them from selling ICP, but—directly and indirectly—sold it anyway. *Id.* ¶¶ 95, 97, 101, 179(f), (i).[14]

## V.   PLAINTIFFS STATE A CLAIM FOR INSIDER TRADING

### A.   Plaintiffs Sufficiently Allege a Predicate Violation

Contrary to Defendants' argument (at 20), Plaintiffs state an underlying Exchange Act claim. Plaintiffs state claims under § 10(b), as shown above, based on Defendants' misleading statements and market manipulation. *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605-06 (N.D. Cal. 2019) ("Evanston has successfully pled a 'predicate insider violation' for the same reasons it has adequately alleged its Section 10(b) claim."); *En Pointe Techs.*, 2003 WL

---

[14] Defendants' argument (at 19 n.12) that they did not act with scienter in connection with their publication of error-filled and complex instructions that precluded seed investors from claiming their ICP at launch flies in the face of the listing deficiencies that led reasonable investors to conclude that Defendants acted intentionally. AC ¶¶ 71-76.

27392762, at *13 (failure to disclose market manipulation misconduct under Rule 10b-5(a) or (c) "gives rise to a violation of Rule 10b-5(b)").

In addition, Plaintiffs state predicate insider trading violations by alleging that Defendants were obligated to disclose the material nonpublic information on which they traded because they "owed Plaintiffs and others who purchased ICP tokens a fiduciary duty." AC ¶ 209; *see McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 876 (9th Cir. 1994) ("corporate issuer in possession of material nonpublic information" must "refrain from trading" with shareholders). ICP investors are analogous to shareholders because they could "vote on decisions relating to the network" and ICP "fluctuate[s] in value based on the network's success." AC ¶¶ 126-31, 209. Defendants failed to address these allegations in their opposition and have thus waived their right to do so on reply. *See In re Capacitors Antitrust Litig.*, 2017 WL 897340, at *2 (N.D. Cal. Mar. 7, 2017).

### B.    Plaintiffs Sufficiently Allege Contemporaneous Trading

Tacitly admitting the sufficiency of Plaintiffs' allegations as to the Foundation, Defendants argue (at 20) that Plaintiffs failed to sufficiently allege that they contemporaneously traded with Dfinity USA and Williams. But purchases made as long as nine days after a defendant's sale satisfy the contemporaneous trading requirement. *See Evanston Police Pension Fund*, 411 F. Supp. 3d at 605-06; *Elec. Workers Pension Fund, Local 103, IBEW v. HP Inc.*, 2021 WL 1056549, at *8 (N.D. Cal. Mar. 19, 2021). Plaintiffs allege that "Dfinity"—defined to include Dfinity USA—sold ICP on May 10-12 and that Plaintiffs purchased ICP on May 10, 12, and 15-21. AC ¶¶ 13-14, 82-83. These allegations are sufficient with respect to Dfinity USA.[15]

## VI.    PLAINTIFFS STATE CONTROL PERSON CLAIMS AGAINST WILLIAMS

Contrary to Defendants' argument (at 20), Plaintiffs state claims for primary liability under both the Securities Act and Exchange Act. Accordingly, Defendants' argument fails.

### CONCLUSION

Plaintiffs respectfully submit, for the reasons set forth above, that the Court should deny Defendants' Motion.

---

[15] Plaintiffs respectfully request leave to amend to add allegations regarding Williams' recently-disclosed sales during the week of May 10, 2021. (Roche Decl. Ex. B.)

Dated: June 3, 2022

Respectfully Submitted,

**ROCHE FREEDMAN LLP**

*/s/ Kyle W. Roche*

Kyle W. Roche (admitted *pro hac vice*)
Edward Normand (admitted *pro hac vice*)
Richard Cipolla (admitted *pro hac vice*)
Stephen Lagos (admitted *pro hac vice*)
Ivy T. Ngo (SBN 249860)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Facsimile: (646) 392-8842
Email: kyle@rochefreedman.com
Email: tnormand@rochefreedman.com
Email: rcipolla@rochefreedman.com
Email: slagos@rochefreedman.com
Email: ingo@rochefreedman.com

*Counsel for Plaintiffs*