# EXHIBIT A

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN MATEO

| | |
|---|---|
| DANIEL OCAMPO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DFINITY USA RESEARCH LLC; DFINITY STIFTUNG; ANDREESEN HOROWITZ; POLYCHAIN CAPITAL; DOMINIC WILLIAMS; and DOES 1-20,<br><br>Defendants. | Case No.: 21-CIV-03843<br><br>Assigned for All Purposes to Hon. Danny Y. Chou<br><br>**ORDER SUSTAINING DEMURRERS WITH LEAVE TO AMEND**<br><br>**FILED**<br>SAN MATEO COUNTY<br>JAN 08 2021<br>Clerk of the Superior Court<br>By _____<br>DEPUTY CLERK |

The Demurrers of Defendants Dfinity USA Research, LLC, Dfinity Stiftung, AH Capital Management, LLC (AH), and Polychain Capital LP (Polychain) (collectively, Defendants) came for hearing before this Court on April 7, 2022 at 11:00 a.m. All parties appeared through counsel at the hearing. Having considered all papers filed in support of and in opposition to the Demurrers, oral arguments of the parties, all testimony and evidence presented at the hearing, and all other pleadings and papers on file herein, the Court SUSTAINS the Demurrers WITH LEAVE TO AMEND.

### BACKGROUND[1]

Dfinity Stiftung is a nonprofit organization that created Internet Computer Project (ICP) tokens. (Compl., ¶ 16.) Dfinity USA Research LLC is a U.S.-based subsidiary of Dfinity Stiftung (collectively, Dfinity). (*Id.*, ¶ 15.) AH is "a private venture capital firm" (*id.*, ¶ 18), and Polychain is "a cryptocurrency investment firm managing portfolios of digital assets" (*id.*, ¶ 19).

Dfinity's Internet Computer Project "is a smart contract platform designed to power blockchain versions of the internet's most population applications . . . which would displace the need to use

---

[1] These facts are taken from the Complaint filed on July 15, 2021.

ORDER SUSTAINING DEMURRERS WITH LEAVE TO AMEND - 1

centralized, gatekeeping hosting services like Amazon Web Services." (Compl., ¶ 44.) "The purported native cryptocurrency for Dfinity's Internet Computer project is the ICP token." (*Id.*, ¶ 45.)

"From 2016 to the present," Defendants promoted Dfinity's Internet Computer Project and its ICP tokens. (Compl., ¶ 73.) These promotional efforts included a web page (*id.*, ¶ 74), blog posts (*id.*, ¶¶ 76-79), articles (*id.*, ¶¶ 80-82, 84), statements at conferences (*id.*, ¶ 82), tweets (*id.*, ¶ 83), virtual events (*id.*, ¶ 85), and press tours (*id.*, ¶ 86-89).

"In February 2017, Dfinity held a 'Seed' fundraising round for the Company to use for its operations and investments in projects developed using ICP technology." (Compl., ¶ 51.) As part of the "Seed" round, Dfinity raised approximately $40 million from " 'enthusiasts,' " including AH and Polychain. (*Id.*, ¶¶ 51, 54.) Although no ICP tokens existed at the time of the Seed fundraising round (see *id.*, ¶ 46 ["all 469,213,710 ICP tokens in existence were simply created by Dfinity in May 2021"], Dfinity, at some point, promised its " 'Seed Contributors' " 24.72% of the ICP tokens created in May 2021 (*id.*, ¶ 57.) In January or Feburary 2018, Dfinity also held a " 'Strategic' fundraising round" in which AH and Polychain participated. (*Id.*, ¶¶ 58-59.) Investors in that round would receive 7% of the ICP tokens created in May 2021. (*Id.*, ¶ 60.) In August 2018, Dfinity also held its " 'Private Presale' " of ICP tokens in which AH and Polychain participated. (*Id.*, ¶ 62.) Participants in the Presale were "eligible to receive 4.96% of the initial supply of ICP tokens." (*Ibid.*)

