# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DFINITY FOUNDATION, Switzerland-based not-for-profit organization, <br><br>         Plaintiff, <br><br>     v. <br><br> THE NEW YORK TIMES COMPANY, a New York corporation; ANDREW ROSS SORKIN, an individual; EPHRAT LIVNI, an individual; ARKHAM INTELLIGENCE, INC., a Delaware corporation; MIGUEL MOREL, an individual; CHARLIE SMITH, an individual; JONAH BENNET, an individual; ZACHARY LERANGIS, an individual; KEEGAN MCNAMARA, an individual; NICK LONGO, an individual; and JOHN DOES 1-10, <br><br>         Defendants. | Case No. 1:22-cv-5418 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> **(1) DEFAMATION** <br> **(2) UNFAIR BUSINESS AND TRADE PRACTICES** |

Plaintiff Dfinity Foundation ("Dfinity" or "Plaintiff") alleges as follows:

<u>**SUMMARY OF THE CASE**</u>

1.      This is an action for defamation and unfair business and trade practices against Defendants The New York Times Company (the "*Times*"), the *Times* reporters Andrew Ross Sorkin ("Sorkin") and Ephrat Livni ("Livni") (collectively, the "*Times* Defendants"), and Arkham Intelligence, Inc. ("Arkham"), Arkham's founder and Chief Executive Officer Miguel Morel ("Morel"), and other current or former Arkham officers, agents, employees, or affiliates Charlie Smith, Jonah Bennet, Zachary Lerangis, Keegan McNamara, Nick Longo, and John Does 1-10 (collectively, the "Arkham Defendants", and together with the *Times* Defendants, the

"Defendants").

2.      This action will show how wealthy and powerful individuals specifically used the *Times* and the willingness of its star reporter, Andrew Ross Sorkin, to knowingly publish with actual malice a defamatory story about a "hit piece" report (the "Arkham Report")—a report that was secretly bought and paid for by the wealthy elites who sought to personally profit from the scheme. As a direct result of the *Times*, through its celebrity reporter Sorkin, publishing the story which relied solely on the false Arkham bought-and-paid for hit piece, the scheme worked and Dfinity suffered extraordinary damages.

3.      The *Times* Defendants' actual malice in publishing the Arkham Report is demonstrated by a number of facts, including:

a.   Arkham is a self-proclaimed "crypto analysis" firm that has released only one single report—the Arkham Report—in the entire duration of its existence. Arkham and its purported founder and CEO, Morel, were previously completely unknown within the world of cryptocurrency analysis.

b.   Arkham's Twitter account has a total of seven (7) tweets, the first one dated on June 28, 2021—all of them concern the Arkham Report.

c.   Like Morel, the other authors of the Arkham Report all appear to be in their 20's with zero experience reporting on the blockchain industry, but many of whom have connections to Dfinity's competitor, Reserve Protocol ("Reserve").

d.   On information and belief, one of Arkham's investors is a billionaire who has significant investments in competing crypto projects. On information and belief, the *Times* Defendants consciously disregarded that Arkham was paid by an as-yet-unidentified individual or individuals to produce the defamatory Arkham Report hit piece.

e.  Simply stated, even minimal journalistic diligence would have demonstrated that the Arkham Report was created for only one purpose: to cause reputational and financial damage to Dfinity and the Internet Computer Protocol.

f.  The article published in the *Times* does not include any facts relating to the unknown status and inexperience of Arkham, even though such information was surely known to *Times* reporters. Nor does the article contain any significant information about Arkham's motives, or who was funding Arkham, even though the *Times* reporters surely had suspicions or obvious reasons to suspect such motives and funding.

g.  Notwithstanding the above origins of Arkham, the Arkham Report was not sent to a junior *Times* reporter who might not understand the Arkham Report's defamatory aim. Rather, it was intentionally provided in advance of public dissemination to Sorkin—the *Times*' star reporter—who ironically is the co-creator behind the hit television series "*Billions*" (which centers on the machinations of New York's most rich and powerful elite and whose plot lines would find familiar the real-life scheme here that resulted in the manufactured, bought-and-paid for defamatory Arkham Report being used—with the help of the *Times*—to cause extraordinary damages to Dfinity). Access to Sorkin is highly coveted, as is getting him to spend the time to publish a story. Sorkin well understood the need, prior to reporting, to investigate who Arkham was, who was financing it, who paid Arkham to produce the hit piece and why and how much, and to avoid publishing rumors and defamation per the *Times*' editorial guidelines alleged below. (Sorkin's dual role as a journalist and television series creator also raises the inference that he had a motive to sensationalize the Dfinity story or to disseminate false or misleading information

to further his second career in the content creation industry.)

h.  On information and belief, Livni, who co-wrote the *Times* article, is a licensed attorney in multiple jurisdictions, including New York—and, as such, expected to be aware of the actual malice standard.

i.  The *Times* Defendants decided not to disclose to Dfinity the existence or contents of the Arkham Report when it sought comment from Dfinity on the Sunday night before the article was published the next day on Monday, June 28, 2021.

j.  Before publication, Dfinity provided detailed information to the *Times* refuting key aspects of the article. Rather than take the time to investigate the claims made by Dfinity to determine whether the article could still be published or would need to be substantially modified or spiked, the *Times* Defendants went ahead and published the article based on the defamatory Arkham Report, complete with false statements of fact, the next day. In maliciously publishing the article, the *Times* Defendants knew that the article would have an immediate, negative impact on the infancy of the decentralized Web3 technology that Dfinity is pioneering. And, in fact, that is precisely what happened as alleged herein.

