# EXHIBIT 9

# ECF 146

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/15/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHASE WILLIAMS, et al.,

              Plaintiffs,

      -against-                            20-cv-2809 (LAK)

BLOCK ONE, et al.,

              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CRYPTO ASSETS OPPORTUNITY FUND, LLC, et al.,

              Plaintiffs,

      -against-                            20-cv-3829 (LAK)

BLOCK ONE, et al.,

              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

      Daniel Lawrence Berger
      GRANT & EISENHOFER P.A.
      *Lead Counsel for Lead Plaintiff Crypto Assets Opportunity Fund,
      LLC*

      Ievgeniia Vatrenko

      Jack Samuel Tenenbaum
      NORTHWESTERN PRITZKER UNIVERSITY SCHOOL OF LAW

      James Koutoulas
      KOUTOULAS LAW, LLC

      *Attorneys for Plaintiff Crypto Assets Opportunity Fund LLC*

Greg Donald Andres
Edmund Polubinski III
Gabriel Jaime-Bettan
Neal Alan Potischman
DAVIS POLK & WARDWELL LLP

Brian Edward Klein
Scott M. Malzahn (*pro hac vice*)
Teresa L. Huggins
Jose R. Nuno (*pro hac vice*)
WAYMAKER LLP

*Attorneys for Defendants Block.one, Daniel Larimer, and Brock Pierce*

LEWIS A. KAPLAN, *District Judge*.

  This case is before the court on Lead Plaintiff Crypto Assets Opportunity Fund LLC's ("CAOF" or "Lead Plaintiff") motions for final approval of a class action settlement[1] and attorneys' fees.[2] Lead Plaintiff moves the Court to appoint Lead Plaintiff as class representative and Grant & Eisenhofer P.A. as class counsel,[3] to certify the proposed class, to approve a $27.5 million settlement and the proposed plan of allocation, and to award fees in the amount of approximately $5.5 million plus costs to Grant & Eisenhofer P.A. and costs to Lead Plaintiff.[4] For the reasons stated below, both motions are denied.

---

[1]   Dkt. 118. All docket citations are to 20-cv-2809 (LAK) unless otherwise indicated.

[2]   Dkt. 122.

[3]   Dkt. 118.

[4]   Dkt. 122.

***Facts***

*Background*

This class action is at the intersection of the federal securities laws and blockchain technology. We begin with some essential background.

The SEC has described blockchain technology as "an electronic distributed ledger list of entries – much like a stock ledger – that is maintained by various participants in a network of computers . . . ."[5] Each of these computers is a node in the network which "use[s] cryptography to process and verify transactions on the ledger . . . ."[6] In general, the first node to identify the cryptographic hash[7] corresponding with a proposed transaction verifies that transaction and adds it to the public ledger, *i.e.*, as a block on the virtual chain. Once one or more nodes has validated a transaction, the original parties to that transaction no longer may rescind their deal. But it is not until the other nodes on the network have accepted the verified transaction and added their own new blocks on top of it that the transaction becomes part of the blockchain's ledger. Blockchain technology thus allows investors to buy and sell so-called crypto assets, cryptocurrencies, in an anonymous, decentralized environment.[8] And the problem before the Court is a product of the anonymity of that

---

[5]     *Investor Bulletin: Initial Coin Offerings*, U.S. SEC. & EXCH. COMM'N., https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_coinofferings (last visited July 27, 2022).

[6]     *Id.*

[7]     A cryptographic hash is the unique string of letters and numbers produced by an algorithm applied to a set of inputs. In the blockchain context, these inputs are derived from the proposed transaction. *See* Jake Frankenfield, *Hash*, INVESTOPEDIA, https://www.investopedia.com/terms/h/hash.asp (last visited July 27, 2022); *see also Strike 3 Holdings, LLC v. Doe*, No. 3:21-cv-106 (VLB), 2021 WL 6932974, at *1 n.1 (D. Conn. Feb. 18, 2021).

4

environment.

Lead Plaintiff represents a conditionally certified class of persons who purchased ERC-20 and EOS tokens – two related digital assets – over a period of about two years. Some of those class members are in the United States. Others are not. Some of those transactions were subject to the securities laws of the United States. Others were not. Yet Lead Plaintiff – whose purchases fell into both categories – has entered into an agreement to settle the case on behalf of the entire class, with every class member to receive the same consideration per unit purchased, regardless of whether the purchase was subject to the securities laws of the United States. The question now presented is whether the Court should approve the settlement, which ultimately turns on whether plaintiff has established that it adequately represented the interests of absent class members. This in turn depends upon whether the proportion of the plaintiff's purchases that were subject to the federal securities laws is the same as, or representative of, the proportion of such purchases by absent class members. For if Lead Plaintiff's proportion of purchases covered by the securities laws was lower than the proportion of such purchases by other class members, plaintiff could have had a financial interest in accepting a settlement at a price lower than the price that would have been demanded by adequately represented absent class members.

*Lead Plaintiff's Allegations*

The story told in the Consolidated Amended Complaint (the "CAC") begins with Block.one's effort to finance its development of software called EOS.IO which ultimately came to

---

8         Proponents claim that this environment permits transactions with fewer transaction costs and inefficiencies than in traditional markets.

5

support the EOS Blockchain.[9]

Brock Pierce, Brendan Blumer, and Daniel Larimer founded Block.one in early 2017.[10] In public statements including a white paper published June 5, 2017, Block.one and its founders promised to develop a software program called EOS.IO which would enable the creation of novel EOS blockchain technologies.[11]  Like the better known Bitcoin and Ethereum blockchains, the proposed EOS blockchains would record cryptographically-verified digital transactions on a public ledger.  Block.one represented that any EOS blockchain would be especially decentralized; whereas the Bitcoin and Ethereum networks "were dominated by fewer than ten large mining entities,"[12] Block.one's white paper stated that any EOS blockchain would be governed by 21 mining entities – called producers – elected by the token holders and 15 of 21 producers would be required to confirm each of the network's transactions.[13]  This framework, according to Block.one, would enable EOS "ultimately [to] scale to millions of transactions per second, eliminate[] user fees, and allow[] for quick and easy deployment and maintenance of decentralized applications[] in the context of a

---

[9]
    CAC ¶ 3.

[10]
    *Id.* ¶ 2.

[11]
    *Id.* ¶ 3; *see also In re Matter of Block.one, Respondent*, Securities Act Rel. No. 10714, 2019 WL 4793292, at *1 (SEC Sept. 30, 2019) [hereinafter "Cease and Desist"].

[12]
    *Id.* ¶ 124.

    Bitcoin and Ethereum miners or mining entities are analogous to EOS producers and similar to nodes in a blockchain network, *i.e.*, they are computers capable of performing complex mathematical calculations to produce tokens and/or verify transactions.

[13]
    *Id.*; *see also* CAC ¶¶ 7-8.

6

governed blockchain."[14]

Block.one commenced a so-called initial coin offering ("ICO") to fund the project. From June 26, 2017 to June 1, 2018, it sold ERC-20 tokens[15] to investors with the expectation that they later could be exchanged for EOS tokens produced on the forthcoming EOS blockchain or blockchains.[16] Block.one accepted approximately 7.12 million ether[17] worth $4.1 billion in exchange for 900 million ERC-20 tokens in the ICO.[18] These sales were made through an automated process called a "smart contract."[19]

The Amended Complaint describes efforts by Block.one to keep its ICO sales beyond the reach of the federal securities laws. Investors were required to enter into a token purchase

---

[14] CAC ¶ 7.

[15] "ERC-20 is not itself a crypto-asset but rather a platform for the creation of new tokens. ERC-20 allows for the creation of customizable tokens that operate on the Ethereum blockchain. . . . Since ERC-20 tokens rely on an existing blockchain and underlying technical architecture, new tokens can be created quickly by users with minimal technical expertise." *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 330 (S.D.N.Y. 2021), *reconsideration denied in part sub nom. In re Bibox Grp. Holdings Ltd. Sec. Litig.*, No. 20-cv-2807 (DLC), 2021 WL 2188177 (S.D.N.Y. May 28, 2021).

[16] Defendants intended for EOS tokens to be produced by third parties through a future EOS blockchain or blockchains built on the EOS.IO platform. *See* Token Purchase Agreement (Dkt. 87-4) at Ex. A. Similar to the process for verifying transactions, token production is done through the labor-intensive completion of cryptographic hash functions.

[17] Ether or ETH is the digital currency associated with the Ethereum blockchain. Jake Frankenfield, *Ether (ETH)*, INVESTOPEDIA, https://www.investopedia.com/terms/e/ether-cryptocurrency.asp (last visited July 27, 2022).

[18] CAC ¶ 78.

