**FREEDMAN NORMAND FRIEDLAND LLP**
Edward Normand (admitted *pro hac vice*)
Richard Cipolla (admitted *pro hac vice*)
Stephen Lagos (admitted *pro hac vice*)
Ivy T. Ngo (SBN 249860)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Facsimile: (646) 392-8842
Email: tnormand@fnf.law
Email: rcipolla@fnf.law
Email: slagos@fnf.law
Email: ingo@fnf.law

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL VALENTI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DFINITY USA RESEARCH LLC, DFINITY FOUNDATION, and DOMINIC WILLIAMS,<br><br>Defendants. | Case No.: 3:21-cv-06118-JD<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY**<br><br>Date:     November 17, 2022<br>Time:     10:00 a.m.<br>Courtroom: 11, 19th Floor<br>Judge:   Hon. James Donato |

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ..................................................................................................... 1

I.      Plaintiffs Allege Defendants Violated the Securities Laws ....................................... 1

II.     Williams Flees to Switzerland as Public Criticism and Legal Problems Mount ..................... 2

III.    Defendants Attempt to Use Defamation Laws to Stifle Public Criticism ............................... 2

IV.     Defendants Launch CryptoLeaks to Attack Their Perceived Critics ...................................... 3

V.      Defendants Apparently Engaged Ager-Hanssen to Secretly Record Mr. Roche.................... 4

VI.     Defendants Rely on CryptoLeaks's Accusations ............................................................... 5

VII.    Roche Separates from the Firm ......................................................................................... 6

LEGAL STANDARD ................................................................................................................ 6

ARGUMENT .............................................................................................................................. 7

I.      Defendants Lack Standing to Complain About a Conflict Among FNF's Clients ................. 7

II.     Defendants' Motion Is the Product of Extreme Tactical Abuse ............................................ 8

III.    Defendants Fail to Establish that Mr. Roche Violated Rule 1.7(b) ....................................... 10

        A.  The Evidence Does Not Support Defendants' Personal-Interest-Conflict Argument. ..... 10

        B.  Defendants Fail to Identify any Actual Conflict Between Ava Labs and Plaintiffs. ........ 11

IV.     Defendants Fail to Establish That Mr. Roche's Alleged Conflict Is Imputed on FNF .......... 12

V.      Defendants Have Failed to Establish That Disqualification of FNF Is Appropriate .............. 14

CONCLUSION .......................................................................................................................... 15

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY – No. 3:21-cv-06118

# **TABLE OF AUTHORITIES**

**Cases**

*Alvarez v. XPO Logistics Cartage, LLC*,
   2022 WL 644168 (C.D. Cal. Feb. 8, 2022)...................................................................... 14

*Andrews Farms v. Calcot, Ltd.*,
   2010 WL 4010146 (E.D. Cal. Oct. 13, 2010) .......................................................... 8, 14

*Balfour v. Beatty Infrastructure, Inc. v. PB&A, Inc.*,
   2017 WL 956650 (N.D. Cal. Mar. 13, 2017) .................................................................. 7

*Baugh v. Garl*,
   137 Cal. App. 4th 737 (2006) ...................................................................................... 13

*Blacktail Mountain Ranch Co., LLC v. Jonas*,
   611 F. App'x 430 (9th Cir. 2015) .................................................................................. 7

*Cal Pak Delivery v. United Parcel Service*,
   52 Cal. App. 4th 1 (1997) ..................................................................................... 11, 14

*Caldwell v. City of San Francisco*,
   2021 WL 242867 (N.D. Cal. Jan. 25, 2021) ......................................................... passim

*Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
   2014 WL 12160744 (S.D. Cal. Jan. 23, 2014) ............................................................. 13

*Corns v. Laborers Int'l Union of N. Am.*,
   2014 WL 1319306 (N.D. Cal. Mar. 31, 2014) ....................................................... 7, 8, 9

*Coyler v. Smith*,
   50 F. Supp. 2d 966 (C.D. Cal. 1999) ............................................................................. 7

*De Dios v. Int'l Realty & Invs.*,
   641 F.3d 1071 (9th Cir. 2011) ....................................................................................... 8

*Derivi Constr. & Architecture, Inc. v. Wong*,
   118 Cal. App. 4th 1268 (2004) .................................................................................... 13

*Frank Gari Prods., Inc.*,
   2012 WL 12895903 (C.D. Cal. June 15, 2012) .............................................................. 7

*Huston v. Imperial Credit Commercial Mortg. Inv. Corp.*,
   179 F. Supp. 2d 1157 (C.D. Cal. 2001) ....................................................................... 14

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
   658 F.2d 1355 (9th Cir. 1981) ..................................................................................... 14

*In re Novastar Fin. Securities Litig.*,
  2007 WL 465649 (W.D. Mo. Feb. 8, 2007) ............................................................. 15

*Jenkins v. Zwebner*,
  2012 WL 13012585 (C.D. Cal. Aug. 3, 2012) ........................................................ 7

*Kendall-Jackson Winery, Ltd. v. Superior Court*,
  76 Cal. App. 4th 970 (1999) ...................................................................................... 9

*Klein v. Facebook, Inc.*,
  2021 WL 3053150 (N.D. Cal. July 20, 2021) ...................................................... 14

*Luck v. OTX Acquisition Corp.*,
  2010 WL 11595723 (C.D. Cal. July 20, 2010) ....................................................... 8

*Marsden v. Select Med. Corp.*,
  246 F.R.D. 480 (E.D. Pa. 2007) ............................................................................ 15

*McIlwain v. Brown*,
  2019 WL 8219492 (C.D. Cal. Aug. 30, 2019) ..................................................... 12

