# EXHIBIT 6

MA3KTETO

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IN RE TETHER AND BITFINEX
     CRYPTO ASSET LITIGATION,                19 CV 9236 (KPF)
4                                            20 CV 169 (KPF)
     ------------------------------x         20 CV 211 (KPF)
5                                            20 CV 453 (KPF)

6                                            New York, N.Y.
                                             October 3, 2022
7                                            3:30 p.m.

8    Before:

9                    HON. KATHERINE POLK FAILLA,

10                                           District Judge

11                            APPEARANCES

12   ROCHE FREEDMAN LLP
          Attorneys for Plaintiffs David Leibowitz, Benjamin
13   Leibowitz, Jason Leibowitz, Aaron Leibowitz, Pinchas
     Goldshtein, Matthew Script
14   BY:  DEVIN FREEDMAN
          EDWARD JOHN NORMAND
15        -AND-
     SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP
16   BY:  TODD MICHAEL SCHNEIDER
          -AND-
17   SELENDY & GAY PLLC
     BY:  CAITLIN JOAN HALLIGAN
18
     KIRBY McINERNEY LLP
19        Attorneys for Consolidated Plaintiffs Eric Young, Adam
     Kurtz, David Crystal
20   BY:  KAREN M. LERNER
          DAVID E. KOVEL
21        -AND-
     RADICE LAW FIRM PC
22   BY:  JOHN D. RADICE

23

24

25

MA3KTETO

APPEARANCES (Continued)

DEBEVOISE & PLIMPTON LLP
        Attorneys for Defendants iFinex Inc. BFXNA Inc., BFXWW
Inc., Tether Holdings Limited, Tether Operations Limited,
Tether International Limited, DigFinex Inc, Giancarlo Devasini,
Ludovicus Jan van der Velde, Tether Limited
BY:  MAEVE L. O'CONNOR

NELSON MULLINS RILEY & SCARBOROUGH LLP
        Attorneys for Defendant Poloniex LLC
BY:  MATTHEW G. LINDENBAUM

O'MELVENY & MYERS LLP
        Attorneys for Defendant Bittrex, Inc.
BY:  ABBY FAITH RUDZIN

MA3KTETO

```
1          (Case called)
2          THE COURT:  Good afternoon to all of you and to those
3     of you who are in the gallery to view this.
4          I've been thinking about how best to structure the
5     oral argument in this matter this afternoon, and I believe
6     that's something that's probably still a little bit under
7     construction.  What I will say is this:  It's unfortunate that
8     we're all here this afternoon, but I think it minimizes the
9     seriousness of the statements made to suggest that this is
10    somehow a litigation tactic or gambit, it's more than that, or
11    at least it is to me, and if you think it's a litigation
12    tactic, then you already know you're going to have to modulate
13    your answers in speaking with me.
14         It's not clear to me that there is a dispute on the
15    law as distinguished from a dispute as to what is the best
16    thing to do in this case.  So, if someone believes that there
17    is a rule of professional responsibility or a case that says
18    specifically that the Roche Freedman firm must stay in the case
19    or must be left out of the case or leave the group of lead
20    plaintiffs counsel, you'll tell me.  Some of you have cited
21    cases, but a lot of times, folks have not.
22         My own feelings on the issue have been evolving, so I
23    thought it might be useful just to give you a sense of where I
24    was.
25         I'm grateful that Mr. Roche is not going to be
```

MA3KTETO

1    participating in this case anymore.  His comments were uniquely

2    stupid and unfortunate.  Whether they were true or not is

3    something I'm still trying to figure out.  But, at first, I was

4    wondering whether the Roche Freedman firm, as a whole firm, had

5    to be disqualified, but then I wondered whether, really, the

6    issue is one of disqualification and whether it might not be

7    something a little bit different, which is this:  I had

8    reasons, all those months ago, when I appointed three firms as

9    lead plaintiff counsel in this case, and I had factual bases

10   for doing so, and arguments for doing so, and now at least it

11   could be argued to me that some of those factual bases have

12   changed.  So, I don't know that I see this necessarily as a

13   motion to disqualify as much as I see it as an examination of

14   whether the initial reasons for my appointing three firms as

15   lead plaintiff counsel still exist today.  And so, I'd like to

16   understand a little bit more about that.

17           Perhaps -- is it Mr. Freedman or Mr. Normand who's

18   going to be speaking on behalf of the Roche Freedman firm?

19           MR. FREEDMAN:  Mr. Freedman, your Honor.

20           THE COURT:  Sir, thank you.  And that's you.

21   Mr. Freedman, thank you.

22           Sir, what is it that you mean when you tell me that

23   Mr. Roche is no longer involved in Roche Freedman's class

24   action practice?  Is that specific to this case or to all

25   currently existing class actions, or something else?

MA3KTETO

1          MR. FREEDMAN:  Your Honor, he's --

2          THE COURT:  May I have you get closer to a microphone?

3          MR. FREEDMAN:  Would you like me to take the podium?

4          THE COURT:  Wherever you can be heard.  Whatever works

5     for you.  Thank you.

6          MR. FREEDMAN:  Judge, he's been dismissed from the

7     firm's plaintiff side class action practice, all existing

8     plaintiff side class action practices.

9          I'll start that again, Judge.  I apologize.

10          THE COURT:  No, thank you.  I want to be sure we all

11     can hear you.  Thank you, sir.

12          MR. FREEDMAN:  He's been dismissed from the firm's

13     plaintiff side class action practice.  Any existing plaintiff

14     side class action, he's not participating in, and any future,

15     he will not participate in, at least given the current

16     circumstances.  Whether that will ever change in the future for

17     future cases is something that I think the firm will need to

18     discuss on an ongoing basis based on the actions Mr. Roche is

19     taking and his development, but in terms of this case, he is no

20     longer participating in it and any other class action.

21          THE COURT:  I understood you to be saying that he was

22     walled off from receiving any money from this case.  Is that

23     correct?

24          MR. FREEDMAN:  That is correct, Judge.  We enacted an

25     ethical screen that walls him off from all participation

MA3KTETO

1    information in the case, all decision-making in the case, and

2    deprives him of any financial interest in the case whatsoever.

3            THE COURT:  Is that the same for all extant class

4    actions at your firm?

5            MR. FREEDMAN:  He has been walled off from all extant

6    class actions at the firm.  His forfeiture of a financial

7    interest is not in every single class action at this point, but

8    many of the cryptocurrency class actions, where these

9    particular comments were most felt, he has forfeited an

10   interest in many of them.

11           THE COURT:  What, if any, access did he have to any

12   discovery that may have been produced in this case pursuant to

13   Rule 26 or something else?

14           MR. FREEDMAN:  So, Judge, he would have had access to

15   discovery in this case that was produced, but I want to make

16   two clarifications, if I may:

17           One, those videos were taken in January 2022, and no

18   discovery had been produced in the case at the time those

19   videos were taken.  So, whatever his comments are, they could

20   not have been referring to discovery materials in this case,

21   certainly.

22           Also, Judge, as you can imagine, I've been over those

23   statements multiple times, and very, very carefully.  At no

24   point in any of the videos does he ever say or suggest that he

25   has shared confidential discovery materials.  That is an

MA3KTETO

1  inference defendants are asking the Court to make and something
2  that he has never said.
3       THE COURT:  All right.
4       But, at times, I believe you're saying to me that
5  certain of his statements are demonstrably false.
6       MR. FREEDMAN:  That's right.
7       THE COURT:  And sometimes, sir, I think that might be
8  an overstatement.  There are things -- I'm not sure that you
9  can prove to me that they are false.  I do appreciate what
10  you're saying, which was that certain statements were made
11  before discovery was produced.  You've also said to me that
12  the -- am I correctly recalling, is it Ava Labs?
13       MR. FREEDMAN:  That's correct.
14       THE COURT:  -- that the Ava Labs' retention postdates
15  the retention of your firm by the plaintiffs in this case, but
16  I'm still not sure that one couldn't find synergies after the
17  retention in this case.  And so, I'm not sure today what is
18  demonstrably false or what you hope is not, in fact, the case.
19       So, how can I have confidence that Mr. Roche hasn't
20  misused any of the information received in this case?
21       MR. FREEDMAN:  Sure.  Judge, I think that breaks out
22  into a couple of different areas.
23       Number one, as I said, he never said that he shared
24  confidential discovery materials.  So, I don't know why we'd
25  think he would be doing that if he never said he did it.  The

MA3KTETO

1    actual quote is that he's seen the inside of crypto companies.

2    He has said that he meant whistleblower submissions on filing

3    class actions, that people inside the companies will send him

4    things, but he never even suggests that he shared that

5    information.  It is a fact, Judge, that Eric Holder can say

6    that he's seen the inside of the DOJ, knows how the DOJ works,

7    and can still represent DOJ targets in investigations, and

8    that's not unethical.

