Pages 1 - 35

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

DANIEL VALENTI, Individually    )
and On Behalf of All Others     )
Similarly Situated,             )
                                )
            Plaintiff,          )
                                )
  VS.                           )   NO. C 21-06118 JD
                                )
DFINITY USA RESEARCH LLC,       )
DFINITY FOUNDATION, and         )
DOMINIC WILLIAMS,               )
                                )
            Defendants.         )
_____ )

                        San Francisco, California
                        Thursday, February 2, 2023

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    FREEDMAN NORMAND FRIEDLAND LLP
                    99 Park Avenue, Suite 1910
                    New York, New York 10016
                **BY:  EDWARD NORMAND, ATTORNEY AT LAW**

For Defendants:
                    CRAVATH, SWAINE & MOORE LLP
                    Worldwide Plaza
                    825 Eighth Avenue
                    New York, New York 10019-7475
                **BY:  KEVIN J. ORSINI, ATTORNEY AT LAW**
                    **EVAN D. SIEGEL, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RDR, CRR, CSR No. 7445
              Official United States Reporter

<u>**Thursday - February 2, 2023**</u>                              <u>**10:47 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

---o0o---

**THE CLERK:**  Calling Civil 21-6118, Valenti vs. Dfinity Research LLC.

Counsel, state your appearances.

**MR. NORMAND:**  Your Honor, it's Ted Normand from Freedman Normand Friedland for the plaintiffs.

**MR. ORSINI:**  Good morning, Your Honor.  Kevin Orsini, Cravath Swain & Moore, along with my colleague Evan Siegel from Cravath on behalf of defendants.

**THE COURT:**  Okay.  Well, this has not gone well in other courts.  So let me just tell you what I'm thinking.  That will help guide our discussion.

My main concern -- I'm not seeing this as a disqualification matter.  I think this is really protecting the putative class and the named plaintiffs, under Rule 23 and the PSLRA, with counsel who are going to have an untarnished allegiance on a fiduciary duty basis to the putative class and the named plaintiffs.

So, really, my only concern is, after all this to-do about -- what was that fellow's name?  Roche?  Is that how you say it?

**MR. NORMAND:**  Yes, Your Honor.

**THE COURT:**  Mr. Roche.

1    -- after all the to-do about Mr. Roche, this new law firm,

2  the successor law firm which grew out of that, is in any way

3  going to have its fiduciary duty clouded or muddied in such a

4  way that it will be a disservice to the named plaintiffs or the

5  putative class.  That's really what I'm focusing on.

6    Now, my colleague in the Southern District of New York

7  concluded that there is enough in the air that she wasn't going

8  to let the firm itself, the reconstituted firm, go forward, and

9  that's really what I want to hear about.

10    On the one hand, I do share the concern that this is a

11  relatively small law firm.  Mr. Roche was the lead named lawyer

12  on the masthead before the firm was reconstituted without him.

13  And it does seem to be a reasonable inference that others at

14  the firm today may have had some problems that are similar to

15  Mr. Roche's.

16    On the other hand, I'm advised that Mr. Roche has been --

17  is out of the firm.  He's out of this case.  He has no

18  financial stake in anything that might happen in this case.

19  And he's all in the rearview mirror, so to speak.  Right?

20  **MR. NORMAND:**  That's right, Your Honor.

21    I think it's important to note that when Judge Failla made

22  her decision, the firm actually had not been reconstituted.

23  Mr. Roche was still at the firm.  This is part of an ongoing

24  process, and she made her decision in the course of an ongoing

25  process.

 1          The beginning of the process was that we immediately

 2   removed him from the firm's class action practice, took him out

 3   of that case.

 4          And that process has now culminated, I can represent to

 5   the Court, after hundreds of attorney hours of work, over

 6   $200,000 spent, the review of tens of thousands of e-mails, our

 7   firm has seen no evidence of what Judge Failla, who said she

 8   was making no factual findings, of what Judge Failla said she

 9   was concerned about.

10          We've not brought class actions for clients other than the

11   plaintiffs.  We haven't pursued class actions for clients other

12   than the plaintiffs.  We had not at that time misused any

13   discovery or disclosed it to any third parties improperly.

14   We're not going to do that.  And that's what we've concluded

15   looking back.

16          Going forward, as Your Honor says, since that order, we've

17   reconstituted.  Mr. Roche, as part of that ongoing process, is

18   out.  And so the defendants' motion -- there are several issues

19   presented; but to the extent Your Honor has framed it,

20   defendants' motion reduces to the notion that you should impute

21   to the 25 or 27 remaining lawyers in the firm -- including

22   myself who has expressly represented that I haven't done

23   anything that Judge Failla was concerned about; my six

24   partners, who have expressly represented that they haven't done

25   anything that Judge Failla said she was concerned about --

1  questions whether to impute this remaining law firm with

2  anything Mr. Roche said.

3        So, one, we've concluded that what Mr. Roche said was

4  self-aggrandizing; obviously profane; obviously inappropriate;

5  obviously meant to make him look more important and bigger than

6  he was; and the things he said were untrue.

7        And looking forward, he's not part of the firm.  And we're

8  not going to misuse discovery.  We're not going to ask for

9  discovery for the wrong reasons.  We're bringing a meritorious

10  case.

11        And with respect to the Court's understandable interest in

12  the administration of justice, the overall interests of the

13  class, we submit that the legal standards that govern a motion

14  to disqualify --

15        **THE COURT:**  Okay.  That's not how I'm looking at it.

16        **MR. NORMAND:**  Understood, Your Honor.

