# EXHIBIT A

1  Eric B. Fastiff (State Bar No. 182260)
   efastiff@lchb.com
2  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   275 Battery Street, 29th Floor
3  San Francisco, CA  94111-3339
   Telephone:  415.956.1000
4  Facsimile:  415.956.1008

5  Counsel for Proposed Amicus Curiae
   The American Antitrust Institute
6

7

8                 UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                     SAN JOSE DIVISION

11

12  FEDERAL TRADE COMMISSION,              Case No. 5:17-cv-00220-LHK

13              Plaintiff,                 **(PROPOSED) AMICUS BRIEF OF THE**
                                           **AMERICAN ANTITRUST INSTITUTE IN**
14  v.                                     **SUPPORT OF THE FTC**

15  QUALCOMM, INCORPORATED, a              Judge: The Hon. Lucy H. Koh
    Delaware Corporation,
16
                Defendant.
17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

INTEREST OF AMICUS CURIAE ............................................................................................ 1

INTRODUCTION ...................................................................................................................... 1

I.      THE COMPLAINT STATES A MONOPOLIZATION CLAIM ..................................... 2

        A.      The Complaint Adequately Alleges that Qualcomm's Licensing Practices
                Are Exclusionary.................................................................................................. 4

        B.      The Complaint Adequately Alleges That Qualcomm's Exclusive Dealing
                with Apple Is Exclusionary................................................................................. 8

II.     THE COMPLAINT STATES A STANDALONE SECTION 5 CLAIM ........................ 10

        A.      The Complaint Pleads Harm to Competition ..................................................... 11

        B.      The Complaint Pleads "Indicia of Oppressiveness" ........................................... 13

CONCLUSION ........................................................................................................................ 14

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*,
No. C 08-01035 JSW, 2008 WL 4830740 (N.D. Cal. Nov. 6, 2008) ...................................... 10

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988) ............................................................................................................ 7

*Am. Soc'y of Mech. Eng'nrs, Inc. v. Hydrolevel Corp.*,
456 U.S. 556 (1982) ............................................................................................................ 7

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ............................................................................................................ 3

*Barry Wright Corp. v. ITT Grinnell Corp.*,
724 F.2d 227 (1st Cir. 1983) ................................................................................................ 3

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) ................................................................................................ 7

*Cascade Health Solutions v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ....................................................................................... 3, 9, 10

*City of Anaheim v. S. Ca. Edison Co.*,
955 F.2d 1373 (9th Cir. 1992) .............................................................................................. 4

*E.I. du Pont de Nemours & Co. v. FTC*,
729 F.2d 128 (2d Cir. 1984) .......................................................................................... 11, 13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) .......................................................................................................... 10

*Feitelson v. Google, Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) ................................................................................. 10

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997) .............................................................................................. 3

*Free Freehand Corp. v. Adobe Sys., Inc.*,
852 F. Supp. 2d 1171 (N.D. Cal. 2012) ......................................................................... 3, 4, 13

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) .......................................................................................................... 10

*FTC v. Sperry & Hutchinson Co.*,
405 U.S. 233 (1972) .......................................................................................................... 10

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) .............................................................................................. 6

*In re Coca Cola Co.*,
117 F.T.C. 795 (1994) ........................................................................................................ 11

*In re Ductile Iron Fittings (DIPF) Direct Purchaser Antitrust Litig.*,
Civ. No. 12-711, 2013 WL 812143 (D. N.J. Mar. 5, 2013) .................................................... 10

*In re General Foods Corp.*,
103 FTC 204 (1984) .......................................................................................................... 13

*In re Motorola Mobility LLC*,
File No. 121-0210, 2013 WL 124100 (FTC Jan. 3, 2013) ...................................................... 12

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Negotiated Data Solutions LLC*,
 File No. 051-0094, 2008 WL 258308 (FTC Jan. 22, 2008) ...................................................... 12

*In re Robert Bosch GmbH*,
 File No. 121-0081, 2012 WL 5944820 (FTC Nov. 21, 2012) .................................................. 12

*John Doe 1 v. Abbott Labs.*,
 571 F.3d 930 (9th Cir. 2009) ..................................................................................................... 6

*linkLine Commc'ns, Inc. v. SBC Cal., Inc.*,
 No. CV03-5265 SVW (SHx), 2004 WL 5503772 (C.D. Cal. Oct. 20, 2004) .......................... 7

*McWane, Inc. v. Fed. Trade Comm'n*,
 783 F.3d 814 (11th Cir. 2015) ......................................................................................... 3, 9, 10

*Microsoft Corp. v. Motorola, Inc.*,
 795 F.3d 1024 (9th Cir. 2015) ...................................................................................... 4, 6, 12

*Morgan v. Ponder*,
 892 F.2d 1355 (8th Cir. 1989) ................................................................................................... 3

*New York ex rel. Schneiderman v. Actavis PLC*,
 787 F.3d 638 (2d Cir. 2015) ....................................................................................................... 7

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
 555 U.S. 438 (2009) ................................................................................................................ 4, 6

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
 No. SACV 12-2101-JLS (ANx), 2013 WL 6229141 (C.D. Cal. Dec. 2, 2013) ...................... 10

*Rambus Inc. v. FTC*,
 522 F.3d 456 (D.C. Cir. 2008) ........................................................................................... 12, 13

*Research in Motion Ltd. v. Morotola, Inc.*,
 644 F. Supp. 2d 788 (N.D. Tex. 2008) ........................................................................................ 7

*Safeway Inc. v. Abbott Labs.*,
 761 F. Supp. 2d 874 (N.D. Cal. 2011) ........................................................................................ 6