In May 2021, Dfinity created 469,213,710 ICP tokens "as part of its "Genesis" launch, "the Company's functional equivalent of an" Initial Coin Offering (ICO). (Compl., ¶¶ 46, 65.) The ICP tokens were "listed on multiple cryptocurrency exchanges like Coinbase, Binance, Huobi, OKEx and others." (*Id.*, ¶ 90.) The ICP tokens "debuted at a price of $731 on its first day." (*Id.*, ¶ 93.) AH "used its relationship with Coinbase to secure a favorable listing and price of ICP" tokens "during its debut on Coinbase." (*Id.*, ¶ 104.) Soon after, however, the price of ICP tokens plummeted, eventually dropping to as low as $30. (*Id.*, ¶¶ 94, 111-112, 114, 119.) Despite this, AH and Polychain "saw a staggering return on" their investment. (*Id.*, ¶¶ 71-72.)

"Plaintiff Daniel Ocampo is an individual and a resident of the State of California." He purchased ICP tokens "between May 10, 2021 and June 25, 2021, and suffered losses on those investments." (Compl., ¶ 14.) He filed this class action on July 15, 2021. (Compl.) In his class action

complaint, Ocampo alleges two causes of action: (1) unregistered offering and sale of securities in violation of sections 5 and 12(a)(1) of the Securities Act of 1933 (Securities Act) (Compl., ¶¶97-205); and (2) violation of section 15 of the Securities Act (Compl., ¶¶ 206-213).

## DISCUSSION

### A. Legal Standard

On a demurrer, the Court must "assume the truth of the facts alleged in the complaint and the reasonable inferences that may be drawn from those facts." (*Miklosy v. Regents of the University of Cal.* (2008) 44 Cal.4th 876, 883.) The Court "may also consider material documents referred to in the allegations of the complaint" (*City of Port Hueneme v. Oxnard Harbor Dist.* (2007) 146 Cal.App.5th 511, 514 (*Port Hueneme*)) and "consider matters that may be judicially noticed" (*Brown v. Deutsche Bank Natl. Trust Co.* (2016) 247 Cal.App.4th 275, 279). The Court does "not, however, assume the truth of contentions, deductions or conclusions of law." (*Guerrero v. Pacific Gas & Electric Co.* (2014) 230 Cal.App.4th 567, 571.)

### B. Analysis

#### 1. Statute of Repose

Defendants contend Plaintiff's claims under the Securities Act are barred by the three-year statute of repose. Because this contention is raised at the demurrer stage, the Court rejects it.

15 U.S.C. § 77m states in relevant part that no action may "be brought to enforce a liability created under" section 12(a)(1) "more than three years after the security was bona fide offered to the public." A bona fide offer of a security occurs when the security is "really and truly (genuinely) being offered to the public, as opposed to, say, a simulated offering." (*P. Stolz Family Partnership L.P. v. Daum* (2d Cir. 2004) 355 F.3d 92, 99.) Thus, the statute of repose is triggered "when the security is *first* bona fide offered." (*Id.* at p. 100; see also *id.* at p. 106 ["Section 13's 'bona fide offered to the public' refers to the time when the stock is *initially* bona fide offered to the public," emphasis added].)

According to Defendants, the first bona fide offer of ICP tokens to the public occurred in February 2017 during the Seed fundraising round—more than four years before Plaintiff filed this action. (Defs. Reply, at pp. 1, 3.) From the Complaint, it is not clear that this fundraising round was open to the public (see Compl., ¶¶ 51 [Dfinity raised money during the Seed fundraising round " 'primarily