4.      Blockchain is a revolutionary database technology that distributes identical copies of a database across an entire network, making it very difficult to cheat or hack a system. This differs from conventional databases, where data is maintained in one location by a centralized administrator. Blockchains are best known for their role in cryptocurrency, or digital currency, for maintaining a secure and decentralized record of transactions.

5.      With a team of more than 200 world-renowned scientists and engineers, Dfinity is a not-for-profit organization that is innovating cryptography, distributed systems, and programming languages. Dfinity develops transformative and disruptive technology for the

groundbreaking Internet Computer blockchain, which is meant to revolutionize what today is done on the World Wide Web by creating a more advanced, open, decentralized, accessible, and secure blockchain-based alternative. In connection with the Internet Computer's Genesis (*i.e.* go-live creation) Event in 2021, the Internet Computer's own native cryptocurrency, the ICP utility token became available. "ICP" is the acronym for the Internet Computer Protocol. ICP tokens provide the fuel for decentralized app ("dapp") developers to build decentralized apps on the Internet Computer.

6.     On June 28, 2021, Defendants executed a coordinated attack to defame and cause significant damage to Dfinity in three (3) back-to-back publications, including the *Times*, falsely and maliciously accusing Dfinity of engaging in illegal and wrongful conduct in connection with the Genesis of the Internet Computer blockchain network and release of the ICP utility token in May 2021.

7.     At approximately 6:04 a.m. on June 28, 2021, Arkham, a previously unknown company with no track record or reputation in the cryptocurrency industry, released a promotional video in a post on its Twitter account @ArkhamIntel (available at https://twitter.com/ArkhamIntel/status/1409497855514062849) (the "Arkham Video"), with the caption: "After a $300 billion valuation at launch, ICP tanked 95%. Everyone wants to know why. Arkham did a comprehensive analysis. This video presents our findings."

8.     The Arkham Video featured Arkham's purported founder and CEO, Morel, who, like Arkham, was also previously unknown and had no track record or reputation within the cryptocurrency industry. Morel's Twitter account has a total of three (3) tweets: the first two (a retweet from Sorkin's DealBook newsletter Twitter account and a retweet from Arkham's Twitter account) both dated on June 28, 2021 and concern the Arkham Report; and the last tweet, an unprompted admission, dated July 3, 2021, falsely distancing himself from any gain the public

may perceive him to have received related to the release of the Arkham Report. In the video, Morel falsely accuses Dfinity of, among other things, engaging in wrongful conduct with insiders who allegedly were "dumping billions of dollars of ICP while smaller supporters and retail had been left in the dark watching their investments tank" and calling the situation "one of the most extreme cases of investor mistreatment in the history of crypto markets and financial markets overall." He also went on to falsely deny that Arkham had been paid to produce the Arkham Report.

9.      At its conclusion, the Arkham Video published the URL address to Arkham's purported analysis—the Arkham Report: "See arkhamintelligence.com/icp for full analysis." The Arkham Report, dated June 28, 2021, was publicly released on that same date.

10.      Shortly thereafter, on June 28, 2021—the same day the Arkham Report was published—the *Times* through Sorkin and Livni published an article at its website, www.nytimes.com, with the headline "*The Dramatic Crash of a Buzzy Cryptocurrency Raises Eyebrows*", which is available at:  https://www.nytimes.com/2021/06/28/business/dealbook/icp-cryptocurrency-crash.html (the "Article"). Among other alleged wrongful conduct, the Article falsely claims that Dfinity engaged in an *illegal* "initial coin offering" and that Dfinity founder Dominic Williams and insiders connected to Dfinity had allegedly deposited "10 million ICP tokens worth more than $2 billion to exchanges after the [alleged and illegal] initial coin offering" which "coincided with significant drops in the price of the ICP" and left small investors "out of the process" and "stuck"—thereby executing a crypto *scam* with respect to the ICP token.