[19] Smart contracts "are programs that verify and enforce the negotiation or performance of binary contracts" and "thus are self-executing and self-enforcing, making the transactions more secure and less costly." *Id.* ¶ 44.

agreement ("TPA") which *inter alia* declared that

> "[s]ales of EOS [t]okens and EOS [t]okens themselves are not securities . . . [and p]urchases and sales of EOS [t]okens are not subject to the protections of any laws governing those types of financial instruments. This [a]greement and all other documents referred to in this [a]greement including the [w]hite [p]aper do not constitute a prospectus or offering document, and are not an offer to sell, nor the solicitation of an offer to buy an investment."[20]

Block.one never registered its sale of ERC-20 tokens with the SEC.[21]

Block.one attempted also to prevent purchases by investors in the United States. The TPA purportedly barred direct purchases of ERC-20 by U.S. persons in the ICO.[22] But this prohibition was easily circumvented. Indeed, in 2019 the SEC found that "a portion" of the capital acquired by Block.one in the ICO "was raised from U.S. persons."[23] This perhaps is unsurprising given Block.one's efforts to promote EOS in the U.S. market, which included appearances at blockchain conferences in U.S. cities, the display of an EOS advertisement on a billboard in Times Square, and various posts on social media and in fora popular with U.S. cryptocurrency investors.[24]

---

[20]  *Id.* ¶ 117.

[21]  *Id.* ¶¶ 9, 77 (quoting Cease and Desist at *1).

[22]  TPA (Dkt. 87-4) §§ 2.2 ("The EOS Tokens are not being offered to U.S. persons."), 5.1 (imposing a representation and warranty on each party to the transaction that "Buyer is not a U.S. person").

[23]  Cease and Desist at *2.

[24]  CAC ¶¶ 51, 96, 104, 113.

8

Moreover, the ERC-20 tokens were available for resale without restriction immediately following the ICO, including on cryptocurrency exchanges based in the United States including Coinbase, Poloniex, and Kraken.[25]

The ICO closed on June 1, 2018 at which point the ERC-20 tokens became "fixed and nontransferable."[26] When the EOS Blockchain – the first blockchain built on the EOS.IO platform – was launched by third parties, ERC-20 tokens purchased in the ICO or on the secondary market became eligible to be traded in for EOS tokens via a smart contract.[27]

Lead Plaintiff asserts that the ERC-20 tokens were securities. If true, and if the ICO was not subject to an exception, Block.one violated the law by failing to register its ICO. Lead Plaintiff alleges also that certain public statements and omissions by Defendants were materially false and misleading. Principal among these were promises by Defendants that the EOS blockchain would be decentralized.[28] Lead Plaintiff claims also that the individual defendants inappropriately pocketed money raised in the ICO for themselves.[29]

The CAC alleges that Block.one and Brendan Blumer, Daniel Larimer, Ian Grigg, and Brock Pierce (the "Individual Defendants" and, together with Block.one, "Defendants") violated the securities laws by failing to register securities with the Securities and Exchange Commission ("SEC")

---

[25]

    *Id.* ¶ 10.

[26]

    Cease and Desist at *3; *see also* CAC ¶¶ 46-47.

[27]

    Cease and Desist at *3.

[28]

    CAC ¶¶ 122-43, 149-72.

[29]

    *Id.* ¶¶ 144-48.

9

as required by Sections 5 and 12(a)(1) of the Securities Act of 1933 and making false and misleading statements to investors prohibited by Section 12(a)(2) of the Securities Act, Section 10(b)(5) of the Exchange Act, and Rule 10b-5.[30]

*The Motion to Dismiss and the Proposed Settlement*

        Defendants Block.one, Larimer, and Pierce moved to dismiss the Amended Complaint on November 2, 2020.[31]  While the motion was pending, Lead Plaintiff and settling defendants Block.one, Blumer, Larimer, and Pierce informed the Court of a proposed class action settlement and moved the Court to certify conditionally the proposed class, approve the manner and form of giving notice of the proposed settlement to the proposed class, and set a hearing date for its approval.[32]  The proposed settlement provides for Block.one to make a cash payment of $27.5 million in exchange for, in sum and substance, a release of all claims that were, could have been, or could in the future be asserted which concern, arise out of, or relate to the allegations made in this action.[33]

        The Court granted the unopposed motion for conditional certification and approval of

---

[30]     CAC ¶¶ 234-294.  Plaintiffs allege also that Individual Defendants are liable for Block.one's alleged violations of §§ 5, 12(a)(1) and 12(a)(2) by virtue of § 15 of the Securities Act, *id.* ¶¶ 259-69, and for its § 10(b) and Rule 10b-5 violations under § 20(a) of the Exchange Act, *id.* ¶¶ 283-94.

[31]     *See* Motion to Dismiss (Dkt. 85).  Blumer did not join the motion.  There is no proof of service on Grigg, who is said to reside in Hong Kong, and he has not appeared in the action.

[32]     *See* Dkt. 110.

[33]     Stipulation of Settlement (Dkt. 112-1) ¶ 1.42 (defining "Settlement Class's Released Claims") and Ex. A-1 at 7 (noting the cash payment amount).

notice to class members and scheduled a fairness hearing (the "Conditional Order").[34]  The Settlement Class consists of "all persons or entities who, directly or indirectly through an intermediary, purchased or otherwise acquired ERC-20 [t]okens and/or EOS [t]okens at any time during the period of June 26, 2017 through May 18, 2020, inclusive" and excludes "(i) Defendants; (ii) the present or former executive officers or members of the Board of Directors of Block.one; (iii) the immediate family members . . . of any excluded person; (iv) any entity in which any Defendant has, or had during the Class Period, a controlling interest; and (v) any affiliate of Block.one."[35]  It denied the motion to dismiss without prejudice to renewal if the proposed settlement were not approved.[36]

*Notice and Claims Administration*

The Conditional Order appointed an administrator ("Epiq") to supervise the notice procedure and, assuming settlement approval, process claims.[37]  Epiq was unable to contact class members in the first instance because Defendants "[did] not keep records of the token purchases," and Epiq was "[un]able to procure a list from any other source, such as the exchanges on which the ERC-20 and EOS Tokens traded."[38]  Instead, Epiq attempted to notify class members through "a broad marketing campaign targeted at online forums and publications designed to reach as many potential

---

[34]  *See* Dkt. 115.

[35]  *Id.*

[36]  *See* Dkt. 114.

[37]  *Id.* ¶ 10.

[38]  Declaration of Joseph Mahan (Dkt. 116) ¶ 6.

ERC-20 and EOS Token purchasers as possible."[39]   These advertisements were posted on "mainstream websites including Google Display Network, Facebook, Reddit, Twitter, and Telegram" and "resulted in numerous cryptocurrency-focused publications, like Cointelegraph, Decrypt, and The Block Crypto, publishing the news on their platforms."[40]  In September 2020, Epiq launched a follow-up social media campaign and reached out to potential claimants who had begun the claims application process but not completed it, which, according to Epiq, resulted in additional claims.[41] Epiq "established and continues to maintain" a website devoted to the proposed settlement, which, as of October 29, 2021 had received 114,011 hits.[42]  Epiq also monitored a mailbox and email address to which class members were instructed to send requests for exclusion.  Epiq has not received any requests for exclusion to date[43] nor has the Court received any objections.

---

[39]      *Id.* ¶ 7.

[40]      Supplemental Declaration of Joseph Mahan (Dkt. 130) ¶¶ 7-8.

[41]      *Id.* ¶ 9.

[42]      *Id.* ¶¶ 4-5.

[43]      *Id.* ¶ 7.

*Motion for Final Approval*

Lead Plaintiff now moves for final approval of the settlement agreement and for certification of the class[44] as well as for attorneys' fees and costs.[45]  In advance of the hearing on the proposed settlement, the Court requested further information on three topics: Lead Counsel's costs associated with the case; Lead Plaintiff's contention that "the majority of EOS purchasers were foreign" and its assumption that "only 25 [percent] of [the] 900 million tokens [issued by Block.one] are likely eligible to recover as part of the Settlement agreement"; and Epiq's ability to confirm the identities of the proper claimants.[46]  The Court made clear its concern that Lead Plaintiff might not be an "adequate class representative."[47]  It requested "a detailed explanation" of Lead Plaintiff's assumption that the majority of class members were foreign and the "impact [of that assumption] on the settlement amount."[48]  It instructed Lead Plaintiff to "address whether the information provided by claimants would be sufficient to identify how a purchase of EOS or ERC-20 was made . . . and whether that information would be sufficient to analyze where a transaction should be deemed foreign or domestic (*i.e.*, location of purchaser, location of validating node, etc.)."[49]  Lead Plaintiff responded that the assumption was based primarily on the estimate contained in a June 2019 article published

---

[44]     Dkt. 118.

[45]     Dkt. 122.

[46]     *See* Memorandum and Order (Dkt. 133) (quoting Lead Plaintiff's Memorandum in Support of Motion for Final Approval (Dkt. 119) at 19).

[47]     *Id.* ¶ 7.

[48]     *Id.* ¶ 6.

[49]     *Id.* ¶ 8.iii.

13

by the consulting firm Chappuis Halder (the "Chappuis Halder Article") that 15.3 million of a total 42.2 million cryptocurrency traders worldwide are located in the United States.[50] Thus, Lead Plaintiff "considered in conducting the settlement negotiations and damages analysis that approximately 36 [percent] of trading in [B]lock.one tokens was domestic . . . ."[51]

## *Discussion*

### *The Reach of the Federal Securities Laws*

The indispensable predicate for consideration of this motion is an understanding of the geographical reach of the federal securities laws. So we begin by outlining the controlling principles.