*Openwave Sys. Inc. v. Myriad France S.A.S.*,
  2011 WL 1225978 (N.D. Cal. Mar. 31, 2011) ..................................................... 10

*Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd.*,
  760 F.2d 1045 (9th Cir. 1985) .................................................................................. 9

*Planned Parenthood Fed'n of Am., Inc. v. Newman*,
  --- F.4th ----, 2022 WL 12234037 (9th Cir. Oct. 21, 2022) ................................. 9

*QuickLogic Corp. v. Konda Techs., Inc.*,
  --- F. Supp. 3d ----, 2022 WL 3046751 (N.D. Cal. Aug. 2, 2022) .................... 7, 9

*Rutti v. Lojack Corp.*,
  2007 WL 9703177 (C.D. Cal. July 23, 2007) ........................................................ 7

*SEC v. King Chuen Tang*,
  831 F. Supp. 2d 1130 (N.D. Cal. 2011) ............................................................ 6, 7

*Simonyan v. Nationwide Ins. Co. of Am.*,
  78 Cal. App. 5th 889 (2022) ................................................................................... 12

*Simpson Strong-Tie Co., Inc. v. Oz-Post Int'l, LLC*,
  2018 WL 3956430 (N.D. Cal. Aug. 17, 2018) ...................................................... 8

*Skyy Spirits, LLC v. Rubyy, LLC*,
  2009 WL 3762418 (N.D. Cal. Nov. 9, 2009) ....................................................... 10

*State Compensation Ins. Fund v. Drobot*,
  2014 WL 12579808 (C.D. Cal. July 11, 2014) ................................................... 13

iv

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY – No. 3:21-cv-06118

*Testone v. Barlean's Organic Oils, LLC*,
  2021 WL 22611 (S.D. Cal. Jan. 4, 2021) .................................................. 15

*United States v. Cty. of Los Angeles*,
  2016 WL 4059712 (C.D. Cal. July 27, 2016) ................................................ 8

*United States v. Kaczynski*,
  551 F.3d 1120 (9th Cir. 2009) ........................................................... 9

*Visa U.S.A., Inc. v. First Data Corp.*,
  241 F. Supp. 2d 1100 (N.D. Cal. 2003) .................................................. 12

**Other Authorities**

Cal. Rule Prof'l Conduct 1.10(a) ......................................................... 12

Cal. Rule Prof'l Conduct 1.8 ............................................................ 14

1

Lead Plaintiff Henry Rodriguez and named plaintiff Daniel Valenti, on behalf of themselves

2

and all others similarly situated, respectfully submit this Memorandum of Law in Opposition to

3

Defendants' Motion to Disqualify Roche Freedman LLP ("RF"). (Dkt. No. 72.)

4

**PRELIMINARY STATEMENT**

5

Plaintiffs allege that Defendants caused hundreds of millions of dollars in damages by sell-

6

ing unregistered securities, making materially false statements about those securities, manipulating

7

the market for them, and engaging in insider trading. Rather than fight those allegations in Court,

8

Defendants have apparently resorted to extreme, out-of-court measures. In particular, they appear

9

to have hired a "conflict management" specialist, Christen Ager-Hanssen, to spy on Plaintiffs' for-

10

mer attorney Kyle Roche; published that secretly recorded footage on their *de facto* website, Cryp-

11

toLeaks; and launched a media campaign attacking Mr. Roche.

12

The result of these efforts is this motion. Defendants' arguments are based almost entirely

13

on the CryptoLeaks videos, which they cite thirty-one times. Those videos show Mr. Roche making

14

inappropriate and concerning statements about his representation of another client, Ava Labs. In

15

response to Defendants' release of the CryptoLeaks footage, Mr. Roche withdrew from this matter

16

and, shortly thereafter, left the firm, which is now called Freedman Normand Friedland ("FNF").

17

Defendants thus seek to disqualify the firm's remaining attorneys. But there is no basis to

18

infer that any of those attorneys engaged in unethical or unprofessional conduct in this or any other

19

matter. To the contrary, Plaintiffs' counsel has worked diligently and professionally to prosecute

20

Plaintiffs' claims. These attorneys should not be punished for Mr. Roche's previous statements, nor

21

should Defendants be further rewarded for their deceptive conduct. The motion should be denied.

22

**FACTUAL BACKGROUND**

23

**I.     Plaintiffs Allege Defendants Violated the Securities Laws**

24

On August 8, 2021, Plaintiff Daniel Valenti commenced this action against Defendants Dfin-

25

ity USA Research LLC ("Dfinity USA"), Dfinity Foundation (the "Foundation"), and Dominic Wil-

26

liams. (Dkt. No. 1.) Dfinity USA and the Foundation (collectively, "Dfinity")—led by Founder,

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY – No. 3:21-cv-06118

President, and Chief Executive Officer Williams—are blockchain technology companies that develop and operate the Internet Computer network, a purportedly decentralized network. In connection with the launch of that network, Defendants created, issued, and sold to the public vast quantities of ICP—a digital asset and unregistered security. (Dkt. No. 45 ("AC") ¶¶ 1-7.) Although the price of ICP initially exceeded $700, by February 2022, it had fallen to just $20. (*Id.* ¶ 8.)

During the years leading up to the launch, and in the months that followed, Plaintiffs allege that Defendants artificially inflated the price of ICP through materially false statements and market manipulation. (*Id.* ¶¶ 176-77, 226.) Plaintiffs further allege that Defendants exploited these inflated prices by dumping billions of dollars in ICP on the market, at the expense of retail investors. (*Id.* ¶ 8.) Plaintiffs allege that the foregoing conduct violated the Securities Act and Exchange Act.