9            Putting that all aside, Judge, when I said things are

10   demonstrably false, I can tell you as an officer of the Court

11   with my credibility intact, that this case was not filed for

12   Ava Labs, and I know that because I began discussing this case

13   with Mr. Roche in January of 2018 while we were still at Boies

14   Schiller & Flexner together.  At that time, Ava Labs did not

15   exist, Judge, and would not exist for another six months.  I

16   can tell you that I spoke about this case with Mr. Roche after

17   the Griffin report came out in June of 2018, which is a month

18   before Ava Labs even existed, and that Mr. Roche and I began

19   analyzing the legal claims at issue in this case in the

20   beginning of 2019 in the course of our work at Boies Schiller &

21   Flexner.  At that time, Ava Labs did exist, but it was an

22   obscure startup that no one had heard of — certainly, we had

23   not heard of — and, Judge, I have case memos and other

24   documents dated from May of 2019 and June of 2019 that mention

25   this case and discusses theories that I could submit in camera

MA3KTETO

1    to the Court, if necessary --

2              THE COURT:  Speak slower.  Thank you.

3              MR. FREEDMAN:  I apologize.

4         I get a little passionate about this particular issue,

5    Judge, because it's frustrating, given the comments that were

6    made, but I know, based on my own personal history, that it's

7    just not true.  I don't have a good explanation beyond the

8    toxication for why it was said.

9              THE COURT:  Which is not a good explanation, and it's

10   not accepted as one.

11             MR. FREEDMAN:  I agree with you, Judge, but I just

12   don't have an explanation for why he said things that were not

13   true, but they are not true.

14             THE COURT:  All right.  Well, hang on.

15        What you've said to me is that there are things that

16   you can speak to because of your own knowledge, and I believe

17   you said a few moments ago with your credibility still intact.

18   I don't know how far out on the limb you want to go for

19   Mr. Roche, because you're not with him every moment of the day,

20   you're not with him — at least I imagine you're not — and, as a

21   result, I don't know how far you want to go in defending what

22   he did and didn't do with discovery in this case.

23             MR. FREEDMAN:  I understand that, Judge.  I'm

24   specifically addressing whether the case was filed on behalf of

25   another client.

MA3KTETO

1          THE COURT:  That's fine.

2          MR. FREEDMAN:  And I know that that is not true

3    because I know that we began discussing this case and working

4    this case up before that client existed, before we even knew

5    that client existed and before we met that client.  And I have

6    documents that predate us even meeting that client that can be

7    submitted to the Court for in camera inspection to demonstrate

8    that we were bringing this case long before we met Ava Labs.

9          As to discovery — again, Judge, I am not with him

10   every moment of the day — I have known Mr. Roche for

11   five years.  I don't have an explanation for the videos.

12   Mr. Roche is here outside the courtroom, if the Court has

13   questions for him.

14          THE COURT:  Oh, no.

15          MR. FREEDMAN:  Okay.

16          But I know him generally to be a good person.  I tried

17   not to --

18          THE COURT:  I don't want you to be his character

19   witness.  I want to know what you can say --

20          MR. FREEDMAN:  Understood, Judge.

21          THE COURT:  -- to give me comfort that he didn't use

22   that discovery for any improper purpose.

23          MR. FREEDMAN:  Judge --

24          THE COURT:  And, to be clear, sir, I should have asked

25   a better question, so I'll do that now.

MA3KTETO

1    I said to you earlier not to go too far out on a limb.

2    Tell me what you can tell me.  Don't guess or surmise what he

3    must have done based on your knowledge of him.  I just want to

4    know what you know, sir.

5    MR. FREEDMAN:  Understood.

6    Judge, I can tell you he's sworn that he did not share

7    any confidential materials.  I can tell you the firm has

8    investigated this and found no evidence of any materials having

9    been shared.  I can tell you that Ava Labs' CEO has publicly

10   denied receiving any materials.

11   And, Judge, one more thing I can add, I can tell you

12   that no person at this firm is aware of any discovery materials

13   ever being shared in violation of a Court's protective order.

14   THE COURT:  Do you, or does your colleague, have an

15   analogous arrangement with Ava Labs?

16   MR. FREEDMAN:  What do you mean by analogous

17   relationship?

18   THE COURT:  I don't think there are videos of you, and

19   if there are, that will be interesting.

20   MR. FREEDMAN:  There are not, Judge.

21   THE COURT:  I thought I understood that he had

22   received some security interest, some securities, in Ava Labs,

23   and I'm asking if you have the same.

24   MR. FREEDMAN:  There are members of the firm with

25   interests in the Evox crypto and equity in Ava Labs itself,

MA3KTETO

1    Judge.

2             THE COURT:  In, I believe, your most recent document,

3    you suggested there may be threats of physical harm against

4    Mr. Roche.  I didn't think, but maybe I was wrong, that you

5    were ascribing them to the defendants in this case.

6             Let me understand, please.  Certainly, I don't want

7    Mr. Roche in this courtroom at this moment for this case, but I

8    don't want him hurt either.  Is there more that you want to

9    tell me about that issue, or is that no longer an issue?

10            MR. FREEDMAN:  Well, I want to clarify that we do not

11   believe it's the defendants in this case.

12            THE COURT:  Okay.  Thank you.

13            MR. FREEDMAN:  As to whether or not there is a

14   continuous danger, we do not know, but we have discussed it

15   with law enforcement.

16            THE COURT:  To what degree have you and your firm been

17   working with the Selendy firm and with the Schneider firm since

18   late August of 2022 on this case?

19            MR. FREEDMAN:  Judge, I don't think there's been any

20   difference in our working relationship with our co-counsel.

21            THE COURT:  I should then ask a follow-up question:  I

22   don't want privileged information, but am I allowed to know

23   what you've been working on?  Because I would have thought, if

24   you received the letters that I've received that have led to

25   this motion, that the working relationship might be strained.

MA3KTETO

1          MR. FREEDMAN:  Judge, there were certainly discussions

2     around the difference of opinion on whether our firm should

3     continue representing plaintiffs in this case, but both

4     Selendy & Gay and Schneider Wallace have been constant

5     professionals.  Those were disciplined and professional

6     opinions where differences of opinion were expressed, and until

7     the Court resolves the issue, co-counsel and our firm have been

8     able to maintain a very professional and productive

9     relationship.

10          THE COURT:  I believe on the issue of the significance

11     of the wishes of the named plaintiffs, that Selendy and

12     Schneider have spoken most recently.  If I'm wrong, then you'll

13     tell me what your letter is because that's what I'm

14     remembering.

15          It is their view that, ultimately, the concern is with

16     who best represents the interests of the class.

17          Do you agree?

18          MR. FREEDMAN:  It is their view -- I'm sorry, Judge, I

19     don't think I understood the question.

20          THE COURT:  I'll try again.  Thank you.

21          One of your arguments for remaining on the case is

22     that it is the wish of the named plaintiffs that you remain on

23     the case.  But I believe I understood the response from your

24     co-counsel to be that my focus should not be on what those

25     plaintiffs want, per se, but on what representation, what firm

MA3KTETO

1    or firms, would represent the best interests of the class.  So,

2    certainly, the named plaintiffs do count for something —

3    they've been involved — but what I'm trying to understand is

4    whether I should be looking at their wishes or at the class'

5    and whether there's a difference, depending on the perspective.

6        MR. FREEDMAN:  I think that final point the Court just

7    made is most important, which is, the named plaintiffs are

8    fiduciaries to the class, and, ultimately, the decision is what

9    is best for the putative class in this case.  However, as named

10   plaintiffs, they are fiduciaries to the class, and their

11   decision about, and their opinion on, what is best for the

12   class is informed by their having hired these lawyers who have

13   been involved in the management of this case for a very long

14   time.

15        Judge, these plaintiffs are not just regular

16   plaintiffs in terms of the way they've sacrificed for this

17   case.  As one painful example, one of the plaintiffs in this

18   case was a vice president at Credit Suisse, and on filing this

19   case, was terminated from their job at Credit Suisse because

20   they filed this case.  He was, before termination, on the

21   strategic blockchain committee at Credit Suisse, and he has

22   given up a lot to pursue this case and continue pursuing it,

23   and he has asked, and believes, that Roche Freedman will be in

24   the best interests of the class and assist the class.  And so,

25   I do believe that while the Court must look at what is in the

MA3KTETO

1    best interests of the class, the named plaintiffs are

2    fiduciaries that are a good indication and voice of what may be

3    in the best interests of the class, though, of course, this

4    Court has final authority over that.

5            THE COURT:  Sir, in one of your last submissions to

6    me, there were a number of cases that spoke about

7    disqualification and the care that a court must use in seeking

8    to disqualify.