17        **THE COURT:**  I'm just doing Rule 23, and I'm using my

18  discretion.

19        **MR. NORMAND:**  Understood.

20        **THE COURT:**  Are you trustworthy, and are you going to

21  honor your fiduciary duties?  That's all I'm asking.

22        **MR. NORMAND:**  Yes, we are going to.  And we think the fact

23  of the motion underscores that it would be in the interest of

24  the class to have us on, because if the defendants were

25  unconcerned with our quality as lawyers and the quality of the

1    complaint, they wouldn't have brought their motion.  And that's

2    what the law says the Court should presume.

3        **THE COURT:**  I'm happy to hear you say here today,

4    Mr. Normand, that your former colleague was on the wrong side

5    of the line, because your brief -- I was going to mention this

6    to you, but you're helping me correct it -- your brief was a

7    little bit defensive about the situation, talking about

8    entrapment and so on.  I don't buy that.

9        That lawyer, had it been my case, I would have done

10   exactly what the judge in the Southern District of New York

11   did.  Okay?  I'm not going to buy this idea that he was duped,

12   drunk, and talkative.  He was completely inappropriate as lead

13   counsel and Rule 23 and under the PSLRA.  So I would have had

14   no problem at all reaching that prior conclusion.

15       So, Mr. Orsini, the only thing that I want to hear from

16   you is why -- I'm not sure why this is any of the defendants'

17   business because you're not really here vindicating the

18   interests of the putative class or the named plaintiffs.  So

19   you can tell me a little bit about that.  I don't see any

20   evidence -- you can help me if I'm wrong.  I don't see any

21   evidence that this is in any way prejudicial to Dfinity.  But

22   I'm happy to hear whatever you have to say about why you think

23   the reconstituted firm --

24       The new firm, I know the initials are F, as in "frank,"

25   N-F.  But what's the name?

1        **MR. NORMAND:**  Freedman Normand Friedland, Your Honor.

2        **THE COURT:**  Freedman Normand Friedland, FNF.

3        -- Freedman Normand Friedland, is not okay to go forward

4    with the case.

5        **MR. ORSINI:**  Thank you, Your Honor.

6        And I think Your Honor is absolutely right to be looking

7    at this from the Rule 23 perspective.

8        Why does it impact us?  The reason it impacts us is

9    because the reprehensible conduct and statements of Mr. Roche

10   have fundamentally tainted this case going forward if his firm,

11   even with him gone, continues to represent the putative class.

12       This case is different from Judge Failla's case in one

13   very significant respect that bears upon the prejudice to us;

14   and that is, in his boasting that was recorded, Mr. Roche

15   specifically identified this case and my clients as examples of

16   his abuse and misuse of the judicial process.  He explained the

17   interrelationship between the prosecution of class actions like

18   this against blockchain providers and crypto companies and the

19   firm's relationship with Ava Labs, which he admitted was a

20   competitor of my client's.

21       And what's critically important is Mr. Roche, who is the

22   first named partner, the founding partner of this small

23   litigation boutique, explained in that video -- points he's not

24   refuted; points he's not refuted -- explained in that video the

25   close interrelationship between the firm, which is basically

```
 1   still that firm minus him, and Ava Labs, which he claimed they

 2   were acting on behalf of in filing these class actions.

 3        They were created at the same time in a joint workspace.

 4   There's significant financial interest that this firm and these

 5   lawyers still have.

 6        THE COURT:  Well, let me just pause on that because --

 7        MR. ORSINI:  Yes, Your Honor.

 8        THE COURT:  -- your colleague here, in one of the filings

 9   for this motion, says that they're not doing anything

10   further -- what is it called?  Ava?

11        MR. ORSINI:  Ava Labs.

12        THE COURT:  -- they're not doing anything further with

13   Ava Labs other than some defamation suit or something.

14        What was the -- what's the one case you have left?

15        MR. NORMAND:  We are local counsel with a very

16   circumscribed role for an executive at Ava Labs.

17        THE COURT:  Oh, okay.  So that's it.

18        MR. ORSINI:  Well, that's not it, Your Honor.

19        THE COURT:  No other financial ties or work relationships

20   of any sort.

21        MR. ORSINI:  That's not what the record demonstrates,

22   respectfully, Your Honor.

23        The individual is one of the two founders.  So he's not

24   just some executive at Ava Labs.  He's one of the key players

25   there.
```

1      But the ongoing financial relationship is this firm, based

2  on the record, was founded and funded in no small part based

3  upon a business relationship between it and Ava Labs that

4  involved providing Ava tokens to Mr. Roche, counsel, and

5  various others at his firm.

6      So there is still a financial relationship between those

7  firms.  They grew up together.  That was the genesis of these

8  two entities.  And as Mr. Roche said in his video-recorded

9  statements, he has acted on their behalf, including by filing

10  this case.

11      And so how does it affect us?  If you look at their

12  brief -- and I understand counsel has recalibrated a little bit

13  today, as Your Honor noted -- but one of the things that was

14  really striking to us was they said:  Well, don't worry about

15  the conflict because at the end of the day, the best thing that

16  Dfinity has pointed out is that Ava Labs wants bad things for

17  Dfinity --

18      **THE COURT:**  Let's just pause here.

19      **MR. ORSINI:**  Yes, Your Honor.

20      **THE COURT:**  What conflict are you referring to?

21      Let me just think out loud here.  People's motivations in

22  filing a lawsuit typically are irrelevant.  They don't have to

23  like you.  They don't have to wish you success.  They don't

24  have to have your interests at heart.  They can sue.  That's

25  just the way our system works.