*Safeway Inc. v. Abbott Labs.*,
 Nos. C 07-05470 CW et al., 2010 WL 147988 (N.D. Cal. Jan. 12, 2010) ................................ 6

*Taylor Publ'g Co. v. Jostens, Inc.*,
 216 F.3d 465 (5th Cir. 2000) ...................................................................................................... 3

*United Mine Workers of Am. v. Pennington*,
 381 U.S. 657 (1965) .................................................................................................................... 5

*United States v. Dentsply Intern'tl, Inc.*,
 399 F.3d 181 (3d Cir. 2005) ............................................................................................. 3, 7, 10

*United States v. Microsoft Corp.*,
 253 F.3d 34 (D.C. Cir. 2001) ........................................................................................ 3, 7, 9, 10

*United States v. United Regional Health Care Sys.*,
 Civ. No. 7:11-cv-00030, 76 Fed. Reg. 13209, 2011 WL 808503 (N.D. Tex. Feb. 25, 2011) ..... 9

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
 540 U.S. 398 (2004) .................................................................................................................... 6

*ZF Meritor, LLC v. Eaton Corp.*,
 696 F.3d 254 (3d Cir. 2012) ....................................................................................................... 9

**TABLE OF AUTHORITIES**
(continued)

Page

**Other Authorities**

3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651c (1996) ............................... 3, 10

Herbert Hovenkamp et al., *IP and Antitrust*
§ 35.5B (2014 Supp.) ...................................................................................................... 13

Herbert Hovenkamp, *The Federal Trade Commission and the Sherman Act*,
62 Fla. L. Rev. 871 (2010) ............................................................................................... 11

Joseph Kattan, *The Next FRAND Battle: Why the Royalty Base Matters*,
CPI Antitrust Chronicle, March 2015 ............................................................................. 5

Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section
5 of the Federal Trade Commission Act,
80 Fed. Reg. 57,056 (Sep. 21, 2015)............................................................................... 11

Steven C. Salop & David T. Scheffman, *Raising Rivals' Costs*,
73 Amer. Econ. Rev. no. 2, May 1983............................................................................. 5

Thomas Kratenmaker & Steven Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to
Achieve Power Over Price*,
96 Yale L. J. 209 (1986) ................................................................................................... 3

### INTEREST OF AMICUS CURIAE

The American Antitrust Institute ("AAI") is an independent nonprofit organization devoted to promoting competition that protects consumers, businesses, and society.  It serves the public through education, research, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy.  AAI is managed by its Board of Directors with the guidance of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders.  *See* http:/www.antitrustinstitute.org.[1]

AAI has a longstanding interest in ensuring that standard setting among competitors is not abused and that FRAND commitments, which are central to preventing abuse, are not evaded. AAI has also been active in advancing the development of monopolization law, the FTC's "standalone" § 5 authority, and the law governing pleading requirements in antitrust cases.  All of these interests are implicated in Qualcomm's motion to dismiss.  Qualcomm's arguments in favor of dismissal, if accepted, not only would prevent the FTC from addressing a serious anticompetitive problem in the mobile cellular industry, but would undermine the enforcement of the antitrust laws in other industries that are dependent on standard setting and throughout the economy.

### INTRODUCTION

The complaint alleges that Qualcomm uses its monopoly power over CDMA and premium LTE baseband processors (or chipsets) to extract *supra* FRAND royalties from its customers (cell phone manufacturers, or OEMs), who are dependent on Qualcomm for at least a portion of their supply of chipsets.  Qualcomm does this primarily by tying the sale of its chipsets to the licensing of its standard essential patents (SEPs), which dramatically increases OEMs'

---

[1] Individual views of members of AAI's Board of Directors or Advisory Board may differ from AAI's positions.  Certain members of the Board of Directors and the Advisory Board, or their law firms, represent parties adverse to Qualcomm in matters related to this one, but were recused from AAI's deliberations and had no role in drafting the brief.  Consistent with Fed. R. App. P. 29, *amicus curiae* states:  No party's counsel authored this brief in whole or in part.  No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person or entity other than *amicus curiae* or its counsel contributed money that was intended to fund preparing or submitting this brief.

1    costs of challenging Qualcomm's royalty demands.  Qualcomm also accomplishes this goal by

2    refusing to license its rivals, who otherwise would be able to sell licensed chipsets to OEMs based

3    on lower negotiated royalties.  The excessive royalties charged to OEMs in turn raise the costs of

4    rival chipmakers.  As the complaint puts it, the excessive royalties impose a "tax" on OEMs

5    doing business with other chipmakers, significantly impairing the other chipmakers' ability to

6    compete and challenge Qualcomm's chipset monopoly.  The complaint also alleges that

7    Qualcomm extracted an exclusive dealing arrangement with Apple, which also significantly

8    foreclosed rival chipset makers and helped it to maintain its monopoly.  The impact is plain.

9    Several chipset makers have exited the market and those that remain have had only limited

10   success.