from enthusiasts who followed the project' "], 79 [stating that the first funding round was conducted with "select investors"])—which would normally end the discussion. But Defendants point to two articles referenced by the Complaint—which purportedly establish that the Seed fundraising round was advertised by tweet and was open to the public. (See Liftik Decl., exs. A & D.) As a threshold matter, it is not clear that the Court may rely upon the hearsay statements in those articles—which are not subject to judicial notice—to sustain the Demurrers. Although Defendants are correct that the Court may consider "material documents" referenced in the Complaint, it is not clear that these articles qualify as *material* documents. (*Port Hueneme*, *supra*, 146 Cal.App.4th at p. 514.) Indeed, courts have typically invoked the maxim cited by Defendants when considering "written documents" that "are the foundation of an action and are attached to the complaint and incorporated therein by reference . . . ." (*City of Pomona v. Superior Court* (2001) 89 Cal.App.4th 793, 800.) The documents cited by Defendants do not appear to be the foundation for Plaintiff's action and the statements in those documents relied upon by Defendants appear to be hearsay statements made by Dominic Williams, the founder of Dfinity, about the Seed fundraising round, casting doubt on whether those representations may be relied upon by this Court in deciding the Demurrers.

   In any event, the Court finds that the Demurrers should be overruled even if those documents are considered. At most, those documents establish that the Seed fundraising round was open to the public. (See Liftik Decl., exs. A & D.) They do not establish what the Seed participants received in exchange for their investment, much less that they received any ICP tokens in February 2017. Indeed, according to the Complaint, the ICP tokens did not exist at the time of the Seed fundraising round (see Compl., ¶ 5), and the documents themselves state that Dfinity "change[d] the funding model" at some later unspecified date after the Seed fundraising round to give "24.72% of the network tokens that will exist at Genesis" to the Seed participants. (See Liftik, ex. A.) Thus, the Court cannot conclude, at the demurrer stage, that a bona fide offer of any ICP tokens occurred in February 2017.

   Accordingly, the Demurrers are overruled on this ground.

2. Statutory Seller Requirement

   Defendants contend Plaintiff has not adequately pled facts establishing that they are statutory sellers. The Court agrees.

ORDER SUSTAINING DEMURRERS WITH LEAVE TO AMEND - 4

Under section 12(a)(1) of the Securities Act, "[a]ny person who—[¶] (1) offers or sells a security in violation of section 77e of this title . . . [¶¶] . . . shall be liable . . . to the person purchasing such security from him . . . ." (15 U.S.C. § 77l(a)(1).) In construing this language, *Jensen v. iShares Trust* (2020) 44 Cal.App.5th 618, 646 (*Jensen*) held that "[l]iability . . . 'extends only to the "immediate sellers" of securities and "those who solicit purchasers to serve their own financial interests or those of the securities owner." ' " Thus, Plaintiff may only assert a cause of action under section 12(a)(1) against the person who actually "pass[ed] title to the" ICP tokens to him (see *Jensen*, at p. 648), or who "direct[ly] or immediate[ly]" solicited his purchase of the tokens (*id.*, at p. 649). As to the latter, "the necessary inquiry . . . 'focuses on the defendant's relationship with the plaintiff-purchaser,' not 'the defendant's degree of involvement in the securities transaction and its surrounding circumstances.' " (*Jensen*, at p. 648.) Thus, "general advertising and promotions of the product to the public" is not enough to establish liability based on solicitation. (*Ibid.*) Rather, Plaintiff must allege a " 'direct' " communication from the alleged solicitor of his purchase. (*Jensen*, at p. 649.)

Here, Plaintiff only alleges that he purchased ICP tokens. He does not allege how he purchased those tokens, much less who he purchased them from. And given the chart provided at paragraph 65 of the Complaint, the Court cannot reasonably infer that any Defendant passed title to any ICP tokens to Plaintiff. Thus, Plaintiff can only state a cause of action against Defendants if he alleges facts establishing that Defendants directly and immediately solicited his purchase of ICP tokens. (See *Jensen*, *supra*, 44 Cal.App.5th at pp. 648-649.) He does not, however, do so. For example, Plaintiff does not allege that he had any relationship with any Defendant, much less a direct relationship or communication with any Defendant. (See *id.* at p. 649.) At most, Plaintiff alleges that Defendants engaged in "general advertising and promotions"—which is not sufficient to establish that any Defendant qualifies as a statutory seller under section 12. (*Ibid.*)

Plaintiff's efforts to distinguish *Jensen*—which is binding on this Court—are unavailing. The trial court in *Jensen* found that the plaintiffs lacked standing to assert a section 12(a)(2) claim in the context of a motion for judgment on the pleadings. (See *Jensen*, *supra*, 44 Cal.App.5th at p. 628.) Thus, contrary to Plaintiff's assertion, *Jensen* was "a decision about the adequacy of pleading of claims." (Pl.