11.      Despite what clearly was almost no due diligence into Arkham, the Article cites Morel and the Arkham Report as its primary sources. The Article concedes that the Arkham Report was shared with the *Times* prior to the publication of the Article, which means that the Arkham Report was also shared with the *Times* prior to its public release on June 28, 2021 and, on information and belief, that the *Times* Defendants and Arkham Defendants closely coordinated the

publication of the Article on the same date that the Arkham Report and Arkham Video would be released. The Article relies on Morel and Arkham even though both were completely previously unknown in the crypto industry and plainly unreliable sources with ulterior motives. Notably, the Arkham Report itself states that Morel is the co-founder of Reserve. The Article states this important fact in passing, but does not mention that as of the date of publication of the Arkham Report and the Article, Reserve was a wannabe competitor of Dfinity in the cryptocurrency industry or the inherent unreliability of a competitor's statements about another crypto company. Nor does the *Times* mention the fact that Arkham has, as its "angel" investor, a noted billionaire investor in other crypto projects—or that an undisclosed third party paid to commission the defamatory Arkham Report. And of course, the Article does not mention that Arkham had no previous existence covering the crypto industry, or any of the other dubious facts about the Arkham Defendants, their lack of experience and qualifications, and malicious ulterior motives in attacking and defaming Dfinity.

12.     In fact, Arkham is a self-proclaimed "crypto analysis" firm that, on information and belief, has released only one single report—the Arkham Report—in the entire duration of its existence, published a year ago. Arkham's Twitter account has a total of seven (7) tweets, the first one dated on June 28, 2021—all of them concern the Arkham Report.  Moreover, the other authors of the Arkham Report besides Morel, many of whom have connections to Dfinity's competitor, Reserve, appear to be in their 20's and shortly after they published the Arkham Report, they fled from Austin, Texas to London, England where flush with apparently newfound cash, they currently reside—frat boy style—in a huge mansion they lease for 32,500 GBP (approximately US $40,000) per month. In other words, it can be reasonably inferred that Arkham was founded and capitalized for only one purpose, to cause reputational damage to Dfinity and its investors. Simply stated, there is no way that the Arkham Defendants, acting alone, could have gotten access to Sorkin, let

alone coordinated this scheme and convinced Sorkin and his editors to publish the Article based on the intentionally false facts contained in the bought-and-paid for Arkham Report.

13.     In June 2022, online investigative video footage posted on Crypto Leaks shows Arkham representatives admitting that Arkham was in fact hired and paid a significant sum by a wealthy individual to create the Arkham Report.[1] On information and belief, this wealthy individual has investments in the cryptocurrency space that are competitive with Dfinity, and paid Arkham and Morel to create the Arkham Report, knowing that the report would make false and defamatory statements about Dfinity therein, and with the intent and purpose that the report and statements would be shared with Sorkin and Livni at the *Times* and republished in an article, to provide instant legitimacy to and bolster the Arkham Report's supposed reliability, and publicize throughout the world the false and highly damaging statements in the Arkham Report.

14.     In a taped interview available at Crypto Leaks, Nick Longo of Arkham, when asked if Arkham has an "angel", responds in the affirmative, naming a billionaire crypto investor.[2] On information and belief, Defendants carried out their malicious actions—simply put, a coordinated hit job—to intentionally harm Dfinity and its reputation, interfere with its business dealings and relationships, including to gain a competitive advantage for the Arkham Defendants and their financier(s) in the cryptocurrency industry, and potentially bankrupt Dfinity in the process. On information and belief, the named Arkham Defendants and their sponsors also profited in additional ways from their actions.

15.     Sorkin and Livni (a lawyer) are seasoned journalists reporting on business and policy matters for the *Times*. At all times, they knew that Arkham, Morel and the other Arkham Defendants  were sudden and suspicious newcomers to the crypto industry who had no credentials

---

[1] https://cryptoleaks.info/case-no-2 (last accessed June 24, 2022).
[2] https://cryptoleaks.info/case-no-2 (last accessed June 24, 2022).

or reputations for their alleged expertise or any legitimate basis for their supposed and very serious "findings" about Dfinity and ICP. The *Times* Defendants doubted or had obvious reasons to doubt the veracity of their sources and the sources' claims about Dfinity. Nevertheless, on the very same day the Arkham Report was released, the *Times* Defendants, without any serious investigation into the backgrounds, ulterior motives, and obvious conflicts of interest of the Arkham Defendants, and also without investigating the truth or falsity of the claims contained in the Arkham Report, even though it would naturally cause tremendous reputational and economic harm to Dfinity, published and repeated the false and defamatory statements about Dfinity contained in the Arkham Report. The *Times* Defendants purposefully avoided investigation or further investigation, with an intent to avoid the truth. Any "investigation" by the *Times* Defendants was deliberately skewed to avoid uncovering the truth—or, worse yet, simply ignored the truth.

16.     Moreover, on Sunday June 27, 2021 (the day before the Arkham Report and Article were published), the *Times* posed a series of allegations to Dfinity that it would ultimately discuss in the Article, and Dfinity responded immediately by emails and telephone, telling the *Times* that all such allegations were completely false and providing detailed explanations as to why. The next day—June 28, 2021—Dfinity responded to the publication of the Article by email to Sorkin and Livni, again informing them that the statements and allegations in the Article (and Arkham Report) were false and providing explanations as to why. In response, Sorkin stated: "We just reported the factual matters of what [Arkham and other critics online] said. We also reported what you said." In reality, and as specifically alleged below, in publishing the Article and engaging in the conduct alleged herein, Sorkin, Livni and the *Times'* editors intentionally and maliciously disregarded both generally recognized journalistic standards and the *Times'* own written standards.