According to the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*[52] and its progeny, the "reach of U.S. securities law is presumptively limited to (1) 'transactions in securities listed on domestic exchanges,' and (2) 'domestic transactions in other securities.'"[53] But the implications of those general principles for blockchain transactions are considerably less than clear. Which blockchain transactions are domestic and which are not remains a relatively novel question.

Regarding the first prong of the *Morrison* test, the SEC has advised, in the context of

---

[50]    Lead Plaintiff's Letter Response (Dkt.134) at 8 and Ex. G (citing Patrick Bucquet, Marie Lermite, and Ally Jo, *How Many Active Crypto Traders Are There Across the Globe?*, CHAPPUIS HALDER (June 2019), available at https://chappuishalder.com/wp-content/uploads/2019/06/Publication_Crypto-traders-06-2019.pdf (last visited July 27, 2022)).

[51]    *Id.*

[52]    561 U.S. 243 (2010).

[53]    *In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017) (quoting *Morrison*, 561 U.S. at 267).

14

online platforms for the purchase and sale of cryptocurrencies, that "a platform that offers trading of digital assets that are securities and operates as an 'exchange,' as defined by the federal securities laws, must register with the Commission as a national securities exchange or operate pursuant to an exemption from registration."[54] At least one cryptocurrency exchange on which Block.one's tokens were traded in the secondary market, Poloniex, was determined by the SEC to be a national securities exchange.[55] This means that investors who acquired ERC-20 or EOS tokens on a domestic exchange such as Poloniex could recover damages under the federal securities laws should the remainder of their requirements be met.

The application of the second prong of the *Morrison* test in this context is more complicated. It holds that "domestic transactions" in securities not listed on domestic exchanges also are covered by the securities laws. In *Absolute Activist Value Master Fund Ltd. v. Ficeto*,[56] the Second Circuit clarified that these transactions "are domestic if irrevocable liability is incurred or title passes within the United States."[57]

Lead Plaintiff offers two main theories regarding how to determine whether a particular transaction that did not take place on a domestic exchange nevertheless was domestic. First, it contends that the location – or, perhaps, the nationality – of the token purchaser is relevant if not

---

[54]

      *In the Matter of Poloniex, LLC, Respondent*, Securities Act Rel. No. 92607, 2021 WL 3501307, at *2 (SEC Aug. 9, 2021) (citing SEC. AND EXCH. COMM'N, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (Exchange Act Rel. No. 81207 (July 25, 2017) (the "DAO Report")).

[55]

      *Id.*

[56]

      677 F.3d 60 (2d Cir. 2012).

[57]

      677 F.3d at 67.

dispositive.[58]  Second, Lead Plaintiff at times highlights the geographic location  of network nodes as evidence of the situs of transactions on that blockchain.  By this logic, it argues, all of the transactions verified by the network are domestic because a plurality of blockchain nodes were located in the United States.[59]

Lead Plaintiff's arguments correspond with theories put forth by two other courts regarding what "irrevocable liability" might mean as applied to blockchain transactions.

*First*, in *Barron v. Helbiz Inc.*,[60] a colleague in this district concluded that the situs of a blockchain transaction does not turn on the location of the nodes or servers that make up the blockchain because "*Morrison* dealt with the location of the change in the legal relationship between persons, not the electronic operations of creation, transport and delivery of the product."[61]  Thus, that case held that the transaction there at issue occurred at plaintiff's location when "he accepted the offer and agreed to the contract of purchase."[62]  That view, however, arguably is at odds with Second

---

[58]  For example, Lead Plaintiff relied on the Chappuis Halder Article's statement that 36 percent of cryptocurrency traders are located in the United States to say that 36 percent of the transactions in ERC-20 and EOS tokens at issue in this case were domestic and covered by the securities laws. Dkt. 134 at 8 ("[W]e considered in conducting the settlement negotiations and damages analysis that approximately 36 [percent] of trading in [B]lock.one tokens was domestic based on the figure contained in the [A]rticle . . . .").

[59]  *Id.* (noting that "the plurality of Ethereum nodes that verified U.S. persons' purchases from [B]lock.one are located in the U.S.").

[60]  No. 20-cv-4703 (LLS), 2021 WL 229609 (S.D.N.Y. Jan. 22, 2021), *vacated and remanded on other grounds*, No. 21-278, 2021 WL 4519887 (2d Cir. Oct. 4, 2021).

[61]  *Id.*, at *5-6.

[62]  *Id.*

Lead Plaintiff relies also on *SEC v. Traffic Monsoon*, 245 F. Supp. 3d 1275, 1296 (D. Utah 2017) *aff'd sub nom. SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) (applying the

Circuit cases holding that the purchaser's location is not determinative of the situs of a transaction in non-blockchain transactions.[63] And at least one other court in this district has declined to conclude that a cryptocurrency exchange transaction was domestic based on plaintiffs' allegation that they "bought tokens while located in the U.S. and that title passed in whole or in part over servers located in California that host [the exchange]'s website."[64]

Second, in *In re Tezos Securities Litigation,*[65] the court concluded that all transactions on the Ethereum Blockchain were domestic under *Morrison* because each transaction "became irrevocable only after it was validated by a network of global 'nodes' clustered more densely in the United States than in any other country."[66] But each blockchain transaction becomes irrevocable *for*

---

"irrevocable liability" test articulated in *Absolute Activist*). The court there held that transactions in securities sold over the internet occur in *both* the location of the seller and the location of the buyer. The Court declines to adopt this reasoning for largely the same reasons it does not follow *Helbiz.*

[63]  *E.g., In re Petrobras Sec.*, 862 F.3d at 262; *Myun-Uk Choi v. Tower Rsch. Cap. LLC* , 890 F.3d 60, 67-68 (2d Cir. 2018) (concluding that night-market trades on a Korean exchange, which were matched by the CME in the United States, were domestic transactions because the trades became irrevocable at the moment of matching); *Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at \*29 (S.D.N.Y. Feb. 21, 2017) (holding that the mere statement that "plaintiffs are U.S. residents who engaged in LIFFE Euribor futures transactions through LIFFE Connect terminals located in the United States" was not sufficient to state a domestic transaction under the CEA under *Absolute Activist*).

[64]  *Anderson v. Binance*, No. 20-cv-2803 (ALC), 2022 WL 976824, at \*4 (S.D.N.Y. Mar. 31, 2022), *appeal docketed*, No. 22-972 (2d Cir. May 2, 2022) (internal quotation marks omitted) (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 187 (2d Cir. 2014)).

[65]  No. 17-cv-6779 (RS), 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018).

[66]  *Id.* at \*8 (applying the "irrevocable liability" test articulated in *Absolute Activist*).

17

*the purchaser and seller* when the transaction has been cryptographically validated by a single node.[67] Other nodes subsequently validate the transaction before it becomes a permanent part of the blockchain, but that validation process lies outside of the transacting parties' control. As the Second Circuit explained in *Myun-Uk Choi*, "[w]hether the exchange can cancel or modify trades . . . says nothing about whether either trading party is free to revoke its error-free acceptance of a trade after matching."[68] Accordingly, the locations of the other nodes on the blockchain that later may accept or reject the transaction does not properly bear on when and where "irrevocable liability" as between the purchaser and the seller is incurred.

In this Court's view, a transaction by transaction approach seems appropriate to determine whether off-domestic exchange blockchain transactions are domestic or foreign under the second prong of *Morrison*. In general, "irrevocable liability" is incurred when the transaction has been verified by at least one individual node of the blockchain. Accordingly, the location of the node that verified the specific transaction at issue should control in this circuit under *Morrison*'s second prong as construed in *Absolute Activist*. Not only does this satisfy the *Absolute Activist* test, but it appears to be administrable as well because the location of the first node to validate a given transaction, the action which renders that transaction binding, appears to be identifiable. But the Court need not decide today which test to apply here because, as explained below, Lead Plaintiff has provided little to no information to the Court regarding the proportion of its transactions which were

---

[67]      Pending   Transactions   (ETH),   *Support*,   BITCOIN.COM, https://support.bitcoin.com/en/articles/5226275-pending-transactions-eth (last visited July 12, 2022) (noting that Ethereum transactions which have not been verified by any node may be cancelled).

[68]      *Myun-Uk Choi*, 890 F.3d at 67-68.

18

domestic as compared to those of the absent class members.  It has not made the showing required for the settlement class to be certified.

*Settlement Class Certification*

As suggested above, the Conditional Order of June 23, 2021 reflected the Court's determination that it likely would be able to certify the settlement class under Rules 23(a) and 23(b)(3).[69]  On further reflection and a much fuller record, however, the Court has concluded that its expectation has not been met.  In light of questions regarding the proportion of Lead Plaintiff's purchases of tokens which were domestic – and therefore covered by the securities laws and eligible for a damages award – compared to the proportions of domestic purchases by the absent class members, the Court now declines to certify the settlement class.

A necessary, albeit not sufficient, requirement for the certification of a class action like this is that all four of the prerequisites set out in Rule 23(a) – numerosity of class members, commonality of issues, typicality of class plaintiffs' claims, and adequacy of representation – be satisfied.  In this case, the numerosity, commonality and typicality requirements plainly are met.  The problem lies at least with adequacy of representation.