## II. Williams Flees to Switzerland as Public Criticism and Legal Problems Mount

Throughout 2021, Defendants faced extensive legal problems and public criticism. On June 28, 2021, Arkham Intelligence published a report highlighting ICP's price collapse and presenting evidence that Defendants may have caused that collapse by selling large amounts of ICP. (*Id.* ¶¶ 107-10.) On June 29, the *New York Times* published an article that discussed ICP's price collapse and cited Arkham's report. (*Id.*) That day, an investor on Reddit concluded in a detailed post that Dfinity "lied to investors, intentionally withheld information, and may have committed fraud." (*Id.*)

In late June 2021, Williams' son, Sacha, sued him for conversion in California state court, alleging that Williams sold Sacha's ICP and kept the proceeds for himself. (Dkt. No. 65-3.) In mid-July 2021, investors commenced an action in California state court claiming that Defendants violated the securities laws by selling unregistered securities. (Dkt. No. 65-2.) And in August 2021, as noted above, Plaintiffs commenced this action, alleging securities fraud, market manipulation, and insider trading. Around that same time, after living in Palo Alto for nearly a decade, Williams abruptly fled to Switzerland, and Dfinity's General Counsel resigned. (AC ¶¶ 21, 114.)

## III. Defendants Attempt to Use Defamation Laws to Stifle Public Criticism

Defendants have taken an extremely aggressive approach to addressing this public criticism. They baselessly threatened legal action against Plaintiffs' counsel, for example, in connection with

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY – No. 3:21-cv-06118

their publication of a PSLRA notice. (Ex. A.)[1] They sued both the *New York Times* and Arkham Intelligence for defamation. (Dkt. No. 68-2.) And Williams has offered bounties to anyone who can help him identify critics, so that he can sue them for "slander." (AC ¶ 97.)

## IV. Defendants Launch CryptoLeaks to Attack Their Perceived Critics

Consistent with this hyper-aggressive approach to addressing public criticism, in May 2022, Defendants secretly launched CryptoLeaks, an anonymous website that promotes conspiracy theories about supposed attacks against Dfinity. Defendants have not expressly admitted that they are behind the site, but the publicly available evidence establishes a clear connection.

*First*, Williams stated—on the exact date that CryptoLeaks's domain was created—that Dfinity was "coming for" its critics. (Ex. B at 1.)

*Second*, Williams has repeatedly front-run CryptoLeaks's stories. On the day that the CryptoLeaks domain was created, Williams tweeted about CryptoLeaks's first story, which would not be published for another month. (*Id.*) He similarly tweeted about CryptoLeaks's second story months before CryptoLeaks announced that story on Twitter. (*Id.* at 2-3.) And he tweeted about CryptoLeaks's third story—the one at issue here—almost immediately after its release. (Ex. G at 2.)

*Third*, although CryptoLeaks purports to "defend the honest crypto community" and "expose big money corruption & hidden attacks in crypto" (Ex. C at 1), each of its three articles concerns Dfinity, which is cast as a victim of lies spread by unscrupulous competitors. The first article purports to absolve Defendants of any responsibility for ICP's price collapse by insinuating that the principal of popular crypto trading platform FTX caused the collapse by engaging in market manipulation. The second article insinuates that Arkham's report on Dfinity was commissioned by one of Dfinity's competitors to harm Dfinity and contains false information. And the third article, called "Case #3," accuses Mr. Roche of conspiring with crypto company Ava Labs to file frivolous lawsuits against its competitors, including Dfinity.

*Fourth*, underscoring that CryptoLeaks is part of Dfinity's PR campaign and not legitimate journalism, CryptoLeaks paid for its tweets to be promoted on Twitter. (Ex. M.)

---

[1] All exhibit references are to documents attached to the Declaration of Edward Normand, filed contemporaneously with this opposition brief.

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY – No. 3:21-cv-06118

*Fifth*, Williams has enthusiastically promoted CryptoLeaks. On June 10, he tweeted a link to CryptoLeaks's "Case #2," which contained secretly recorded videos of individuals from Arkham: "The video is compelling. Stunning. Gobsmacking. Horrifying. . . . Professional defamation & market manipulation?" (Ex. G at 1.) One week later, Williams tweeted: "Crypto Leaks exposé is stunning. Videos from Arkham Intelligence case make your jaw drop." (*Id.*)

*Sixth*, the CryptoLeaks story about Mr. Roche, "Case #3," appears to have been timed to impact the motion-to-dismiss hearing in this action. Indeed, although the story was based on footage from January 2022, that footage was not released until late August 2022—approximately two weeks before the motion to dismiss hearing was scheduled. (Ex. F at 1.)

## V.    Defendants Apparently Engaged Ager-Hanssen to Secretly Record Mr. Roche

CryptoLeaks's story about Mr. Roche, "Case #3," "shares extensive spy videos" of Mr. Roche at meetings with unidentified individuals. (*Id.*) The videos, as explained below, were recorded without Mr. Roche's knowledge or consent at meetings that were set up under false pretenses by a man named Christen Ager-Hanssen. The available evidence demonstrates that Mr. Ager-Hanssen was acting on behalf of Dfinity and in coordination with CryptoLeaks.

Indeed, Mr. Ager-Hanssen provides "conflict management" services for "eccentric billionaires." (Ex. H at 3.) In particular, he helps his clients gain strategic advantages in litigation through methods such as "covert recording" and "social engineering." (*Id.*) This involves "infiltrating the other party" with his "intelligence people," including "former intelligence officers from the CIA, MI6 and Mossad" (the latter of which are, in his view, "the best at social engineering"). (Ex. I at 9.) In one engagement, for example, Mr. Ager-Hanssen's "mission was to pretend that [he] was going to bring about a settlement" between the parties, and he met with the opposing party "many times" and secretly recorded "everything he said." (*Id.* at 11.)