9            You heard me say earlier, at the beginning of this

10   argument, that I'm not sure whether it's a disqualification

11   motion or a motion for perhaps reconsideration of a prior

12   decision.

13           May I hear from you on that issue, please?

14           MR. FREEDMAN:  I think, Judge, that touches on many

15   issues.

16           In terms of should you reconsider your prior decision

17   of the leadership, Mr. Roche was certainly a well-informed

18   lawyer on cryptoassets, but he is, by no means, the only crypto

19   lawyer at Roche Freedman that has that expertise.  The original

20   complaint in this case was drafted and fashioned by myself,

21   Mr. Delich, who is in the court in the gallery, and Mr. Roche.

22   Certainly, this firm has taken on more cases in the cryptoasset

23   space than I believe any other firm has in history and dealt

24   with discovery in cryptoasset cases and led the charge in

25   various other cases where these same co-counsel are co-counsel

MA3KTETO

1   with us.

2            When it comes to the substantive issues of

3   cryptoassets, this firm has lawyers that know how to deal with

4   that very, very well, and Mr. Roche is, by no means, the extent

5   of that expertise.  And so, if it comes to should you replace

6   the Roche Freedman firm because Mr. Roche is no longer involved

7   in this case, I submit to you that the answer is certainly no.

8   Speaking for myself, I led a trial in December of last year in

9   a cryptoasset case that resulted in -- a one-month long jury

10  trial that resulted in a $100 million jury verdict.  Mr. Delich

11  has been involved in a variety of cryptoasset cases.

12  Mr. Normand, who sits to my right, has also been involved in a

13  significant amount of cryptoasset cases.  Some of the

14  associates in the room, Judge — Dan Stone, Maya Jumper, Kelvin

15  Goode, Constantine Economides, one of my other partners — are

16  handling multiple cryptoasset cases across the country.

17           Judge, I know that you said that this is not a

18  tactical maneuver, and I understand where the Court's coming

19  from on that, but there is something that's a little different

20  about this case, which is, as terrible as Mr. Roche's

21  statements are — and I want to be unequivocal that the firm

22  condemns those statements, they are a mix of vulgar opinion

23  statements, unprofessional puffery and patent untruths — they

24  do not reflect the opinions of this firm or the 24 other

25  lawyers that have worked at this firm and continue working at

MA3KTETO

1    this firm.

2            The firm took immediate action to ensure its work on

3    behalf of the class wouldn't be impugned by those statements

4    and, therefore, removed Mr. Roche from its plaintiff side class

5    action practice, walled him off from those cases, called for

6    him to file a motion to withdraw in this case, and caused him

7    to forfeit financial interest in the cases.

8            That being said, Judge, this firm has filed more

9    cryptoasset cases than any other firm in the country.  While

10   it's not the defendants in this case, someone — and we believe

11   defendants in another class action — orchestrated an elaborate

12   scheme to place Mr. Roche in a compromising position,

13   videotaped the results --

14           THE COURT:  No one made him say what he said.

15           MR. FREEDMAN:  Judge, I agree with you a hundred

16   percent, nobody --

17           THE COURT:  I'm not even sure he was intoxicated to

18   the degree you want me to believe when he said it.  I don't

19   know whether it was puffery, but -- yes, maybe he was set up,

20   but you're not helping yourself with those arguments.

21           MR. FREEDMAN:  Understood, Judge.

22           I think that regardless of whether he was or was not

23   inebriated, someone put in place a scheme to target him, and he

24   should not have fallen for that scheme — we are in a hundred

25   percent alignment — but nonetheless someone did that, and I

MA3KTETO

1   think there is something to be said for not incentivizing

2   stratagems aimed at compromising counsel.

3         THE COURT:  Because everyone else is going to have the

4   good fortune to have their target be as singularly stupid as

5   Mr. Roche?  I hear what you're saying.  I hardly think that

6   were I to rule in a certain way, I would be incentivizing bad

7   behavior by defendants in the -- putative defendants in the

8   cryptoasset space, but, okay, I understand your argument.

9         Please continue.

10        MR. FREEDMAN:  Again, Judge, I'm not saying we have a

11  concern of your opinion, but I do think it's a relevant factor

12  to take into account.  Maybe it's a very minor factor.

13        Judge, on that note, I don't think -- the 24 other

14  lawyers at this firm have stellar representations and

15  impeccable credentials, and they have labored on behalf of this

16  class, and I submit to you, they deserve to be judged by their

17  own actions, and that the 100 percent inappropriate despicable

18  comments made by Mr. Roche, whether or not he was in a state of

19  inebriation, should not impugn the reputation of every other

20  lawyer at this firm.

21        And since there is no evidence of him sharing

22  discovery materials, if the Court were to hold that this firm

23  could not continue acting as counsel simply because one lawyer

24  was irresponsible and stupid, Judge, it would essentially mean

25  that this firm can't represent clients because one of its

MA3KTETO

1   lawyers did something incredibly stupid.  And, Judge, I'd

2   submit to you that's a bit unfair and a little too far to the

3   rest of the lawyers at this firm who have not acted stupidly.

4           THE COURT:  All right.  From the co-counsel, am I

5   hearing from Ms. Halligan or Mr. Schneider or both?

6           MS. HALLIGAN:  From Ms. Halligan, your Honor.

7           Is it okay if I address the Court from the podium?

8           THE COURT:  You may as long as I'm able to hear you.

9   Thank you.

10          MS. HALLIGAN:  Okay.  If not, please let me know.  It

11  will just be easier to stand up.  Thank you.

12          If you can hear me okay from here, I think we're good

13  to go.

14          THE COURT:  I can.

15          MS. HALLIGAN:  Thank you.

16          I'm happy to answer any of the Court's questions, but

17  if I could start with a few remarks, your Honor?

18          THE COURT:  Yes.

19          MS. HALLIGAN:  Thank you.

20          And I'm speaking here, I think it's fair to say, on

21  behalf of Selendy & Gay as well as Schneider Wallace.  I'm sure

22  that Mr. Schneider will add anything to the extent he feels it

23  necessary.

24          We were shocked by the disclosures of Mr. Roche's

25  comments.  They are deeply troubling.  We had absolutely no

1    knowledge of any of them until they became public, and we

2    cannot evaluate the credibility of Roche Freedman's statements

3    about their implications.  We immediately looked to assess

4    where we should go from here because, in our view, after doing

5    extensive legal research, our obligation was to the class as a

6    whole, not only to the class plaintiffs.  And we felt that our

7    obligation was to be candid with the Court about the risk of

8    distraction going forward, which would not be in the best

9    interests of the class, even though that is, frankly, not a

10   comfortable position to take, but we felt like we were

11   obligated to do that.

12          I will note, in response to your Honor's question to

13   Mr. Freedman, we have had a professional and smooth-working

14   relationship with the lawyers at Roche Freedman for the past

15   two and a half years.  That has also been the case over the

16   past month, and we have continued to move the case forward

17   despite our obvious disagreement about the role that they

18   should properly play, because our view was that we had to

19   proceed in a professional way that best served the interests of

20   the class.  So, we have been moving the case forward over the

21   past month.

22          You asked, your Honor, if there are any legal

23   questions, and you specifically asked about whether there is a

24   disqualification issue here.  It seems to us, from reviewing

25   the submissions to your Honor, that there is not a

MA3KTETO

1    disqualification motion pending, and I don't know whether the

2    conduct here would rise to the obviously high bar for

3    disqualification.  But it does seem to us — and, again, I

4    believe I speak here for Schneider Wallace as well — that you

5    have authority under Rule 23 to revisit the decision that you

6    made in appointing interim lead class counsel, and that that

7    would permit you, if you were to choose to do so, to terminate

8    Roche Freedman's involvement here.

9         Again, your Honor, the reason that we have taken that

10   position before the Court is not at all from any position of

11   personal animosity, but simply because the fact that defendants

12   have objected, that they have suggested that discovery might

13   somehow be colored by these disclosures, leads us to think that

14   sorting this out at this juncture is important so that it

15   doesn't yield delay, motion practice, and unnecessary costs for

16   the class.

17        We have been --

18        THE COURT:  At some point, I want to know -- you had

19   opening remarks, and I will hear them, but I do have questions.

20        MS. HALLIGAN:  Absolutely, your Honor.  Let me answer

21   whatever I can.

22        THE COURT:  You've expressed a concern that were Roche

23   Freedman to stay, that that might prove a distraction, that it

24   might delay discovery, that it might complicate the

25   certification process, but how do you know that those things

MA3KTETO

1    aren't going to happen anyway?  Because the Kirby folks behind

2    you believe that there's no way that the three firms can escape

3    whatever taint might inhere in this situation, and that the

4    better course of action is to start all over again.  I think

5    there would be some serious delays there, and I have concerns

6    about that, but to the extent that you're saying to me that

7    removing Roche Freedman from the equation eases the path of

8    discovery and eases the path of certification, I'm not sure

9    that's the case because I'm wondering if defense counsel still

10   won't have all the same questions.