1      **MR. ORSINI:**  I agree with that.

2      **THE COURT:**  And the fact that somebody had an axe to grind

3   isn't ever a reason to throw out a lawsuit.

4      Now, if it turns out that that was such an overwhelming

5   impulse that the lawsuit was frivolous or a violation of

6   Rule 11, you have ample sanction opportunities at the end of

7   the case to get your money back and maybe even more.  Okay?

8      But, you know, whether someone likes you or dislikes you

9   or wants to salt the earth you walk on is not really relevant

10   to this.  The only thing that is relevant is if you can tell me

11   that there is a conflict between the current law firm without

12   this offender, Mr. Roche, and the putative class or the named

13   plaintiffs.

14      **MR. ORSINI:**  And I --

15      **THE COURT:**  Now, I don't know why that would be anything

16   you'd worry about, but I'd be happy to hear it, since you've

17   spent a lot of time thinking about it.

18      **MR. ORSINI:**  I appreciate that, Your Honor.  And I agree

19   that the mere dislike of me or my client is not sufficient.

20   I've, unfortunately, become accustomed to that.

21      The problem here is not Ava Labs' dislike of us or

22   counsel's dislike of Dfinity and desire for it to have bad

23   results.  The point here is the potential competing interests

24   between their financial stake and their, you know, grown-up

25   desire to support Ava Labs and their duty to the class.

1      They could both want Dfinity to lose this case, but you

2  can absolutely see circumstances in which -- and Mr. Roche

3  talks about this during the video -- in which it could become

4  in the best interests of the absent class members -- which is

5  who we really have to be concerned about here -- in the best

6  interests of the absent class members to resolve the case on

7  certain terms.

8      **THE COURT:** Let me just jump in.

9      That's what I'm wondering about.  And let me just be

10  up-front about it.  That is the concern.  Okay, Mr. Normand?

11  For example, there may -- an opportunity to settle the case on

12  terms favorable to the putative class presented itself but

13  let's say Mr. Roche had such a vendetta against the defendant

14  because of his allegiance to this Ava Labs company and there

15  was some strategic value in not settling for Ava Labs, an

16  opportunity to resolve would be lost.

17      So why do I not have to worry about that with you?

18      **MR. NORMAND:** Well, two things, Your Honor.

19      One, under the law, the issue is not backwards-looking and

20  punitive.  We have seen no evidence that Mr. Roche did file a

21  lawsuit in a context in which you would have any such conflict.

22      But let's take the worst-case scenario and assume he might

23  have privately had that intent.  We've seen no evidence of

24  that.  He's disclaimed it.

25      I've had no conversations with Ava Labs in my three years

1    at the firm.  I don't have that motivation.

2        Let's assume Mr. Roche did.  He's not part of the firm

3    anymore.  I'm representing to the Court that's not going to

4    happen.  We don't have those motivations.  I never had them.

5    No one on my team has them.

6        **THE COURT:**  Let me ask you this.  Mr. Orsini is suggesting

7    that there are deeper ties between your firm and Ava Labs than

8    I'm aware of at this point.  Now, what's the status of that?

9        **MR. NORMAND:**  There are no deeper ties.  We don't

10   represent Ava Labs.  As I said, we have a local counsel

11   circumscribe role for one executive.

12       Ava Labs has publicly disclaimed that we brought any suits

13   on their behalf.  In fact, they were angry that we brought the

14   Solana suit.  They've said that publicly, among the many things

15   the Court can take judicial notice of.

16       **THE COURT:**  Other than this one case for the executive

17   that you're local counsel on, are you getting any other fees or

18   money from Ava Labs?

19       **MR. NORMAND:**  No.  The firm does not have an equity stake

20   in Ava Labs.  I think there's a suggestion in the briefing that

21   we do.  I have no equity stake in Ava Labs.

22       Several partners at the firm were paid in AVAX tokens.

23   One, there's nothing unethical about being paid in non-cash

24   form.  Two, there's no connection between that payment and how

25   this lawsuit's going to be prosecuted.

1        They've not offered any coherent theory of how --

2        **THE COURT:**  Let me ask you this, because crypto is a big

3   black box for everybody, particularly me.  Is there any

4   possibility that the value of that coin that your partners are

5   holding is going to be affected by developments in this case?

6        **MR. NORMAND:**  Your Honor, a moment of levity.  No one

7   knows what's going to happen with crypto; right?

8        So we have no designs, no prediction, no intent in that

9   regard.

10       **THE COURT:**  I understand.  But is there any reasonable --

11       **MR. NORMAND:**  There's no connection, and they haven't

12  offered a coherent theory of how any way this suit gets

13  prosecuted, it could result in any effect on AVAX tokens.

14       **THE COURT:**  All right.  Let me pause on that.

15       Mr. Orsini, what's your view of that?

16       **MR. ORSINI:**  So my view of that is quite different, which

17  is these are both, as Mr. Roche admitted, competing blockchain

18  companies.  They're developing technology on the blockchain.

19  These tokens are utility tokens that are used to conduct

20  activity on the blockchain that's being developed by these

21  different entities.  There are also people who use the tokens

22  for different purposes.

23       Crypto is also a bit of a mystery to me, notwithstanding

24  me representing the company.  It's complicated.

25       **THE COURT:**  It's an intentional mystery.  It's --

1       **MR. ORSINI:**  Yes.

2       **THE COURT:**  -- in my view, structured to be mysterious.

3       Anyway, go ahead.

4       **MR. ORSINI:**  Whether that's true or not, Your Honor, the

5       reality is, when you have these two different competing

6       blockchain entities where the value of the token turns, in no

7       small part, on how it can be used on the blockchain that each

8       one is developing, the notion that they're unrelated is just

9       fundamentally false.