11        Qualcomm's behavior harms consumers in two ways.  They are harmed immediately

12   because excessive royalties charged to OEMs are passed along to consumers who pay higher

13   prices for cell phones or receive lower quality devices with fewer features, or both.  And they are

14   harmed over the longer term because the foreclosure of rivals reinforces Qualcomm's chipset

15   monopoly, which allows it to charge supracompetitive "all in" prices for chipsets (chipsets plus

16   royalties) and impairs innovation in mobile technologies.  The complaint alleges that

17   Qualcomm's conduct constitutes monopolization and unreasonable restraints of trade, and is a

18   "standalone" violation of Section 5 of the FTC Act.  In this brief, AAI articulates the legal

19   standards applicable to the FTC's monopolization and unfair methods of competition claims, and

20   explains why Qualcomm's principal legal and factual attacks on the complaint lack merit.[2]

21   **I.      THE COMPLAINT STATES A MONOPOLIZATION CLAIM**

22        In its motion to dismiss, Qualcomm does not contest the first element of a monopolization

23   claim, namely that it has monopoly power supported by high barriers to entry.  Rather, it argues

24   that the complaint fails to sufficiently allege the second element, "exclusionary conduct."  The

25   Ninth Circuit, following the Supreme Court, defines such conduct as "behavior that tends to

26   ───────────────

27   [2] Qualcomm's arguments directed at the § 1 claim are repetitive of its § 2 arguments and are not
     addressed in this brief.  AAI's points are necessarily limited by the fact that certain parts of the
     complaint and the parties' briefs (including the discussion of Qualcomm's strategic funds) are

28   redacted.

impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985) (same); *accord Free Freehand Corp. v. Adobe Sys., Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012) (Koh, D.J.).  The government is not required to show "clear evidence" of anticompetitive effect.  *McWane, Inc. v. Fed. Trade Comm'n*, 783 F.3d 814, 836 (11th Cir. 2015) (noting that "Supreme Court precedent speaks not of 'clear evidence' or definitive proof of anticompetitive harm, but of 'probable effect'") (citation omitted).  In a monopoly maintenance case, it is enough that "a defendant has engaged in anticompetitive conduct that 'reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (alterations in original) (quoting 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651c, at 78 (1996).[3]

Qualcomm contends that the government has failed to allege a "plausible antitrust theory," Q. Br. 1, but the government's theory of exclusionary conduct fits within the well-accepted framework of "raising rivals' costs." *See Forsyth v. Humana, Inc*., 114 F.3d 1467, 1478 (9th Cir. 1997) (monopolist's conduct that increased the operating costs of rivals, enabling it to charge higher prices, qualifies as exclusionary conduct (*citing, inter alia*, Thomas Kratenmaker & Steven Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 Yale L. J. 209 (1986))); *McWane*, 783 F.3d at 832 (conduct is exclusionary "when it allows a monopolist to maintain its monopoly power by raising its rivals' costs sufficiently to prevent them from growing into effective competitors").  Indeed, Qualcomm appears to accept that the government's "tax" and exclusive-dealing theories, which are applications of the raising rivals' costs framework, are sound monopolization theories in principle.  Qualcomm argues primarily that the complaint insufficiently details the magnitude and impact of the costs it imposes on its rivals and

---

[3] The same formulation is followed by other circuits. *See Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000); *Morgan v. Ponder*, 892 F.2d 1355, 1363 (8th Cir. 1989); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 230 (1st Cir. 1983) (Breyer, J.); *see also McWane*, 783 F.3d at 837 ("reasonably appears to significantly contribute to maintaining monopoly power"); *United States v. Dentsply Intern'tl, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) ("reasonably appears to be a significant contribution to maintaining monopoly power").

1  is barred by *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009).  But Qualcomm

2  misapprehends the relevant law and fails to credit plausible allegations in the complaint.[4]

3  **A.**     **The Complaint Adequately Alleges that Qualcomm's Licensing Practices Are**
       **Exclusionary**

4

5     Qualcomm questions the complaint's "tax" theory first by challenging the sufficiency of

6  the allegations that it used its monopoly power over certain baseband processors to obtain

7  elevated royalties.  Q. Br. 9-11.  Qualcomm says that the complaint does not allege that

8  Qualcomm's royalties are unreasonable or above a FRAND level.  This argument is hard to

9  fathom given the extensive evidence cited by the complaint that Qualcomm's royalties are above

10  the level that a court or neutral arbiter would determine to be FRAND.  ¶¶ 4, 77.  Indeed, the fact

11  that Qualcomm's royalties increase (proportionally) with increases in the price of a smart phone

12  due to features that have nothing to do with cellular connectivity (like longer battery life or

13  greater data storage), while Qualcomm's share of cellular patents declines, would seem to be

14  *prima facie* evidence of unreasonableness.  Moreover, the complaint's allegation that Qualcomm

15  is able to obtain elevated royalties by threatening to withhold essential chip supplies if OEMs

16  challenge Qualcomm's royalty demands in court is well grounded.  ¶¶ 79-83; *see also* ¶ 123

17  (Qualcomm paid Apple not to initiate or induce others to litigate challenge to royalty demands).

18  *Cf. Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1031 (9th Cir. 2015) (describing patent

19  "hold-up" where SEP holder obtains "an unduly high royalty rate" by threatening to withhold

20  license).

21     Qualcomm also argues that the FTC's "tax" theory lacks merit because the complaint does

22  not allege any disparity in the royalties Qualcomm charges OEMs that use rival chipsets instead

23

24  [4] Before addressing Qualcomm's arguments, we note an overriding flaw in Qualcomm's motion
to dismiss is its attempt to isolate each alleged anticompetitive behavior and argue that it is
insufficiently exclusionary to violate § 2 on its own, without considering the cumulative effect of

25  the conduct.  Such an approach is improper, particularly where, as here, its anticompetitive
policies and practices are "interrelated," and its "course of conduct" is alleged to be unlawful.

26  FTC's Complaint for Equitable Relief, ECF No. 1 ¶¶ 3, 147 [citations in the form ¶__ refer to the
FTC's complaint]; *see City of Anaheim v. S. Ca. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992)

27  ("it would not be proper to focus on specific individual acts of an accused monopolist while
refusing to consider their overall combined effect"); *Free Freehand*, 852 F. Supp. 2d at 1180,

28  1184 (aggregated anticompetitive effect must be considered).

of Qualcomm chipsets.  According to Qualcomm, "because there is no difference in the royalty

rates, there is no 'tax' on competitors' products, and there is no foreclosure of competition."  Q.