ORDER SUSTAINING DEMURRERS WITH LEAVE TO AMEND - 5

Opp. to AH and Polychain, at p. 7.) And like the plaintiff in *Jensen*, Plaintiff failed to allege facts establishing that any Defendant qualifies as a statutory seller.

Plaintiff's invocation of Rule 159A is also misplaced. By its terms, Rule 159A only applies to claims under section 12(a)(2) of the Securities Act and does not apply to claims under section 12(a)(1). (17 C.F.R. § 230.159A(a) ["Definition of seller for purposes of *Section 12(a)(2)* of the Act," emphasis added].) In any event, the Court finds the federal authorities declining to apply Rule 159A in light of *Pinter* more persuasive. (See *Jensen*, *supra*, 44 Cal.App.5th at p. 650, fn. 21.) As the Court of Appeal noted in *Jensen*, " '[a]s a policy matter, because Section 12(a)(2) claims do not require allegations of scienter, reliance or loss causation, liability is more easily established.' " (*Ibid.*, internal citation omitted.) " '[A] more narrowly drawn interpretation of a statutory seller' " is therefore warranted here. (*Ibid.*, quoting *Maine State Retirement System v. Countrywide Financial Corp.* (C.D.Cal. May 5, 2011) 2011 WL 4389689, *10.)

Accordingly, Defendants' Demurrers to the section 12(a)(1) claim are sustained on this ground.

3. Domestic Transactions

The Court also sustains Defendants' Demurrers because Plaintiff has not sufficiently alleged that he purchased ICP tokens in a domestic transaction. To state a claim under the Securities Act, a "plaintiff must plausibly allege that the purchase incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States." (*Stoyas v. Toshiba Corp.* (9th Cir. 2018) 896 F.3d 933, 948.) The allegation in the Complaint that Plaintiff is resident of California who purchased ICP tokens is not enough to establish either requirement. (Compl., ¶ 14.) Accordingly, Defendants' Demurrers to the section 12(a)(1) claims are sustained on this independent ground.

4. Section 15 Claim

To allege a violation of section 15 of the Securities Act, Plaintiff must "allege (1) a primary violation of federal securities law and (2) that" Defendants" exercised actual power or control over the primary violator." (*Welgus v. TriNet Group, Inc.* (N.D.Cal. Jan. 17, 2017) 2017 WL 167708, *20.) For the reasons stated above, Plaintiff has not alleged a primary violation of section 12(a)(1) of the Securities Act against any Defendant. (See, *supra*, at pp. 4-6.) His section 15 claim therefore fails as

well. (*City of Warren Police and Fire Retirement System v. Natera Inc.* (2020) 46 Cal.App.5th 946, 962.) In addition, Plaintiff fails to allege facts sufficient to establish that any Defendant is a control person as defined by 15 U.S.C. § 77o(a). (See *Pirani v. Slack Technologies, Inc.* (N.D.Cal. 2020) 445 F.Supp.3d 367, 391.) Accordingly, Defendants' Demurrers to the section 15 claim are sustained.

5. <u>Leave to Amend</u>

Because the Court cannot conclude that there is no reasonable probability that Plaintiff can cure the defects in his Complaint, leave to amend is granted. (See Code Civ. Proc., § 430.41, subd. (e)(1).)

**ORDER**

Based on the foregoing, the Court SUSTAINS the Demurrers WITH LEAVE TO AMEND.

Dated: April 7, 2022

Danny Y. Chou
Judge of the Superior Court

ORDER SUSTAINING DEMURRERS WITH LEAVE TO AMEND - 7