17.     The fact that Sorkin, who writes about the influence the uber-wealthy has on the media,[3] and Livni (a lawyer), conducted no diligence on their primary (and apparently only) source for the Article is alarming and strongly suggests undue influence by a third party, causing these seasoned reporters to ignore the *Times*' own standards for reporting and ethics. Dfinity finds it highly suspicious that a company with no track record (Arkham) and an individual with limited work experience (Morel) managed to convince veteran *Times* reporters to base an entire story on a dubious paid-for report that made unsubstantiated and defamatory allegations **unless** the *Times* reporters were unduly influenced by a third party with direct access to the reporters. Dfinity believes discovery will reveal that Sorkin and/or Livni were unduly influenced by an uber-wealthy and influential third party to be an accomplice in this coordinated hit job along with Arkham and its financier(s) (competitors to Dfinity who, on information and belief, also used their inside and advanced knowledge that Sorkin and the *Times* would maliciously publish the Article based on the Arkham Report to personally profit in additional ways) to cause substantial damage to Dfinity's business and reputation.

18.     Defendants' false and defamatory statements and tortious conduct have caused, and will continue to cause, extraordinary damages to Dfinity and the Internet Computer Protocol. Defendants must be held accountable for the harm they foreseeably caused Dfinity and the Internet Computer Protocol by their defamatory statements made with actual malice and their tortious conduct.

---

[3]  *See*, *e.g.*, Andrew Ross Sorkin, *Billionaires' latest trophies are newspapers*, CNBC, https://www.cnbc.com/id/100941146 (Aug. 6, 2013) ("If it wasn't clear that newspapers have become trophies for the wealthy with an interest in journalism or power – or a combination of both – it should be now.") (last accessed June 23, 2022).

## PARTIES

19.     Dfinity is a not-for-profit organization, organized under the laws of Switzerland, with its principal place of business in Zurich, Switzerland.

20.     Defendant the *Times* is a New York corporation with its principal place of business at 620 Eighth Street, New York, New York.

21.     On information and belief, defendant Sorkin is an individual who resides in and is a citizen of the State of New York, where he works as a reporter for the *Times*.

22.      On information and belief, defendant Livni is a lawyer licensed in New York who resides in the District of Columbia, and works in the State of New York as a reporter for the *Times*.

23.     On information and belief, defendant Arkham is a Delaware corporation, which is registered to do business in the State of New York with its principal place of business in New York, New York.

24.     On information and belief, defendant Morel is an individual who resides in and is a citizen of the State of New York.

25.     On information and belief, defendants Charlie Smith, Jonah Bennet, Zachary Lerangis, Keegan McNamara, and Nick Longo, who all co-authored the Arkham Report with Morel, are individuals currently residing in a $40,000 per month Chelsea mansion in London, England.

26.     On information and belief, defendants John Does 1-10 are current or former officers, employees, agents, or affiliates of Arkham that contributed to the Arkham Report and/or caused or contributed to it being published.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and an amount in controversy over $75,000, and personal jurisdiction because Defendants reside in, transact business in, are licensed and/or registered in, contract to supply goods or services in, committed a tortious act in, and/or work in the state of New York.

28.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2), because Defendants are located in this district and because a substantial portion of the events giving rise to the claims asserted in this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

### The Parties

29.     Dfinity is a not-for-profit organization, founded in 2016, by crypto theoretician and entrepreneur, Dominic Williams, who has a vision for transforming the public internet with the world's first web-speed, internet-scale public blockchain: the Internet Computer. In May 2021, the Internet Computer Genesis Event launched its much-anticipated network and ICP utility token that provides the fuel for dapp developers to create decentralized apps on the Internet Computer.

30.     The *Times* is a multi-billion dollar global media organization that publishes *The New York Times* daily newspaper and distributes content through its website at the URL address www.nytimes.com, as well as several mobile platforms. Sorkin and Livni are reporters for the *Times*.

31.     Before the events alleged herein, the Arkham Defendants were completely unknown in the crypto industry and space, and were hired and paid a significant sum by a wealthy

individual to manufacture the Arkham Report[4] and promote and disseminate the report and its false

and defamatory "findings" throughout the crypto industry, including but not limited to, in the

Arkham Video and in the *Times* Article.

**The Article**

32.     On Sunday, June 27, 2021, Livni sent an email to Seamus Conwell, the Account

Director for Dfinity, stating that she was working on a story about ICP "for tomorrow [Monday]

morning" and that she needed to "speak to Dominic Williams or get his comment today [Sunday]

if that is at all possible." Livni stated that her deadline was "late [Sunday] for a story on Monday

morning ET." Livni never explained why a story with no time element other than the release of the

defamatory Arkham Report was being rushed into print, leaving little time for Dfinity to provide

adequate responses. Mr. Conwell responded, however, stating that it might not be possible for

Livni to reach Mr. Williams (Dfinity's founder) on such short notice and requesting a list of

questions from Livni. Livni sent Mr. Conwell a list of eight (8) questions, to which Dfinity

provided extensive responses *refuting in advance* many of the false and defamatory claims the

*Times* Defendants ultimately published in the Article the very next day. Mr. Conwell and another

Dfinity representative Michael Lee also participated in a phone call to discuss with Livni the

information, and provide additional context, again refuting *in advance* the claims the *Times*

Defendants ultimately published in the Article the next day.