The adequacy inquiry requires courts to consider both "(i) whether the class representatives' claims conflict with those of the class and (ii) whether class counsel is qualified, experienced, and generally able to conduct the litigation."[70]  The Court finds that the second

---

[69]

      Dkt. 115 ¶ 6.

[70]

      *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 452 (S.D.N.Y. 2004) (citing *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 376 (S.D.N.Y. 2000); *In re the Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992); *see also Baffa v. Donaldson,*

requirement has been met. However – despite supplemental briefing and a hearing focused on the issue – the Court is not satisfied that Lead Plaintiff's interests do not conflict with those of the absent class members on the issue of domestic versus foreign transactions.

A mere "variation between the interests of an absent class member and those of the class generally" will not necessarily preclude class certification.[71] A conflict of interest arises when "the class members [] have interests that are antagonistic to one another . . . ."[72] Such antagonism may be present in this case because transactions in ERC-20 or EOS tokens that were domestic under *Morrison* may be eligible for damages but foreign transactions are not. This follows from the fact that Lead Plaintiff, in view of the proportion of its investments made in domestic versus foreign transactions, may have had an incentive to accept a lower settlement offer than would have been insisted upon by absent class members who purchased only or more predominantly in domestic transactions. To take a hypothetical example, if say 20 percent of Lead Plaintiff's purchases were domestic, its interest in settling all claims for all purchasers, domestic and foreign, at a given aggregate price on terms that would compensate it with respect to *all* of its purchases, foreign as well as domestic, could well have been far greater than the interest of other class members who had made say 50 percent of their investments in domestic transactions. In other words, Lead Plaintiff had an incentive to take a bigger "haircut" on the aggregate settlement price than would have existed for class members who had higher proportions of domestic purchase. And the problem is structural. The Court

---

[71] *Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

[72] *Wolfert ex rel. Est. of Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165, 173 (2d Cir. 2006).

*Id.* (citing *In re Joint Eastern and Southern District Asbestos Litig.*, 78 F.3d 764, 778 (2d Cir.1996) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at 291)).

does not suggest that either the Lead Plaintiff or its counsel were guilty of any misfeasance.

Exactly which transactions are domestic and which are foreign of course is a merits question. But the facts available to the Court at this stage suggest both that the proportion of Lead Plaintiff's purchases of EOS tokens which are domestic may be lower than those of many absent class members, and the stipulation of settlement entered into by Lead Plaintiff thus to some extent may have "traded away" viable claims by absent class members in order to obtain a settlement acceptable to it.

Lead Plaintiff represented to the Court that "[b]ecause the majority of EOS purchasers were foreign and because the price of EOS fluctuated significantly during the Class Period, Lead Plaintiff and Lead Counsel estimate that only 25 [percent] of those 900 million tokens are likely eligible to recover . . . ."[73] It based the assumption that the majority of EOS purchasers were foreign on the Chappuis Halder Article, which concluded that 36 percent of cryptocurrency traders are in the United States. There are several reasons to question whether it was reasonable for Lead Plaintiff to submit to such a steep haircut to the total value of its claims based on the estimate set forth in that article.

Class members purchased the relevant tokens through various pathways including (i) directly from Block.one in the ICO, (ii) in the secondary market on domestic exchanges, and (iii) in the secondary market via foreign exchanges. The Amended Complaint does not contemplate that class members may also have purchased ERC-20 or EOS tokens in the secondary market via peer-to-peer transactions or on decentralized exchanges, but it is quite likely that such purchases occurred. The 36 percent figure in the Chappuis Halder Article applies only to secondary market purchases on

---

[73] Dkt. 119 at 19.

centralized exchanges,[74] so by definition it does not address all of the relevant pathways. And, as discussed in greater detail above, an investor's location does not answer the question whether his or her purchases were domestic transactions. For example, the Chappuis Halder figure does not distinguish between domestic and foreign exchanges, which is critical in view of *Morrison*. Meanwhile, whether correctly or not, Lead Plaintiff contends that all purchases made directly from Block.one of ERC-20 in the ICO were domestic transactions because the contract for sale became irrevocable when the bid was received by Block.one's servers in the United States.[75] With this is mind, it does not logically follow that, because the Chappuis Halder Article says that 36 percent of cryptocurrency exchange traders are located in the U.S., Lead Plaintiff should operate on the assumption that "the majority of EOS purchasers were foreign" and therefore be willing to accept such a significant reduction to the total recovery of the class on this basis.

       Lead Plaintiff did not purchase tokens directly from Block.one in the ICO. It asserts that, under the SEC's analysis in *In re Poloniex*, its trades in EOS tokens were both "domestic and foreign transactions" because it "traded EOS on both U.S.-based and foreign exchanges."[76] In the alternative, it argues that all of its trades were domestic, under the analyses in *In re Tezos* and *Helbiz*, "because CAOF is a U.S.-based entity that was physically located in the U.S. when it conducted the trades."[77] Lead Plaintiff's physical location while trading EOS, however, tells the Court little about

---

[74]         Chappuis Halder Article at 2 ("Not that we focused on crypto investors only. We did not estimate the number of crypto users, meaning that we studied traders who are using Exchanges to trade at some point.").

[75]         Fairness Hearing Transcript (Dkt. 141) at 10:19-14:24.

[76]         Dkt. 134 at 9.

[77]         *Id.*

the situs of those transactions for purposes of *Morrison.* So the Court is left only with the knowledge

that some of Lead Plaintiff's purchases were domestic and some were foreign. Even after the Court

directed Lead Counsel's attention to the issue, the most it could say at the fairness hearing was that

the percentage of Lead Plaintiff's purchases made on a domestic exchange was "less than 50 percent,

but more than 25 percent."[78] The Court has no way to compare this estimate to the proportion of the

absent class members' purchases that were domestic. And it does not escape the Court's notice that

the Chappuis Halder Article's 36 percent figure falls neatly within that proffered range.

Lead Plaintiff correctly notes that "[t]he presence of foreign investors and/or foreign

transactions is not a bar to certification of the Settlement Class or of approval of the Settlement."[79]

Lead Plaintiff relies on *In re Petrobras Securities Litigation* for the proposition that "the Second

Circuit permits settlement of 'entirely non-meritorious claims' so that 'defendants might buy global

peace.'"[80] The issue here, however, is not that the parties seek to settle potentially non-meritorious

claims based on foreign purchases of ERC-20 or EOS tokens along with claims based on domestic

transactions. It is that absent class members who made domestic purchases only or who purchased

a higher proportion of securities domestically than CAOF are not represented and had no say in the

---

[78]    Dkt. 141 at 4:6-11.

[79]    Dkt. 134 (citing *In re Petrobras Sec. Litig.*, 317 F. Supp. 3d 858, 866 (S.D.N.Y. 2018), *aff'd*, 784 F. App'x 10 (2d Cir. 2019)).

[80]    *Id.* (internal citations omitted). *See also TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982) ("[I]n order to achieve a comprehensive settlement that would prevent the relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and *might not have been presentable* in the class action."); *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 135 (2d Cir. 2011) ("The law is well established in this Circuit and others that class action releases may include claims not presented and *even those which could not have been presented.*").

23

amount by which the aggregate settlement payment was reduced to account for the inclusion of foreign purchase claims.

Judge Rakoff certified the *In re Petrobras* settlement class despite an objection on the basis that "Class Counsel agreed to a proposed settlement agreement that unfairly diluted the recovery of domestic-purchasing class members" by including both domestic and foreign purchasers.[81] But that case is distinguishable for at least three reasons.

*First*, there were three named plaintiffs in *In re Petrobras*, each of whom was represented by separate counsel. "[T]wo of those three named plaintiffs . . . ha[d] exclusively domestic claims," and "neither objected to the equal treatment of [claimants whose transactions were foreign], even though these [named plaintiffs] . . . ha[d] no plausible reason to agree to disadvantageous settlement terms."[82] Here, CAOF is the only named plaintiff and was solely responsible for negotiating the settlement.

*Second*, claimants whose transactions were foreign made up only approximately two percent of the settlement class,[83] so Judge Rakoff viewed as significant "the substantial administrative costs of differentiating between the comparatively small number of [foreign] claimants and the overwhelming majority of domestic claimants."[84] In this case, Lead Plaintiff represents that a significantly larger proportion of claimants made foreign purchases, thus creating a larger dilution to

---

[81]   *In re Petrobras*, 317 F. Supp. at 867.

[82]   *Id.* at 869-70.

[83]   *Id.* at 869 n.11.

[84]   *Id.* at 869.

the recovery of domestic class members.

*Third*, the settlement amount in *In re Petrobras* does not appear to be have been reduced to account for the presence of foreign claims as Lead Plaintiff represents it was in this case. For these reasons, *In re Petrobras* does not support certification of the settlement class here.

The foregoing considerations alone warrant the conclusion that Lead Plaintiff has not carried its burden of establishing adequacy of representation. But there is an additional consideration as well.