Plaintiffs believe that Mr. Ager-Hanssen has been providing these "conflict management" services for Dfinity. In January 2022, Mr. Roche traveled to London to meet with Mr. Ager-Hanssen. (Roche Decl. ¶ 2.) At the time, Mr. Roche believed that the purpose of the meeting was to discuss a potential multimillion-dollar investment from Mr. Ager-Hanssen in a litigation funding venture that

Mr. Roche had founded; indeed, Mr. Ager-Hanssen paid for Mr. Roche and his now-fiancée to travel first-class to London, and similarly paid for their accommodations there. (*Id.* ¶ 3.)

But the meetings were a setup. Mr. Roche was secretly recorded without his consent by a hidden camera, including at a dinner meeting. (*Id.* ¶ 4.) Those secretly recorded videos were published on CryptoLeaks approximately six months later, just two weeks before the argument on Defendants' motion to dismiss was scheduled in this matter. The posted video clips were highly edited, spliced, cut, and otherwise taken out of context. (*Id.*) The result, as surely intended, is a highly misleading account of the meetings and Mr. Roche's statements. (*Id.*)

Mr. Ager-Hanssen's conduct in the period following CryptoLeaks's publication of the videos is further evidence that he participated in Defendants' campaign to retaliate against Mr. Roche for his involvement in this matter. During this period, for example, Mr. Ager-Hanssen has tweeted incessantly about Mr. Roche, stating that he "want[s] to see Kyle Roche disbarred" and that he has an "obsession" with Mr. Roche. (Ex. J at 1-2.)

## VI. Defendants Rely on CryptoLeaks's Accusations

Defendants' motion is based almost exclusively on the CryptoLeaks article about Mr. Roche. In that article, CryptoLeaks accuses Mr. Roche of being involved in an "evil conspiracy," suggests that he is a "psychopath," and theorizes that he "established a secret pact" with his client Ava Labs, pursuant to which he agreed to commence frivolous class actions against Ava Labs' competitors, for purposes of "[h]arvesting confidential information," "[h]arming competitors," and "fooling regulators." (Ex. F at 1, 5, 9-12, 26.) These accusations are false.

The Firm has never filed a class action at the direction of or for the benefit of another Firm client. (Roche Decl. ¶ 6; Normand Decl. ¶ 3.) Neither Mr. Roche nor the Firm has ever disclosed or used, for any collateral purpose, any confidential information from any lawsuit. (Roche Decl. ¶ 6; Normand Decl. ¶ 3.) Indeed, notwithstanding Defendants' repeated insinuations to the contrary (at 5, 10, 13), Mr. Roche did not state in any of the secretly recorded videos that he or anyone else at the Firm engaged in such egregious misconduct.

Ava Labs' CEO, Emin Gun Sirer, has corroborated these facts. In a public statement, he explained that no one at Ava Labs "ever directed Roche in his selection of cases"; that Mr. Roche "has filed all [of his] lawsuits independently of [Ava Labs]"; and that Ava Labs does "not receive materials or information from him" in connection with those lawsuits. (Ex. K at 1-2.) He further explained that he "learned about" a lawsuit filed against one of Ava Labs' competitors, Solana, "only through the press" and was "livid" that Mr. Roche "was suing another project, and attempted to persuade him to drop the case." (*Id.*) Indeed, Ava Labs' own General Counsel penned an op-ed criticizing that lawsuit as "a scurrilous attack by plaintiffs' lawyers." (Ex. L at 1.)

## VII.    Roche Separates from the Firm

The foregoing factual background is not intended to offer an excuse for Mr. Roche's statements; the statements are not excusable. Although the statements are false, FNF is deeply concerned by the suggestion that Mr. Roche engaged in unethical conduct. To address those concerns, and considering his inappropriate statements, Mr. Roche is no longer with the firm. (Normand Decl. ¶ 7.) He is no longer representing Ava Labs in connection with any matter. (Roche Decl. ¶ 8.) And FNF is no longer representing Ava Labs in any matter (though it acts as local counsel to an Ava Labs principal in a longstanding defamation case). (Normand Decl. ¶ 6.)

## **LEGAL STANDARD**

"Because motions to disqualify are often tactically motivated, they are strongly disfavored and are subjected to 'particularly strict judicial scrutiny.'" *SEC v. King Chuen Tang*, 831 F. Supp. 2d 1130, 1142 (N.D. Cal. 2011) (quoting *Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985)). The movant "carries a heavy burden and must satisfy a high standard of proof." *Caldwell v. City of San Francisco*, 2021 WL 242867, at *3 (N.D. Cal. Jan. 25, 2021). Moreover, the motion "must be based on present concerns and not concerns which are merely anticipatory and speculative." *Id.* (quoting *In re Marvel*, 251 B.R. 869, 871 (N.D. Cal. 2000)).