11           MS. HALLIGAN:  Well, defense counsel has not objected

12   to us staying in the case.  That is why, though, we think that

13   it is appropriate to sort this issue out at this juncture.

14           A couple of more specific responses, if I can, your

15   Honor?

16           THE COURT:  Please.

17           MS. HALLIGAN:  The discovery process has been vetted

18   along the way by all three firms, and we had no knowledge at

19   all of any of these underlying facts, let alone any inferences

20   that you could draw from them, until they became public at the

21   end of August, and there is no allegation from anyone, as I

22   think there should not be, that that is the case.

23           We have invested thousands of hours and developed

24   substantial expertise on the issues that are at play here, and

25   should the Court decide that Roche Freedman should not

MA3KTETO

1   continue, we are fully prepared and fully capable to continue

2   to move that litigation forward expeditiously.  And that, I

3   think, we are quite confident in, especially given the work

4   that we have put in and the expertise we have amassed over the

5   past couple of years.

6          We also have three other cases involving cryptoassets

7   pending in this district and have been doing a good amount of

8   work on that front.

9          With respect to Kirby and Radice, as they say in their

10  submission to the Court, they have done no work in the

11  litigation at all.  The only crypto-specific experience they

12  raise is the work they did in filing this complaint, and I

13  think that we are far better positioned to move the case

14  forward.

15         To the extent there is some suggestion that we cannot

16  work together professionally should Roche Freedman stay in the

17  case, I think that is also belied by the fact that we have

18  managed to do that over the past month, and I can assure the

19  Court that we would do that going forward.

20         THE COURT:  I appreciate that.  I actually was

21  thinking about it from the other perspective.

22         I'm not sure that there is a legal basis, although I'm

23  still working through that, for the Roche Freedman firm to be

24  terminated as one of the colead plaintiff interim counsel.  But

25  if everybody said to me, look, it's going to be really tough to

MA3KTETO

1    work together after this oral argument, that would matter to

2    me, because I care about the plaintiffs' class in this case

3    more than I care about any one particular law firm taking the

4    laboring oar with respect to advancing the claims of the

5    plaintiffs class.  So that's the issue, but I appreciate you've

6    all now told me you can get along no matter what I do, so

7    that's not going to be an issue for me to worry about.

8          MS. HALLIGAN:  No.  And that, we can assure you of

9    that, and, like I said, we have done that over the past month,

10   your Honor, and we would absolutely continue to do that.

11         THE COURT:  Okay.

12         MS. HALLIGAN:  Our concern here is really just with

13   respect to our ability to move the litigation forward and not

14   anything beyond that, and that there not be really a sideshow

15   of distractions about whether any discovery requests are

16   colored by any allegations and about any collateral interests

17   that Roche Freedman might have.  And that really is what we

18   want to make sure gets resolved so that we can push this

19   forward in an expeditious way.

20         THE COURT:  Well, I think this is something that I

21   perhaps should direct more to defendants' counsel, but it would

22   be unfortunate if my decision were based, in part, on what I

23   thought would ease the path of discovery, and it ended up not

24   easing the path of discovery in this case.  So, if Roche

25   Freedman remains, and we have what you call the sideshow, what

MA3KTETO

1    I might call some additional collateral discovery, that will be

2    one thing.  If they leave the case, and we still have the

3    sideshow or the collateral discovery, that will be unfortunate

4    as well.  I'm sure that's what no one wants.

5        MS. HALLIGAN:  That certainly would not be in the

6    class' best interests, and that is what we are trying very much

7    to avoid, your Honor, yes.

8        THE COURT:  One of your earlier answers sort of laid

9    the groundwork for what I suspect will be the answer to this

10    question, but at the time that you were appointed as interim

11    plaintiffs' counsel, interim class plaintiffs' counsel, the way

12    I thought about it — and I think I was pretty transparent with

13    this — was that the Roche Freedman firm had more familiarity

14    with the cryptocurrency space.

15        MS. HALLIGAN:  Yes.

16        THE COURT:  But that I thought your firm had perhaps

17    more familiarity with large-scale litigation of the type

18    contemplated by the class actions.

19        I think what you're suggesting to me is that in the

20    ensuing two years, there has been, if nothing else, on-the-job

21    training that gives you some comfort that you have the

22    knowledge that Roche Freedman has regarding cryptocurrency and

23    cryptoassets and the litigation that can result from them, but

24    would you like to engage, please, with Mr. Freedman's comments

25    about the fact that their firm still has filed more cases than

MA3KTETO

1    any other firm, and has more experience?

2            MS. HALLIGAN:  I wouldn't contest that, your Honor.

3    They are definitely very expert in the field.

4            What I would say to the Court is that I am fully

5    comfortable — and we would not represent this to the Court if

6    we had not thought carefully about this — that we have the

7    expertise to successfully and effectively litigate this case.

8    We have been working on this for more than two and a half

9    years.  We have developed deep expertise in the crypto space.

10   And I would say, looking back at the applications that were

11   before you, now almost three years ago, deeper experience in

12   those intervening years than anyone else other than Roche

13   Freedman who came before you looking to be selected for this

14   position.

15           So, I am confident that we can do that.  But I don't

16   contest that they've done a lot of work in this space,

17   obviously.

18           THE COURT:  You heard me discuss other things with

19   Mr. Freedman.

20           Is there anything else on which you would like to

21   comment?

22           MS. HALLIGAN:  No.  The only additional point I would

23   make, your Honor, is that we were really appalled by these

24   disclosures.  We have invested a tremendous amount of time and

25   resources in this litigation.  As I said, that has allowed us

1    to develop deep expertise in this space, which I think is

2    invaluable to the class.  But I do think that with respect, in

3    particular, to Kirby and Radice's suggestion that it would

4    benefit the class to completely readjust the leadership

5    structure at this point has no basis in any facts and also no

6    basis in fairness either.

7         THE COURT:  Would you comment on Mr. Freedman's last

8    point to me, was that whatever Mr. Roche may or may not have

9    said or meant or not have meant, that there are a host of other

10   attorneys in the firm who should not be — I'll use the word

11   again — tainted by the disclosures regarding his conduct?

12        MS. HALLIGAN:  I appreciate that point.  I think that

13   my obligation is to be focused on what is in the class' best

14   interest, and I think that that is to short-circuit any further

15   distraction that is created by this whole situation.

16        One last point, if I can, your Honor, should the Court

17   have any questions on it, you asked Mr. Freedman about the

18   question of the scope of our obligations.  We took that

19   question very seriously, we did extensive research on our own,

20   and concluded that our obligations were, as you say, to the

21   class as a whole, not that the wishes of the named plaintiffs

22   are irrelevant, and also retained an ethics expert, who

23   confirmed that view.  So, should the Court have any questions

24   on that, I would be happy to address it.

25        THE COURT:  No, I did read the affidavit.  I was

MA3KTETO

1    wondering, and before I came down here, I checked to see

2    whether there were any eleventh-hour, 59th-minute filings in

3    response, did not see any, but I did read the affidavit.  Thank

4    you very much.

5              MS. HALLIGAN:  Thank you, your Honor.

6              If there's nothing further --

7              THE COURT:  There is nothing further.  Thank you.

8              MS. HALLIGAN:  Thank you.

9              THE COURT:  Mr. Schneider, do you wish to be heard?

10             MR. SCHNEIDER:  Just very briefly.

11             I wanted to start where I think everyone has started,

12   which is, I think Mr. Roche's comments were -- I think you

13   called them stupid.  I think that's charitable, honestly.  They

14   were appalling, and I'm sorry that it happened.  In 31 years of

15   practicing law, I've never had to deal with this before, and

16   there's a reason for that — because every morning when I wake

17   up, and I say what do I do, the answer is what's in the class'

18   best interests?  And that's why we came to you in the way that

19   we did.  That's why we said to the named plaintiffs we're going

20   to have to break with you on this decision because we truly

21   believed in our heart of hearts that the plan that we've put

22   forward is in the best interests of the class.

23             Let me just be clear about what I think is in the best

24   interests of the class — to move this case to resolution or

25   trial as quickly as possible.  And I'd love to try and avoid

MA3KTETO

1      the sideshow, as Ms. Halligan called it.  Whether we can or not

2      may remain to be seen, but I would like to put us in the best

3      posture to avoid that sideshow.

4              With regard to my firm and the Selendy & Gay firm, we

5      have put huge resources into this case.