10      **THE COURT:**  Let's just put some specifics on this.

11      **MR. ORSINI:**  Sure.

12      **THE COURT:**  Okay.  So there are a couple of partners at

13      this FNF law firm holding an Ava Labs-related token, the value

14      of which is going to fluctuate over time.  How is anything in

15      this lawsuit going to be -- how would anything in this lawsuit

16      affect the value that those partners hold?

17      **MR. ORSINI:**  Harming Dfinity's ability financially to

18      continue to develop its competing blockchain technology will

19      benefit its competitors and, by definition, drive up the value

20      of the tokens on those competing --

21      **THE COURT:**  But this is a securities lawsuit.  This isn't

22      a products lawsuit.  This isn't a patent lawsuit.  Why would a

23      resolution of a securities claim in any way, shape, or form

24      directly influence the value of the token that these partners

25      hold?

1     **MR. ORSINI:**  Well, we, Your Honor, don't believe they have

2  a securities claim, but let's assume -- let's play this out.

3  Let's assume for a second that they have the claims they've

4  asserted, which is that this was an unregistered offering of

5  securities.  There are two claims.  There's a Section 11 claim,

6  which is the unregistered offering of securities for which they

7  want full rescission; and then there are 10b-5

8  misrepresentation and market manipulation claims.  Right?

9     If they were to win, particularly the rescissionary

10  damages claim -- and we don't believe they can, should, or

11  will --

12     **THE COURT:**  I understand.

13     **MR. ORSINI:**  -- but we're in possibilities here.

14     If they did, Your Honor, that would be a massive judgment

15  that would hobble this company's ability to continue to develop

16  the blockchain --

17     **THE COURT:**  Okay.  I get that.  You could be ground to

18  dust.  How is that going to enrich the partners at this law

19  firm who hold the Ava Labs-related token?

20     **MR. ORSINI:**  Because to the extent destroying my client

21  helps them attract more people onto their blockchain, that

22  therefore increases the value of those tokens --

23     **THE COURT:**  All right.  Well, that's --

24     **MR. ORSINI:**  -- which benefits those who hold them.

25     **THE COURT:**  -- highly, highly speculative.

1    **MR. ORSINI:** Well, Your Honor, the only reason I disagree

2    with that is because it's not as simple as they hold a couple

3    of shares of Apple stock and they're suing Google or Meta or

4    Epic, something Your Honor is familiar with.

5        **THE COURT:** By the way, I'm not even sure it's a problem

6    in itself.

7        **MR. ORSINI:** No, I agree with that. I agree with that. I

8    agree with that. But this is not that situation. This is a

9    firm that was created with Ava Labs. They have been

10   intermeshed since their beginning, according to not only --

11       **THE COURT:** Okay. I understand. Let's pause here.

12       I understand that, but your colleague here is representing

13   they have zero ties to Ava Labs except for one tiny legacy role

14   as the mailbox local counsel for one executive in the firm.

15   So, okay. They may have been joined at the hip a year ago,

16   five years ago, but now they've been severed. So that's what

17   matters now.

18       So what is it today that's a problem?

19       **MR. ORSINI:** So I think, Your Honor, first of all, I think

20   the continued holding of the tokens against that backdrop is

21   still a problem. I've already addressed that.

22       **THE COURT:** But you haven't. You've just said maybe

23   someday something might happen way down a chain of a series of

24   events that could enrich these partners. That's really quite

25   tenuous.

1      **MR. ORSINI:**  What the Ninth Circuit has said, Your Honor,

2  in terms of the discretion that the Court can exercise in a

3  class context, is even the appearance of a potential conflict,

4  the appearance of a potential conflict -- and this is from the

5  *Kayes* case -- is sufficient to remove counsel.

6      **THE COURT:**  I'm well aware of this.  I take

7  extraordinarily seriously, as all of my colleagues do,

8  entrusting the fate of a putative class in the hands of a

9  lawyer because that is my job.  I have an independent duty,

10  separate from you, separate from him, separate from everyone

11  but the putative class, to protect them.  That's the only thing

12  I'm interested in.

13      So your best shot -- and I think it's a weak one -- seems

14  to be someday, somehow, some way somebody at the firm who holds

15  an old token from Ava Labs might make a little money on the

16  devise of Dfinity.

17      **MR. ORSINI:**  That's Part 1, Your Honor.

18      **THE COURT:**  Fairly weak.  What's --

19      **MR. ORSINI:**  Part 2, Your Honor --

20      **THE COURT:**  What's second prize?  Let me ask that.

21      **MR. ORSINI:**  Part 2 --

22      **THE COURT:**  Yes.

23      **MR. ORSINI:**  Part 2 is the reasonable inferences about the

24  ongoing concerns of the culture of this firm that

25  Judge Failla --

1    **THE COURT:**  Tell me about that.

2    **MR. ORSINI:**  -- that I believe is appropriate.

3    And it comes back, again, to where this firm was created

4    from and the fact that Mr. Roche specifically identified this

5    lawsuit against my clients as an example of the type of abuse

6    of the legal system that they've undertaken.

7    And I think there are absolutely reasonable inferences

8    that can be drawn that we can continue to have significant

9    concern about turning over our internal, highly confidential

10   information to these lawyers.  Right?  We're not here --

11   **THE COURT:**  Because why?

12   **MR. ORSINI:**  Why?

13   **THE COURT:**  Yeah.