Br. 12.  However, raising rivals' costs can be an effective exclusionary strategy even if the costs

nominally apply across the board, as the FTC ably explains.  *See* Steven C. Salop & David T.

Scheffman, *Raising Rivals' Costs*, 73 Amer. Econ. Rev. no. 2, May 1983, at 267, 268 (citing

industry-wide wage increases and product standards as examples); *United Mine Workers of Am. v.*

*Pennington*, 381 U.S. 657, 668-69 (1965) (agreement between union and large operators to secure

*uniform* labor standards throughout the industry violates sections 1 and 2 of Sherman Act where it

has the purpose and effect of excluding marginal producers).  The FTC's brief details the ways

that Qualcomm's ostensibly "chip neutral" tax imposes disproportionate costs on its rivals.  In

addition, the complaint alleges that the elevated royalties impose higher all-in costs on OEMs

buying chipsets from rivals than from Qualcomm.  It alleges that setting royalty rates at elevated

levels, for example, allows Qualcomm (but not rivals) to "discount" from those rates in order to

purchase exclusivity or provide other inducements for OEMs to purchase Qualcomm's chipsets.[5]

¶¶ 102, 121.  Moreover, in a but-for world in which OEMs could purchase licensed chipsets from

rivals and did not need a separate patent license from Qualcomm, the all-in price for non-

Qualcomm chipsets would be reduced,[6] and Qualcomm would be forced to compete for chipset

sales on the basis of the price and quality of its chipsets alone.  *See* ¶ 94.

    Qualcomm argues that "the FTC's 'tax' claim is, at best, a 'price squeeze' claim" which is

---

[5] The royalty-free SEP cross licenses that Qualcomm is able to extract from OEMs also allow it to
provide OEMs that purchase Qualcomm chipsets (but not rival chipsets) patent protection from
third-party suits; OEMs that purchase rival chipsets presumably must pay additional royalties to
those third parties.  ¶ 77d; ¶ 111 ("Qualcomm has insisted on cross-licenses to its licensees' SEPs,
for the benefit of Qualcomm's baseband processor business and the customers of that business.").

[6] OEMs would obtain the rights they need for chipsets sold by Qualcomm's rivals by virtue of
exhaustive patent licenses FRAND requires Qualcomm to provide to the rivals.  *See infra* pp. 6-7.
The royalty burden would be reduced because Qualcomm would have less leverage over rivals in
negotiating royalties than it has over OEMs, as the negotiation would depend solely on the
parties' predictions of how a court or neutral arbiter would set the FRAND rate.  Not expressly
stated by the complaint is the fact that the royalty burden is also likely to be reduced because the
royalty base (the chipset rather than the handset) would be smaller and not continually growing as
features unrelated to processor technology are added.  *See* Joseph Kattan, *The Next FRAND*
*Battle: Why the Royalty Base Matters*, CPI Antitrust Chronicle, March 2015 (1), http://www.
gibsondunn.com/publications/Documents/Kattan-Why-the-Royalty-Base-Matters-CPI-
03.2015.pdf.

foreclosed by *linkLine*, 555 U.S. 438.  Q. Br. 12.  But *linkLine* is inapposite even if Qualcomm's conduct is characterized as a price squeeze.  As Qualcomm acknowledges, *linkLine* declined to recognize a price-squeeze claim under § 2 of the Sherman Act in the absence of an antitrust "duty to deal."[7]  The Court reasoned that if a monopolist could refuse to deal with a rival without incurring antitrust liability, then there could be no liability for squeezing a rival by charging the rival an excessively high wholesale price compared to the monopolist's retail price.[8]  But the complaint here alleges that Qualcomm *does* have an antitrust "duty to deal" with its rivals, which arises from its FRAND obligations.[9]

Although not conceding the point, Qualcomm does not argue with the allegations that FRAND requires it to license *all* applicants, including rivals.  *See Motorola,* 795 F.3d at 1031 ("SEP holder cannot refuse a license to a manufacturer who commits to paying the [F]RAND rate").[10]  Qualcomm does suggest that a FRAND obligation cannot create an antitrust duty to deal because such a duty "must arise under the antitrust laws rather than some other body of law."  Q. Br. 15 n.12.  But a FRAND obligation is exactly the kind of *voluntary* undertaking the breach of which may give rise to a refusal-to-deal claim under the antitrust laws.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004) (distinguishing *Aspen Skiing* because the "complaint does not allege that Verizon voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion"); *cf. linkLine Commc'ns, Inc. v. SBC Cal., Inc.*, No. CV03-5265 SVW (SHx), 2004 WL 5503772, at *6, *11

---

[7] "The question before us is whether . . . a price-squeeze claim may be brought under § 2 of the Sherman Act when the defendant is under no antitrust obligation to sell the inputs to the plaintiff in the first place.  We hold that no such claim may be brought."  555 U.S. at 442.

[8] *Id.* at 451; *see id.* at 456-57 (also questioning whether predatory pricing claim could be brought "if AT&T can bankrupt the plaintiffs by refusing to deal altogether").