33.     Importantly, during these pre-publication communications on the eve of the

publication of the Article, Livni and Sorkin of the *Times*, *aware of the contents of the Arkham*

*Report having been provided with it prior to publication of the Article, intentionally did not ask*

*Dfinity or its representatives about the Arkham Report, Morel, or the specific false and defamatory*

---

[4] https://cryptoleaks.info/case-no-2 (last accessed June 24, 2022)—see video interview with Longo
of Arkham.

*"findings"* in the Arkham Report that they (Livni and Sorkin) knew they would be reporting in the *Article the very next morning.* On information and belief, these seasoned journalists Livni and Sorkin consciously, intentionally and maliciously decided not to disclose any of this, nor to ask Dfinity representatives about these subject areas, because they did not wish to receive factual information that contradicted the preconceived—and false and defamatory—narrative they had settled on for their story.

34.     The very next day, on June 28, 2021, the *Times* published the Article, falsely accusing Dfinity, its founder Dominic Williams, and other "insiders" of orchestrating a crypto scam where Dfinity and its "insiders" allegedly sold their tokens early for an immense profit while small holders were unable to access their tokens and lost money when their ICP tokens supposedly "crashed" or deflated. Prior to publication, the *Times* Defendants did not give Dfinity any opportunity to respond to many of the explosive, sensational, and false and defamatory claims in the Article.

35.     The Article includes several false and defamatory statements of and concerning Dfinity, including:

a.  **Statement 1:** The project, years in the works, generated a lot of buzz last month ahead of its initial coin offering, the crypto equivalent of a company going public and listing shares for investors to buy.

b.  **Statement 2:** Even in the famously volatile crypto market, ICP stands out. The stunning climb and crash of this prominent project has market watchers puzzling about what happened — and who may have profited.

c.  **Statement 3:** Miguel Morel, the founder of Arkham Intelligence, a crypto analysis firm that followed the movements of ICP tokens on the blockchain, said that the price action and flaws in the coin offering process suggested "something went

wrong."

d. **Statement 4:** The process for claiming ICP tokens stands out, because "Dfinity did not follow the playbook of other successful projects," Arkham said. "Instead, it appears they quietly allowed the treasury and insiders to send billions of dollars of ICP to exchanges, while making it extremely difficult for their longtime supporters to access the tokens they were promised."

e. **Statement 5:** Arkham identified 34 (misreported by the *Times* in the Article as 44) "probable insider addresses" that deposited 10 million ICP tokens worth more than $2 billion to exchanges after the initial coin offering [Genesis event], giving the impression they were transferred for trading, not safeguarding. These transfers coincided with significant drops in the price of ICP, the report said. Small investors, left out of the process, were stuck.

36.   These statements are false and defamatory because, among other things:

a. They falsely accuse Dfinity of having an *illegal* "initial coin offering, the crypto equivalent of a company going public and listing shares for investors to buy" and "dr[iving] a massive crash in the price of ICP. When considering the dollar amounts involved, it might come to be viewed as one of the biggest financial controversies ever."

b. The ICP token is not a security—ICP is a utility token that is required to fuel the energy required by dapp developers to build decentralized apps on the Internet Computer. There was no initial coin offering. ICP utility tokens were lawfully created out of the launch of a decentralized network—the Internet Computer Protocol—and gain their utility through empowering independent actors to build decentralized apps on the Internet Computer.  Dfinity did not drive a massive crash

in the price of the ICP token. Rather, Arkham, through its false and defamatory report, and the *Times* through its publication of the false and defamatory Article and Arkham allegations with actual malice as alleged herein, were responsible for driving the crash.

c.  *Before* publication, Mr. Conwell at Dfinity explained in detail to the *Times* Defendants the facts leading up to the launch of the Internet Computer, the percentage of utility tokens put into circulation and their transfer, and the very important difference between "transferring tokens from Coinbase Custody to other exchange wallets for safekeeping" and "selling" tokens. More specifically, Mr. Conwell rejected as false allegations raised by the *Times* via email that "a small group of big ICP holders transferred and sold tokens en masse immediately upon listing in May, causing prices to drop dramatically while small seed investors were unable to retrieve their tokens due to what [some] say is a deliberately difficult process" and that "Dfinity appears to have transferred a quarter of the ICP tokens minted on listing day to a single address, which distributed about 30 million ICP immediately to a few dozen addresses – all of those addresses, including the initial distributor, quickly moved millions of ICP to exchanges and sold off tokens." Mr. Conwell further explained in a pre-publication email:

"At the Genesis launch of the Internet Computer, on May 10, approximately 26% of ICP tokens were put into circulation. (This can be verified by independent data sources such as CoinMarketGap, CoinGecko, and Messari.) The initial circulation supply of 26% was moved to a DFINITY Foundation Coinbase Custody wallet, to then transfer to early contributors, seed donors, strategic partners, former team members, etc.  Coinbase Custody was the only non-technical wallet available on Day 1, so many ICP token holders received tokens and immediately transferred tokens to another exchange wallet to avoid custody fees or to alternative wallets they were more familiar with to safeguard their ICP tokens. Important not to confuse transferring tokens from Coinbase Custody to other exchange wallets for safekeeping as 'selling' tokens."