The plan of allocation proposed here suggests another way in which Lead Plaintiff's apparent structural conflict has had a detrimental effect on absent class members. The parties have agreed, in essence, to divide the settlement fund equally among all claimants on a *pro rata* basis. Lead Plaintiff already has accepted a settlement offer that is 75 percent less than the total alleged loss to class members largely because of the presence of foreign purchases. For those class members who purchased tokens in domestic transactions, the settlement amount is in effect further reduced because, as members of the settlement class, claimants who made foreign purchases are eligible to collect on the same terms and therefore reduce the amount of the settlement pot available to domestic purchasers.

## Conclusion

This Court is entirely mindful of the adage that the law favors settlements. Indeed, it perhaps would blink reality to deny that the law sometimes may have a special place in its metaphorical heart for settlements of complicated cases that otherwise would be costly, time consuming, and difficult to resolve. And class actions serve an important and useful purpose as long as the overriding principle of fairness and the requirement of adequacy of representation are

rigorously observed lest an individual class action become an instrument of inequity. That is why the burden of establishing the adequacy of representation in and overall fairness of a proposed class settlement is on the proponent.[85]

In this case, the Court has not been persuaded that the requirement of adequate representation has been satisfied. And it hastens to add that it implies no misconduct or criticism of the Lead Plaintiff or its experienced and well regarded Lead Counsel. The problem, as the Court already has noted, is a structural problem having roots in the unusual market that the case concerns.

For the foregoing reasons, Lead Plaintiffs' motions (a) for final approval of the proposed settlement, to certify the proposed settlement class, and to appoint Lead Plaintiff as class representative and Grant & Eisenhofer P.A. as class counsel (Dkt. 118), and (b) to award fees and costs to Lead Counsel and costs to Lead Plaintiff (Dkt. 122) are denied.

SO ORDERED.

Dated: August 13, 2022

_____

Lewis A. Kaplan
United States District Judge

---

[85]  *Johnson v. Nextel Comm'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)); *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010).

# ECF 148

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CHASE WILLIAMS, et al.,

Plaintiffs,

-against-

BLOCK.ONE, et al.,

Defendants.

-------------------------------------------x

CRYPTO ASSETS OPPORTUNITY FUND, LLC, et al.,

Plaintiffs,

-against-

BLOCK.ONE, et al.,

Defendants.

Case No. 1:20-cv-02809-LAK

Honorable Lewis A. Kaplan

## NOTICE OF MOTION TO SUBSTITUTE LEAD PLAINTIFF
## AND TO APPROVE LEAD COUNSEL

PLEASE TAKE NOTICE that, pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77z-1, 78u-4, Jeffrey Derrick Anderson moves this Court (i) to substitute as Lead Plaintiff in the above-captioned action; (ii) to approve his selection of Roche Freedman LLP and Selendy Gay Elsberg PLLC as Co-Lead Counsel; and (iii) for leave to file a Second Amended Complaint within 14 days of his appointment as Lead Plaintiff. A proposed order is attached to this notice and will be submitted to the Orders Clerk concurrently with this filing. In support of the motion, Anderson relies upon the accompanying memorandum of law, declarations of counsel, and any other written or oral argument as may be requested or permitted by the Court.

Dated:     August 22, 2022
           New York, New York

Respectfully submitted,

| */s/ Jordan A. Goldstein* | */s/ Kyle W. Roche* |
|---|---|
| Jordan A. Goldstein | Kyle W. Roche |
| Oscar Shine | Edward Normand |
| SELENDY GAY ELSBERG PLLC | ROCHE FREEDMAN LLP |
| 1290 Sixth Avenue, 17th Floor | 99 Park Avenue, 19th Floor |
| New York, NY 10104 | New York, NY 10016 |
| jgoldstein@selendygay.com | kyle@rochefreedman.com |
| oshine@selendygay.com | tnormand@rochefreedman.com |

# ECF 149

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

CHASE WILLIAMS, et al.,

                              Plaintiffs,

                  -against-

BLOCK.ONE, et al.,

                            Defendants.

-------------------------------------------x

CRYPTO ASSETS OPPORTUNITY FUND, LLC, et al.,

                              Plaintiffs,

                  -against-

BLOCK.ONE, et al.,

                            Defendants.

Case No. 1:20-cv-02809-LAK

Honorable Lewis A. Kaplan

## JEFFREY DERRICK ANDERSON'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUBSTITUTE LEAD PLAINTIFF AND TO APPROVE LEAD COUNSEL

# <u>TABLE OF CONTENTS</u>

<u>Pages</u>

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................1

PROCEDURAL BACKGROUND.....................................................................................2

ARGUMENT .....................................................................................................................3

I.      Anderson Satisfies Rule 23's Adequacy Requirement. .......................................3

II.     Anderson Is the Only Possible Adequate Lead Plaintiff Under the Securities Act ............4

III.    The Court Should Substitute Anderson As Lead Plaintiff.....................................6

      A.     The Court Has Authority To Substitute A New Lead Plaintiff ..............................6

      B.     Anderson Should Be Appointed Lead Plaintiff ......................................................7

             1.     Anderson Has The Largest Loss Of All Viable Lead Plaintiffs .................8

             2.     Anderson Satisfies The Other Requirements Of Rule 23 ..........................9

      C.     Roche Freedman And Selendy Gay Elsberg Should Be Approved As Lead Counsel ..........................................................................................10

             1.     Roche Freedman ......................................................................................11

             2.     Selendy Gay Elsberg..............................................................................13

CONCLUSION.................................................................................................................14

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) .......................................... 9, 10

*Batter v. Hecla Mining Co.*, 2020 WL 1444934 (S.D.N.Y. Mar. 25, 2020)................................ 10

*Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017).................................. 5

*In re Barclays Bank PLC Sec. Litig.*, 2015 U.S. Dist. LEXIS 156676 (S.D.N.Y. Nov. 19, 2015) ............................................................................................................................ 5

*In re Barclays Bank PLC Sec. Litig.*, 2016 WL 3235290 (S.D.N.Y. June 9, 2016)..................... 6

*In re Facebook, Inc., IPO Sec & Derivative Litig.*, 288 F.R.D. 26 (S.D.N.Y. 2012).................. 11

*In re Imax Securities Litigation*, 2011 WL 1487090 (S.D.N.Y. Apr. 15, 2011) ........................... 7

*In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117 (S.D.N.Y. 2002)...................................... 6

*In re Lehman Bros. Sec. & Erisa Litig.*, 800 F. Supp. 2d 477 (S.D.N.Y. 2011)........................... 4

*In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128 (S.D.N.Y. 2007) ........................................... 7

*In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112 (S.D.N.Y. 2009)...................................................... 7

*In re Tezos Securities Litigation*, 2019 WL 2183448 (N.D. Cal. 2019) ....................................... 7

*In the Matter of Poloniex, LLC, Respondent*, Securities Act Rel. No. 92607, 2021 WL 3501307 (SEC Aug. 9, 2021)................................................................................................ 3

*Janbay v. Canadian Solar, Inc.*, 272 F.R.D. 112 (S.D.N.Y. 2010) ............................................ 11

*Kux-Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471 (S.D.N.Y. 2016) ................................... 10

*Lundy v. Ideanomics, Inc.*, 2020 WL 7389027 (S.D.N.Y. Dec. 16, 2020) ................................... 6

*P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004)................................................... 5

*Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013) ............................................................................................................................ 5, 6

*Rhode Island Laborers' Pension Fund v. FedEx Corp.*, 2019 WL 5287997 (S.D.N.Y. Oct. 18, 2019) ....................................................................................................................... 8

*Salinger v. Sarepta Therapeutics, Inc.*, 2019 WL 6873807 (S.D.N.Y. Dec. 17, 2019)............ 9, 10

## **Statutes**

15 U.S.C. § 77m ....................................................................................................... 4

15 U.S.C. § 77z-1 .................................................................................................... 8

15 U.S.C. § 78u-4 ................................................................................................... 8

Fed. R. Civ. P. 15 .................................................................................................... 4

Tex. Gov. Code § 4003.001 ..................................................................................... 4

## PRELIMINARY STATEMENT

On August 15, 2022, the Court denied a motion by Lead Plaintiff Crypto Assets Opportunity Fund LLC ("CAOF") for final approval of a proposed class action settlement. *See* ECF No. 146 (the "August 15 Order"). The Court found that CAOF cannot meet Federal Rule of Civil Procedure 23's adequacy requirement because of "a structural problem having roots in the unusual market that the case concerns." *Id.* at 25. In particular, CAOF's proportion of "purchases of EOS tokens which are domestic may be lower than those of many absent class members," thereby giving CAOF "an incentive to take a bigger 'haircut' on the aggregate settlement price than would have existed for class members who had higher proportions of domestic purchase." *Id.* at 19, 20.

The August 15 Order means that the proposed class currently has no adequate lead plaintiff. And, because the three-year repose period has lapsed for the Securities Act of 1933 ("Securities Act") claims at issue, *see* 15 U.S.C. § 77m, it is too late for an entirely new absent class member to come forward to seek appointment as lead plaintiff to pursue those claims. The absent class members are thus in danger of having no redress for their Securities Act claims against defendants.