Disqualification is "a drastic measure" that may "affect several important interests," including "a client's right to choose counsel, an attorney's interest in representing a client, the financial burden on a client who must replace disqualified counsel, and the possibility that the disqualification

motion is merely pursued for tactical reasons." *QuickLogic Corp. v. Konda Techs., Inc.*, --- F. Supp. 3d ----, 2022 WL 3046751, at *4-6 (N.D. Cal. Aug. 2, 2022). Accordingly, courts "carefully examine the implications of counsel disqualification," *Rutti v. Lojack Corp.*, 2007 WL 9703177, at *2 (C.D. Cal. July 23, 2007), and "hesitate" to disqualify counsel "except in circumstances of absolute necessity," *Caldwell*, 2021 WL 242867, at *3. The "purpose of disqualification must be prophylactic; an attorney may not be disqualified purely as a punitive or disciplinary measure." *Balfour v. Beatty Infrastructure, Inc. v. PB&A, Inc.*, 2017 WL 956650, at *6 (N.D. Cal. Mar. 13, 2017) (quoting *Neal v. Health Net, Inc.*, 100 Cal. App. 4th 831, 844 (2002)).

**ARGUMENT**

## I.    Defendants Lack Standing to Complain About a Conflict Among FNF's Clients

"A complaining party who files a motion to disqualify is required to have standing." *Frank Gari Prods., Inc.*, 2012 WL 12895903, at *2 (C.D. Cal. June 15, 2012) (quoting *Blue Water Sunset, LLC v. Markowitz*, 192 Cal. App. 4th 477, 485 (2010)). "The standing requirement protects against the strategic exploitation of the rules of ethics long disfavored by the Courts." *Coyler v. Smith*, 50 F. Supp. 2d 966, 973 (C.D. Cal. 1999). "Except in limited circumstances, the party moving for disqualification must be a present (or former) client." *Corns v. Laborers Int'l Union of N. Am.*, 2014 WL 1319306, at *2 (N.D. Cal. Mar. 31, 2014); *see also Blacktail Mountain Ranch Co., LLC v. Jonas*, 611 F. App'x 430, 431 (9th Cir. 2015) ("Plaintiffs lack standing to move for disqualification because they were not clients or former clients of Defendant's counsel.").

Standing for non-clients is thus a "rare exception," *Jenkins v. Zwebner*, 2012 WL 13012585, at *2 (C.D. Cal. Aug. 3, 2012), that applies only where the non-client demonstrates "a personal stake beyond the general interest in the fair administration of justice," *King Chuen Tang*, 831 F. Supp. 2d at 1143. The non-client must, in other words, point to something more than an allegation that the opposing party's counsel breached a duty to his or her client. Defendants, who have never been FNF's clients, cannot meet that burden.

Defendants' sole basis for disqualification is that Mr. Roche has a conflict under California Rule of Professional Conduct 1.7(b), and that this conflict is imputed to FNF. But whether Mr.

Roche's representation of Ava Labs presents a "significant risk" that FNF's representation of *Plaintiffs* "will be materially limited," Cal. Rule Prof'l Conduct 1.7(b), has no impact on Defendants. *See Corns*, 2014 WL 1319306, at *3 (no standing where plaintiff moved to disqualify "based upon an alleged conflict between the Defendants, rather than asserting his own personal interest in policing counsel's duty of loyalty to him"). Defendants lack standing "to seek disqualification" based on Mr. Roche's "alleged breach of duties to *his* clients." *De Dios v. Int'l Realty & Invs.*, 641 F.3d 1071, 1077 (9th Cir. 2011) (emphasis in original).[2]

## II. Defendants' Motion Is the Product of Extreme Tactical Abuse

Defendants' motion constitutes extreme tactical abuse that should not be rewarded. In deciding a motion for disqualification, "a court must balance such varied interests as a party's right to chosen counsel, the interest in representing a client, the burden placed on a client to find new counsel, and the possibility that 'tactical abuse underlies the disqualification motion.'" *Caldwell*, 2021 WL 242867, at *3 (citations omitted); *see also Luck v. OTX Acquisition Corp.*, 2010 WL 11595723, at *7 (C.D. Cal. July 20, 2010) ("[T]he Court must always consider the possibility that counsel is using the motion for purely tactical reasons."). "[E]quitable considerations such as waiver, unclean hands, and estoppel" also apply. *United States v. Cty. of Los Angeles*, 2016 WL 4059712, at *2 (C.D. Cal. July 27, 2016). These factors and considerations—which Defendants ignore—establish that disqualification is inappropriate here.

*First*, as explained above, Mr. Roche's alleged conflicts are largely—if not entirely—irrelevant to Defendants' interests in this litigation. That Defendants have nevertheless sought to disqualify FNF based on those alleged conflicts suggests that Defendants' motion is motivated by strategic concerns, rather than legal ethics. *See Simpson Strong-Tie Co., Inc. v. Oz-Post Int'l, LLC*, 2018 WL 3956430, at *18 (N.D. Cal. Aug. 17, 2018) (denying motion, where "several factors" suggested that movant was "not truly concerned with a potential breach of the duty of loyalty").

---

[2] To the extent that Defendants' position is that they have standing because they "have serious concerns" that FNF will share confidential discovery material with Mr. Roche, who will in turn share that information with Ava Labs, that argument fails. As explained in detail below, this purported concern is baseless and wholly speculative, and therefore cannot satisfy Defendants' "burden to substantiate an actual, particularized and immediate injury in fact." *Andrews Farms v. Calcot, Ltd.*, 2010 WL 4010146, at *4 (E.D. Cal. Oct. 13, 2010).