6              THE COURT:  So has Roche Freedman, no?

7              MR. SCHNEIDER:  Agreed.

8              THE COURT:  Okay.

9              MR. SCHNEIDER:  Yes.

10             My point isn't that Roche Freedman should be kicked

11     off the case because they have put huge resources into it.  I

12     guess I'm going to get into the Kirby motion at this point.

13             THE COURT:  Oh, okay.

14             MR. SCHNEIDER:  And the notion that because Mr. Roche

15     did something stupid, that either my firm or the Selendy firm

16     should pay a price for that, given the good work we've done on

17     the case, the huge resources we've done on the case, I think

18     would be both a disservice to the class and fundamentally

19     unfair.

20             THE COURT:  And, yet, you believe it's okay, and, in

21     fact, you're asking for me to cut loose the Roche Freedman firm

22     because it is their partner, after all, who said the stupid

23     things, and because you believe the concerns about the

24     discovery litigation, the ancillary litigation, that will ensue

25     are such that your advocacy for the class mandates that?

MA3KTETO

1          MR. SCHNEIDER:  I hesitate, your Honor, and let me

2    tell you why I hesitate.

3          THE COURT:  Okay.

4          MR. SCHNEIDER:  In thinking about this, I've said to

5    myself, if -- what Mr. Freedman said, is why should their 24

6    lawyers in their firm pay the price.  I also say to myself I've

7    got a duty to this class.  I think there are several ways to

8    serve the fairness to the class, and the Court can make a

9    decision as to which is appropriate.

10          If this is going to devolve into a sideshow anyway,

11    let's go ahead and get it done now.  Everybody stays in, the

12    sideshow gets played out, and the Court will determine whether

13    or not there is a reason to change a protective order or

14    whatever have you.  I don't even know how that plays out.

15          Another way is to remove the Roche Freedman firm,

16    which I think obviates the need for the sideshow altogether and

17    allows you to get this case to trial quicker, but a lot of that

18    is based on your Honor's view of the best way to manage this

19    case.  I am just a lawyer who comes into court and does my job

20    every day; you're in the position of deciding how to manage

21    this case, obviously with the advice of counsel, but depending

22    upon how you do it, I think answers that question.

23          THE COURT:  Sir, is there anything else you'd like me

24    to know?

25          MR. SCHNEIDER:  No, your Honor.

MA3KTETO

1        THE COURT:  Is there someone in the Kirby-Radice team

2   who would like to speak this afternoon?

3        Is it Mr. Kovel?

4        MR. KOVEL:  Kovel, yes, your Honor.

5        Good afternoon, your Honor.  I'm here with my

6   colleagues John Radice, from the Radice firm, and Karen Lerner,

7   a partner of mine.

8        THE COURT:  Yes.

9        MR. KOVEL:  Well, I think what's been construed or has

10  been called a vice is really a virtue — we haven't within

11  involved in the case for the last two years, and that's a good

12  thing, we think, at this point, given what's going on.

13       We don't even need to echo all the sentiments — but we

14  agree with them — about how awful what was said is, but we also

15  think that, I think contrary to Selendy & Gay and Schneider

16  Wallace, we also think that the Roche Freedman firm should not

17  be part of this case anymore.  We also think that if the facts

18  had been known back in 2020 or in 2019 even, when this case was

19  first filed, we would be lead counsel, and we think that our

20  presence here and the work we've done originally in the case

21  should be considered again now.

22       I think there's a misconception here that we say that

23  there hasn't been anything done by Selendy & Gay or that they

24  should be booted from the case, same with Schneider Wallace.

25  We don't say that in our papers; I'm not sure where they're

MA3KTETO

```
 1    coming up with that.  We think they've done good work — we've
 2    read their briefings from the outside, we've seen the discovery
 3    motions from the outside — but what we do know is that what was
 4    sold to your Honor back in 2020 for lead counsel was that the
 5    Roche Freedman firm — and, by the way, it was Kyle Roche, it
 6    was not any of the other members of the firm that you see here
 7    today — that Kyle Roche had the information, he had the
 8    knowledge, he was the one who was going to take the leading
 9    part in this case, he was going to do all the discovery, and
10    Ms. Halligan said that discovery was going to be run by them —
11    that's the Roche Freedman firm — and it was always called
12    Roche, not even Freedman.  And I think the Selendy & Gay firm
13    would take some of the briefing, as it was represented, they
14    would work on some of the depositions, which haven't occurred
15    yet and maybe work with experts, and that Schneider Wallace was
16    the class certification expert and they would come into play
17    then.  None of that has happened now.
18            So, we're not saying they haven't done good work or
19    learned on the job, but we are saying that back at the time
20    when this was filed, we had a very strong claim to be lead —
21    and it's even stronger now — that we should be part of the
22    case.  We are untainted.  The issues that may linger, even if
23    Roche Freedman is gone, would not apply to us.  We worked on
24    the case.
25            And I appreciate what Mr. Freedman says about them
```

MA3KTETO

1    having worked on the case earlier on, before the filing; we did

2    too.  We think it's a real case, we think there's real value

3    here, that has been stolen from the class, and we want to

4    protect the interests of the class.

5         One thing that hasn't been addressed, I think,

6    directly by Selendy & Gay or Schneider Wallace is that they

7    don't really have clients in this case.  The clients belong, in

8    the sense -- that retained the Roche Freedman firm.  They have

9    a conflict with those clients, and the conflict is a real one.

10   I appreciate the position they're in, but what they've said is

11   that it's in the best interests of the class for Roche Freedman

12   to leave, and the clients have said it's in the best interests

13   of the class for Roche Freedman to stay.  And that's a

14   fundamental conflict.

15        And say we go forward, Roche Freedman is no longer in

16   the case — that will lead to adequacy questions about those

17   particular plaintiffs.  And it's not --

18        THE COURT:  Do you not think that if I were to resolve

19   the case in that manner, that they would get in line, they'd be

20   fine?  It may not be their first choice, but do you really

21   think that they would jump ship if Selendy and Schneider were

22   to be the firms that remained?

23        MR. KOVEL:  I don't know, but I think the position

24   they've taken now exposes them to attacks at class

25   certification on adequacy under 23(a)(4).  I think they have

MA3KTETO

1    typicality and adequacy problems.  And I --

2              THE COURT:  So, adequacy and typicality?  So,

3    typicality for the plaintiffs and adequacy for counsel?

4              MR. KOVEL:  Well, adequacy for the plaintiffs as well.

5    You want class reps to be adequate and typical.  Adequacy means

6    they have to have pursued the case in a way that satisfied

7    their fiduciary duties.

8              Now, class counsel also have to be adequate.  Here, we

9    have what I would say is an untenable conflict because they are

10   taking divergent views.  Selendy & Gay and Schneider Wallace

11   have not moved to withdraw from representing those clients.

12   And we think, and our clients, Mr. Crystal and Mr. Kurtz, they

13   take the position that we say is consonant with what is in the

14   best interests of the class; and that is that the Roche

15   Freedman firm should go.

16             The day after --

17             THE COURT:  One moment, please.  It's not just that

18   the Roche Freedman firm should go.  You're saying lead

19   plaintiffs should go, too?

20             MR. KOVEL:  Well, if we were to substitute in, we

21   wouldn't think that they would belong, that's right.  We would

22   substitute in our own class representatives, the plaintiffs we

23   currently represent, that's correct.

24             THE COURT:  And that's not going to engender delay and

25   disruption in the case?

1          MR. KOVEL:  Your Honor, if you look at the schedule --

2     and I appreciate that point, and inevitably there might be

3     delay, and that's something that is not caused because we're in

4     here saying that this case should be slowed down; it's caused

5     because there's a super big problem caused by one of the lead

6     counsel in this case.  And if it slows down a little bit, that

7     may be the cost of righting the ship; in other words, having a

8     law firm that isn't tainted, including not -- I'm not saying

9     they should be, but not tainted like Selendy & Gay and

10    Schneider Wallace are, who came in pretty much after the case

11    had already been filed by Roche Freedman and was brought in

12    during the lead plaintiff/lead counsel motions.

13         THE COURT:  All right.  I interrupted you.  Please

14    continue with your argument, sir.

15         MR. KOVEL:  All right.  I'm nearing the end.

16         But what I would say about --

17         THE COURT:  No, my concern is, you've now told me —

18    and I'm putting too fine a point on, it let's be clear — that

19    if I don't agree with you, that I'll either have a sideshow, as

20    it has been described to me, or I'll never be able to certify a

21    class if I don't have your firm and the new lead plaintiffs.

22         MR. KOVEL:  I did not say that, your Honor.

23         THE COURT:  Okay.  It will be much more difficult to

24    certify a class?

25         MR. KOVEL:  Having been through class representative

MA3KTETO

1    depositions many, many numbers, of times, there are all kinds

2    of areas that are explored, and adequacy is one of the big

3    ones.  And I can't imagine that in this case — and you can ask

4    them yourself — that defendants won't engage in an inquiry,

5    scrutiny, into the adequacy of the plaintiffs, or the counsel

6    perhaps either, by the way, your Honor.