14   **MR. ORSINI:**  Because of this firm.  Because of the nature

15   of this firm.  Because of the conduct we've seen from

16   Mr. Roche.  Because of the way in which they --

17   **THE COURT:**  But why -- what is the -- you're afraid

18   they're going to leak it to Ava Labs?  Is that what you're

19   saying?

20   **MR. ORSINI:**  We're afraid that the culture at this firm is

21   consistent with its founder's culture, as he described, which

22   is to abuse the discovery process to understand competing

23   blockchain technologies to assist others rather than just

24   pursue the best interests of the class.

25   **THE COURT:**  All right.  That's --

1      **MR. ORSINI:**  That's what we're concerned about.

2      **THE COURT:**  -- a long tap dance.

3      Just put it more plainly.  Just say "yes" or "no."  Is

4 your concern that the lawyers at FNF are going to improperly

5 disclose confidential litigation materials to Ava Labs?

6      **MR. ORSINI:**  Yes.

7      **THE COURT:**  Why?

8      **MR. ORSINI:**  Because that's what --

9      **THE COURT:**  What is the basis for that?

10      **MR. ORSINI:**  That's what their founder said they do.

11 That's what their founder --

12      **THE COURT:**  Okay.  But he's been cut out like a bad apple;

13 so --

14      **MR. ORSINI:**  And if this were -- if this were --

15      **THE COURT:**  Like the bad apple he apparently was, he's

16 been cut out of the bushel.

17      So the rest of the bushel, you're going to say "Just

18 because"?  I mean, I need some evidence.  I need some facts.

19 It can't be "Just because."

20      **MR. ORSINI:**  Well, it's not "Just because," Your Honor.

21 It's a reasonable inference, we believe, based on the fact that

22 this is a small litigation boutique that operates almost

23 exclusively, if not exclusively, in the crypto space, and that

24 you would expect their founder's ethos to be part and parcel of

25 the firm's dynamic and the fact that they have a former

1  partner who's --

2      **THE COURT:**  Let me just jump in.

3      What you're saying is Mr. Roche's spirit so permeates the

4  firm that even though he's long gone, financially, personally,

5  everything else, even though he's long gone, he's left a

6  mind-set, an attitude, a culture that irrevocably taints all of

7  these lawyers so you can't trust them with a burnt match.  That

8  seems a little over the top, Mr. Orsini.

9      **MR. ORSINI:**  Your Honor --

10     **THE COURT:**  If your firm, for example, had a bad guy or a

11 bad woman who did insider trading, I guarantee you, you would

12 not be telling any judges:  We should -- we're voluntarily

13 extracting ourselves from every securities case.

14     **MR. ORSINI:**  I completely agree.

15     **THE COURT:**  Okay.

16     **MR. ORSINI:**  And I think it's fundamentally different.

17     **THE COURT:**  So how is this different?

18     **MR. ORSINI:**  I think it's fundamentally different because

19 this is a small litigation boutique that was born with Ava in a

20 co-working space, who are their best friends, who provided them

21 the funding to get going, on whose behalf their founder, who

22 shaped the firm and developed the firm, has said they engaged

23 in misconduct for, and that continues to be the same firm minus

24 one individual and continues to prosecute cases almost entirely

25 in the crypto space.

 1        And I think, given that history that's brought us here,

 2   right, there is a reasonable concern on our part that cutting

 3   out the one bad apple doesn't save us and doesn't protect us,

 4   it certainly doesn't ameliorate our concerns and doesn't take

 5   away the taint on this potential process going forward,

 6   especially when that can be -- when we have an overlapping

 7   class, an identical class, Your Honor, being pursued in state

 8   court down the Peninsula and we can easily have an opportunity

 9   for the named plaintiff to bring in counsel who is free of any

10   appearance -- any potential appearance of impropriety.

11        **THE COURT:**  Well, I will tell you, one difference here

12   from Southern District of New York is they're the only show in

13   town right now for the putative class.

14        **MR. ORSINI:**  In this case.

15        **THE COURT:**  Yes.  So if they're gone, I mean, that

16   effectively, I think, terminates the case because there's no

17   lawyer.  The head has been cut off the body.  And that's -- I

18   don't know -- nobody asked -- nobody came in and pitched for

19   this other than this firm, your colleague here, Mr. Normand's

20   firm.  Nobody told me they were interested.

21        I have considered, and I may very well do, put this out to

22   bid again and see if anybody comes forward.  I think that might

23   be an easy way of resolving all this.

24        But if they don't, I'm very reluctant to hand you what is

25   effectively a procedural gimme in terms of getting out of this

1  case.  I just don't think that's right.

2      **MR. ORSINI:**  Judge --

3      **THE COURT:**  Now, why isn't it adequate -- you have what we

4  used to call in law school a parade of horribles that might

5  happen.  I'm not gainsaying that, but it hasn't yet.  And you

6  don't have any evidence that they have had -- have happened or

7  even likely to happen.

8      But why not, if they do -- you've got plenty of ammo to

9  fire at them if it happens.  You have Rule 11.  You have

10  Rule 23.  You have my inherent disciplinary authority over

11  counsel and parties.  You have a plethora of solutions if

12  anything goes wrong.

13      And if it ever turned out, for example -- and I'm not --

14  I'm just saying the obvious that everybody will know.  But if

15  it ever turned out that some lawyer at the FNF firm,

16  Mr. Normand or one of his colleagues inappropriately disclosed

17  confidential information, they would be disbarred in all

18  likelihood.  I happen to chair that committee.  So I can't

19  predict what would happen because we have a third-party

20  process, but they would, at a minimum, face significant

21  personal, professional conduct sanctions.