[9] The duty-to-deal here also distinguishes this case from *John Doe 1 v. Abbott Labs.*, 571 F. 3d 930 (9th Cir. 2009), cited by Qualcomm.  Indeed, Judge Wilken upheld a monopolization claim involving the same conduct at issue in *Doe* under the theory, not asserted in *Doe*, that defendants breached a duty to deal.  *See Safeway Inc. v. Abbott Labs.*, Nos. C 07-05470 CW et al., 2010 WL 147988 (N.D. Cal. Jan. 12, 2010) (denying motion to dismiss); *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874 (N.D. Cal. 2011) (denying summary judgment).

[10] The FRAND obligation displaces ordinary patent and antitrust principles under which courts are reluctant to circumscribe a patent holder's right to choose its licensees.  But even without a FRAND obligation, a patent holder's exclusive rights are not as absolute as Qualcomm would have it. *See, e.g., Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) (adopting only a *rebuttable* presumption that protecting patent rights provides legitimate justification for a refusal to license rivals in § 2 case).

1    (C.D. Cal. Oct. 20, 2004) (holding that there could be no liability for SBC's alleged refusal to

2    deal where the dealing was not voluntary, but compelled by law).[11]  Indeed, the Third Circuit has

3    recognized that an allegation that Qualcomm sought to have its technology included in an

4    industry-wide standard and that it "voluntarily agreed to license that technology on FRAND

5    terms" was consistent with *Trinko*'s requirements for a refusal-to-deal claim.  *Broadcom Corp. v.*

6    *Qualcomm Inc.*, 501 F.3d 297, 316-17 (3d Cir. 2007) (also noting that *Trinko* pointed "to the

7    extensive regulatory framework that created oversight functions," which was absent in the

8    standard-setting context).  Moreover, the FRAND duty to license competitors may even be

9    *required* by antitrust law to ensure that collaborative standard setting does not violate § 1 of the

10   Sherman Act.  *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988)

11   (legality of standard setting depends on "'meaningful safeguards' that "prevent the standard-

12   setting process from being biased by members with economic interests in stifling product

13   competition" (quoting *Am. Soc'y of Mech. Eng'nrs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 570-

14   73 (1982))); *Research in Motion Ltd. v. Morotola, Inc.*, 644 F. Supp. 2d 788, 796 (N.D. Tex.

15   2008) (*Allied Tube* and *Broadcom* make clear that "standards, without the proper safeguards, are

16   inherently anticompetitive").

17        Qualcomm argues that the complaint alleges no harm to competition from its refusal to

18   license its rivals because its rivals are still able to compete.  Q. Br. 15.  However, it is well settled

19   that "'[t]he test is not total foreclosure.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787

20   F.3d 638, 656 (2d Cir. 2015) (holding that monopolist's conduct violated § 2 where it barred

21   rivals "'from the cost-efficient'" means of distribution (quoting *Dentsply*, 399 F.3d at 191, and

22   *Microsoft*, 253 F.3d at 64)).  Moreover, Qualcomm ignores the complaint's theory that

23   Qualcomm's refusal to license rivals helps it to obtain elevated royalties from OEMs and thereby

24   raise rivals' costs.  *See supra* n. 6.  Qualcomm also argues that the FTC's theory is "internally

25   inconsistent" because OEMs will still need a license for those Qualcomm patents that are not

26   exhausted by a rival's sale of chipsets, and therefore Qualcomm will still be able to use its

27

28   _____

[11] While dismissing plaintiff's refusal-to-deal claim, the district court in *linkLine* declined to
dismiss plaintiff's price-squeeze claim.  The Supreme Court reversed the latter ruling.

1   leverage over chipset supply to extract elevated royalties on those residual patents.  Q. Br. 17.  Of

2   course, the complaint says nothing about such patents.  But even assuming such patents exist to a

3   non-trivial degree, Qualcomm's argument ignores (again) that the complaint alleges Qualcomm's

4   "no license, no chips" policy works *together* with its refusal to license rivals to elevate royalties

5   and foreclose rivals, and that separating chipset access from the royalty negotiation with OEMs

6   on any non-exhausted patents would preclude Qualcomm from using its leverage to obtain

7   elevated royalties on those patents.

8       **B.      The Complaint Adequately Alleges That Qualcomm's Exclusive Dealing with
         Apple Is Exclusionary**
9

10      Qualcomm maintains that the complaint's exclusive dealing allegations fail to state a

11  claim for unlawful monopolization because they fail to allege sufficient anticompetitive effects.

12  Besides the fact that Qualcomm improperly considers the exclusive dealing allegations in

13  isolation,[12] Qualcomm's argument is inconsistent with monopolization law, pleading standards,

14  and a fair reading of allegations in the complaint.

15      Qualcomm does not seriously contest that its agreements with Apple—which provided for

16  Qualcomm to pay Apple billions of dollars in conditional rebates from 2011 through 2016 in

17  exchange for Apple using Qualcomm chipsets exclusively in all new iPhone and iPad models—

18  constituted *de facto* exclusive dealing arrangements.  Qualcomm points out that conditional-

19  pricing arrangements do not *automatically* constitute *de facto* exclusive dealing, which of course

20  is true.  But, exclusive dealing is plainly established where, as here, the complaint alleges that

21  "[a]s a result of" the conditional rebates, Apple *in fact* "sourced baseband processors exclusively

22  from Qualcomm for all new iPad and iPhone products that it launched over [a] five-year period."

23  ¶ 126.

24      Moreover, the complaint alleges that "the penalties under these agreements are

25  sufficiently large that, if they were attributed as discounts to the price of Qualcomm baseband

26  _____

27  [12] *See supra* n. 4.  Qualcomm's exclusive dealing arrangements with Apple not only contributed
    directly to the foreclosure of rival chipmakers, but also did so indirectly by committing Apple not
    to "initiate nor induce others to initiate litigation claiming that Qualcomm had failed to offer a
28  license on FRAND terms." ¶ 123.