In addition, Dominic Williams and other senior members of the team were placed under a lockup restriction following the Genesis event. Moreover, many of Dfinity's other executive team and employees did not receive their first token allocations until June 21.

d.  The Article's statements that the launch had "flaws" and that "something went wrong" are false and defamatory because the network had been operating at 100% availability since its launch, which is rare for a blockchain of its scale.

e.  The Article falsely accuses Dfinity of "not follow[ing] the playbook of other successful projects" (in an ironic twist, the Arkham report cited Reserve as a "good example of crypto best practices"—a project co-founded by Morel, the CEO of Arkham—whose token is now essentially worthless at $.008) and "quietly allow[ing] the treasury and insiders to send billions of dollars of ICP to exchanges, while making it extremely difficult for their longtime supporters to access the tokens they were promised." As previously stated above, Dfinity explained the process to the *Times* in the pre-publication communications. It is completely normal at listing for an organization to transfer (not sell) tokens to relevant parties for distribution. There is nothing unusual or improper about this. The tokens are then re-distributed. This is how the industry works, and it is false and highly defamatory for the *Times* Defendants to accuse of Dfinity of misconduct when it acted properly here.

f.  The Article falsely claims that Dfinity deposited 10 million ICP tokens worth more than $2 billion to 44 (the Arkham Report claimed it was 34) "insider addresses," "giving the impression they were transferred for trading, not safeguarding." Dfinity did not act improperly in connection with the launch of the Internet

Computer. Once tokens are distributed and logged on chain, the token holders are free to then do as they wish with their tokens. Dfinity did not "give any impression" about the behavior of non-Dfinity employee token holders. And as previously explained, there were lockups in place for Dominic Williams and other senior members of the team. Seed investors had their allocations locked in neurons which dissolved monthly—a fact Dfinity publicly disclosed on May 10, 2021—more than a month before Arkham released its false and defamatory report and the *Times* published the Article. Thus, the Article contradicts itself in this respect, alleging that seed investors could not sell because it was allegedly too complicated while also alleging that they must have sold because they got transfers and the price fell. Both cannot be true at the same time.

37.    The Article cited and included a link to the Arkham Report (at https://assets.website-files.com/62879326fd745f7489b43224/62a923938bc9235e93d47b4f_ICP%20Report_vF.pdf), assuring to its staggering readership that the Arkham Report is allegedly legitimate. Without referencing Arkham or Morel's lack of credentials and lack of a track record or conflicts of interests as alleged above, Livni and Sorkin cited Arkham as authoritative and referred to Arkham as "a crypto analysis firm."

38.    The Arkham Report, which had been promoted by Arkham and Morel in the Arkham Video in the early morning of June 28, 2021, was publicly released by Arkham that same day. The Arkham Video contains additional false and defamatory statements, including:

  a. Morel: "It appears that this was not a coincidence or accident, but was a case of misconduct by those who seem closely connected to ICP and who have been dumping billions of dollars of ICP while smaller supporters and retail have been

left in the dark watching their investments tank…I am going to… provid[e] ICP holders with the clarity that they deserve….”

b.  Morel: “My team at Arkham Intelligence conducted a comprehensive analysis of the ICP blockchain, and what we found causes us to believe that insiders have continuously deposited billions of dollars of ICP on exchanges as everyone else watched their investments tank.”

c.  Morel: “If the available data in our analysis is accurate, we should be asking questions about what could be one of the most extreme cases of investor mistreatment in the history of crypto markets and financial markets overall.”

39.   These statements are 100% false and defamatory, for the same reasons outlined above with respect to the statements in the Article.

40.   The Arkham Report contains additional false and defamatory statements, including among others:

a.  Our analysis has led us to believe that possible insiders connected to Dfinity have been dumping billions of dollars of ICP on exchanges at the expense of small early supporters and retail investors.

b.  Addresses we suspect belong to the Dfinity treasury and project insiders have deposited 18.9 million ICP, worth ~$3.6 billion at time of deposit, to exchanges.

c.  Based on a review of their public materials, Dfinity has not followed industry practices meant to demonstrate good faith and assure investors that project insiders won’t trigger a price collapse through massive selling.

d.  Dfinity has not been transparent about token allocation and unlocking, unlike other major projects.

e.  The Treasury and suspected insiders have continually sent millions of ICP worth

billions of dollars to exchanges, totaling 75% of the total deposited, possibly driving ICP's price collapse.