Fortunately, there is one person still capable of serving as lead plaintiff and asserting Securities Act claims: Jeffrey Derrick Anderson. Unlike CAOF, Anderson is an adequate lead plaintiff because nearly all of his EOS purchases were domestic, rather than foreign. *See* Part I, *infra*. In addition, because Anderson timely moved for appointment as lead plaintiff at the outset of this litigation, *see* ECF No. 21, his Securities Act claims are not barred by the three-year statute of repose. *See* Part II, *infra*. Anderson therefore respectfully asks that the Court enter an order substituting him as Lead Plaintiff under the Private Securities Litigation Reform Act of 1995

1

("PSLRA") and approving his selection of Roche Freedman LLP ("RF") and Selendy Gay Elsberg PLLC ("SGE," and together with RF, "Counsel") as Lead Counsel in this action.

## PROCEDURAL BACKGROUND

On April 3, 2020, Chase Williams and William Zhang, through Counsel, filed the Complaint (the "Williams Complaint") against Defendants, which was the first-filed complaint alleging the claims described therein. On April 8, 2020, Counsel published the requisite PSLRA notice through Business News Wire. *See* Declaration of Kyle Roche ("Roche Declaration"), Exhibit A (PSLRA Notice).

On May 18, 2020, a second complaint—largely copied from and patterned off the Williams Complaint—was filed by Grant & Eisenhoffer P.A.; the Bluhm Legal Clinic of the Northwestern Pritzker School of Law, Complex Civil Litigation And Investor Protection Center; and Ievgeniia Vatrenko, Esq. on behalf of the putative class. *See Crypto Assets Opportunity Fund LLC, et al. v. Block.one, et. al.,* Case No. 1:20-cv-03829 (S.D.N.Y. May 18, 2020).

On June 8, 2020, two groups of plaintiffs timely sought appointment as Lead Plaintiffs: one consisting of Anderson, David Muhammad, Rajith Thiagarajan, Chase Williams, and Token Fund I LLC, ECF No. 20, and the other consisting of CAOF, ECF No. 22. On August 4, 2020, the Court appointed CAOF as the lead plaintiff. ECF No. 57.

In the August 15 Order, the Court denied CAOF's motion for final approval of a proposed class action settlement. *See* ECF No. 146. The Court held that, because the majority of CAOF's purchases of EOS were made in foreign transactions, CAOF was not an adequate class representative. *Id.* at 19–25. As a result of the foreign skew of CAOF's purchases, it had "an incentive to accept a lower settlement offer than would have been insisted upon by absent class

members who purchased only or more predominantly in domestic transactions," rendering it conflicted and thus inadequate. *Id.* at 19.

## ARGUMENT

### I. Anderson Satisfies Rule 23's Adequacy Requirement.

Unlike CAOF, nearly all of Anderson's losses from his purchases of EOS derive from domestic transactions. As reflected in his certification and the accompanying loss chart, Declaration of Jordan A. Goldstein ("Goldstein Declaration") Exhibits A & B, Anderson suffered 85.5 percent of his losses on Kraken, a domestic exchange. As the Court has recognized, Kraken is a cryptocurrency exchange based in the United States. August 15 Order at 8. Kraken also meets all the factors that the SEC identified in finding Poloniex to be a domestic securities exchange. *See In the Matter of Poloniex, LLC, Respondent*, Securities Act Rel. No. 92607, 2021 WL 3501307, at *2 (SEC Aug. 9, 2021). Like Poloniex, Kraken:

- Provides a limit order book for bringing together orders of multiple buyers and sellers of EOS (Roche Decl. ¶ 5);

- Receives and stores orders from users of EOS on the Kraken order book and displays the top orders as bids and offers on the Kraken website (Roche Decl. ¶ 6);

- Provides the means for these orders to interact and execute (Roche Decl. ¶ 7); and

- Allows users to agree upon the terms of their trades in EOS on Kraken (Roche Decl. ¶ 7).

*Compare with Poloniex*, 2021 WL 3501307, at *6. Because nearly all of Anderson's losses were on Kraken, Anderson can "recover damages under the federal securities laws should the remainder of [his] requirements be met." August 15 Order at 14.

As an overwhelmingly domestic purchaser, Anderson does not have "an incentive to take a bigger 'haircut' on the aggregate settlement price than" other class members. *Id.* at 19. Instead, he is fully incentivized to pursue the best outcome for members of the class holding claims arising

from purchases on domestic exchanges. Because the proportion of Anderson's "purchases of EOS tokens which are domestic" will not be "lower than those of many absent class members," he is not incentivized to "trade away" meritorious domestic claims to obtain a settlement for non-domestic purchases. The adequacy issues that prevented the Court from appointing CAOF as Lead Plaintiff thus do not apply to Anderson.

## II.   Anderson Is the Only Possible Adequate Lead Plaintiff Under the Securities Act

Anderson is the only class member that could replace CAOF as Lead Plaintiff to bring claims under the Securities Act because the claims of any other individual or entity would be barred by the three-year statute of repose governing the Section 12 claims in this action. This means that appointing Anderson as Lead Plaintiff is the only way to allow this action to proceed and for class members potentially to recover under the Securities Act.[1]

Claims under Section 12(a)(1) of the Securities Act are barred by a statute of repose if they are brought "more than three years after the security was bona fide offered to the public." 15 U.S.C. § 77m. As the Court has recognized, EOS was offered to the public "from June 26, 2017 to June 1, 2018." Order at 6. The repose period thus closed on June 26, 2020.[2] *See P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 106 (2d Cir. 2004) (repose period begins at "the time when the stock is initially bona fide offered to the public").

---

[1] In addition to his claims under Section 12 of the Securities Act, Anderson can also timely assert claims under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. Anderson also has timely Texas blue-sky claims, as they were asserted within three years of EOS being issued to the public. *See* ECF No. 39-1 ¶ 15, 689–707; *see also* Tex. Gov. Code § 4003.001(a) (formerly codified at Tex. Rev. Civ. Stat. art. 581-7(A)(1)) (prohibiting sale of unregistered securities). Anderson would file an amended complaint within 14 days of appointment to include these claims. *See* Fed. R. Civ. P. 15(a)(2) (courts "should freely give leave when justice so requires").

[2] The same analysis applies to the Section 15 claims brought against Daniel Larimer and Brock Pierce, which are governed by the same three-year repose period. *See In re Lehman Bros. Sec. & Erisa Litig.*, 800 F. Supp. 2d 477, 483 (S.D.N.Y. 2011) (recognizing that pending action did not toll repose period for Section 15 claims against individual defendants).

4

The statute of repose was <u>not</u> tolled by the commencement of this class action. As the Second Circuit and this Court have held, "*American Pipe*'s tolling rule, whether grounded in equitable authority or on Rule 23, does not extend to the statute of repose in Section 13." *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 109 (2d Cir. 2013) (affirming *In re IndyMac Mortg.-Backed Sec. Litig.*, 793 F. Supp. 2d 637 (S.D.N.Y. 2011) (Kaplan, J.)); *see also Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2051 (2017) (holding that "statutes of repose are not subject to equitable tolling"). The fact that CAOF is not an adequate plaintiff does <u>not</u> permit the substitution of another lead plaintiff whose claims were not commenced within the statute of repose. *See In re Barclays Bank PLC Sec. Litig.*, 2015 U.S. Dist. LEXIS 156676, at *11 (S.D.N.Y. Nov. 19, 2015) (Goldstein Decl. Ex. C) (holding that, after death of class representative, *IndyMac* did not allow tolling or relation-back of repose period). Because the repose period has run, no new plaintiff can bring a claim. Accordingly, absent Anderson's appointment as lead plaintiff, not only would this class action be unable to proceed under the Securities Act, but none of the absent class members could bring a claim under that statute in an individual action.

Anderson, however, is unique in that the statute of repose does not prevent him from bringing claims under Section 12 on either an individual or representative basis. Anderson preserved his claims because he timely moved for appointment as lead plaintiff on June 8, 2020. ECF No. 20; s*ee also Cal. Pub. Employees' Ret. Sys.*, 137 S. Ct. at 2054 (finding that a "simple motion to intervene or request to be included as a named plaintiff in the class-action complaint may well suffice" to ensure a plaintiff has preserved their claims from being barred by Section 13's repose); *IndyMac*, 721 F.3d at 112 (explaining that would-be plaintiffs' claims would have

been timely if they had made "timely *motions*" to enter "the action as named plaintiffs" (emphasis added)).

Courts have recognized the importance of a potential class representative's unique ability to assert claims that would otherwise be barred by the statute of repose. *See, e.g.*, *In re Barclays Bank PLC Sec. Litig.*, 2016 WL 3235290, at *7 (S.D.N.Y. June 9, 2016) (certifying a class where "Defendants' proposed remedy—denying certification and depriving [the putative lead plaintiff] of the opportunity to pursue any claims on behalf of the class—would leave the proposed class far worse, given the bar on tolling the Securities Act's repose period after dismissal of a putative class action"); *Lundy v. Ideanomics, Inc.*, 2020 WL 7389027, at *3 (S.D.N.Y. Dec. 16, 2020) (rejecting proposed lead plaintiff who was subject to a unique defense because "if Defendants are later successful in any opposition to class certification or [the proposed lead plaintiff] as the class representative as a result of [his] unique defense, class members may be subject to statute of repose concerns"). Anderson's unique ability to bring these claims thus makes him the only appropriate replacement lead plaintiff to bring claims under the Securities Act.