8

*Second*, Defendants' apparent, extraordinary conduct—(i) engaging Mr. Ager-Hanssen to provide "conflict management" services, (ii) luring Mr. Roche to London under false pretenses, (iii) secretly recording him at a dinner meeting there, (iv) distributing those secretly recorded videos via an anonymous website, and (v) relying on the content posted on that anonymous website as a basis for this motion—confirms that Defendants have "used the ethical rules and a disqualification motion as tactical devices." *Optyl Eyewear*, 760 F.2d at 1051. It also confirms that they have unclean hands. The unclean hands doctrine "prevents 'a wrongdoer from enjoying the fruits of his transgression,'" and may be invoked in response to "[a]ny conduct that violates conscience, or good faith, or other equitable standards of conduct," *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978-79 (1999) (quoting *Precision Co. v. Automotive Co.*, 324 U.S. 806, 815 (1945)). Defendants' underhanded conduct easily meets that standard and should not be rewarded. *See United States v. Kaczynski*, 551 F.3d 1120, 1129-30 (9th Cir. 2009) (unclean hands "allows a court to withhold equitable relief if such relief would encourage or reward illegal activity") (citations omitted); *cf. Planned Parenthood Fed'n of Am., Inc. v. Newman*, --- F.4th ----, 2022 WL 12234037, at *1-6 (9th Cir. Oct. 21, 2022) (affirming damages against defendant that engaged in similar conduct as at issue here—namely, secretly videotaping a party without consent).

*Third*, "[e]ven where a motion to disqualify is otherwise meritorious, inexcusable delay may warrant denial." *Corns*, 2014 WL 1319306, at *4. "[T]he court should consider not only the length of the delay but also such factors as when the movant learned of the conflict; whether the movant was represented by counsel during the delay; why the delay occurred, and in particular whether the motion was delayed for tactical reasons; and whether disqualification would result in prejudice to the nonmoving party.'" *Id.* (cleaned up). The evidence indicates that Defendants had the information that forms the basis of their motion by January 2022, but waited until October 4, 2022—approximately one week before the motion to dismiss hearing was scheduled in this matter—to file. During the intervening eight-plus months, the parties were represented by counsel and fully briefed Defendants' motion to dismiss. Defendants' delay was thus "unreasonable as a matter of law" and "motivated by a desire to derail the ongoing litigation." *QuickLogic Corp.*, 2022 WL 3046751, at

*5-6; *see also Skyy Spirits, LLC v. Rubyy, LLC*, 2009 WL 3762418, at *4 (N.D. Cal. Nov. 9, 2009) (eight-month delay); *Openwave Sys. Inc. v. Myriad France S.A.S.*, 2011 WL 1225978, at *6 (N.D. Cal. Mar. 31, 2011) (four-month delay).

## III. Defendants Fail to Establish that Mr. Roche Violated Rule 1.7(b)

### A. The Evidence Does Not Support Defendants' Personal-Interest-Conflict Argument.

Defendants' invocation of Rule 1.7(b) is based on an unsupportable interpretation of Mr. Roche's secretly recorded statements. Defendants assert, paradoxically, that Mr. Roche has a personal-interest conflict under Rule 1.7(b) because he allegedly admitted that he (i) prioritizes his personal preference for going to trial over Plaintiffs' interest in *settling* and (ii) prioritizes his law firm's interest in settlement over Plaintiffs' interest in *not settling*. Setting aside that Mr. Roche's views about settlement are not relevant given that he is no longer at the firm, Defendants' argument fails because Mr. Roche did not state what Defendants claim he admitted.[3]

*First*, with respect to Mr. Roche's supposed disregard of his client's interests in *settlement*, Defendants omit the critical context that makes clear that Mr. Roche was discussing (in an unprofessionally profane way) an approach to settlement negotiation, not expressing a personal policy against settlement. Indeed, Defendants claim that Mr. Roche admitted that "because of the payments he has received from Ava Labs, he doesn't 'care about settling'" and that "it's not about the money anymore for me it's about taking you guys to trial and the sport of it." In reality, he stated:

> Most plaintiff-side law firms, they don't like litigating. They want to just file a lawsuit. Settle. File a lawsuit. Settle. *You say to a defendant*, I don't f------- care about settling. I'm just a crazy motherf------ and I have resources and I will take you to the end. And taking you to the end, it won't be a nuisance settlement. It will be, I've got a piece of paper that says, "I own your company now."

Mr. Roche further stated: "I was fortunate in that I did the Ava Labs deal, *so I have the ability to say*, "Look, it's not about the money anymore for me; it's about taking you guys to trial." (emphasis added). Defendants' suggestion that Mr. Roche prioritizes his own personal preference for trials over his client's interest in settling is thus meritless.

---

[3] To the extent that Defendants argue that Mr. Roche's statements about jurors and class members demonstrate a conflict, that argument is supported by no authority and is meritless. Mr. Roche's statements, made while intoxicated, do not reflect FNF's beliefs. (Normand Decl. ¶ 8.)

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY – No. 3:21-cv-06118

*Second*, with respect to Mr. Roche's supposed disregard of his client's interest in *not settling*, Defendants' argument is based solely on a statement that does not support the inference that they draw. Mr. Roche observed in a 17-second video clip that a $100-million settlement would lead to publicity for the Firm; he does not say or suggest—as Defendants conclude—that he prioritizes "payment and publicity of [RF] at the expense of the putative class members." Moreover, the video clip on which Defendants rely cuts off as Mr. Roche is in the middle of a sentence; this kind of "evidence" is insufficient to meet Defendants' "heavy burden" and "high standard of proof." *Caldwell*, 2021 WL 242867, at *3.[4]

B. <u>Defendants Fail to Identify any Actual Conflict Between Ava Labs and Plaintiffs</u>.

Defendants' argument that Mr. Roche's representation of Plaintiffs (which has ended) conflicts with his representation of Ava Labs (which has also ended) fails on the facts and law.

*First*, on the facts, Defendants' argument is based on their assertion that Mr. Roche's "priorities are to use litigation as a tool against competitors of Ava Labs, obtain confidential information regarding the companies in the crypto space to benefit Ava Labs, and maintain lawsuits to direct the attention of regulators to other magnets to avoid scrutiny of Ava Labs." (quotations and alterations omitted). Both Mr. Roche and Ava Labs have denied those allegations.