7              In terms of delay, as we've read the schedule, there

8    is a trial date that may or may not be sometime in 2025, based

9    on the briefing schedule that's in play right now.  We're still

10   not even done with document discovery.  This is something that,

11   if you look at the *American Express* case, which is one we cited

12   to — which is probably the one closest on point to this case,

13   although it occurred after preliminary approval of a class

14   settlement in the Eastern District — the judge didn't approve

15   the final settlement because one of the lead counsel had been

16   communicating with the competitors of the defendant, at that

17   point, all of the lead counsel left that case.  The judge was

18   concerned that this one counsel, who had been communicating

19   with competitors, had led the case, had led the *American*

20   *Express* class action, the others had just followed, and he was

21   concerned that the other lead counsel were more interested in

22   the settlement and the fees that they were going to get than in

23   pursuing the interests of the class.  He was concerned about

24   that.  And he put in an order to show cause why the coleads

25   shouldn't be removed from the case as well, and they

1  voluntarily removed themselves, and he removed the lead counsel

2  who had been the lead.

3          In this case, Kyle Roche has been the lead.  That's

4  the fact.  And that case was -- the ship was righted there, to

5  the extent you would call it that, after a trial, after a

6  discovery, when a settlement had been inked.  Here, we are

7  fairly early on — I know it doesn't seem like it, but in terms

8  of the discovery and in terms of where we're going for summary

9  judgment, class cert, those are months, if not years, away —

10  and there is time to right this ship.  And we do think that

11  there are adequacy problems with the plaintiffs that the Roche

12  Freedman firm represents, and that are represented, although in

13  a very conflicted way at this point, by Selendy & Gay and

14  Schneider Wallace.

15          THE COURT:  Thank you very much.

16          MS. HALLIGAN:  Your Honor, may I respond very briefly

17  to what he said?

18          THE COURT:  Extremely briefly.

19          MS. HALLIGAN:  Thank you, your Honor.

20          THE COURT:  I do want to hear from the folks at the

21  back table.

22          MS. HALLIGAN:  Yes, thank you.

23          The *American Express* case could not be more different

24  than this case.  The colead counsel who were not allowed to

25  continue were not allowed to continue because as the Court said

MA3KTETO

— and I'm quoting — they did not understand the problem with

Mr. Friedman's conduct, and they did nothing about it.  It

could not be further from the truth, the steps that we have

taken, and immediately so.

        With respect to the named plaintiffs, I am advised by

Mr. Freedman that already three of the named plaintiffs have

indicated that they would continue with the case should Roche

Freedman not continue.  And in any event, there is ample case

law making clear that the Second Circuit's preferred approach,

in the event that a named plaintiff cannot continue, is to give

class counsel an opportunity to find someone to substitute or

intervene, and that's something that we would obviously request

a reasonable but quick time to do, should we come to that

impasse, which I would certainly hope we would not.

        Thank you.

        THE COURT:  Thank you.

        MR. FREEDMAN:  Judge, if I may, can I have ten seconds

to add on to that because we have the relationship with

plaintiffs --

        THE COURT:  I want to hear from you but I want to hear

from the folks at the back table.  Can you hold everything

until then?

        MR. FREEDMAN:  Absolutely.

        THE COURT:  May I ask the folks at the back table if

you've organized who would be speaking?

MA3KTETO

1    MS. O'CONNOR:  We have, your Honor.  Maeve O'Connor.

2    I'll be taking the lead.

3    THE COURT:  Thank you, Ms. O'Connor.  I'll hear from

4    you now.

5    MS. O'CONNOR:  A couple of points just previously,

6    because a lot of ground has been covered and I don't want to

7    retread.  Thank you very much.

8    First, I do very much appreciate the Court's comments

9    at the outset regarding tactics, because our clients have very

10   significant concerns about the security of their very, very

11   sensitive data, including PI of customers and of the purposes

12   for which discovery has been sought in this case.  I'm not hear

13   saying I know what those facts are but simply that concerns

14   have been raised by Mr. Roche's own statements, as discussed,

15   and the explanations we've heard do not give us complete

16   comfort on that.  And there are a couple of reasons for that,

17   if I can just briefly mention them:

18   One is that the concern resonated with a concern that

19   our clients already had about certain of the discovery requests

20   being sought.  And this may feed into one of your Honor's

21   questions earlier, about whether this issue will continue to be

22   an overhang in the case, even after this particular motion is

23   resolved, depending how it's resolved.  There are a number of

24   discovery requests that seek enormously broad discovery, that,

25   to us -- and I'm not trying to litigate that today, but our

MA3KTETO

1    clients have a strongly held view that this has nothing to do

2    with the case, it has to do with their business relations with

3    other parties, efforts to get a loan, financial matters that

4    are just really not clearly related to any aspect of the

5    lawsuit.

6            And, relatedly, one other issue of, I think, very

7    significant concern to all of the defendants is that, as your

8    Honor will recall, this case survived a motion to dismiss on

9    the basis of a market manipulation theory based on two --

10   trading in two accounts.  And way back in the fall of 2020, the

11   Exchange defendants came forward with an affidavit from an

12   anonymous trader.  Your Honor recalls the issue.

13           THE COURT:  I do.

14           MS. O'CONNOR:  The thing I wanted to just highlight

15   about that is that the anonymous trader was willing to make

16   himself available to speak with plaintiffs' counsel outside the

17   presence of lawyers, without prejudice to their ability to

18   depose him, and the Roche Freedman firm refused to do that,

19   which, frankly, as a lawyer, I found baffling.  The opportunity

20   to speak to a key witness, to gather information, to try to

21   understand what might be going on in the case without prejudice

22   to my ability to depose that person — we couldn't understand

23   why on earth that would not have been something that they would

24   jump at.  And it did fuel the same concern of, is discovery

25   being sought for another reason, because that reason goes right

MA3KTETO

1    to the heart of, are these claims meritorious or are they

2    misguided and frivolous?  There's a very key question of who

3    controls these two accounts, that was at the heart of

4    everything.

5          So, there is some concern from the defense side about

6    the way discovery has been conducted, that has already been

7    alive in the case even before these issues were injected.

8          THE COURT:  Yes, but now, my concern is that you or

9    your clients are reflexively looking back at the matter and

10   seeing the videos and assuming that all along this litigation

11   was geared to get information for a competitor.  I will, at

12   least for now, accept Mr. Freedman's comments about — or

13   timeline — which suggests that some of these discussions were

14   taking place before Ava Labs was a thing, or at least was a

15   thing that was a client of the Roche Freedman firm.

16         So, your clients are allowed to be concerned, and I

17   understand that, but I'm not yet sure that the concerns that

18   they have aren't being adequately addressed by the protective

19   order that is in place.

20         They believe that they are not?

21         MS. O'CONNOR:  Well, your Honor, I think the problem

22   is, we believe that we don't know, and we aren't comfortable

23   with the explanations that have been offered.  For example, on

24   the one hand, Mr. Roche's statements were taken out of context;

25   on the other, he immediately withdrew from the class action

MA3KTETO

1    practice that he built, and the named plaintiffs say that he

2    was sent to ethics training.  Why?  Is there something behind

3    this?  And what exactly is going on?  The explanations have

4    sort of felt confusing to us.

5         On this question of was the lawsuit filed before or

6    after Ava Labs was a thing, I'm not sure that that matters,

7    your Honor, because it's clear, from what Mr. Roche said, that

8    he and the head of Ava Labs are very close — I believe he said

9    like brothers — and I'm not sure it matters which came first,

10   if there's a desire to work together.

11        Again, we don't have access to these facts, but we do

12   have concerns that we think are very, very reasonable under the

13   circumstances.  And some of these concerns about the scope of

14   discovery existed before the videos came out — that's

15   absolutely true.  There was a sense of why would they want

16   this?  What does this have to do with this?  It doesn't seem

17   connected to this lawsuit, and the video kind of crystallized

18   that concern.

19        So, I feel like there are a lot of unaddressed,

20   unanswered questions that we would still be concerned about if

21   the Roche Freedman firm continued to be in the case, given this

22   backdrop.

23        THE COURT:  Please pause right there.  Thank you very

24   much.

25        I am very interested in the very last part of what you

MA3KTETO

said to me, which is that you have this concern if the Roche

Freedman were to remain in the case.  I'd like you, therefore,

to please comment on what Mr. Freedman has said about the 24,

approximately, other people in the Roche Freedman firm who have

not been found or who do not appear to have engaged in the same

conduct as Mr. Roche.  And I'd like, as well, when you're done

with that, to please comment perhaps on what Ms. Halligan has

shorthanded as a sideshow, because, of course, if the folks at

the back table are going to have additional ancillary

litigation and discovery disputes stemming from Mr. Roche's

statements that are going to exist whether or not the Roche

Freedman firm is part of the plaintiffs' team of attorneys, I

need to know that, because an argument being made to me is that

it is in the interests of the plaintiff class to not have the

distractions, but if we're going to have the distractions

anyway, I think I need to know.