22      So with all of these safeguards, why not just go forward

23  and be vigilant?  What's wrong with that?

24      **MR. ORSINI:**  And I think, Your Honor, that, in part, is

25  exactly the problem, given that this is a putative

1   class action.

2       We are going -- if they go forward as class counsel in

3   this case, it's going to create an ongoing set of questions

4   about all of those issues and an ongoing sideshow about those

5   potential concerns that we don't believe is fair to our client,

6   given the taint that comes with this case from Mr. Roche's

7   statement, and we don't believe is the best protective means

8   for the absent class members.

9       And I agree with Your Honor.  If we find evidence of that

10  six months from now, I have no doubt that when I bring it to

11  this Court, the Court will take it seriously.  That, I'm sure

12  of.

13      But going through every stage of this litigation with that

14  hanging over us, with that hanging over the class unnecessarily

15  raises significant complications and problems with their

16  potential representation.

17      And that's why we believe that, given that it's a putative

18  class -- we might have a different conversation if it was just

19  a one-on-one case.  I still think the same result would be

20  appropriate, but we wouldn't be talking about Rule 23.  But

21  given that it's a putative class, that sideshow, that concern,

22  that continued vigilance we're going to have to put in and the

23  distraction it's going to do, I don't believe, Your Honor, is

24  appropriate for them to continue on as lead counsel.

25      And to your earlier point about not wanting to hand us a

```
 1   procedural gimme, I get that.  Right?  Two responses to that.
 2        One, it wouldn't end our litigation because --
 3        THE COURT:  It would.
 4        MR. ORSINI:  No.
 5        THE COURT:  There's no other lawyer on deck.
 6        MR. ORSINI:  We have the state court case which is an
 7   overlapping class.
 8        THE COURT:  It would end it here.
 9        MR. ORSINI:  Two, Your Honor, I do think one easy
10   potential solution to that is -- there are two potential
11   solutions to that I thought of coming in today.
12        One is the one Your Honor mentioned, which is you can do
13   the process again and see if anybody comes in.  If this is such
14   a meritorious case that is worth so much money, you'd think
15   someone else would show up.  Right?
16        Or we could give the putative class representative,
17   Mr. Valenti, an opportunity to identify potential substitute
18   counsel.
19        THE COURT:  I thought he was no longer -- is he the -- is
20   he still the named --
21        MR. ORSINI:  I'm sorry.  It's not Mr. Valenti.  You're
22   right, Your Honor.
23        THE COURT:  It's someone else, isn't it?
24        MR. ORSINI:  The client, it's someone else.
25        THE COURT:  Do you remember who it is?
```

1          **MR. NORMAND:**  Mr. Rodriguez.

2          **MR. ORSINI:**  Thank you.  Yes.

3          **THE COURT:**  I'm not -- I just wanted to make sure.

4          **MR. ORSINI:**  Yes.  I had the caption in my mind,

5     Your Honor.

6          **THE COURT:**  No, I understand.  I do too.

7          **MR. ORSINI:**  But you're absolutely right.

8          **THE COURT:**  But it's Mr. Rodriguez.

9          Okay.  How about this?  Let's just think out loud here.

10    I'm concerned, but I'm not going to hit any buttons quite yet.

11         **MR. NORMAND:**  Your Honor, can I say --

12         **THE COURT:**  One thing that I'm --

13         **MR. NORMAND:**  -- if it helps --

14         **THE COURT:**  -- not clear about --

15         **MR. NORMAND:**  -- to a couple of Mr. Orsini's --

16         **THE COURT:**  Hold on.

17         **MR. NORMAND:**  -- comments?

18         (Simultaneous speaking; court reporter interrupts.)

19         **THE COURT:**  When I start, you just need to stop.

20         **MR. NORMAND:**  Sorry, Your Honor.

21         **THE COURT:**  I'm just not clear about your Ava ties.

22    Basically, Mr. Orsini is saying you sprang from the head of

23    Ava Labs like Athena from Zeus.  So maybe some discovery on

24    that might be worthwhile.

25         I'm operating in an evidentiary vacuum.  Mr. Orsini is

giving me some concerns; you're denying them.  I don't have an

independent set of facts on which to make my own informed

decision.

So it could be as easy as -- you've heard what we

discussed today -- you swear out a declaration and got it under

oath.  And if there's any problem with that, the consequences

would be swift and certain and unfavorable to you and your

future.  When I say "you," I mean you personally and your firm.

Or maybe take a deposition.  I think it's a novel

situation that may require a novel response.  Maybe Mr. Orsini

sits down for an hour or two with some designee of the firm,

basically 30(b)(6), goes over the books, so to speak, between

what the status of you and Ava Labs is.

And if there's anything that comes out of it, you can let

me know.  What do you think about that, Mr. Orsini?

**MR. ORSINI:**  So as you might imagine, Your Honor, my first

answer will be we don't believe such discovery is necessary;

but if the Court believes such discovery is necessary --

**THE COURT:**  I do.

**MR. ORSINI:**  That's why I said you wouldn't be surprised

by my first answer.

My second answer is, I'd have no objection to taking that

discovery.

**THE COURT:**  Well, I should say, I'm thinking it is.

**MR. ORSINI:**  I would have no objection --

1      **THE COURT:**  Well, how about that?  What if you take this

2  deposition under penalty of perjury, everything is answered in

3  a way that suggests that although your fears are -- your fears

4  are hypothetical.  That seems like enough, don't you think?

5      **MR. ORSINI:**  I think we would need a deposition of the

6  firm and Mr. Roche to understand sort of both sides of this.