1  processors reasonably contestable by a Qualcomm competitor, the resulting price of Qualcomm

2  processors would be below Qualcomm's cost." ¶ 125c.  This means that an equally efficient rival

3  could not compete for Apple's business, a particularly potent hallmark of exclusionary conduct.

4  *See Cascade*, 515 F.3d at 906-07 (bundled rebate "is exclusionary for purpose of § 2" where it

5  fails to satisfy "discount attribution standard" because it means that it is likely to exclude "an

6  equally or more efficient competitor") (citation omitted); *ZF Meritor, LLC v. Eaton Corp.*, 696

7  F.3d 254, 282-83 (3d Cir. 2012) (conditional rebates tied to market-share targets constituted *de*

8  *facto* partial exclusive dealing where "due to Eaton's position as the dominant supplier, no OEM

9  could satisfy customer demand without at least some Eaton products, and therefore no OEM

10  could afford to lose Eaton as a supplier"); Competitive Impact Statement 13-16, *United States v.*

11  *United Regional Health Care Sys.*, Civ. No. 7:11-cv-00030, 76 Fed. Reg. 13209, 13220, 2011

12  WL 808503 (N.D. Tex. Feb. 25, 2011) (where discount tied to exclusivity fails to satisfy discount

13  attribution test, contracts amount to *de facto* exclusive dealing and are anticompetitive because

14  they would "likely exclude an equally-efficient competitor").

15      Qualcomm also argues that the complaint insufficiently alleges anticompetitive effects

16  from its exclusive dealing agreement with "just one customer." Q. Br. 4.  Notwithstanding that

17  the complaint details the importance of that customer for "a nascent broadband processor

18  supplier," and that the agreements foreclosed "a substantial share of the market for premium LTE

19  baseband processors" and "impeded the development of other baseband processor suppliers into

20  effective competitors to Qualcomm," ¶¶ 129-130, Qualcomm contends that the allegations are

21  deficient because they fail to identify the precise portion of the market foreclosed and the

22  particular competitors that were excluded.  Q. Br. 18.

23      Qualcomm's demand for greater specificity of foreclosure and anticompetitive effects is

24  misplaced.[13]  As noted above, the question under § 2 is whether the exclusive dealing "reasonably

25  ────────────────────

26  [13] Qualcomm states, without support, that "the FTC must allege foreclosure or rivals that is sufficient in magnitude and scope to deprive them of the opportunity to compete for efficient scale." Q. Br. 3-4.  There is no such requirement.  *See McWane*, 783 F.3d at 840 (upholding

27  liability where foreclosure was sufficient to slow rival's growth and its ability to constrain monopolist's monopoly power); *Microsoft*, 253 F.3d at 71 (exclusive dealing unlawful where it

28  prevented "rival [from] pos[ing] a real threat to Microsoft's monopoly").

appears capable of making a significant contribution to maintaining monopoly power." *See supra* p. 3; *see also McWane*, 783 F.3d at 837 ("'It is enough to show that anticompetitive consequences are a naturally-to-be-expected outcome of the challenged conduct.'" (quoting 3 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 657a2, at 162 (3d ed. 2008))).  Where a monopolist's exclusive dealing "tends to impair the opportunities of rivals" and lacks a procompetitive justification, it violates the rule of reason under § 2.  *Cascade*, 515 F.3d at 894.

Accordingly, courts in § 2 cases have held, "The question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage." *In re Ductile Iron Fittings (DIPF) Direct Purchaser Antitrust Litig.*, Civ. No. 12-711, 2013 WL 812143, at *19 (D. N.J. Mar. 5, 2013); *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. SACV 12-2101-JLS (ANx), 2013 WL 6229141, at *7 (C.D. Cal. Dec. 2, 2013) (same).  Even after trial it is not necessary for the Commission to "place an exact number on the percentage foreclosed." *McWane*, 783 F.3d at 838.  The cases cited by Qualcomm are inapposite because they involve exclusive dealing claims under § 1 rather than § 2,[14] are not rulings on the pleadings, or are otherwise distinguishable.[15]

## II.    THE COMPLAINT STATES A STANDALONE SECTION 5 CLAIM

It is well settled that the ban on "unfair methods of competition" under § 5 of the FTC Act goes beyond the scope of the Sherman Act.  *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986); *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972) (FTC may consider "public

---

[14] Qualcomm cites *Feitelson v. Google, Inc.*, 80 F. Supp. 3d 1019 (N.D. Cal. 2015), which involved exclusive dealing claims under § 1 and § 2, for the proposition that "Courts have generally 'assume[d] that at the pleading stage, the degree of foreclosure required to make out an exclusive dealing claim does not differ under § 1 and § 2.'" Q. Br. 22 n.20.  However, what the court in *Feitelson* actually said was, "*For purposes of this motion*, the Court assumes" the standards do not differ, which made sense because "the parties' briefing [did] not suggest they believe there is a difference." 80 F. Supp. 3d at 1030 n.8 (emphasis added).  In fact, courts generally hold that exclusive dealing may violate § 2 even if it does not satisfy the foreclosure requirements for a § 1 violation.  *See Microsoft*, 253 F.3d at 70; *Dentsply*, 399 F.3d at 197; s*ee also Cascade*, 515 F.3d at 911 n.22 (rejecting argument that jury verdict for defendant on exclusive dealing claim under § 1 precluded liability under § 2).  The reason is that foreclosure has the greater potential to harm competition in monopoly markets.  *See McWane*, 783 F.3d at 836; *cf. Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting) (monopolist's "activities are examined through a special lens").
[15] For example, *Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*, No. C 08-01035 JSW, 2008 WL 4830740, at *2 (N.D. Cal. Nov. 6, 2008) is a case in which the plaintiff "has not pled any foreclosure whatsoever in the relevant market."