f.    Finally, the exceptional decrease in the price of ICP since listing is indicative of massive selling, which would likely be coming from these deposits, seeing as, based on our analysis, they are the source of the vast majority of the ICP deposited to exchanges.

g.    It appears Dfinity was not transparent about how tokens were distributed and when they would be unlocked, contrary to industry best practices.

h.    These practices are not up to the standard[s] set by the most respected and legitimate projects in crypto. Such standards exist in order to demonstrate good faith on the part of the project and assure community members and retail investors that project insiders will not risk collapsing the token's price by selling large amounts of tokens—what's known in crypto as a "rug pull", "team dump" or "VC dump". These insider-driven price collapses happen sometimes, and getting caught in one is the biggest fear of many retail investors, leading legitimate projects like Uniswap and Reserve to do everything they can to demonstrate that there is no dump coming. (As alleged above, Reserve, Morel's crypto project and then-wannabe competitor to Dfinity that he self-referenced in the Arkham Video and Arkham Report as the "model"—released its own token that has now fallen to $.008 and is essentially worthless.)

i.    Putting together the pieces of this analysis—large deposits to exchanges from the Treasury and suspected insiders, lack of transparency on token distribution, a byzantine process for outside supporters to claim tokens, and an ICP price collapse—an overall picture emerges. It appears that Dfinity insiders made billions

of dollars dumping ICP on the market while making it difficult for their biggest potential rival sellers to dump theirs. It appears they tried to prevent outsiders from uncovering this activity through a lack of transparency about Dfinity's token allocation and unlocking.  And it appears that their activity drove a massive crash in the price of ICP. When considering the dollar amounts involved, it might come to be viewed as one of the biggest financial controversies ever.

41.     These statements are also 100% false and defamatory, for the same reasons outlined above with respect to the statements in the Article.

42.     Nevertheless, the *Times* Defendants maliciously elevated and amplified the Arkham Report and its purported "findings" in the Article, citing the report as both legitimate and authoritative despite its authors' obvious lack of credentials and conflicts of interest.

43.     On June 28, 2021, Dfinity sent a written request to the *Times* Defendants, identifying the serious and damaging falsities in the Article and notifying the *Times* of Arkham and Morel's lack of qualifications and motives to be untruthful. Dfinity's communication also expressed alarm that the *Times* did not give Dfinity an opportunity to respond to the many Arkham Report alleged "findings" parroted in the Article before publication. The *Times* Defendants nevertheless refused to retract the statements, and have not corrected any of them, claiming that they allegedly "just reported that factual matters of what [Arkham and other critics online] said" and what Dfinity allegedly said.

44.     In publishing the Article and refusing the retraction and corrections Dfinity requested, the *Times* Defendants ignored and violated the *Times*' own ethical guidelines:

> The Times treats its readers as fairly and openly as possible.  In print and online, we tell our readers the complete, unvarnished truth as best we can learn it.  It is our policy to correct our errors, large and small, as soon as we become aware of them.

…

> Staff members who … knowingly or recklessly provide false information for publication betray our fundamental pact with our readers.  We will not tolerate such behavior.[5]

45. The *Times* Defendants also ignored and violated the *Times*' own guidelines on integrity:

> Attribution to another publication, though, cannot serve as license to print rumors that would not meet the test of The Times's own reporting standards.  Rumors must satisfy The Times's standard of newsworthiness, taste and plausibility before publication, even when attributed.  And when the need arises to attribute, that is a good cue to consult with the department head about whether publication is warranted at all.
>
> …
>
> Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small.  The paper regrets every error, but it applauds the integrity of a writer who volunteers a correction of his or her own published story.  Whatever the origin, though, any complaint should be relayed to a responsible supervising editor and investigated quickly.  If a correction is warranted, fairness demands that it be published immediately.  In case of reasonable doubt or disagreement about the facts, we can acknowledge that a statement was 'imprecise' or 'incomplete' even if we are not sure it was wrong.[6]

46. The *Times* Defendants also ignored and violated the Society of Professional Journalists' Code of Ethics, which the *Times* purports to follow and has posted on its website:

> **Seek Truth and Report It**
>
> Journalists should be honest, fair and courageous in gathering, reporting and interpreting information.
>
> Journalists should:
>
> - Test the accuracy of information from all sources and exercise care

---

[5] https://www.nytimes.com/editorial-standards/ethical-journalism.html#ourDutyToOurReaders (last accessed June 23, 2022).
[6] https://www.nytimes.com/editorial-standards/guidelines-on-integrity.html (last accessed June 23, 2022).

to avoid inadvertent error. Deliberate distortion is never permissible.

- Diligently seek out subjects of news articles to give them the opportunity to respond to allegations of wrongdoing. …

**Minimize Harm** …

Journalists should: …

- Recognize that gathering and reporting information may cause harm …

**Act Independently**

Journalists should be free of obligation to any interest other than the public's right to know.

Journalists should:

- Avoid conflicts of interest, real or perceived.