## III. The Court Should Substitute Anderson As Lead Plaintiff

### A. The Court Has Authority To Substitute A New Lead Plaintiff

"The PSLRA is entirely silent on the proper procedure for substituting a new lead plaintiff." *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 120 (S.D.N.Y. 2002) (analyzing new lead plaintiff process when the previously certified one withdraws). However, courts in this District have found that "[i]t only stands to reason that the appropriate lead plaintiff would be the next 'most adequate' plaintiff in accordance with the above criteria." *Id.* Further, where "all putative class members were given notice of the opportunity to move for appointment as lead plaintiff by the original motion, there is no need for the Court to re-open the process by ordering a new notice and motion period." *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 143 (S.D.N.Y. 2007)

6

(granting motion to disqualify and remove lead plaintiff where previously appointed lead plaintiff was found to be inadequate); *see also In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112, 116–18 (S.D.N.Y. 2009) (after determining that the originally appointed lead plaintiff lacked standing, court selected a new lead plaintiff from among applicants who moved for appointment during initial 60-day notice period); *In re Tezos Securities Litigation*, 2019 WL 2183448, *1–2 (N.D. Cal. 2019) (explaining that the PSLRA does not "require[] re-noticing this action for the selection of a new lead plaintiff" and granting motion to substitute lead plaintiff after the previously appointed lead plaintiff withdrew).

*In re Imax Securities Litigation*, 2011 WL 1487090 (S.D.N.Y. Apr. 15, 2011), is instructive. The court initially appointed a lead plaintiff, but later denied its motion for class certification. *Id.* at *1. The court then proceeded to assess competing applications for substitute lead plaintiffs by analyzing the same three factors courts use in assessing the most adequate plaintiff in the context of lead plaintiff motions made pursuant to the PSLRA. *Id.* at *2–7. Finally, in appointing a sole substitute lead plaintiff, the court rejected the argument by prior lead counsel that it needed to be appointed as class counsel or co-class counsel, finding that the substitute lead plaintiff's choice of lead counsel, who "ha[d] already had significant involvement with this case," would "best [represent] the interests of the class." *Id.* at *9.

### B. Anderson Should Be Appointed Lead Plaintiff

In addition to being the only class representative who can assert Section 12(a)(1) claims, Anderson also meets the other requirements for a lead plaintiff. The PSLRA provides that the Court shall adopt a presumption that the most adequate plaintiff is the person that:

> (aa) has either filed the complaint or made a motion in response to a notice …;
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal
Rules of Civil Procedure.

15 U.S.C. §§ 77z-1(a)(3)(B)(iii)(I); 78u-4(a)(3)(B)(iii)(I). Here, there are no other applicants, and

no other applicant could assert the Section 12 claims on behalf of the class. But, even if there were

other applicants, Anderson would satisfy the PSLRA factors.

### 1.    Anderson Has The Largest Loss Of All Viable Lead Plaintiffs

As the only adequate plaintiff with a timely claim under Section 12(a)(1), Anderson has

suffered losses that make him, by definition, the only potential lead plaintiff with the largest

financial interest in this matter. But, even if there were other applicants, Anderson has suffered

significant losses in trading EOS. *See* Goldstein Decl. Ex. B (Loss Chart). The PSLRA does not

specify a method for calculating who has the "largest financial interest," but courts in this District

commonly look to four factors in making this determination: "(1) the number of shares purchased;

(2) the number of net shares purchased; (3) total net funds expended by the plaintiff during the

class period; and (4) the approximate losses suffered by the plaintiff." *Rhode Island Laborers'*

*Pension Fund v. FedEx Corp.*, 2019 WL 5287997, at *1 (S.D.N.Y. Oct. 18, 2019). "The fourth

factor, the largest loss, is considered by most courts to be the critical ingredient in determining the

largest financial interest and outweighs net shares purchased and ne[t] expenditures." *Id.* (internal

quotation marks omitted).

Each factor shows that Anderson has an extensive financial interest in this litigation. *First*,

Anderson purchased 3,828.43 EOS tokens during the Class Period, of which 3,320.00 were

purchased on a domestic exchange. Goldstein Decl. Ex. A (Anderson Certification). *Second*,

Anderson sold 3,821.31 EOS tokens, of which 3,313.39 were sold on a domestic exchange.

Anderson therefore had a net purchase of 7.12 EOS tokens overall and 6.61 EOS tokens

domestically. *Id. Third*, Anderson expended $11,392.03 in net funds for his overall net purchase

8

of 3,828.43 EOS tokens and $4,768.97 for his domestic net purchase of 3,320.00 EOS tokens. *Id.* *Finally*, Anderson suffered a total realized loss of approximately $3,608.66 of which $3,086.58 (*i.e.*, 85.5 percent) was suffered based upon purchases on the domestic exchange Kraken. *Id.*; *see also* Goldstein Decl. Ex. B.

Because Anderson has the largest financial interest and is the sole potential lead plaintiff who satisfies Rule 23's adequacy and typicality requirements, he should be appointed lead plaintiff. *See Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 361 (S.D.N.Y. 2019) (appointing lead plaintiff who "had incurred losses of approximately $1,422.99 in connection with his purchase of ATB Coins during the Class Period … has the largest financial interest of any class member seeking appointment as lead plaintiff, and … is aware of no other class member with a larger financial interest").

### 2. Anderson Satisfies The Other Requirements Of Rule 23

"In making the determination of whether a movant otherwise satisfies the requirements of Rule 23, the movant must make a preliminary showing that it satisfies the typicality and adequacy requirements of Rule 23." *Salinger v. Sarepta Therapeutics, Inc.*, 2019 WL 6873807 at *3 (S.D.N.Y. Dec. 17, 2019) (internal quotation marks omitted). "This determination need not be as complete as would a similar determination for the purpose of class certification, and the movant is only required to make a prima facie showing that it meets the typicality and adequacy requirements." *Id.* (internal quotation marks and citations omitted). For the reasons stated in Part I, *supra*, Anderson is an adequate lead plaintiff. Moreover, his claims are typical of the class.

For the typicality analysis, "courts consider whether the claims of the proposed lead plaintiff arise from the same conduct from which the other class members' claims and injuries arise." *Id.* A lead plaintiff's claims are typical where they "arise[] from the same course of events

as those of other class members and [the lead plaintiff] will make[] similar legal arguments to prove the defendant[s'] liability." *Kux-Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 477 (S.D.N.Y. 2016) (internal quotation marks omitted). "While the claims need not be identical, the claims of the proposed lead plaintiff must be substantially similar to the other members' claims." *ATBCOIN*, 380 F. Supp. 3d at 362.

Anderson's claims are typical. Like every member of the class, Anderson purchased EOS tokens during the Class Period, and those EOS tokens were offered by Defendants without registering as required under federal and state securities laws. Because of that conduct, Anderson has the same right as every member of the class to recover consideration paid for EOS tokens or damages for EOS tokens previously sold. Thus, Anderson's claims are typical of those of the class.

### C. Roche Freedman And Selendy Gay Elsberg Should Be Approved As Lead Counsel

Anderson's choice of Roche Freedman and Selendy Gay Elsberg to represent him and the putative class should be approved. "The PSLRA vests authority in the lead plaintiff to select lead counsel, subject to approval by the Court." *Batter v. Hecla Mining Co.*, 2020 WL 1444934, at *9 (S.D.N.Y. Mar. 25, 2020) (internal citation and quotations omitted). Courts approve the selection of counsel that are "qualified, experienced, and generally able to conduct the litigation." *VimpelCom,* 151 F. Supp. 3d at 479 (approving firm that "appears to be competent and experienced counsel, based on its past experience in securities fraud class actions").

RF and SGE are qualified, experienced, and capable of effectively prosecuting this class action on behalf of Anderson and the class. Counsel collectively has unparalleled experience litigating matters relating to crypto-assets. Before filing this action, RF and SGE together "devoted substantial time and resources working . . . in identifying and investigating the claims set forth in the complaint." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 288 F.R.D. 26, 40 (S.D.N.Y.

2012) (recognizing import of counsel's pre-suit work in appointing lead counsel); *see also Janbay v. Canadian Solar, Inc.*, 272 F.R.D. 112, 121 (S.D.N.Y. 2010) (same). Counsel's extensive pre-suit investigation into the claims included speaking with dozens of cryptocurrency experts and industry insiders to understand the unique mechanics of the Defendants' unregistered offering and retaining experts to assist with data analysis. This six-month investigation culminated on April 3, 2020, when Counsel filed eleven class actions, including this case, which all asserted federal and state securities claims arising from the sale of unregistered crypto-securities. Notably the claims filed by CAOF on May 18, 2020 largely copied and were patterned off the Williams Complaint filed by RF and SGE in this action.