*Second*, on the law, even accepting Defendants' accusations as true, Defendants have failed to identify a *conflict* between Mr. Roche's representation of Plaintiffs and his representation of Ava Labs. Rule 1.7(b), the only rule that Defendants invoke, "applies where 'there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities, interests, or relationships, whether legal, business, financial, professional, or personal.'" *Simonyan v. Nationwide*

---

[4] Notwithstanding these evidentiary shortcomings, Defendants suggest that this case is somehow analogous to *Cal Pak Delivery v. United Parcel Service*, where class counsel offered to settle the plaintiff's claims in exchange for an $8 million payment, to be made directly to counsel and not shared with the class. 52 Cal. App. 4th 1, 6-7 (1997). But there is no evidence of such an "obvious breach" of fiduciary duties here, *id.* at 11, nor is there any basis to conclude that Mr. Roche would have "sold out" the class to make a quick buck. In fact Defendants' other accusations against Mr. Roche—that he would push for a trial and that he sought to harm Dfinity to benefit its competitor, Ava Labs—suggest precisely the opposite.

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY – No. 3:21-cv-06118

*Ins. Co. of Am.*, 78 Cal. App. 5th 889, 897-98 (2022) (quoting Cal. Rule Prof'l Conduct 1.7 cmt. 4). "'The mere possibility of subsequent harm' is insufficient"; instead, "[t]he critical questions are the likelihood that a difference in interests exists or will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose course of action that reasonably should be pursued on behalf of each client." *Id.* at 898 (quoting Cal. Rule Prof'l Conduct 1.7 cmt. 4).

A conflict *may* exist where an attorney separately represents two "major competitors," *see Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1107 (N.D. Cal. 2003), but that is not what happened here. Instead, Mr. Roche represented Plaintiffs, who are *adverse* to a competitor of one of his other former clients, Ava Labs. Defendants do not present any evidence that indicates that Ava Labs' interests conflict with Plaintiffs' interests; to the contrary, under Defendants' facts, both Plaintiffs and Ava Labs want to maximize Plaintiffs' recovery against Defendants. *See McIlwain v. Brown*, 2019 WL 8219492, at *8-9 (C.D. Cal. Aug. 30, 2019) (finding that facts did "not give rise to a conflict because Defendant's and Hagens' interests are aligned against Plaintiff," and "[n]either wants Plaintiff to recover"). This is not to say that it is *ever* proper for an attorney to commence a class action for the benefit of anyone other than the named plaintiffs and putative class. Instead, Plaintiffs merely intend to argue that, under the facts asserted by Defendants, Mr. Roche's former clients did not have conflicting interests.

## IV. Defendants Fail to Establish That Mr. Roche's Alleged Conflict Is Imputed on FNF

If Mr. Roche had a conflict under Rule 1.7(b), it would not be imputed to FNF. Indeed, to the extent a conflict ever existed, it no longer does: Mr. Roche, the one with the purported conflict, has left the firm, and neither he nor the firm represents Ava Labs anymore. Defendants' contrary argument is meritless and should be rejected.

*First*, even if Mr. Roche's views about settlement created a conflict, that conflict would be personal to him and would not be imputed. *See* Cal. Rule Prof'l Conduct 1.10(a) (personal-interest conflict not imputed, where conflict "does not present a significant risk of materially limiting the

representation of the client by the remaining lawyers in the firm"). In addition, because Mr. Roche does not work on this matter and is no longer at FNF, his views regarding settlement are not relevant.

*Second*, Defendants speculate that Plaintiffs' counsel may share confidential information with Mr. Roche, so that he can share that information with Ava Labs. But Mr. Roche is no longer counsel in this matter, is no longer at FNF, and no longer represents Ava Labs. *See Baugh v. Garl*, 137 Cal. App. 4th 737, 744 (2006) ("Disqualification is only justified where the misconduct will have a 'continuing effect' on judicial proceedings."); *State Compensation Ins. Fund v. Drobot*, 2014 WL 12579808, at *10 (C.D. Cal. July 11, 2014) ("The Court's focus must be forward, not backward."); *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 2014 WL 12160744, at *4 (S.D. Cal. Jan. 23, 2014) (denying motion, where attorney left firm). In addition, there is no evidence that the remaining attorneys at FNF—which no longer represents Ava Labs—would engage in such misconduct, which would presumably involve a breach of client confidentiality and violation of a protective order. *See Derivi Constr. & Architecture, Inc. v. Wong*, 118 Cal. App. 4th 1268, 1274 (2004) ("[C]ourts should presume that, unless proven otherwise, lawyers behave in an ethical manner and do not violate confidences."). Indeed, Plaintiffs' lead counsel, Mr. Normand, has never spoken with anyone from Ava Labs about bringing or pursuing any litigation. (Normand Decl. ¶ 6.)