          MS. O'CONNOR:  Sure.  Thank you, your Honor.

          On the first point, I believe it's the case that other

members of the Roche Freedman firm are also investors in Ava

Labs.  And when you think of the comments that Mr. Roche made

about an overall strategy and approach toward litigation and

filing it for competitive reasons — I'm paraphrasing I'm not

meaning to misstate anything — he wasn't speaking just of

himself, that's certainly not how it appears.  He didn't file

these lawsuits as himself.  They were filed by a law firm.  And

MA3KTETO

so we do feel that the firm is implicated.  It's not that easy
to just peel Mr. Roche off the top of the firm that bears his
name and then assume that no one else is tainted or that no
other action the firm has taken is going to be under the same
shadow.

        Whether these issues will continue to be an issue in
the case, look, we obviously have a concern about the Roche
Freedman's firms access to discovery materials.  If they were
no longer colead counsel for the class, I don't know why they
would have access, and so I guess that resolves itself.  I do
think that whatever issues exist around these discovery
requests of concern, if we were discussing them on our client's
behalf with Selendy & Gay only, that would certainly alleviate
the concern.

        THE COURT:  Other than what you've just said to me,
which is that Mr. Roche's comments might have been spoken in
the first-person plural, rather than the first-person singular,
why should I be concerned about the Roche Freedman firm
continuing to have access to discovery in this case?

        MS. O'CONNOR:  Well, if I could turn it around, your
Honor, I would ask, why shouldn't we be concerned?  Because the
statements that were made were shocking, they suggested class
action litigation being brought for competitive reasons, they
suggested that Mr. Roche knows the insides of every crypto
company because of -- he doesn't explain because of what, but

1    it seems to be related to the litigation, and he has a law

2    firm, that he built, that has filed multiple lawsuits in this

3    space, and it feels like it's all part of the same hole.

4         So, if they were to stay in the case, I think our

5    clients would feel that we need some discovery into whether, in

6    fact, we can feel comfortable that there's a difference between

7    Mr. Roche and the firm that Mr. Roche built.  And to hear him

8    speak on this video, he's describing a whole strategy, a whole

9    new approach to litigation.  He built this law firm.  And so,

10   no, we're not comfortable simply by hearing some disavowals of

11   his statements.  And there's obviously a big credibility

12   problem, from the getgo, around, he said these things, he

13   didn't mean them; that doesn't help the situation.

14        So, we feel that the questions really are not fully

15   answered.

16        THE COURT:  So, just going back to one of your more

17   recent answers:  Your view is if the Roche Freedman firm no

18   longer has access to discovery, at least certain of the issues

19   that your clients would have, they'd no longer have them

20   because of the access point, yes?

21        MS. O'CONNOR:  The access point is the huge point for

22   our clients, in light of Mr. Roche's comments, yes.

23        THE COURT:  Okay.

24        What else should I know?

25        MS. O'CONNOR:  I think those are the main points that

1  we wanted to cover today, your Honor.  The other points, I
2  think, have all come up.
3          If I can speak to one point that came up earlier in
4  the day:  I do think that there is a difference between a
5  disqualification framework and a framework under Rule 23(g), of
6  appointing class counsel, and Rule 23(d), of revisiting that
7  decision.  And I think the Court has discretion here, because
8  it's a class action, that's different from straight-up
9  disqualification that might exist outside of a class action
10 setting.
11         THE COURT:  Do you wish to be heard on the conflict
12 issues that Mr. Kovel was discussing with me on behalf of the
13 Kirby/Radice team, or do you not have a horse in that
14 particular race?
15         MS. O'CONNOR:  Yes, we do not have a horse in the
16 race, of who would best represent the class.
17         THE COURT:  Okay.  Thank you.
18         MS. O'CONNOR:  Thank you.
19         THE COURT:  Mr. Freedman, I appreciate your patience,
20 and I will hear from you now.
21         MR. LINDENBAUM:  Your Honor, could another defendant
22 speak as well?
23         THE COURT:  I beg your pardon, I'm sorry.  Excuse me.
24 I thought I understood that Ms. O'Connor was speaking on behalf
25 of everyone; but, no, absolutely.

MA3KTETO

1          And you are Mr. Lindenbaum; is that correct?

2          MR. LINDENBAUM:  Yes.

3          THE COURT:  Excuse me, please.  And I will hear from

4     everyone at the back table if you want to be heard.  Thank you.

5          MR. LINDENBAUM:  Thank you, your Honor.  I'm Matthew

6     Lindenbaum for Poloniex.  And Ms. O'Connor was taking the lead

7     for all of us, but on behalf of Poloniex and the Exchange

8     defendants, I just wanted to give a little bit of context

9     behind how this case has been litigated as to us.

10         So, both Poloniex and Bittrex were not in the original

11    complaint.  And I don't know the timing of when Roche Freedman

12    began to be engaged with Ava Labs, but we were added later in

13    an amended complaint.  And, as Ms. O'Connor said, that amended

14    complaint, as to Poloniex and to Bittrex, focuses on these two

15    accounts as part of the market manipulation scheme that is

16    essentially the only -- or at least the key allegation against

17    Poloniex and Bittrex.  And when we brought the trader

18    declaration to the plaintiffs — that comprehensively in nine

19    pages explains, no, it's not this scheme, it's me, the trader,

20    who was doing this, and this is a legal arbitrage strategy —

21    they said, well, we're going to need to have to interview,

22    speak with them, figure out what's going on here.

23         That was two years ago, and it hasn't happened, at

24    least as far as we know.  We've provided them with the contact

25    information for the trader, and they just haven't spoken with

MA3KTETO

1   them.

2           So, nothing has happened on that key allegation since

3   then.  Instead, again, as Ms. O'Connor noted, we have been hit

4   with very wide-ranging document discovery.  And I will give you

5   one particularly egregious example:  So, this was served on my

6   client Poloniex, and I'm going to quote this one:  "Documents

7   sufficient to show the existence and subject matter of any

8   investigation or inquiry of you that any governmental entity

9   has undertaken or made."  So, they want to know about any

10  government investigation into my client regarding any topic,

11  not topic regarding this action, litigation.  So, that's an

12  example; there's others.

13          We are actually substantially complete with our

14  document production in this case.  There has been no document

15  or shred of information supporting the claims against us.

16  They've had the declaration for two years, and we've wondered,

17  why have they not dropped us from this case?  Why are we still

18  here?  And, look, we don't know what motivations they have —

19  we've only seen the public disclosures that everyone else has

20  seen — but there's the least the suggestion as to there being

21  an improper commercial business purpose behind our continued

22  involvement in this case.

23          THE COURT:  Anything else, sir?

24          MR. LINDENBAUM:  No, at all.

25          THE COURT:  All right.  One moment, please.

MA3KTETO

1              (Pause)

2              THE COURT:  Ms. Rudzin, do you also want to be heard?

3              MR. RUDZIN:  No, thank you.  They covered everything.

4              THE COURT:  I'll try again, Mr. Freedman.  Thank you.

5              MR. FREEDMAN:  Thank you, Judge.

6              THE COURT:  Perhaps now you have more things you wish

7       to speak about?

8              MR. FREEDMAN:  I do, Judge.  That was the right call.

9              Starting with the Kirby presentation, Judge:  First of

10      all, there were discussions of adequacy of the class

11      plaintiffs.  Certainly, I think it's clear to the Court that

12      Roche Freedman would like to stay in this case, and believes it

13      should, and I'll get to those facts in a moment.  But, as I

14      said, our plaintiffs have sacrificed greatly for this case, and

15      if the Court were to decide we were not permitted to continue

16      in this case, our clients should not suffer for that.  That is

17      for sure true.

18             More as a legal issue, though, the Kirby plaintiffs do

19      not have a plaintiff with standing to assert the CEA claims,

20      the Commodity Exchange Act claims.  They do not have any

21      plaintiff that has purchased futures.  So, their clients would

22      be inadequate, and I believe the Court, when choosing lead

23      counsel, that was an issue that was discussed extensively.

24             Furthermore, Judge, if I recall correctly, the Kirby

25      plaintiffs only purchased Bitcoin.  At this point, the class

1    consists of purchasers of Ethereum, C-cash --

2              THE COURT:  No, no, no — for court reporter and judge,

3    please repeat those.  Thank you.

4              MR. FREEDMAN:  Yes, Judge, I apologize.  I said that

5    is an issue I have; I speak a little too quickly.