7      **THE COURT:**  Why Mr. Roche?  We all know that he's out of

8  the picture.  What difference does it make for him?

9      **MR. ORSINI:**  Mr. Roche is now claiming that some of his

10  statements were false and not false.  I think, you know --

11      **THE COURT:**  Look, he's done.  Okay?  He was dealt with, in

12  my view, in an appropriate fashion, which means he was kicked

13  out of the case, kicked out of the firm, kicked out of the

14  picture.  Okay?  So who cares whether he's back-hoeing or not?

15  It's irrelevant.  I can't attribute that to the current

16  lawyers.

17      **MR. ORSINI:**  So -- so I respectfully disagree with that,

18  Your Honor, but I understand your --

19      **THE COURT:**  Well, tell me why.

20      **MR. ORSINI:**  Because I think, frankly, to test what the

21  current firm that has a financial interest in continuing in

22  this case is saying versus what their named founding partner,

23  who started all of this by saying he brought this case --

24      **THE COURT:**  That guy can say whatever he wants and

25  apparently has.  So I just -- I mean, I'm not worried about

1    that.

2         But what's your next point?

3         **MR. ORSINI:**  My next point is simply, Your Honor --

4         **THE COURT:**  I'm not going to do that.

5         **MR. ORSINI:**  -- I'm not going to say "no" to taking their

6    deposition.

7         **THE COURT:**  All right.  Mr. Normand, what do you think?

8         **MR. NORMAND:**  Three things, Your Honor.

9         One, we've already put in a declaration, myself and my six

10   partners, in the Avaton case, under oath, saying that we didn't

11   misuse any discovery; we're not going to misuse any discovery;

12   we haven't brought actions for the wrong reasons.

13        **THE COURT:**  No, I understand that, but this is really

14   focused on the --

15        **MR. NORMAND:**  Understood.

16        **THE COURT:**  -- labs ties.

17        What do you think about that?

18        **MR. NORMAND:**  We can do it.  It's going to be redundant of

19   things we've already said under oath because we've already

20   spoken to the issue of our motivations, supposedly, with

21   respect to these AVAX tokens.

22        **THE COURT:**  I think it's going to be a lot of

23   nuts-and-bolts questions.  Like, when was the last time you

24   received an invoice from the labs?  Or what's the value of

25   these tokens?  You know, that kind of stuff.  Are you okay with

1  that?

2  **MR. NORMAND:**  Understood, Your Honor.  We're an open book,

3  subject to attorney-client privilege, of course; but we're

4  happy to do that if that's what the Court, in a fact finding

5  capacity, thinks is appropriate.

6  **THE COURT:**  Well, it would help me because I just have two

7  conflicting narratives and no place to drop my anchor.

8  **MR. NORMAND:**  I would say a second thing, Your Honor,

9  which is, as you know because we briefed it in detail on the

10  law, the law makes relevant defendants' motivation in bringing

11  their motion.  So I think what would be symmetrical and

12  appropriate and warranted under the law is a corresponding

13  deposition of their clients to ask about their role in the

14  Crypto Leaks and to ask what their motivations were --

15  **THE COURT:**  No.

16  **MR. NORMAND:**  -- in bringing the motion.

17  **THE COURT:**  I'm not going to do that.  Look, I really

18  cannot -- oddly enough, I had to deal with this.  There's

19  actually Supreme Court case law on this.

20  You don't have to have good motivations.  Now, you can't

21  violate Rule 11.  You can't violate the other rules that

22  require civility and professionalism and honesty.  There's no

23  question about that.  But you don't have to have goodness in

24  your heart when you're a litigant.  Okay?

25  So it doesn't matter what Dfinity -- I'm not reopening the

1    books on this Mr. Roche guy and Sweden and all that.  I'm not

2    doing it.  I don't care.  It's irrelevant to me.  It's

3    irrelevant to my protection of the putative class.

4        So when can you do this?  A week?  Two weeks?

5        **MR. NORMAND:**  We can work out a schedule and let the Court

6    know.

7        **THE COURT:**  Three hours, Mr. Orsini, max.  This shouldn't

8    take anything more than that.  Probably should be shorter.

9    I'll give you three hours max.  All right?

10       I don't want this to be the shootout at the O.K. Corral.

11   You come in; you ask your questions; you answer them; and

12   that's it.  All right?  I don't want -- I don't want any

13   theatrics, fireworks, drama.  I don't want any questions about

14   Mr. Roche other than confirming that he's in every way, shape,

15   and form been excised out of the firm.  That's it.  Okay?  But

16   I don't a want to hear any questions about what happened in

17   Sweden, none of that.

18       This is just from today on, and that's on the suitability

19   of this firm to go forward in a way that is appropriate.  Okay?

20       **MR. ORSINI:**  Can I ask one clarifying question,

21   Your Honor?

22       **THE COURT:**  Sure.

23       **MR. ORSINI:**  I understand that.  I understand all of that,

24   and I appreciate that, Your Honor.

25       When you say "from today forward," I understand your

point, you don't want me asking any questions about Kyle Roche

and what he did and what he said.  But one of the issues that

I've addressed to the Court is sort of the way in which the

firm itself was created and the interrelationships they've had

from the beginning with Ava Labs.

Is that -- would that be --

**THE COURT:**  Let me just pause on that.

I mean, is there any dispute about -- look, it may be that

it was in the mists of time you were, as I said earlier, joined

at the hip.

But just tell me, Mr. Normand.

**MR. NORMAND:**  I think it's irrelevant.  I agree with what

I understood to be --

**THE COURT:**  Well, but is it true?  Did it sort of start

out that way and things have developed since, or what's the

formation story?