values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws"). This is not controversial. *See generally* Herbert Hovenkamp, *The Federal Trade Commission and the Sherman Act*, 62 Fla. L. Rev. 871, 875 (2010) ("[T]he rationales for expansive coverage are quite persuasive as a whole and may even be overwhelming.").[16] However, in its prosecutorial discretion, the FTC has adopted principles that limit its enforcement of "standalone" violations to activities and practices that "contravene the spirit of the antitrust laws and those that, if allowed to mature or complete could violate the Sherman Act or Clayton Act." Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the Federal Trade Commission Act, 80 Fed. Reg. 57,056 (Sep. 21, 2015). Under these principles, the Commission will use its authority to remedy "harm to competition or the competitive process" that impairs consumer welfare, taking into account "cognizable efficiencies and business justifications." *Id.*

### A.    The Complaint Pleads Harm to Competition

Qualcomm argues that the complaint fails to state an "unfair methods" violation because it fails to plead any plausible harm to the competitive process or any "indicia of oppressiveness." Q. Br. 23 (citing *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128 (2d Cir. 1984)). As to competitive harm, Qualcomm recycles its (incorrect) arguments for dismissing the monopolization count. But there are two respects in which the requisite competitive harm for an unfair methods claim may be less than, or different from, the competitive harm required for a § 2 violation. First, "a showing of an actual anticompetitive effect is unnecessary to prove a violation of Section 5 because that section was designed to stop [in] their incipiency acts and practices that could lead to violations of the Sherman or Clayton Acts." *In re Coca Cola Co.*, 117 F.T.C. 795, 970 n.25 (1994); Hovenkamp, *supra*, at 875. Accordingly, even if the effect of Qualcomm's conduct were insufficient to state a claim under § 2, its *tendency* to harm competition may be sufficient for an unfair methods claim, assuming the absence of a countervailing procompetitive justification.

---

[16] One of the reasons is that while the Sherman Act is largely enforced by private parties who may obtain treble damages, the FTC Act is only enforced by the Federal Trade Commission for equitable relief. *See* Hovenkamp, *supra*, at 877-78.

Second, an unfair methods claim may lie where the conduct of a monopolist harms competition or the competitive process without regard to its exclusion of rivals. Thus, the FTC has brought "standalone" claims under § 5 when a patent holder breaches a licensing commitment designed to mitigate monopoly power in technology markets that is conferred by the standard-setting process, where the resultant harm is to competition in the markets that use the technology (i.e., among implementers) and to the standard-setting process itself. For example, in *N-Data*, the FTC brought and settled a complaint that a non-practicing entity that acquired certain SEPs had violated § 5 when it opportunistically demanded royalties from computer device manufactures well in excess of the fees its assignor had promised the SSO it would charge, thereby increasing the price of devices and decreasing the incentives of manufacturers and others to participate in standard setting activities. *In re Negotiated Data Solutions LLC*, File No. 051-0094, 2008 WL 258308, at *37 (FTC Jan. 22, 2008) (analysis of proposed consent order to aid public comment). And in *Motorola Mobility*, the FTC brought and settled claims that an SEP holder violated § 5 by seeking injunctive relief against willing licensees in violation of its commitment to license its SEPs on FRAND terms, where the threats enhanced its bargaining leverage to demand *supra* FRAND royalties and had the likely anticompetitive effect, among others, of increasing the costs and prices of the numerous products that comply with the relevant standards. *In re Motorola Mobility LLC*, File No. 121-0210, 2013 WL 124100, at *5, *37 (FTC Jan. 3, 2013) (complaint and statement of the Commission). As the FTC explained, "standard setting often supplants the competitive process with the collective decision-making of competitors, requiring that we be vigilant in protecting the integrity of the standard-setting process," and "a breach of a FRAND commitment in the context of standard setting poses serious risks to the standard-setting process, competition, and consumers." *Id.* at *38; *see also In re Robert Bosch GmbH*, File No. 121-0081, 2012 WL 5944820, at *28-*29 (FTC Nov. 21, 2012) (similar); *cf. Motorola*, 795 F.3d at 1052 n.22 (noting that a "RAND commitment . . . is crafted for the public interest") (internal quotation marks omitted).[17]

---

[17] In *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008), the FTC found that a monopolist in DRAM technology had violated § 2 by breaching its commitment to disclose relevant patent

*Footnote continued on next page*

In this case, where Qualcomm is alleged to use its monopoly power in baseband processors to obtain elevated royalties on its SEPs in violation of its FRAND commitment, an unfair methods claim may be based on the harm to competition and consumers in the markets in which OEMs pay Qualcomm inflated royalties, ¶ 144, as well as the harm to the standard setting process itself, *see* ¶¶ 49, 77.[18]

## B. The Complaint Pleads "Indicia of Oppressiveness"

As to the Second Circuit's "indicia of oppressiveness," there is no basis to impose such a requirement here. The Second Circuit adopted that requirement to address facilitating practices in an oligopolistic industry, *du Pont*, 729 F.2d at 139, not monopolistic conduct. In any event, *du Pont* allowed that "unfair methods" includes conduct that is "coercive," *id.* at 138, 140, which aptly describes Qualcomm's use of its dominant position in chipsets to demand and obtain royalties and other "onerous" licensing terms from OEMs that they believe are not FRAND. ¶¶ 47, 83, 86. Moreover, contrary to Qualcomm's argument, the complaint satisfies *du Pont*'s "oppressiveness" requirement by alleging that Qualcomm's conduct lacks independent legitimate business reasons. *See* ¶ 145.