- Remain free of associations and activities that may compromise integrity or damage credibility. …

**Be Accountable**

Journalists are accountable to their readers, listeners, viewers and each other.

Journalists should:

- Clarify and explain news coverage and invite dialogue with the public over journalistic conduct. …

- Admit mistakes and correct them promptly. …

Abide by the same high standards to which they hold others.[7]

47.     Instead of upholding the above standards, conducting any good faith serious investigation into Arkham or Morel's credentials or their motives, or subjecting their explosive, sensational, defamatory and damaging claims to any scrutiny, the *Times* Defendants published the

---

[7] https://archive.nytimes.com/www.nytimes.com/learning/general/weblines/4111.html (last accessed June 23, 2022).

Article and promoted the false and defamatory Arkham Report, causing substantial harm to Dfinity in the process. The *Times* Defendants then compounded this injury by refusing Dfinity's requested retraction and corrections.

48.     At the time of the publication of the Arkham Report and the *Times* Article, the industry was in the midst of a bull market. Defendants' conduct caused a major price collapse of the ICP token, causing Dfinity an enormous amount of direct monetary damage, and reputational and business harm. Specifically, the Internet Computer was a revolutionary product which had been under development for 5 years and which should have rebounded substantial benefits to the Foundation that created it. Due to Defendants' defamatory statements, this did not happen as expected, and instead, the token eventually lost a substantial percentage of its value.

49.     In addition, Defendants' conduct directly harmed the reputation of Dfinity, making it more difficult for Dfinity to develop its business and related products and services, as Defendants' defamation was repeated and republished in industry media. Furthermore, the reputational damage caused to Dfinity has manifested itself in additional and ongoing ways, including but not limited to creating obstacles for Dfinity in attracting and retaining talent, generating an ongoing rumor mill about Dfinity specifically focused on the false and defamatory statements that are the subject of this lawsuit, and leading to decreased industry coverage of the Internet Computer's revolutionary technological advancements. Defendants' false and defamatory statements did substantial harm to Dfinity as an ongoing business in a growing business sector of the high-tech economy, while benefitting Dfinity's competitors in that same sector.

## FIRST CAUSE OF ACTION

### (Defamation Against All Defendants)

50.     Dfinity re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

51.     The *Times* Defendants published or caused to be published false and defamatory statements in the Article of and concerning Dfinity, and did so with actual malice.

52.     The Arkham Defendants published or caused to be published false and defamatory statements in the Arkham Video, the Arkham Report, and the Article of and concerning Dfinity, and did so with actual malice.

53.     Defendants' false and defamatory statements caused actual damages to Dfinity.

54.     The above-referenced published statements constitute egregious conduct constituting malice. Defendants' acts were willful and malicious. As such, in addition to compensatory damages and/or presumed damages, Dfinity demands punitive damages relating to Defendants' defamatory statements, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Violation of N.Y. Gen. Bus. Law § 349 Against the Arkham Defendants)

55.     Dfinity re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

56.     The Arkham Defendants willfully and knowingly committed deceptive acts or practices in the conduct of any business, trade or commerce in publishing or causing to be published false and defamatory statements in the Arkham Video, the Arkham Report, and the Article of and concerning Dfinity, in violation of N.Y. Gen. Bus. Law. § 349(a).

57.     The Arkham Video, Arkham Report, and Article were publicly disseminated and directed at actual and potential users of the Internet Computer and anyone who was then or might

be contemplating transacting business with Dfinity, as well as consumers and potential consumers of the Reserve project co-founded by Morel and affiliated with the Arkham Defendants that purport to compete with Dfinity.

58.     As discussed further above, the statements in the Arkham Video, Arkham Report, and Article were materially misleading.

59.     The Arkham Defendants' deceptive acts or practices caused actual damages to Dfinity and further harmed Dfinity's reputation and that of its researchers and developers.

60.     The above-referenced published statements constitute intentional or deliberate wrongdoing, aggravating or outrageous circumstances, a fraudulent or evil motive, and/or a conscious act that willfully and wantonly disregarded Dfinity's rights. As such, in addition to compensatory damages, Dfinity demands both treble and punitive damages relating to the Arkham Defendants' deceptive acts or practices, in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

Dfinity demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Dfinity respectfully requests:

(a)  An award of damages to Dfinity in an amount to be determined at trial but well in excess of $75,000;

(b)  An award of treble damages to Dfinity in an amount to be determined at trial;

(c)  An award of punitive damages to Dfinity in an amount to be determined at trial;

(d)  An order granting permanent injunctive relief enjoining Defendants from continuing to publish or republish the statements adjudicated to be defamatory;

(e)  An award of reasonable attorneys' fees and costs; and

(f)  An award of such other and further relief as the Court may deem just and proper.


Dated: June 27, 2022                          Respectfully submitted,


                                              By: */s/ Charles J. Harder*
                                                  Charles J. Harder, Esq.
                                                  HARDER LLP
                                                  100 Park Avenue, Sixteenth Floor
                                                  New York, New York 10017
                                                  (212) 799-1400

                                                  *Counsel for Plaintiff*