### 1. Roche Freedman

Courts have recognized that RF has "extensive experience and expertise in the field of securities litigation and has successfully prosecuted numerous securities fraud class actions and obtained excellent recoveries on behalf of defrauded investors." *D'Arcy v. Sequential Brands Group, Inc.*, No. 2:21-cv-02305, Dkt. No. 25 (C.D. Cal. June 11, 2021) (appointing RF as lead counsel).[3] In addition to *D'Arcy*, RF has recently secured lead counsel appointments in numerous other matters, including *Valenti v. Dfinity USA Research LLC et al.,* No. 3:21-cv-06118-JD (N.D. Cal.); *In re Qutoutiao Inc. Sec. Litig.*, No. 1:20-cv-06707 (SHS) (S.D.N.Y.); *Carl D. Cachia v. Bellus Health Inc. et al.*, No. 1:21-cv-02278 (S.D.N.Y.); *In re Renewable Energy Grp. Sec. Litig.*, No. 1:21-cv-01832 (S.D.N.Y.); *In re Qiwi Plc Sec. Litig.*, No. 1:20-cv-06054 (E.D.N.Y.); *Chapman v. Fennec Pharma Inc. et al.*, No. 1:20-cv-812 (M.D.N.C.); *Garcia v. J2 Global, Inc. et al.*, No. 2:20-cv-06096 (C.D. Cal.); *In re Sona Nanotech, Inc. Sec. Litig.*, No. 2:20-cv-11405 (C.D.

---

[3] A description of RF's qualifications is set forth at Exhibit B to the accompanying Declaration of Kyle W. Roche.

Cal.); *Lowry v. RTI Surgical Holdings, Inc. et al.*, No. 1:20-cv-01939 (N.D. Ill.) (co-lead counsel); and *Hartel v. Geo Group, Inc. et al.*, No. 9:20-cv-81063 (S.D. Fla.) (co-lead counsel).

In addition to their extensive experience in prosecuting traditional securities claims, RF's lawyers have unsurpassed expertise in litigation involving crypto-assets. Mr. Roche, a lead attorney from RF, is a recognized thought leader in the industry. He has published multiple articles on the intersection of crypto-assets and law (*see, e.g.*, Kyle Roche, *Bitcoin: Order Without Law in the Digital Age*, 94 Indiana L.J. 1497 (2019); Kyle Roche, *Why Bitcoin is Booming*, Wall Street Journal (July 10, 2017)), and is a frequent speaker and lecturer on the topic, having guest-lectured at Harvard Law School and the Northwestern Pritzker School of Law. Together with his colleagues, he represents plaintiffs in some of the most significant disputes in the crypto industry. RF has secured several notable lead counsel class counsel appointments in class actions involving crypto-assets. *See, e.g.*, *In re Tether & Bitfinex Crypto Asset Litig.*, No. 19-cv-9236-KPF (S.D.N.Y.) (co-lead interim class counsel with SGE in litigation concerning multibillion-dollar crypto market manipulation scheme); *Valenti v. Dfinity USA Research LLC et al.*, No. 3:21-cv-06118-JD (N.D. Cal.) (unregistered securities and manipulation action); *Lee v. Binance*, No. 1:20-cv-02803-ALC (S.D.N.Y.) (unregistered securities offering); *accord Clifford v. TRON Found.*, No. 20-cv-2804-VSB (S.D.N.Y.). RF also has significant experience in crypto-asset litigation outside of the class action context. *See Kleiman v. Wright*, No. 9:18-cv-80176-BB (S.D. Fla.) (securing $143 million judgment in litigation concerning the rightful ownership of bitcoin-related intellectual property rights); *Shin v. Icon Found.*, No. 20-cv-07363-WHO (N.D. Cal.) (litigation concerning ownership of automatically generated crypto-assets).

### 2. Selendy Gay Elsberg

SGE is also well-qualified to represent the interests of Anderson and the class.[4] SGE has substantial experience in cases involving crypto-assets, complex financial transactions, and class actions.

SGE's attorneys have litigated the entire spectrum of complex financial matters—from residential mortgage-backed securities to reinsurance contracts to credit default swaps—securing trial and appellate victories and numerous favorable settlements for their clients. For example, SGE's attorneys have served as class counsel in numerous high-profile actions, including representing a class of public servants in an action against loan servicer Navient, *Hyland v. Navient Corp.*, No. 1:18-cv-9031-DLC (S.D.N.Y.) (Cote, J.), and having represented the American Federation of Teachers and other investors in a class action against Goldman Sachs, Merrill Lynch, Barclays, Citigroup, and others alleging collusive violations of the Sherman Act arising out of the $13 trillion U.S. Treasuries market, *In re: Treasury Secs. Auction Antitrust Litig.*, No. 1:15-md-02673 (S.D.N.Y.). In the last decade, SGE lawyers recovered tens of billions of dollars for their clients.

SGE has also been appointed under the PSLRA as interim class co-counsel in multiple matters involving crypto-assets in this District. Those cases include *Underwood, et al. v. Coinbase Global, Inc., et al.*, No. 1:21-cv-08353-PAE (S.D.N.Y.) (Engelmayer, J.); *Anderson, et al. v. Binance, et al.*, No. 1:20-cv-02803-ALC, (S.D.N.Y) (Carter, J.); *Hardin, et al. v. Tron et al.*, No. 1:20-cv-02804-VSB (S.D.N.Y.) (Broderick, J.); and *Williams, et al. v. KuCoin et al.*, No. 1:20-cv-02806-GBD (S.D.N.Y.) (Daniels, J.)—all of which, like this action, allege violations of the

---

[4] A description of SGE's qualifications is set forth at Exhibit D to the accompanying Declaration of Jordan A. Goldstein.

securities laws based on the sale of unregistered crypto-securities. In appointing SGE as lead counsel, courts in this District have recognized SGE's "pertinent background and experience, including [its] experience litigating securities class actions." *Underwood*, Dkt. No. 21 at 10 (S.D.N.Y. Jan. 11, 2022).

SGE has similarly been appointed interim class co-counsel for purchasers asserting claims under the Commodity Exchange Act in an action filed in this District against the BitMEX crypto-asset exchange concerning the sale of futures contracts on digital assets. *See Messieh, et al. v. HDR Global Trading Limited, et al.*, No. 20-cv-3232-ALC (S.D.N.Y.) (Carter, J.). In addition, SGE has been appointed as interim class co-counsel in another large crypto-asset class action in this District. *See In re Tether and Bitfinex Crypto Asset Litigation*, No. 1:19-cv-09236-KPF (S.D.N.Y.) (Failla, J.). In that litigation, SGE represents the plaintiffs in alleging that Bitfinex, a prominent crypto-exchange, and Tether, a prominent crypto-asset issuer, worked with major crypto-exchanges Bittrex and Poloniex to manipulate the market for crypto-assets in violation of various federal and state laws. On September 28, 2021, the *Tether* Court denied a motion to dismiss plaintiffs' claims alleging violations of the Sherman Antitrust Act, the Commodity Exchange Act, and common law fraud, and discovery is proceeding in that action.

In short, RF and SGE are well qualified to represent the putative class in pursuing securities claims against Defendants arising from their issuance and sale of EOS.

## CONCLUSION

For the foregoing reasons, Anderson respectfully requests that the Court: (a) appoint Anderson as Lead Plaintiff; (b) approve Anderson's selection of RF and SGE as Co-Lead Counsel; (c) grant Anderson leave to file a Second Amended Complaint within 14 days of his appointment; and (d) issue any other relief that the Court deems just and proper.

Dated:    August 22, 2022
          New York, New York

                    Respectfully submitted,

*/s/ Jordan A. Goldstein*                    */s/ Kyle W. Roche*
Jordan A. Goldstein                          Kyle W. Roche
Oscar Shine                                  Edward Normand
SELENDY GAY ELSBERG PLLC                     ROCHE FREEDMAN LLP
1290 Sixth Avenue, 17th Floor                99 Park Avenue, 19th Floor
New York, NY 10104                           New York, NY 10016
jgoldstein@selendygay.com                    kyle@rochefreedman.com.com
oshine@selendygay.com                        tnormand@rochefreedman.com

# ECF 154

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CHASE WILLIAMS, et al.

      Plaintiffs,

v.

BLOCK.ONE, et al.,

      Defendants.

CASE NO. 1:20-cv-02809-LAK

CRYPTO ASSETS OPPORTUNITY FUND,
LLC, et al.,

        Plaintiffs,

v.

BLOCK.ONE, et al.,

      Defendants.

## NOTICE OF MOTION TO WITHDRAW

Given recent restructuring of its class action practice group, the press of its current business, and the early stage of this litigation, the firm seeks leave to withdraw from this case. Selendy and Gay will remain on as counsel in this action and the client consents to this withdrawal.

DATED: September 1, 2022          Respectfully Submitted,

**ROCHE FREEDMAN LLP**

*/s/ Kyle W. Roche*
Kyle W. Roche
Velvel Freedman

Edward Normand
Joseph Delich
99 Park Avenue, 19th Floor
New York, NY 10016
kyle@rochefreedman.com

*Counsel for Jeffrey Derrick Andserson*

SO ORDERED this _____ day of _____, 2022.

_____
HON. LEWIS A. KAPLAN
UNITED STATES DISTRICT JUDGE

2

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on September 1, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

/s/ Kyle W. Roche
Kyle W. Roche