*Third*, Defendants suggest that the entire firm shared Mr. Roche's allegedly improper purpose in pursuing class actions. In the strongest terms possible, FNF rejects that accusation. It is unsupported by any evidence and false. Plaintiffs' counsel commenced this action, and have pursued it on behalf of Plaintiffs, because they believe that the claims are meritorious and that Defendants' wrongdoing caused substantial harm to Plaintiffs and the proposed class. (Normand Decl. ¶ 4.) Defendants do not (and cannot) suggest that this action is frivolous; indeed, a prominent law firm (with no relationship with Ava Labs) commenced a similar action against Defendants in state court before Plaintiffs commenced this action.[5]

---

[5] Certain partners at FNF, including Mr. Normand, received tokens issued by Ava Labs. But those tokens, AVAX, are publicly available for purchase at myriad exchanges throughout the country and world. This does not remotely indicate than any FNF lawyer is acting with any improper purpose and would be an incoherent theory—making allegations against Dfinity would have no predictable impact on the price of AVAX. In addition, there is nothing unethical about an attorney or law firm

## V.  Defendants Have Failed to Establish That Disqualification of FNF Is Appropriate

Defendants cannot meet their burden to disqualify FNF. Counsel may in limited circumstances be disqualified based on the "appearance of impropriety," *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 658 F.2d 1355, 1360-61 (9th Cir. 1981), but the courts have repeatedly emphasized that a motion for disqualification must be based on "present"—as opposed to "anticipatory" or "speculative"—concerns. *Caldwell*, 2021 WL 242867, at *3. Defendants' motion, as explained above, is based on nothing more than the baseless "concern" that Plaintiffs' counsel will disregard their ethical obligations and share discovery material with their former client, Ava Labs. That is not enough to warrant the "drastic remedy" of disqualification.

The fact that this is a class action does not support Defendants' tenuous theory. *See Andrews Farms*, 2010 WL 4010146, at *4 ("Courts generally discourage rigid application of disqualification rules in class action cases because of the nature of class representation and the importance of retaining counsel with the most experience on the case."). Regardless of whether a case arises in the class-action context, where, as here, "there is no evidence of conflicting interests," courts do not disqualify counsel. *Alvarez v. XPO Logistics Cartage, LLC*, 2022 WL 644168, at *3 (C.D. Cal. Feb. 8, 2022). None of Defendants' cited authority suggests otherwise or is even remotely analogous to this case. *See Petroleum Prods. Antitrust Litig.*, 658 F.2d at 1362 (reversing disqualification order); *Cal Pak Delivery*, 52 Cal. App. 4th at 10-13 (class counsel contacted opposing party and offered to dismiss client's action in return for payment of fees directly to him, but not to class); *Klein v. Facebook, Inc.*, 2021 WL 3053150, at *4 (N.D. Cal. July 20, 2021) (law firm hired and failed to timely screen attorney who represented opposing party in related matter); *Huston v. Imperial Credit Commercial Mortg. Inv. Corp.*, 179 F. Supp. 2d 1157, 1168-80 (C.D. Cal. 2001) (attorneys disqualified, where one represented opposing party in a related matter and attorneys concealed his involvement). Indeed, even under Rule 23's adequacy standard, courts have refused to remove firms with attorneys who

---

accepting non-cash assets as a fee. *See* Cal. Rule Prof'l Conduct 1.8. Nor is it unethical for an attorney to invest in stocks or other assets, especially where, as here, the value of those investments is not negatively correlated with a client's litigation outcomes. Nor is there any other rule that applies to this situation or that would, for example, bar lawyers who hold Apple stock from representing a client suing Microsoft. Defendants do not argue otherwise.

engaged in far more egregious misconduct than what Mr. Roche is accused of. *See, e.g.*, *Marsden v. Select Med. Corp.*, 246 F.R.D. 480, 487 (E.D. Pa. 2007) (attorneys indicted); *In re Novastar Fin. Securities Litig.*, 2007 WL 465649, at *4 (W.D. Mo. Feb. 8, 2007) (same).

Defendants baselessly accuse FNF of a "betrayal of [Plaintiffs'] interests," failing to cite any fact that even implies that FNF has done anything other than vigorously prosecute the interests of Plaintiffs and the class in this action. Nor could they: FNF has invested significant resources into this action by (i) conducting extensive preliminary factual and legal research, (ii) drafting the complaint and amended complaint, (iii) serving Defendants Williams and the Foundation under the Hague Convention, and (iv) opposing Defendants' motion to dismiss. (Normand Decl. ¶ 5.)

Defendants similarly misrepresent that FNF's withdrawal from another matter "evidences its recognition that the firm is unable to fairly and adequately represent a class in an action against Ava Labs competitors." As an initial matter, Defendants' argument relating to class certification is premature. *See, e.g.*, *Testone v. Barlean's Organic Oils, LLC*, 2021 WL 22611, at *4-6 (S.D. Cal. Jan. 4, 2021) (collecting cases). But more fundamentally, FNF withdrew from that matter at the request of its co-counsel (as Defendants could have reasonably inferred, based on their citation to disqualification motions filed by that same co-counsel in other matters), not because FNF believed it could not fairly or adequately represent the class.[6]

## CONCLUSION

Plaintiffs respectfully submit, for the foregoing reasons, that the Court should deny Defendants' motion to disqualify FNF.

Dated: October 25, 2022

Respectfully Submitted,

**FREEDMAN NORMAND FRIEDLAND LLP**

*/s/ Edward Normand*
Edward Normand (admitted *pro hac vice*)
Richard Cipolla (admitted *pro hac vice*)
Stephen Lagos (admitted *pro hac vice*)

---

[6] Defendants may rely on the recent order in *In re Tether and Bitfinex Crypto Asset Litigation*, No. 19-cv-9236 (S.D.N.Y.), but that order is inapposite, including because (i) Mr. Roche was still at the firm when it was decided, (ii) discovery was underway, (iii) the putative class was represented by two additional law firms, and (iv) the firm was not disqualified.

Ivy T. Ngo (SBN 249860)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Facsimile: (646) 392-8842
Email: tnormand@fnf.law
Email: rcipolla@fnf.law
Email: slagos@fnf.law
Email: ingo@fnf.law

*Counsel for Plaintiffs and the Class*

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY – No. 3:21-cv-06118