6              The Kirby plaintiffs only purchased Bitcoin.  The

7    current named plaintiffs have purchased Ethereum, ZCash,

8    B-cash, Litecoin, Light Cash, Dash, and, as I mentioned,

9    futures, which enables the Commodity Exchange Act claim.  So,

10   if there was any plaintiff that is inadequate to represent the

11   class at this point, it is the Kirby plaintiffs, Judge.

12             Unless the Court has questions on that, I can move on.

13             THE COURT:  Please do.

14             MR. FREEDMAN:  Judge, it is true that Selendy & Gay

15   and Schneider Wallace are excellent, excellent litigators, and

16   they have learned a lot about cryptocurrency assets in the past

17   two years.

18             That being said, this is about maximizing the recovery

19   for the class and what is in the class' best interests.

20   Putting aside for a moment Mr. Roche's comments, which we'll

21   get to in a moment, I don't think it's disputable that our firm

22   has the most expertise in understanding these assets and the

23   way they work, and we believe our continued participation would

24   maximize the clients' recovery and the class' recovery.  I

25   don't think that's disputed by my co-counsel, but I will let

MA3KTETO

them speak for themselves.

Turning to the broad discovery request, Judge:  Every discovery request in this case has been issued by three firms, two of which have not even at all been impugned or accused of any misconduct.

Second of all, on the broadness issue, defendants said the same thing and recently lost a motion to compel before this Court.  In fact, I believe the Court found that the claims that defendants thought were too broad or the discovery that was far too broad was actually central to the issues of this case, of whether or not crypto commodities were manipulated using unbacked Tether.  So, it is not shocking, I'm sure, for the Court to hear that defendants think plaintiffs are seeking discovery that is too broad.

Judge, there was a concern about why we didn't take up an opportunity to interview someone.  It's pretty unconventional, Judge, but we want documents before we can talk to somebody; and if they're not speaking under oath, then that doesn't really mean anything.  Also, Judge, I believe you've already dealt with this issue when this issue came up initially, and you found that that wouldn't even resolve everything, even if it was an arbitrage trading; and, therefore, I'm not sure why we're jumping to resolve this if the exchange defendants would need to remain in regardless. Certainly, the failure to resolve it is not some indicia of bad

MA3KTETO

1   faith.

2          Also, Judge, I'd like to discuss the issue of the 24

3   other lawyers.  Investing in a company, or having an interest

4   in a company, does not mean you cannot handle litigation.

5   Lawyers that sue Microsoft don't have to disclose they hold

6   shares in Apple.  But we don't even get that far, Judge.  The

7   Evox cryptoasset is not a competitor to any of the defendants.

8   USDT Tether is a crypto commodity that leverages the Avalanche

9   system.  They are synergistic, not competitors.  The exchanges

10  sell the Evox cryptoasset.

11         The idea that Ava Labs would need to get some kind of

12  confidential information from them is nonsensical.  These are

13  not competitors that are trying to take advantage of each

14  other; obviously, putting aside the fact, Judge, that I'm

15  telling you that that is not why this case was brought.  And I

16  know that not because I'm going out on a limb for Mr. Roche but

17  because I lived it, and Ava Labs didn't exist when we began

18  bringing this case and thinking through the issues in this

19  case.

20         The example given by the defendants, Judge, about a

21  request for all investigations brought by any government

22  agency:

23         First of all, I'll note it's documents sufficient to

24  show, which is always a good thing.

25         Second of all, they are an exchange, Judge; all they

MA3KTETO

1    do is engage in the sale of cryptoassets.  So, it is not

2    shocking that we would be seeking documents sufficient to show

3    government inquiries into the sale of crypto commodities when

4    this case is about the manipulation of the crypto commodity

5    market.

6              The defendants raised another issue, Judge, which is,

7    if nothing happened, why did Mr. Roche withdraw?  Why is he

8    seeking ethics counseling?

9              Number one, Judge, I think we can all agree that

10   Mr. Roche could use some help with what he says, and when he

11   says it, and where he says it, how he says it.  So, for that

12   reason, he's going to seek that kind of counseling.

13             In terms of why he withdrew despite our statement that

14   nothing actually inappropriate happened beyond one lawyer's

15   stupid statements — because, Judge, we were trying to stop the

16   appearance of impropriety.  Obviously, there's an issue with

17   what Mr. Roche did; everyone in this courtroom agrees to that.

18   This firm, I want to point out, before anyone moved to

19   disqualify Mr. Roche, took the actions it took on its own

20   accord.  It caused him to withdraw, it removed him from its

21   class action practice, it enacted an ethical wall, it caused

22   him to forfeit his financial interest in this case.

23             So, there could be no accusation, there could be no

24   say, that he was attempting to influence this case going

25   forward.  We did it out of an abundance of caution and to avoid

MA3KTETO

1    an appearance of impropriety, not because anything untoward

2    actually happened beyond his stupid statements, Judge.

3            Finally, I'll end on the access point, unless the

4    Court has more questions, which is:  A finding that this firm

5    cannot abide by protective orders would mean this firm cannot

6    litigate any case.  Mr. Roche has been screened from this case.

7    There is no evidence of any sharing of discovery materials in

8    violation of the order beyond statements of Mr. Roche that

9    don't even say he shared discovery materials.  They were

10   stupid, but he wasn't even that stupid.  He did not say that,

11   and there is no evidence of it.  And this firm and its 24

12   lawyers take their obligations and their professional

13   obligations extraordinarily seriously.  We would never breach a

14   court's protective order.  And any finding that we would,

15   because one lawyer made stupid comments while allowing himself

16   to get incapacitated, would be unjust to the rest of this firm

17   and unfair and unfounded under the law.

18           THE COURT:  I've asked the questions that I wanted to

19   ask, and I want to think about what you all have said to me, so

20   what I expect will happen will be:  Within the next week, I'll

21   be calling the parties and letting you know about a telephonic

22   decision.  I won't drag you all in here because I didn't really

23   know how many people would come in here.

24           It's my belief that you've all given your arguments to

25   me, but just to forestall someone sending me a letter tonight

MA3KTETO

1    or tomorrow, tell me now if there is some argument you feel you

2    must tell me.

3            MR. NORMAND:  Your Honor, it's Ted Normand.  Very

4    briefly, I speak only because your Honor asked about areas of

5    law that the parties might not have addressed.

6            It's been held sort of held constant --

7            THE COURT:  I'm sorry.

8            MR. NORMAND:  It's been sort of held constant

9    throughout this argument that the prospect of discovery that

10   might be taken, or even the reality of discovery that might be

11   taken, is some sort of disabling distraction.  This is an area

12   of law that the parties haven't briefed for the Court, but in

13   the Second Circuit decision, in *Dennis Friedman*, this is then

14   Judge Sotomayor, she made a couple of important points:

15           One is that there's a strong presumption against

16   taking discovery of opposing counsel.  I can imagine a scenario

17   in which the Court thinks that presumption might be overcome

18   here, but there are critical factors that, in our view, would

19   counsel against it.  One, the Court says, look to the matter on

20   which you want to take discovery; and, two, consider the extent

21   to which confidential communications are going to be

22   implicated.

23           So, there's no matter, as we understand it, that the

24   defendants want to take discovery on, that concerns a claim or

25   defense in the case.  They don't want to take discovery on the

1    merits of the case; it's a collateral matter.

2            And, two, to the extent they want to ask about

3    communications with Ava Labs, that directly implicates

4    confidential communications.

5            But what I really want to end with, your Honor, is

6    when you read Judge Sotomayor's opinion in *Dennis Friedman*, the

7    upshot is the discovery itself might be a distraction but it's

8    just a distraction.  The Second Circuit said, we're not going

9    to create a rule that says you absolutely cannot take discovery

10   of opposing counsel, because, in so many words, it's not that

11   big a deal, it's not that disabling, it doesn't preclude the

12   parties from prosecuting the case, it doesn't cast a pall over

13   the case.

14           So, what I've heard defendants to say is, there's a

15   prospect of discovery, the mere prospect isn't the distraction,

16   and even if they were to take the discovery, it would be just a

17   distraction.  And that has to be balanced against the Rule 23

18   factors and the many other factors that Mr. Freedman has spoken

19   to.

20           Where we disagree with our co-counsel is that there's

21   a suggestion that the analysis is, all things being equal, our

22   firm should be removed.  All things aren't equal.  It would be

23   a cost to the class to remove our firm, and that's balanced

24   against, as I say, what Judge Sotomayor described as a

25   distraction.

MA3KTETO

1              So, we think, on balance, our removal would be

2      disproportionate under that standard.

3              THE COURT:  Thank you, sir.

4              Hearing nothing else, we are adjourned.  Thank you

5      very much.

6                                   *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25