**MR. NORMAND:**  There was a -- if I'm following the question

and Mr. Orsini's point, Ava Labs was a client --

**THE COURT:**  The client?

**MR. NORMAND:**  -- towards the beginning --

**THE COURT:**  A major client?

**MR. NORMAND:**  -- of this firm's life, a previous iteration

of this firm.

**THE COURT:**  Okay.  So the old firm, Roche -- what was the

old firm called?

 1        **MR. NORMAND:**  Roche Freedman.

 2        **THE COURT:**  Roche Freedman.  Okay.  Its first big client

 3   was Ava Labs.

 4        **MR. NORMAND:**  I don't know if it was his first big client,

 5   but it was one of the original clients.

 6        **THE COURT:**  Okay.  I don't think he disagrees with you

 7   about this.  So it may have started that way.  The question is

 8   what's happening today and what's going to happen tomorrow.

 9        **MR. ORSINI:**  I understand that, Your Honor.  My point is

10   simply that the nature of that relationship, at least alleged

11   by one of their former partners with whom they're in

12   litigation --

13        **THE COURT:**  Ask a few.  Don't go nuts.

14        **MR. ORSINI:**  Understood.

15        **THE COURT:**  Okay?  Because I think it's of questionable

16   utility.  But if you want to ask a little bit, that's fine.

17        **MR. ORSINI:**  I appreciate that.

18        **THE COURT:**  Don't spend a third or a quarter of the

19   deposition on it.  Just ask some foundational questions.  Move

20   on.  Okay?

21        **MR. ORSINI:**  Understood, Your Honor.

22        **THE COURT:**  If you cannot get this done, we'll just do the

23   deposition here and I'll just watch you.

24        **MR. NORMAND:**  Point of --

25        **THE COURT:**  I really don't want to do that, so...

1      **MR. NORMAND:**  Point of clarification, Your Honor.

2      **THE COURT:**  Yes.

3      **MR. NORMAND:**  Do you want a 30(b)(6), or do you want me to

4   appear personally?

5      **THE COURT:**  How do you want to do it?

6      **MR. ORSINI:**  I think a 30(b)(6) would be most appropriate

7   so we get the testimony from the firm, and whomever they'd like

8   to designate is fine with me.

9      **THE COURT:**  Like, four topics.  Okay?  Four or five

10  topics.  That's it.  All right?

11     **MR. ORSINI:**  Understood, Your Honor.

12     **THE COURT:**  Okay.  And you can -- have you been there

13  since day one at the firm?

14     **MR. NORMAND:**  Not technically, no.  It started off with

15  Roche and Freedman and one other lawyer for six months, and

16  then --

17     **THE COURT:**  You've been there all but six months?

18     **MR. NORMAND:**  That's correct.

19     **THE COURT:**  Okay.  You pick whoever you want.  It's

20  30(b)(6).  But make sure they can answer.  It might be better

21  to have -- how long has the firm been around, by the way, just

22  in both iterations?

23     **MR. NORMAND:**  About three and a half years.

24     **THE COURT:**  Oh, okay.  So you don't have to go too far

25  back.  Okay.

1    All right.  So really remember, at the end of the day, my

2  major concern, my overriding concern is the protection of the

3  putative class and the named plaintiffs.  That's what I'm

4  most -- really, that's all I'm interested in.

5    But I also want to make sure that what happens today

6  doesn't change tomorrow and that we have some of the problems

7  that Mr. Orsini has sketched in his parade of horribles -- I'm

8  not making any findings about that.  This will help me make my

9  findings about that.  Okay?

10    So do you want to come back in 30 days?

11    Here's what I'm thinking.  You'll take the depo, say, in

12  the next two weeks, and then you'll both file a supplemental

13  statement for the pending requests.  Okay?  Now, it's not a

14  disqualification.  Just report on what you found.

15    Now, if it is the case, Mr. Orsini, that you don't -- you

16  till the field and no potatoes come up, be forthright about

17  that.  Okay?

18    **MR. ORSINI:**  Understood, Your Honor.

19    **THE COURT:**  You can still have your concerns.  You've got,

20  as I said, plenty of opportunities -- if you believe something

21  has gone wrong in an objectively reasonable way, you've got

22  plenty of things you can do to bring the issue before me.  But

23  if you take this deposition and there's nothing there, I'm

24  expecting you to be candid about it.

25    And then, Mr. Normand, obviously, this goes without

1    saying, but I'll saying it.  I'm expecting your designee,

2    whoever it is, to be completely forthright, unevasive and just

3    answer the questions.  Okay?

4         **MR. NORMAND:**  Sure.

5         **THE COURT:**  All right.  Anything else for today?

6         **MR. ORSINI:**  Not for today, Your Honor.  Thank you for the

7    time.

8         **THE COURT:**  Mr. Normand?

9         **MR. NORMAND:**  No.

10        **THE COURT:**  Okay.  Thanks very much.

11        **MR. ORSINI:**  Thank you, Your Honor.

12        **MR. NORMAND:**  Thanks.

13        **THE COURT:**  Yes.

14             (Proceedings adjourned at 11:27 a.m.)

15                       ---o0o---

16              **<u>CERTIFICATE OF REPORTER</u>**

17         I certify that the foregoing is a correct transcript

18   from the record of proceedings in the above-entitled matter.

19

20   DATE:  Sunday, February 5, 2023

21

22                  *Ana Dub*

23   _____

24              Ana Dub, CSR No. 7445, RDR, CRR
                Official United States Reporter

25