Qualcomm contests this allegation, but "the existence of valid business reasons in antitrust cases is generally a question of fact not appropriate for resolution at the motion dismiss stage." *Free Freehand*, 852 F. Supp. 2d at 1182 (internal quotation marks omitted). Moreover,

*Footnote continued from previous page*
rights to a standard setting organization. The D.C. Circuit reversed because the FTC failed to prove that the breach enabled the respondent to attain monopoly power (i.e., that had the patents been disclosed, the relevant technology would not have been included in the standard). Rather, it was just as likely that that standard setting organization would have chosen the technology anyway, but would have insisted on a FRAND commitment to mitigate the conferral of monopoly power. Importantly, while the Court held that § 2 is not violated when conduct merely permits a monopolist to avoid (non-competitive) constraints on the exercise of monopoly power, the Court remanded the case to the Commission for potential consideration under a standalone § 5 theory. *Id.* at 467; *see also* Herbert Hovenkamp et al., *IP and Antitrust* § 35.5B, at 33-54.1 (2014 Supp.) (commenting on *Rambus* that "overcharge can properly constitute competitive harm" in downstream market)

[18] Qualcomm cites *In re General Foods Corp.*, 103 FTC 204 (1984), for the proposition that § 5 does not reach conduct that is "affirmatively *permitted* or encouraged by the antitrust laws." Q. Br. 23. Assuming that is correct, it does not mean that the same standards necessarily apply to monopolistic conduct under § 2 and § 5, as *General Foods* implicitly recognized. 103 FTC 204, 1984 WL 565373, at *123 n.127. In any event, the antitrust laws do not *affirmatively* permit or encourage the use of monopoly power in one market to facilitate the breach of a FRAND commitment in another.

1    Qualcomm's purported justifications are dubious.  Qualcomm argues that it conditions the sale of

2    its chipsets to the licensing of its standard essential patents because it "does not wish to facilitate

3    infringement of its patents."  Q. Br. 24.  But no infringement of its patents would occur if it sold

4    its chipsets without requiring a separate patent license.  The complaint alleges that Qualcomm's

5    "no license-no chips" policy is unique in the industry and that "[o]ther component suppliers rely

6    on component sales, rather than separate patent licenses, to convey" the IP rights their customers

7    need to use or resell the components.  ¶¶ 64-65.  As to its refusal to license its rivals, Qualcomm

8    suggests that this is justified by its desire not to assist its competitors, but this can't be a

9    *legitimate* business justification insofar as it contradicts its FRAND commitment.[19]  And while

10   Qualcomm asserts that there *can* be legitimate business reasons for exclusive dealing

11   arrangements, it does not suggest one for its exclusive dealing arrangements at issue here.

12                                            ***

13         Collaborative standard setting among competitors "creates an opportunity for companies

14   to engage in anti-competitive behavior," *Motorola*, 795 F.3d at 1030-31, and FRAND

15   commitments are "important safeguards against monopoly power."  *Broadcom*, 501 F.3d at 314.

16   Indeed, they are essential to permit standard setting to occur "at all under the antitrust laws."

17   *Allied Tube*, 486 U.S at 506-07.  Accordingly, the antitrust laws play a critical role in policing

18   FRAND evasions where harm to competition is evident in technology markets or product markets

19   in which the technology used.  That role is doubly important where, as alleged here, a standard-

20   setting participant has monopoly power in a product market and it uses that power to evade

21   FRAND constraints and thereby hobble its rivals, entrench its monopoly, and harm millions of

22   consumers.

23                                     **CONCLUSION**

24         The complaint states a monopolization claim because it plausibly alleges conduct that:

25   (a) impairs Qualcomm's rivals' opportunities, and (b) reasonably appears capable of making a

26   significant contribution to maintaining Qualcomm's monopoly power.  The complaint's "tax" and

---

[19] Qualcomm points out that the complaint does not allege that licensing only at the handset level is "anomalous."  Q. Br. 17.  But the complaint does allege that Qualcomm demands a chipset-level license for itself.  ¶ 111.

1  exclusive dealing theories no doubt involve raising Qualcomm's rivals' costs which makes it

2  more difficult for them to compete and to challenge Qualcomm's monopoly.  At this stage of the

3  proceeding, the Court must assume Qualcomm's alleged conduct not to have procompetitive

4  justifications, and the conduct therefore violates § 2.  The complaint also alleges a standalone

5  violation of § 5, which may be found even in the absence of exclusion.  For these and the other

6  reasons stated above and in the FTC's brief, Qualcomm's motion to dismiss should be denied.

7  Dated: May 12, 2017                    Respectfully submitted,

8                                          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

9

10                                         By:*/s/ Eric B. Fastiff*_____
                                              Eric B. Fastiff
11

12                                         Eric B. Fastiff (State Bar No. 182260)
                                           efastiff@lchb.com
13                                         275 Battery Street, 29th Floor
                                           San Francisco, CA  94111-3339
14                                         Telephone:  415.956.1000
                                           Facsimile:  415.956.1008
15
                                           Counsel for Proposed Amicus Curiae
16                                         The American Antitrust Institute

17 Richard Brunell
   Vice President & General Counsel
18 American Antitrust Institute
   1730 Rhode Island Avenue, NW
19 Suite 1100
   Washington, DC  20036
20 Telephone:  202.600.9640

21

22

23

24

25

26

27

28