SELENDY GAY ELSBERG PLLC
Jordan Goldstein (*admitted pro hac vice*)
Oscar Shine (*admitted pro hac vice*)
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
Fax: 212-390-9399
jgoldstein@selendygay.com
oshine@selendygay.com

ERICKSON KRAMER OSBORNE LLP
Elizabeth A. Kramer (SBN 293129)
Kevin M. Osborne (SBN 261367)
44 Tehama St.
San Francisco, CA 94105
Tel: 415-635-0631
Fax: 415-599-8088
elizabeth@eko.law
kevin@eko.law

*Attorneys for Lead Plaintiff Henry Rodriguez,*
*Plaintiff Daniel Valenti, and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DANIEL VALENTI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DFINITY USA RESEARCH LLC, DFINITY FOUNDATION, and DOMINIC WILLIAMS,<br><br>Defendants. | Case No.: 3:21-cv-06118-JD<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

**Table of Contents**

INTRODUCTION ...................................................................................................1

PARTIES ..............................................................................................................3

JURISDICTION AND VENUE .............................................................................4

FACTUAL ALLEGATIONS .................................................................................5

    A.    Background of Crypto-Assets and Exchanges ...........................................5

    B.    Defendants Solicit ICP Tokens Sales ........................................................7

        a.    Defendants Raise Funds from Investors ..........................................7

        b.    Defendants Promote ICP to Investors as a Safe, Long-Term Investment .........................................................................................8

        c.    Defendants Tout the May 10, 2021 ICP Token Launch...................9

        d.    Defendants Further Promote ICP by Publicly Offering It on Major Crypto-Asset Exchanges on May 10, 2021 and Thereafter .......11

    C.    Defendants Mislead Investors About Lock-Up Restrictions on Dfinity Insiders to Boost ICP's Price .....................................................12

    D.    Defendants Sell ICP at Inflated Prices Based on Their Insider Knowledge..........13

    E.    Defendants Repeatedly Mislead Investors About Defendants' Dumping of ICP ...........................................................................................14

    F.    ICP Tokens Are Securities ......................................................................15

        a.    ICP Investors Invested Money ......................................................17

        b.    ICP Investors Participated in a Common Enterprise .....................17

        c.    Investors Purchased the ICP Tokens with a Reasonable Expectation of Profit from Owning Them .......................................17

        d.    ICP Investors Expected Profits from ICP to Be Derived from Defendants' Managerial Efforts.....................................................18

    G.    The SEC Has Concluded That Tokens Such As ICP Are Securities ...................21

    H.    Plaintiffs and the Other Class Members Have Suffered Significant Damages from Defendants' Actions.............................................................22

CLASS ACTION ALLEGATIONS .....................................................................22

CAUSES OF ACTION ........................................................................................25

PRAYER FOR RELIEF ......................................................................................41

Lead Plaintiff Henry Rodriguez and Plaintiff Daniel Valenti, individually and on behalf of all others similarly situated, bring this action against Defendants Dfinity USA Research LLC ("Dfinity USA"), Dfinity Foundation (the "Foundation," and together with Dfinity USA, "Dfinity"), and Dominic Williams. Plaintiffs base their allegations as to their own acts upon personal knowledge, and upon information and belief as to the matters based on their attorneys' investigation. Plaintiffs believe that discovery will reveal substantial additional evidence for the allegations and claims below. Plaintiffs hereby allege as follows:

## **INTRODUCTION**

1.    From May 10, 2021, through the present (the "Class Period"), Defendants have promoted, offered, and sold throughout the United States unregistered securities called "ICP tokens" in violation of federal law.[1] During parts of the Class Period, Defendants also made false and misleading statements concerning ICP and engaged in insider trading of ICP in violation of federal law.

2.    Starting in early 2017, Williams, the founder of Dfinity, began promoting his "Internet Computer" blockchain. Along with other Dfinity employees, Williams wrote about the Internet Computer's promise in various internet posts, aimed at investors, that described the supposed utility of Dfinity's eventual network. The apparent purpose of these posts was to drum up demand for an initial coin offering ("ICO") of the blockchain's native token, ICP, in 2018.

3.    Although ICP is a security, Dfinity did not register it as a security with the Securities and Exchange Commission ("SEC") and did not qualify for an exemption from registration requirements. The SEC's detailed "Framework" for analyzing digital assets, issued on April 3, 2019,[2] indicates that ICP and other similar digital tokens are "investment contracts" and therefore securities under Section 2 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(1). Indeed, since the release of the Framework, the SEC has found the sale of comparable crypto-assets to violate the Securities Act's prohibition against the sale of unregistered securities.

---

[1] ICP was formerly referred to as "DFN." For clarity, the Complaint refers to the token as ICP throughout the relevant time period, but the two terms refer to the same digital token.

[2] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

4.      Given the legal repercussions for selling unregistered securities as SEC crackdowns began during this period, Defendants delayed their planned 2018 ICO, bided their time, and continued to drum up demand and hype for ICP through online posts. These posts, however, omitted the disclosures that securities laws and the SEC have deemed essential to investor protections in initial public offerings, including use of "plain English" to describe the offering; a required list of key risk factors; a description of key information and incentives concerning management; an explanation of how the proceeds from the offering would be used; and a standardized format that investors could readily follow. Without these critical risk disclosures, investors in ICP tokens were left to fend for themselves—precisely the opposite of what the securities laws require.

5.      After generating hype regarding the ICP tokens for several years, Defendants first began selling ICP tokens to retail investors in the United States and elsewhere beginning on May 10, 2021.  In connection with this initial public offering of ICP, Defendants (primarily speaking through Williams) misled investors about the extent of lock-up restrictions on ICP held by Dfinity insiders, which artificially pumped up the price of ICP. Defendants took advantage of ICP's inflated price and their access to material non-public information concerning ICP's lock-up restrictions to sell into the market at these inflated prices and secure outsize profits for themselves. When the truth about Defendants' coordinated dumping scheme was revealed, and ICP's price predictably cratered, Plaintiffs and other investors were left holding the bag.

6.      Defendants' large-scale dumping of ICP tokens on secondary markets—contrary to the representations they had made that insiders' trading in ICP would be restricted following the May 10, 2021 initial coin offering—caused the price of ICP to plummet. During this period when Plaintiffs and the other Class members were also transacting in ICP tokens, the token price of ICP fell from a high of over $750 immediately after issuance on May 10, 2021, to approximately $32 as of June 22, 2021. Even by the volatile standards of the crypto-asset market, this constitutes an astonishing collapse in value. As of January 26, 2024, ICP traded at an average price of $11.76 per token.

7.     Plaintiffs and the other Class members are entitled to recover the consideration they paid for the ICP tokens with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate. Plaintiffs and the other Class members are further entitled to recover their net losses and Defendants' ill-gotten gains from their misconduct.

<u>**PARTIES**</u>

8.     Plaintiff Daniel Valenti is a resident of Tampa, Florida. Valenti purchased ICP tokens, on Coinbase, beginning on May 10, 2021. Valenti purchased 45.2504 ICP tokens on May 10, 2021, and thereafter regularly transacted in ICP tokens through August 3, 2021. For example, in addition to purchasing ICP on May 10, 2021, Valenti also purchased ICP on May 12, May 15, May 16, May 17, May 18, May 19, May 20, May 21, May 22, May 24, May 27, May 30, May 31, June 4, June 11, June 12, June 15, June 16, June 17, June 18, June 20, and June 21, among other dates. On his transactions in ICP tokens through August 3, 2021, Valenti suffered substantial losses.

9.     Lead Plaintiff Henry Rodriguez is a resident of New Jersey. Rodriguez purchased ICP tokens, on Coinbase, beginning on May 18, 2021. In addition to purchasing ICP on that date, Lead Plaintiff also purchased ICP on May 28, June 2, June 5, June 8, June 10, and June 11, among other dates. On his transactions in ICP tokens through October 7, 2021, Rodriguez suffered substantial losses.

10.     Defendant Dfinity USA Research, LLC is a Delaware company headquartered in San Francisco, California. Dfinity USA is wholly owned and managed by the Foundation.

11.     Defendant Dfinity Foundation is a Swiss-based not-for-profit organization, with operations and employees in California, Switzerland, and Japan. Although the Foundation is nominally based in Switzerland, its operations are substantially located in Palo Alto. For example, when asked on Dfinity's Telegram page where the team was based, Dfinity representatives informed investors that "the operations are based in Palo Alto (California, USA)" and that the "core team is based in Palo Alto." Defendant Williams has also referred to the Foundation's Palo Alto "research center" as the "flagship." Consistent with that, data from LinkedIn showed that, as of January 26, 2024, the Foundation had 36 employees located in California.

12.     Defendant Dominic Williams is the founder, President, and Chief Scientist (and also a director) of the Foundation, as well as CEO of Dfinity USA. As President of the Foundation, Williams casts the deciding vote about the Foundation's operations in the event of a tie vote among the Foundation's "council members," which appear to have consisted of only Williams and Gian Bochsler for much, if not all, of the Class Period. Williams resided in Palo Alto, California, from 2012 until at least August 2021. He has appeared as a defendant in multiple cases in California state court, including in a tort and breach of contract action in which he filed documents as recently as April 10, 2023.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs bring claims under Sections 5, 12(a)(1), and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o, and under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), *id*. §§ 78j, 78t(a), 78t-1. This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of that Act, *id*. § 77v, and over the Exchange Act claims pursuant to Section 27 of that Act, *id*. § 78aa.

14.     The Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this case is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which any member of the Class is a citizen of a State different from any Defendant, and in which any member of the Class is a citizen of a State and any defendant is a citizen of a foreign state.

15.     The Court has personal jurisdiction over Defendants as a result of their acts occurring in or aimed at California in connection with the offer or sale of unregistered securities and Defendants' materially false and misleading statements and omissions regarding such securities.

16.     Venue is proper pursuant to 15 U.S.C. §§ 77v(a), 78aa(a), and 28 U.S.C. § 1391(b), in that this is a district wherein one or more Defendants is found or transacts business, where the offer or sale of ICP took place, and where a substantial part of the events or omissions giving rise to the claims occurred. Dfinity has operations and employees in San Francisco and Palo Alto,

California; at least as of the filing of the complaint in this action, Williams resided in Palo Alto at the time of the violations herein; Defendants sold ICP to persons in this district, made materially false and misleading statements and omissions regarding securities in this district, and transacted in ICO tokens in this district.

17.     Defendants have waived any defenses to personal jurisdiction and venue in this Court, as well as to process and service of process, by their conduct in this litigation, including but not limited to Defendants' failure to raise any such defenses in their April 4, 2022 motion to dismiss, which was made solely pursuant to Federal Rule of Civil Procedure 12(b)(6).

**FACTUAL ALLEGATIONS**

**A.     Background of Crypto-Assets and Exchanges**

18.     A crypto-asset is a digital asset designed to work as a medium of exchange or a store of value or both. Crypto-assets leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

19.     Created in 2009, Bitcoin was the world's first decentralized crypto-asset.[3] With a market capitalization of nearly $825 billion as of January 26, 2024, Bitcoin is also the largest and most popular crypto-asset. Bitcoin spawned a market of other crypto-assets that, together with Bitcoin, have a market capitalization of nearly $1.7 trillion as of January 26, 2024.

20.     One of the main features that Bitcoin popularized was the use of a distributed ledger to track the ownership and transfer of every Bitcoin in existence. This distributed ledger is known as a blockchain. Blockchains are a central technical commonality across most crypto-assets. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve a form of decentralization.

21.     There are two main ways to obtain crypto-assets. One way is to be part of the framework of incentives to validate the transactions on the blockchain, under either a "Proof of Work" or "Proof of Stake" scheme. Users who expend resources to validate the blockchain get

---

[3] Bitcoin and other crypto-assets are also commonly referred to as "cryptocurrencies" regardless of whether they are commodities (as the term implies) or securities.

1    rewarded with newly minted tokens. This process is colloquially referred to as "mining" for Proof

2    of Work blockchains or "validating" for Proof of Stake blockchains.

3         22.     A second and typically more common way to obtain crypto-assets is to acquire

4    them from someone else. This may involve acquiring them from the issuer in a private or public

5    sale, or through online crypto-asset exchanges. These exchanges may operate similarly to

6    traditional exchanges by matching buyers and sellers, or they may stand on one side of each trade

7    by transacting directly with buyers and sellers.

8         23.     Bitcoin, for a time, was the only crypto-asset available on exchanges. As crypto-

9    assets grew in popularity, however, exchanges began listing other crypto-assets as well and trading

10    volumes expanded. In early 2013, daily Bitcoin trading volumes hovered between $1 million and

11    $25 million. By January 2024, daily Bitcoin trading volumes ranged between $25 and $40 billion.

12         24.     Ethereum, or "Ether," is the second-most popular crypto-asset, with a market

13    capitalization of approximately $300 billion as of January 2024. Ethereum was designed to enable

14    "smart contract" functionality. A smart contract is a program that verifies and enforces the

15    negotiation or performance of a contract. Smart contracts can be self-executing and self-enforcing,

16    which theoretically reduces the transaction costs associated with traditional contracting.

17         25.     For example, a smart contract enables two parties to submit Ether to a secure

18    destination and automatically distribute the Ether at the end of the month without any third-party

19    action. The smart contract self-executes with instructions written in its code which get executed

20    when the specified conditions are met. Since Ethereum first introduced the concept of smart

21    contracts, many other companies, including Dfinity, have sought to create crypto-assets that

22    compete with Ethereum in the smart contract ecosystem.

23         26.     Interest in crypto-assets began to accelerate towards the end of 2016, with prices

24    growing at a rate historically unprecedented for any asset class. Over the course of 2017 alone,

25    Bitcoin's price increased from approximately $1,000 to approximately $20,000. On January 1,

26    2017, Ethereum was trading at approximately $8 per Ether. Approximately one year later, it was

27    trading at over $1,400 per Ether—a return of approximately 17,000 percent over that period.

28

27.     This enthusiasm for crypto-assets prompted many entrepreneurs to raise funds through initial coin offerings, or ICOs. Often, as with ICP, these entrepreneurs would promise investors that the funds raised during the ICO would go to fund a new blockchain—commonly touted as revolutionary in some way—and that the tokens obtained at the ICO could be used on that new blockchain. Between 2017 and 2018, ICOs raised nearly $20 billion. None of these ICOs was registered with the SEC.

**B.      Defendants Solicit ICP Tokens Sales**

  **a.      Defendants Raise Funds from Investors**

28.     Williams conceived of the "Internet Computer" blockchain in 2015, established the Foundation in the fall of 2016, and began promoting and fundraising for the project in early 2017.

29.     In February 2017, Williams announced that the Foundation would fundraise for the blockchain's development "by collecting donations in public 'seed' and 'main' rounds," in which Ethereum-based smart contracts would "record contributions (donations) to the [F]oundation." No actual tokens were sold through this fundraising. Instead, as Williams explained, once the blockchain was "sufficiently mature," the Foundation would merely *recommend* that donors *eventually* receive ICP tokens in proportion to their donations. Williams cautioned that U.S. investors were "blocked" from this fundraising "due to regulatory uncertainties," an apparent reference to federal securities laws.

30.     Dfinity USA was incorporated in August 2017, just as Williams began negotiating with Polychain Capital—a crypto hedge fund backed by Andreessen Horowitz and others—to lead a private "strategic" fundraising round for the Foundation. This "strategic" round closed in February 2018 and raised approximately $61 million for the Foundation. A subsequent private "presale" fundraising round, led by Polychain Capital and Andreesen Horowitz, closed in August 2018 and raised approximately $102 million for the Foundation. As with the "seed" round, no actual ICP tokens were issued in the "strategic" or "presale" rounds. Instead, investors in those rounds hoped to receive portions of ICP tokens reflecting their investments once the blockchain officially launched.

31.    In April 2018, Williams explained that Dfinity's decision to seek private investments and "not to run an ICO fundraise" was based on the "regulatory hornet's nest" that arose after the "fundraising frenzy of 2017," as well as the "grey legal territory" occupied by "decentralized networks and ICO fundraising." He wrote, "if the DFINITY Foundation ran an ICO today that made its genesis tokens available to the American public in exchange for cash (cryptocurrency or otherwise) we might very well be on the losing end of litigation." Nonetheless, Defendants had planned since early 2018 to hold a funding round "termed the 'ICO' … to be run by regulated traditional exchanges at the moment the network [went] live."

32.    In May 2018, Williams and other Dfinity employees announced a process through which "early contributors" to the Dfinity "community" could register to receive free distributions of ICP tokens upon the blockchain's official launch. Williams claimed that U.S. persons would be excluded from the promotion "due to regulatory issues," because "even giving away dfinity tokens for free before the network has launched can still be classified as an unregulated public securities transaction." As with the "seed," "strategic," and "presale" rounds of fundraising, no actual ICP tokens were issued at the time of the "early contributors" promotion.

**b.    Defendants Promote ICP to Investors as a Safe, Long-Term Investment**

33.    Throughout the fundraising period, recognizing this would be material information to investors, Defendants issued public assurances that ICP allocated to certain Dfinity insiders and large investors would be locked up in vesting schedules to promote long-term growth in value.

34.    In June 2017, Williams described several "important principles" guiding the Foundation's fundraising. He publicly wrote that the Foundation would "tie in founders and key technical personnel with *vesting incentive packages* where tokens are released *slowly over years*, contingent upon continued contributions being made."

35.    In response to concerns that the February 2018 private "strategic" round of fundraising involved hedge funds and not individual investors, Williams insisted that "tokens granted in exchange for 'strategic' round contributions come with a 3 year vesting schedule," adding that Dfinity team members' "incentive tokens are bound by even longer vesting schedules." He publicly stated that "everyone here at DFINITY and our partners are in the [sic] for the long

haul" and that "the idea of doing whale/insider sweetheart deals simply to benefit friends and associates is an anathema to us."

36.    In response to similar concerns about the April 2018 private "presale" round of fundraising from hedge funds, and questions about whether Dfinity was making decisions to profit insiders, Williams stated, "We are a long term operation, which is why we did not dump all our tokens."

37.    In a video published by Dfinity on October 7, 2020, Williams explained that the blockchain would also enable ICP holders to manually "dial" their own lock-up periods, known as "dissolve delays," of up to eight years. He stated, "Personally, I plan to twist all my dissolve dials right the way around to eight years, to maximize my voting power and rewards, as this is a long-term project." Williams never subsequently corrected this statement.

38.    In a January 10, 2021 post on Twitter, Williams stated that Dfinity was "not a traditional cryptocurrency pump and dump."

### c.    Defendants Tout the May 10, 2021 ICP Token Launch

39.    In the period leading up to the May 10, 2021 offering, Defendants began to describe the network in laudatory terms, which became amplified in publications such as *Forbes*, *Business Insider*, and *Bloomberg*. As the *New York Times* would later explain, these efforts worked and "generated a lot of buzz" ahead of Dfinity's ICO, "the crypto equivalent to a company going public and listing shares for investors to buy."

40.    **June / July 2020**: Dfinity's Twitter account stated, "Billions of dollars are waiting to invest in the open web." A few days later, Dfinity published an article promoting investment in the "Internet Computer" project and stating, "Financial backers see tremendous upside in the open web's ability to create financial opportunities for innovation that previously didn't exist…. VCs are eager to deploy billions in capital to foster the decentralized web[.]"

41.    **February 2021**: Dfinity "convened top investors and entrepreneurs" for an event entitled "Trillion Dollar Opportunity: How a New Internet Will Completely Reimagine Your Business Model" which addresses how "businesses can seize this opportunity."

42. **March 2021**: Dfinity announced that ICP's "Genesis Launch," another name for the ICO, was "imminent." Dfinity further announced a "Genesis Launch Event," at which Williams and other Dfinity personnel would give presentations, to precede and promote the ICO.

43. **April 2021**: Dfinity called the Genesis Launch Event "the most anticipated event in blockchain."

44. **May 2021**: To promote Dfinity and ICP, Williams participated in interviews with journalists from several different outlets, including *Bloomberg* and *Decrypt*.

45. **May 4, 2021**: Williams stated that ICP "represents the product of an unprecedented multi-year R&D effort, orchestrated by the DFINITY Foundation from research and development centers in Zurich, Palo Alto, San Francisco and Tokyo."

46. **May 7, 2021**: Dfinity held the Genesis Launch Event, an hours-long, road-show type presentation in which Williams played a prominent role. Williams stated that Dfinity's blockchain represented "a giant leap forward," allowing the running of "smart contracts at web speed, that can serve web directly to users, that can increase its capacity with demand as needed, that is efficient, that governs itself, and that can provide better usability than those systems built on traditional technology." Williams went so far as to say that the network using ICP would be "humanity's primary comput[ing] platform for building software" in 20 years. Dfinity employee Liz Yang (who is based in the San Francisco Bay Area) instructed investors that they could "begin acquiring the ICP utility token through approved channels such as exchanges very soon." Dfinity employee Michael Hunte (also based in the San Francisco Bay Area) described the launch of Dfinity network as "the dawn of the new open and free internet."

47. **May 10, 2021**: The Genesis Launch occurred at 9 a.m. Pacific Time, with what Williams described as a "fully public mode" for the blockchain and "full token liquidity" of ICP. Dfinity described the milestone as "a giant leap for blockchain and the internet ecosystem." In a video presentation for the Genesis Launch Event, Dfinity Researcher Lara Schmid stated that "the value of [ICP] tokens is a rough estimate of the network's success" and that the design of the blockchain's governance system incentivized holders to make decisions "in the long-term interests of the Internet Computer" and to maximize the future value of their ICP tokens.

  **d.**  **Defendants Further Promote ICP by Publicly Offering It on Major Crypto-Asset Exchanges on May 10, 2021 and Thereafter**

48. On May 10, 2021, the same day as the Genesis Launch, Defendants further promoted ICP by ensuring it was listed on numerous cryptocurrency exchanges at once, including Coinbase, Binance, Huobi, OKEx, Kucoin, CoinList, CoinEx, and FTX, in order to attract purchasers. As one Twitter observer commented, this was uncommon in crypto-asset listings: "Major exchanges listing $ICP all at once, never happened before." Not only would Dfinity have to take affirmative steps to list ICP with any given exchange (including by applying to be listed, paying listing fees, and paying transaction fees incurred selling ICP on those exchanges), this simultaneous listing, as *Coin Telegraph* reported, "reflected a carefully structured strategy by Dfinity … that landed ICP tokens right into the conscience of everyday traders." Defendants planned these listings in advance to create trading markets, especially in the United States.

49. Defendants' strategy worked, and ICP immediately catapulted to the upper echelon of crypto-assets, peaking at a market capitalization of over $46 billion, making it the eighth most valuable crypto-asset at the time. As a direct result of Defendants' promotional efforts, including its decision to list ICP on at least eight exchanges on the first day of trading, Plaintiff Valenti and other members of the Class purchased ICP on May 10, 2021. Other members of the Class, including Plaintiffs Valenti and Rodriguez, purchased ICP in the days immediately following.

50. On May 11, 2021, Dfinity promoted a report from Binance, one of the world's largest crypto-asset exchanges. That report included, on a panel on the left-hand side, an icon indicating the current price of ICP with a button stating: "Trade now."

51. In further promoting ICP, Williams touted Dfinity's relationships with crypto investing companies. In a Medium post from June 2021, Williams noted that there was a "boost of institutional demand" for ICP and linked to a press release from Crypto Finance explaining that the "Crypto Finance Group provides institutional and professional investors a full suite of crypto asset products and services" and "now enables trading and secure storage for [ICP]."

**C. Defendants Mislead Investors About Lock-Up Restrictions on Dfinity Insiders to Boost ICP's Price**

52. As explained above, Defendants for years promoted ICP to investors as a safe, long-term investment, including by representing that ICP tokens distributed to Defendants, Dfinity insiders, and others would be subject to lock-up and vesting restrictions following the ICO, in order to align incentives and avoid a large price drop following the ICO. Indeed, Williams had represented that Dfinity team members' ICP tokens would be "bound by even longer vesting schedules" than the three-year lock-ups imposed on private "strategic" investors. Williams had further represented that he personally would lock up his ICP tokens for at least *eight* years.

53. On May 10, 2021, the date of the ICO, Dfinity announced that ICP tokens allocated to individual donors who participated in the Foundation's February 2017 "seed" fundraiser and Dfinity's May 2018 "early contributor" distribution would be subject to four-year and one-year vesting schedules, respectively, providing for only a fraction of the tokens to be unlocked each month. Dfinity stated, "It is very important that the flow of liquid ICP tokens around the network is released on a schedule for the safety and security of ICP holders, the network, and its users while the underlying technology is being fettled and its ecosystem is being established."

54. Defendants' representations about lock-up and vesting restrictions on ICP boosted its price above $750 on the date of the ICO.

55. In the weeks following the ICO, Defendants continued to make false and misleading claims about the extent to which ICP tokens held by Dfinity, its team members, and other Dfinity insiders were subject to lock-up and vesting restrictions. On May 18, 2021, Williams stated, "For regulatory reasons, the foundation and key early team members were locked up at launch for a week (it's the reverse of what people think)." On June 11, 2021, Williams publicly stated that "the foundation, founders and directors weren't even able to sell initially because of regulatory lockups." These statements were false because, as alleged below, the Foundation began making significant sales of ICP tokens as soon as the ICO launched on May 10, 2021.

56. By concealing the truth from investors, Defendants were able to continue dumping ICP on the market at artificially inflated prices.

**D.      Defendants Sell ICP at Inflated Prices Based on Their Insider Knowledge**

57.      Having pumped up the price of ICP based on false and misleading representations about lock-up and vesting requirements, the truth of which only they knew, Defendants and those they controlled then began dumping massive quantities of ICP tokens on crypto-asset exchanges as soon as trading opened on May 10, 2021.

58.      According to a June 28, 2021 report by Arkham Intelligence (the "Arkham Report"), Dfinity directly transferred approximately 8.3 million ICP tokens (with an aggregate value of approximately $2 billion at the time of transfer) to crypto-asset exchange-based accounts in three sets of transactions:

(a)      on May 10, 2021, Dfinity directly transferred approximately 2 million ICP tokens to Coinbase accounts, and approximately 1.1 million tokens across Huobi, OKEx, and Binance accounts;

(b)      on June 15, 2021, Dfinity directly transferred approximately 4.7 million ICP tokens to Coinbase accounts; and

(c)      between May 11 and June 15, 2021, Dfinity directly transferred nearly 400,000 ICP tokens to accounts on Coinbase, Huobi, OKEx, and Binance.

59.      In addition, according to the Arkham Report, Dfinity transferred approximately 34.1 million ICP tokens to approximately three dozen accounts apparently belonging to Dfinity, its team members or other Dfinity insiders, with approximately three-quarters of these transfers taking place within three hours of Coinbase's listing of ICP on May 10, 2021. Between May 10 and June 26, 2021, 10.7 million ICP tokens (with an aggregate value of approximately $1.6 billion at the time of the transfers) were transferred from those insider accounts to exchange-based accounts.

60.      In addition, Defendants indirectly sold ICP tokens through the Internet Computer Association ("ICA"), which, like Dfinity, is also controlled by Defendant Williams. According to a group of Dfinity employees, around May 3, 2021, Williams, the Foundation's other "council" member Gian Bochsler, and Dfinity's Vice President of Finance Paul Meeusen met as an "emergency committee" to strategize the Foundation's sale of ICP at launch. The sales were

initially managed by Meeusen and Dfinity's Head of Finance, but they were subsequently replaced by, as Boschler informed the employees, a "professional trader." The same day, the Foundation transferred 20 million ICP tokens to the ICA so it could sell them on the Foundation's behalf. Throughout May 2021, ICA-affiliated "neurons," the name given to accounts holding ICP tokens—including Neurons 3005 and 3006—transferred substantial numbers of ICP tokens to crypto-asset exchanges.

61.     Transfers by Dfinity and its insiders to exchange-based accounts—which constituted approximately three-quarters of *all* such ICP transfers in May and June 2021—were apparently made so that Dfinity and its insiders could immediately sell the tokens at these inflated prices. For example, transferring these tokens to Coinbase and other exchanges would have made little sense if the purpose of the transfer was anything other than to facilitate immediate sales (given that ICP holders could earn rewards, including newly minted ICP tokens, by storing their tokens on Dfinity's native blockchain).

### E.     Defendants Repeatedly Mislead Investors About Defendants' Dumping of ICP

62.     While they were dumping ICP on the market in May and June 2021, Defendants publicly misrepresented who was making the sales, apparently to avoid causing an even greater crash of ICP's price.

63.     On May 26, 2021, a Twitter user asked Williams, "What's a source/summary for token allocation, lock-in periods, & other guidelines, including for the foundation's tokens?" Williams responded that night via Twitter: "Foundation didn't vest itself but plans on putting most of its ICP into neurons. It is doing this carefully to make sure foundation+team members don't control the network." This statement—the first time Williams publicly stated that Dfinity's ICP tokens were not subject to lock-up and vesting requirements—gave investors the misleading impression that the Foundation was not selling large numbers of ICP tokens when, in reality and as alleged above, the Foundation was directly and indirectly doing so. Having traded at a high of $185.75 on May 26, 2021, ICP fell to a low of $125.53 on May 27, 2021, the day after Williams's statement.

64.    On June 11, 2021, as ICP was trading between $56 and $72 (down more than 90% from its May 10, 2021 high), Williams made public statements blaming third parties for causing the collapse with their own sales of ICP:

(a)    In a statement on the website Reddit, Williams wrote that "the foundation, founders and directors weren't even able to sell initially because of regulatory lockups. The price drop was largely (it seems) due to people who have very low basis selling to lock in huge gains."

(b)    In another statement on the website Medium, Williams wrote that "the Foundation did NOT sell ICP tokens from its endowment at or soon after Genesis launch." Williams accused "seed" donors of "divesting their ICP tokens," and he further stated that "a significant portion of the irresponsible token divesting stemmed from former employees."

These statements were misleading because, as described above, the vast majority of sales of ICP in the weeks following the May 10, 2021 ICO were made by Dfinity, its team members, and other insiders including the ICA. Moreover, Williams knew these statements were false because he had previously announced that tokens distributed to Dfinity employees and "seed" donors would be subject to lock-up and vesting restrictions significantly limiting the number of ICP tokens those groups could sell for years after the ICO.

65.    By June 22, 2021, it became clear to investors that Defendants and other Dfinity insiders were the ones dumping ICP on the markets. That day, one investor stated that "Dfinity foundation should buy back some of the icp it dumped," and another investor stated that "Dfinity and team sold 90 million tokens since Genesis." By June 22, 2021, ICP traded at between approximately $32 and $40 per token.

66.    Defendants have continued promoting sales of ICP in the years since the May 10, 2021 ICO.

## F.    ICP Tokens Are Securities

67.    On April 3, 2019, the SEC published a "Framework for 'Investment Contract' Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset

1    is an investment contract and whether offers and sales of a digital asset are securities transactions."
2    Among the most significant statements therein is the SEC's description of how to analyze the
3    various facts surrounding ICOs in determining whether a given digital asset, like ICP, is a security.
4    Under application of the Framework, ICP tokens are securities.

5        68.    In the Framework, the SEC cautioned potential issuers: "If you are considering an
6    Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale,
7    or distribution of a digital asset, you need to consider whether the U.S. federal securities laws
8    apply." The SEC explained the basics of the *Howey* test:

> The U.S. Supreme Court's *Howey* case and subsequent case law
> have found that an "investment contract" exists when there is the
> investment of money in a common enterprise with a reasonable
> expectation of profits to be derived from the efforts of others.
> The so-called "*Howey* test" applies to any contract, scheme, or
> transaction, regardless of whether it has any of the characteristics of
> typical securities. The focus of the *Howey* analysis is not only on the
> form and terms of the instrument itself (in this case, the digital asset)
> but also on the circumstances surrounding the digital asset and the
> manner in which it is offered, sold, or resold (which includes
> secondary market sales). Therefore, issuers and other persons and
> entities engaged in the marketing, offer, sale, resale, or distribution
> of any digital asset will need to analyze the relevant transactions to
> determine if the federal securities laws apply.

23   Investors who bought ICP tokens invested money or other valuable consideration, such as Bitcoin
24   and Ether, in a common enterprise—Dfinity. Investors had a reasonable expectation of profit based
25   upon the efforts of Dfinity, including, among other things, Dfinity building a successful network
26   that achieved widespread use.

### a.    ICP Investors Invested Money

69.    Investors in Dfinity made an investment of money or other valuable consideration for purposes of *Howey*. The Framework states: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency, another digital asset, or other type of consideration."

70.    ICP tokens have been listed on many crypto-asset exchanges, and those crypto-asset exchanges permit investors to purchase ICP with Bitcoin and Ether and other digital assets.

### b.    ICP Investors Participated in a Common Enterprise

71.    The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists." This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

72.    The ICP tokens are no different. Investors are passive participants, and the profits of each investor are intertwined with those of both Defendants and of other investors.

73.    Indeed, in a video published by Dfinity on May 13, 2023, in connection with the Genesis Launch Event, Dfinity researcher Lara Schmid stated that "the value of [ICP] tokens is a rough estimate of the [Dfinity] network's success" and that the design of the blockchain's governance system incentivized holders to make decisions "in the long-term interests of the Internet Computer" and to maximize the future value of their ICP tokens.

74.    Moreover, Defendants are responsible for supporting and building ICP, pooled investors' assets, and effectively controlled those assets. Defendants also retained a significant stake in ICP, holding approximately 50% of all tokens, thus sharing in the profits and risk of the venture.

### c.    Investors Purchased the ICP Tokens with a Reasonable Expectation of Profit from Owning Them

75.    As to "reasonable expectation of profits," the SEC Framework states: "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

76.    Investors in the ICP tokens, including Plaintiffs and the other Class members, made their investment with a reasonable expectation of profits.

77.    Alluding to the "AP" (the "Active Participant"), which is the promoter, sponsor, or other third party that "provides essential managerial efforts that affect the success of the enterprise," the Framework identifies a series of factually intense questions underscoring both the time the SEC had spent considering these issues and the challenges a layperson would face in analyzing whether a digital asset constitutes a security.

78.    The Framework lays out a number of characteristics to assess whether the "reasonable expectation of profits" element is met with respect to whether digital assets (such as ICP) thereby satisfy the *Howey* test. These include factors such as whether the asset is tradable on an exchange, whether investors can buy more assets than they would individually need to use the technology, if it is marketed as an investment, and the lack of an existing product with which to use the assets.

79.    The SEC Framework clarifies that investors purchased the ICP tokens with a reasonable expectation of profits. Indeed, Defendants touted the potential for ICP tokens to increase in value, with Williams stating on February 1, 2017, that the tokens may "gain value" and that it will be "useful for the network" if they do. Defendants ensured that ICP tokens were listed on every major crypto-asset exchange and engaged in a multi-month campaign to generate interest in those tokens.

**d.    ICP Investors Expected Profits from ICP to Be Derived from Defendants' Managerial Efforts**

80.    The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant]? Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?" The more of the following characteristics (among others) that are present, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others'":

- An ["Active Participant" or "AP"] is responsible for the development, improvement (or enhancement), operation, or promotion of the network.
- The AP is expected to perform essentials tasks.
- The AP controls the market for the digital asset, such as by limiting supply.
- The AP has a lead role in the development of the network or the character of the digital asset.
- The AP decides who receives digital assets and under what conditions.
- The AP distributes the digital asset to internal team members as compensation.

81.    Shifting its focus to the numerous facts bearing on the nature of the digital asset at issue, the SEC explained still further that the greater the presence of the following factors (among others), the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.
- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.
- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network. For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.
- Prospects for appreciation in the value of the digital asset are limited.
- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.
- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services.

▪ If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

82.    Investors' profits in ICP tokens were to be derived from the managerial efforts of others—specifically, Dfinity and its founders, including Williams, and development teams. ICP token investors rely on the managerial and entrepreneurial efforts of Dfinity and their executive and development teams to manage and develop Dfinity's network, as well as projects funded by Defendants' sales of ICP to the public.

83.    Under the SEC's Framework, ICP tokens satisfy most if not all of the relevant SEC factors as to whether a digital asset is a security. Dfinity created ICP tokens from thin air. Dfinity represented that it would develop an ecosystem (*i.e.*, the overall network of individuals using ICP or participating in the development of its network) that would increase the value of ICP tokens. Plaintiffs and the other Class members reasonably expected Dfinity to provide significant managerial efforts, to develop and improve the ICP ecosystem, to develop and sustain a supportive network, and to secure listings at exchanges through which ICP tokens could be traded or liquidated. And Dfinity represented that it would provide significant managerial efforts to achieve these objectives.

84.    Indeed, Dfinity has acknowledged that their "mission is to build, promote, and maintain [Dfinity's network]." Williams's statements, as well as those made by Dfinity, demonstrate that the price of ICP tokens is dependent on whether Dfinity's network succeeds. In a February 2017 *Medium* post, for example, Williams explained how ICP tokens would become "valueless" if Dfinity's mission failed and how "markets will react very swiftly to punish" the price of ICP if its stakeholders made poor decisions with respect to the development of the network. Dfinity's website similarly states that ICP "[t]okens reflect the value of the [network] and can fluctuate." The price of ICP tokens thus depends on whether Defendants succeed in their "mission" to make their product a success.

85.    In a further demonstration that investors' profits were dependent on Defendants' efforts, Defendants represented that Dfinity would use the proceeds of ICP token sales to help develop Dfinity's network. In *Medium* posts, for example, Williams stated that such tokens could

be "sold to raise funds for salaries and offices, granted to team members to help attract and motivate the world's best talent, for acquisitions of technology and teams, and many other potential purposes." He further stated that such tokens could be used "to fund aggressive operations for years in the mode of an agile Silicon Valley startup (which is the best way to make the Internet Computer a mass market phenomenon)."

**G.   The SEC Has Concluded That Tokens Such As ICP Are Securities**

86.   The SEC has found that several tokens very similar to ICP, issued between 2017 and the present, are securities.

87.   On September 30, 2019, for example, the SEC found that Block.one had violated the Securities Act through its unregistered sale to U.S. investors of its EOS token.

88.   In arriving at its determination that the EOS token is a security, the SEC reached the following conclusions:

- "A number of US investors participated in Block.one's ICO."
- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."
- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."
- "[EOS] Tokens were securities under the federal securities laws"
- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."
- "Block.one violated Sections 5(a)
- and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

1    As a result of the SEC's enforcement action, Block.one consented to a settlement whereby it would

2    pay $24 million to the SEC.

3        89.    In December 2020, the SEC sued Ripple Labs Inc. and its executives for conducting

4    a $1.3 billion unregistered, ongoing digital asset securities offering of its token, "XRP," several

5    years after its offering and after millions of users used it. The SEC alleged that because Ripple held

6    so much XRP itself, XRP holders necessarily depended on the efforts of Ripple to maintain the

7    value of XRP. Ripple itself promoted XRP and touted its ability to create demand for XRP.

8        90.    In January 2022, the SEC sued Australian citizen Craig Sproule and two companies

9    he founded, Crowd Machine, Inc. and Metavine, Inc., for making materially false and misleading

10   statements in connection with an unregistered offer and sale of digital asset securities they called

11   "Crowd Machine Compute Tokens" or "CMCTs." The SEC alleged that the defendants

12   emphasized that the "success of the project" was dependent on the "sales and marketing" efforts

13   of the defendants' management and employees to "establish[] a recognized brand to engender

14   global community participation" and "promote the project and product consumption," which

15   would increase demand for CMCTs. On January 17, 2024, a district court in the Northern District

16   of California issued a final judgment and order of disgorgement against the defendants.

17
18
     **H.    Plaintiffs and the Other Class Members Have Suffered Significant Damages
             from Defendants' Actions**

19       91.    As a direct result of Defendants' misconduct, Plaintiffs and the other Class

20   members—many of whom are retail investors who lack the technical and financial sophistication

21   necessary to have evaluated the risks associated with their investments in the ICP token—have

22   suffered significant damages, in an amount to be proven at trial. The ICP tokens today are worth

23   far less than the price the Class members paid for them. Inasmuch as Plaintiffs and the other Class

24   members still hold ICP tokens, they demand rescission and make any necessary tender of the ICP

25   tokens.

26                              **CLASS ACTION ALLEGATIONS**

27       92.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 and seek

28   certification of the following Class: All persons who purchased ICP tokens from May 10, 2021 to

the present. In addition, Plaintiffs seek certification of a subclass of all persons who purchased ICP tokens from May 10, 2021, to June 22, 2021 (the "Securities Fraud Subclass").

93.     The Class and Securities Fraud Subclass include individuals who purchased ICP tokens in the ICO and individuals who purchased ICP tokens in sales made through online crypto-asset exchanges.

94.     The Class and Securities Fraud Subclass exclude Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. The Class and Securities Fraud Subclass also exclude individuals subject to any enforceable arbitration clause contained in any of the purchase agreements executed in connection with the ICP ICO.

95.     In addition, the Class excludes individuals who, during the Class Period, sold all of their ICP tokens at a price higher than the price at which they purchased them; and the Securities Fraud Subclass excludes individuals who, during the Securities Fraud Subclass Period (*i.e.*, May 10, 2021, to June 22, 2021), sold all their ICP tokens at a price higher than the price at which they purchased them.

96.     Plaintiffs reserve the right to amend the Class and Securities Fraud Subclass definitions if investigation or discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

97.     The Class members are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands. The Securities Fraud Subclass members are so numerous that joinder of all of them is impracticable. The precise number of Securities Fraud Subclass members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands.

98.     The Class and Securities Fraud Subclass members are readily ascertainable and identifiable. Class Securities Fraud Subclass members may be identified by publicly accessible blockchain ledger information and records maintained by Defendants, crypto-asset exchanges, or their agents. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

99.     Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein. Plaintiffs' claims are typical of the claims of the Securities Fraud Subclass members as all Securities Fraud Subclass members are similarly affected by Defendants' wrongful conduct in violation of the laws complained of herein. Plaintiffs do not have any interests that are in conflict with the interests of the Class or Securities Fraud Subclass members.

100.    Plaintiffs and the other Class and Securities Fraud Subclass members sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the ICP token.

101.    Plaintiffs have fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the other Class and Securities Fraud Subclass members, and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to those of the Class or Securities Fraud Subclass member.

102.    Common questions and answers of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including, but not limited to, the following:

- Whether an ICP token is a security under federal law;
- Whether Defendants unlawfully failed to register ICP tokens as a security under federal law;
- Whether Defendants offered or sold ICP tokens to Class members;
- Whether Defendants promoted or solicited the sale of ICP tokens to Class members;
- Whether Defendants engaged in insider trading of ICP tokens, and whether they did so contemporaneously with Plaintiffs' and the other Class members' transactions in ICP tokens;
- Whether the Class members suffered damages as a result of Defendants' conduct in violation of federal law;

- Whether the Class members are entitled to recover the monies they paid for their purchases of ICP; and
- Whether the Class members are entitled to recover from Defendants some or all of their ill-gotten gain as a result of their violation of federal law.

103.    Additional common questions and answers of law and fact exist as to all Securities Fraud Subclass members and predominate over any questions solely affecting individual Securities Fraud Subclass members, including, but not limited to, the following:

- Whether Defendants made false or misleading statements regarding restrictions imposed, or not imposed, on their and their insiders' ICP;
- Whether Defendants made false or misleading statements regarding their sales or other insiders' sales of ICP;
- Whether Defendants made such statements recklessly or knowing that such statements were false or misleading; and
- Whether the Securities Fraud Class members suffered damages as a result of Defendants' conduct in violation of federal law.

104.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class and Securities Fraud Subclass members is impracticable. In addition, as the damages suffered by some of the individual Class and Securities Fraud Subclass members may be relatively small, the expense and burden of individual litigation makes it impossible for Class and Securities Fraud Subclass members to individually redress the wrongs done to them.

105.    There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Sections 5 and 12(a)(1) of the Securities Act**
**(On Behalf of the Class Against Defendants)**

106.    Plaintiffs incorporate the allegations above, but disclaim any allegations of fraud as to the First Cause of Action.

107.    Plaintiffs bring this claim for violations of Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e, 77*l*(a)(1).

108.    Plaintiffs bring this claim on behalf of all Class members who purchased ICP tokens from May 10, 2021 to the present.

109.    Section 5(a) states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." *Id*. § 77e(a).

110.    Section 5(c) makes in unlawful "for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e(c).

111.    When sold and issued, in May 2021, the ICP tokens were securities within the meaning of Section 2(a)(1) of the Securities Act, *id*. § 77b(a)(1), and Dfinity is an issuer of the ICP that Plaintiffs and the other Class members have purchased, *id*. § 77b(a)(4).

112.    Defendants promoted or solicited purchases of ICP tokens by Plaintiffs and other Class members with the motivation to serve Defendants' own financial interest. For example, on May 10, 2021, the same day as the Genesis Launch, Defendants promoted ICP by ensuring it was listed on multiple cryptocurrency exchanges at once, including Coinbase, Binance, Huobi, OKEx, Kucoin, CoinList, CoinEx, FTX, and others. As a direct result of Defendants' promotional efforts, Plaintiff Valenti and other members of the Class purchased ICP that day. Other members of the Class, including Plaintiff Rodriguez purchased ICP on the days immediately following.

113.    Defendants directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

114.    Section 12(a)(1) provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title … shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* § 77*l*(a)(1).

115.    Accordingly, Defendants have violated Sections 5(a) and 5(c) of the Securities Act, *id.* §§ 77e(a), 77e(c), and are liable under Section 12(a)(1), *id.* § 77*l*(a)(1).

116.    Plaintiffs and the other Class members seek to recover the consideration they paid for the ICP tokens with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate.

### SECOND CAUSE OF ACTION
#### Section 15 of the Securities Act
#### (On Behalf of the Class Against Williams)

117.    Plaintiffs incorporate the allegations above, but disclaim any allegations of fraud as to the Second Cause of Action.

118.    Plaintiffs bring this claim under Section 15 of the Securities Act, 15 U.S.C. § 77o.

119.    Plaintiffs bring this claim on behalf of all Class members who purchased ICP tokens from May 10, 2021 to the present.

120.    Section 15(a) states: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable,

1  unless the controlling person had no knowledge of or reasonable ground to believe in the existence

2  of the facts by reason of which the liability of the controlled person is alleged to exist." *Id.* § 77o(a).

3      121.    Williams, by virtue of his offices, stock ownership, agency, agreements or

4  understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein,

5  had the power and authority to direct the management and activities of Dfinity and its employees,

6  and to cause Dfinity to engage in the wrongful conduct complained of herein, in connection with

7  the May 2021 offering of ICP tokens.

8      122.    As the founder and Chief Scientist at the Foundation, and the CEO at Dfinity USA,

9  Williams had and exercised the power and influence to cause the unlawful solicitation of purchases

10  of ICP tokens in connection with the May 2021 offering of ICP tokens, with the power to direct or

11  cause the direction of the management and policies of Dfinity.

12      123.    Williams had sufficient influence to have caused Dfinity to solicit transactions of

13  securities in connection with the May 2021 offering of ICP tokens, and he himself participated in

14  the solicitation of such transactions.

15      124.    By virtue of the conduct alleged herein, Williams is liable for the wrongful conduct

16  complained of herein and are liable to Plaintiffs and the other Class members to recover the

17  consideration they paid for the ICP tokens with interest thereon at the legal rate, or the equivalent

18  in monetary damages plus interest at the legal rate.

19

20

21

**THIRD CAUSE OF ACTION**
**Section 10(b) and Rule 10b-5**
**False and Misleading Statements**
**(On Behalf of the Securities Fraud Subclass Against Defendants)**

22      125.    Plaintiffs incorporate the allegations above.

23      126.    Plaintiffs bring this claim for violations of Section 10(b) of the Exchange Act,

24  15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b).

25      127.    Plaintiffs bring this claim on behalf of all Securities Fraud Subclass members who

26  purchased ICP tokens from May 10, 2021, to June 22, 2021.

27

28

128.     The ICP tokens are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1). Defendants sold ICP tokens to Plaintiffs and the other Securities Fraud Subclass members in connection with the May 2021 offering.

129.     Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange … to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

130.     It can be reasonably inferred that Defendants carried out a plan, scheme, and course of conduct that Dfinity intended to and did deceive the retail investors—Plaintiffs and the other Securities Fraud Subclass members—who acquired ICP tokens in the May 2021 offering and thereby caused them to purchase ICP tokens at artificially inflated prices.

131.     In connection with the May 2021 offering of ICP tokens, Defendants disseminated and approved the false statements described herein, which these Defendants knew or recklessly should have known were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

132.     Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Securities Fraud Subclass members that resulted in artificially high market prices for ICP tokens in connection with the May 2021 offering, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

<u>Misrepresentations and Omissions</u>

133.     Defendants' untrue statements and omissions of material facts in connection with the May 2021 offering of ICP tokens include at least the following:

(a)    On May 10, 2021, speaking for and on behalf of Dfinity, Williams publicly stated: "It is very important that the flow of liquid ICP tokens around the network is released on a schedule for the safety and security of ICP holders, the network, and its users while the underlying technology is being fettled and its ecosystem is being established." This statement indicated that Dfinity viewed it as important that "the flow of liquid ICP tokens around the network" be "released on a schedule," and thus implied that Dfinity and its team's tokens were subject to vesting requirements. In order to make this statement not misleading, in connection with the May 2021 offering, Defendants were obligated to (but did not) disclose that (i) the Foundation was not subject to any vesting schedule, (ii) any applicable vesting periods would nevertheless allow Dfinity insiders (including Dfinity USA and Dfinity's current and former team members) to immediately sell substantial amounts of ICP on crypto-asset exchanges like Coinbase, (iii) Dfinity had in fact transferred ICP to the ICA, for purposes of dumping ICP; and (iv) Dfinity and its insiders intended to deposit tens of millions of these tokens on such exchanges.

(b)    On May 18, 2021, speaking for and on behalf of Dfinity, Williams publicly stated: "For regulatory reasons, the foundation and key early team members were locked up at launch for a week." In order to make this statement not misleading, Defendants were obligated to (but did not) disclose that Dfinity USA and Dfinity insiders (apart from the unidentified "key early team members") were not locked up at launch for a week and were not subject to vesting schedules that precluded them dumping, as can be reasonably inferred they had done, a substantial portion of their ICP tokens on the market over the prior week or that precluded them from continuing to trade in the tokens at such volumes going forward. Defendants were likewise

obligated to disclose (but did not disclose) that they had transferred ICP to the ICA, which sold ICP, for purposes of circumventing regulations.

(c) On May 26, 2021, speaking for and on behalf of Dfinity, Williams publicly stated: "Foundation didn't vest itself but plans on putting most of its ICP into neurons. It is doing this carefully to make sure foundation+team members don't control the network." In addition to confirming that the Foundation had not been subject to any vesting requirements, in order to make this statement not misleading, Defendants were obligated to (but did not) disclose that Williams was referring only to those ICP tokens that the Foundation had retained and that the Foundation had already sold a substantial portion of its tokens into the market for substantial profit, which based on reasonable inferences Defendants had done. Defendants were likewise obligated to (but did not) disclose that they and their insiders did in fact control the vast majority of available ICP. And that they had transferred ICP to the ICA, for purposes of selling that ICP.

(d) On June 11, 2021, speaking for and on behalf of Dfinity, Williams stated: "[T]he Foundation did NOT sell ICP tokens from its endowment at or soon after Genesis launch." In order to make this statement not misleading, Defendants were obligated to (but did not) disclose that, as can be reasonably inferred, (i) Dfinity insiders (including Dfinity USA and current and former Dfinity team members) had sold ICP "at or soon after Genesis launch," (ii) such sales were so large in magnitude that they contributed to the price of ICP collapsing, and (iii) the Foundation had begun selling ICP on exchanges no later than May 24, 2021. Defendants were likewise obligated to (but did not) disclose that they had transferred ICP to the ICA prior to launch, for purposes of selling that ICP on and immediately following the launch date, and that the ICA did in fact sell ICP during that period.

(e)     On June 11, 2021, speaking for and on behalf of Dfinity, Williams stated that "the foundation, founders and directors weren't even able to sell initially because of regulatory lockups." In order to make this statement not misleading, Defendants were obligated to (but did not) disclose that Dfinity insiders (including Dfinity USA and current and former Dfinity team members) were not subject to such regulatory lock-ups and therefore were able to, and as can be reasonably inferred did in fact, sell substantial amounts of ICP during that period. Defendants were likewise obligated to (but did not) disclose that they had transferred ICP to the ICA prior to launch, for purposes of selling that ICP on and immediately following the launch date, and that the ICA did in fact sell ICP during that period, in circumvention of the relevant regulatory lock-ups.

(f)     On June 11, 2021, speaking for and on behalf of Dfinity, in discussing who was responsible for selling ICP, Williams accused "seed" donors of "divesting their ICP tokens." In order to make this statement not misleading, Defendants were obligated to (but did not) disclose that "seed" donors had not been able to access, and were restricted from selling, the vast majority of their ICP tokens and that, as can be reasonably inferred, Dfinity insiders (including Dfinity USA, current Dfinity team members, and the ICA) had in fact sold substantial amounts of ICP over that period.

(g)     On June 11, 2021, speaking for and on behalf of Dfinity, in discussing who was responsible for selling ICP, Williams stated that "a significant portion of the irresponsible token divesting stemmed from former employees." In order to make this statement not misleading, Defendants were obligated to (but did not) disclose that the vast majority of sales of ICP were apparently made by Dfinity, its current team members, and other current Dfinity insiders.

Materiality

134.    The forgoing misrepresentations and omissions were each material. These misrepresentations and omissions related to (i) the extent to which vesting restrictions precluded Dfinity and its insiders, who collectively held approximately 98% of liquid ICP (and 50% of all ICP) as of May 10, 2021, from selling substantial amounts of their ICP on crypto-asset exchanges in the weeks immediately following May 10, 2021, (ii) the extent to which Dfinity and its insiders intended to sell their ICP on crypto-asset exchanges over that same period, and (iii) the extent to which Dfinity and its insiders did in fact sell substantial amounts of their ICP on crypto-asset exchanges over that same period. Information regarding whether approximately 50% of tokenholders could, intended to, and did sell their ICP, as Defendants' own public statements illustrate, are material—and they had a significant impact on the market price of ICP.

135.    If a reasonable investor knew that Dfinity and its insiders collectively could and intended to sell a substantial percentage of the ICP that had been issued on and immediately following May 10, 2021, then that investor would reasonably expect the price of ICP to be significantly lower than if Dfinity and its insiders could not or did not intend to sell their ICP on and immediately following the launch date. Indeed, Defendants' assurances made on Reddit on February 7, 2018, in the face of exactly these concerns, reflect these Defendants' own admission of their materiality. Accordingly, there is a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

136.    Williams has acknowledged that information regarding his own sales of ICP would be material to investors. For example, in a sworn declaration filed in connection with another matter, Williams asserted that he had "substantial pressure to hold and not sell [ICP tokens], since they were granted to incentivize me as a leader to make DFINITY a success, and given the potential impact on outside investor confidence if I were to sell."

Scienter

137.    Defendants acted with scienter in engaging in the forgoing misconduct, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth

herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

138.    Defendants knew before the May 10, 2021 offering that any applicable vesting periods would not preclude Dfinity and its insiders from dumping massive quantities of ICP tokens on the market and Dfinity intended to transfer tens of millions of the newly issued ICP tokens to project insiders, and that as can be reasonably inferred it, along with those insiders, intended to dump tens of millions of these tokens on crypto-asset exchanges, such that Dfinity and its insiders intended to profit massively from the offering, while outside investors would be precluded from doing so.

139.    Indeed, Defendants necessarily knew what restrictions were imposed on their own tokens, as well as the tokens that they issued and allocated to current and former team members, and to outside investors. Defendants likewise knew that they, along with current and former team members, held approximately 50% of all ICP tokens (Williams wrote about the allocation in an April 4, 2018 post on *Medium*), and that if half of those tokens were sold, the price of ICP would likely collapse. This is demonstrated by a February 23, 2021 tweet, where Williams, in discussing a potential vesting restriction on "seed" donors (who collectively held approximately 25% of all ICP tokens): "A price collapse would be bad for security." It was thus highly unreasonable for Defendants to conceal information relating to vesting restrictions imposed on their and their insiders' tokens.

140.    Defendants' failure to disclose such information, coupled with their imposition of vesting restrictions on outside investors but not on themselves, demonstrates that these Defendants intended that they and their insiders would sell substantial amounts of ICP at significant profits on and during the weeks that followed May 10, 2021. Defendants executed on that plan, too, by (along with current and former team members) selling tens of millions of ICP tokens on the market during that period.

141.    It can be reasonably inferred that Defendants knew that they had sold ICP on the market on and in the weeks that followed May 10, 2021. It can likewise be reasonably inferred that they knew that their current and former team members sold ICP: in addition to stating that such

1  individuals had sold ICP tokens, Defendants know which tokens they allocated to team members

2  and can therefore track the transaction history of those tokens on the blockchain.

3     142.    It can reasonably be inferred that Williams was aware of the foregoing facts,

4  including that (i) Defendants and their insiders were not subject to vesting restrictions that would

5  preclude them from dumping ICP, (ii) Defendants had transferred ICP to the ICA for purposes of

6  selling that ICP in circumvention of regulatory restrictions, and (iii) Defendants did in fact dump

7  ICP on and in the days following May 10, 2021. That Williams had knowledge of such matters is

8  demonstrated by direct evidence— including that Williams himself authorized the transfer of ICP

9  to the ICA, that Williams ran the ICA, and that Williams admitted that he sold ICP—as well as by

10  the fact that Williams, as the founder and Chief Scientist at the Foundation and CEO of Dfinity

11  USA, would necessarily have knowledge of facts concerning Dfinity's core operations, such as

12  Dfinity's decisions regarding the issuance and sale of billions of dollars in ICP, as well as any

13  lock-up or vesting restrictions applicable to ICP tokens. At the very least, it is reasonable to infer

14  that Williams knew what lock-up and vesting restrictions, if any, applied to his own ICP tokens.

15     143.    Defendants had the motive not to disclose these facts because such disclosure

16  would have been self-defeating—it would have massively lowered the offering price of the ICP

17  tokens and thus effectively precluded Dfinity and its insiders from generating the profit they

18  apparently made. Defendants had the opportunity thus to generate ill-gotten gains because they

19  controlled the distribution of the ICP tokens to themselves and their insiders and the extent to

20  which any restrictions would be placed on such tokens.

21     144.    Defendants likewise had the motive not to disclose these facts *after* May 10, 2021,

22  because they still held significant amounts of ICP. If Dfinity and its insiders sold 100 million ICP,

23  for example, they would still have had over 100 million ICP remaining. These Defendants therefore

24  had an incentive to ensure that the price of ICP remained artificially inflated.

25

26

27

28

1      <u>Reliance, Economic Loss, and Loss Causation</u>

2      145.    As a result of the publication and dissemination of the materially false and

3  misleading information and failure to disclose material facts, as set forth above, the price of the

4  ICP tokens upon issuance in May 2021, and for a period of time thereafter, was artificially inflated.

5      146.    In ignorance of the fact that the price of ICP tokens was artificially inflated,

6  and relying directly or indirectly on the false, misleading, and materially incomplete statements

7  that  Defendants made and approved, or upon the integrity of the market in which the ICP tokens

8  were sold, or on the absence of material adverse information that these Defendants knew or

9  recklessly should have known of but failed to disclose in public statement, Plaintiffs and the other

10 Securities Fraud Subclass members acquired ICP tokens at artificially high prices and were

11 damaged thereby.

12     147.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and

13 the other Securities Fraud Subclass members suffered damages in connection with the respective

14 purchases of ICP tokens and are entitled to an award compensating them for such damages.

15     148.    Indeed, the price of ICP dropped significantly as Defendants disclosed, and the

16 market discovered, that Defendants' and Dfinity insiders' ICP tokens were not locked up in vesting

17 schedules, as had been previously understood. For example:

18          (a)     The price of ICP dropped by 16% when Williams disclosed, on May 18,

19                  2021, that "*for regulatory reasons*, the foundation and key early team

20                  members were locked up at launch for a week."

21          (b)     The price of ICP dropped by an additional 9% when Williams disclosed, on

22                  May 26, 2021, that "Foundation didn't vest itself."

23          (c)     The price of ICP dropped by an additional 12% when Williams disclosed, on

24                  June 11, 2021, that "former employees" had been able to sell a significant

25                  amount of ICP tokens.

26          (d)     The price of ICP dropped by an additional 40% between June 11 and June

27                  22, 2021, by which point investors had realized that Dfinity and its team

28

1    had sold a significant amount of ICP on the market since May 10, 2021, as

2    demonstrated by discussions on Reddit from June 11 to June 22.

3    149.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and

4    the other Securities Fraud Subclass members have suffered damages in connection with their

5    purchase or acquisition of ICP during the Securities Fraud Subclass Period.

6    150.    In addition, as a direct and proximate result of Defendants' wrongful conduct, it can

7    be reasonably inferred that Dfinity has generated and retained ill-gotten in connection with the

8    May 2021 offering of ICP tokens, such that Plaintiffs and the other Securities Fraud Subclass

9    members are entitled to the disgorgement of Dfinity's ill-gotten gain from such misconduct.

10
11
12

**FOURTH CAUSE OF ACTION**
**Section 20(a) of the Exchange Act**
**For Violation of Section 10(b) and Rule 10b-5**
**(On Behalf of the Securities Fraud Subclass Against Williams)**

13    151.    Plaintiffs incorporate the allegations above.

14    152.    Plaintiffs bring this claim against Defendant Williams for violations of Section

15    20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

16    153.    Plaintiffs bring this claim on behalf of all Securities Fraud Subclass members who

17    purchased ICP tokens from May 10, 2021, to June 22, 2021.

18    154.    Section 20(a) states in relevant part: "Every person who, directly or indirectly,

19    controls any person liable under any provision of this chapter or of any rule or regulation thereunder

20    shall also be liable jointly and severally with and to the same extent as such controlled person to

21    any person to whom such controlled person is liable … unless the controlling person acted in good

22    faith and did not directly or indirectly induce the act or acts constituting the violation or cause of

23    action." *Id*.

24    155.    Williams, by virtue of his offices, stock ownership, agency, agreements or

25    understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein,

26    in connection with the May 2021 offering of ICP tokens, had the power and authority to direct the

27    management and activities of Dfinity and its employees, and to cause Dfinity to engage in the

28    wrongful conduct complained of herein.

156.     Williams was provided with or had unlimited access to the information underlying his and Dfinity's public statements in connection with the May 2021 offering and had the ability to prevent the issuance of those statements and to disclose the information necessary to make statements not misleading under the circumstances in which they were made.

157.     As a direct and proximate result of Williams's wrongful conduct, Plaintiffs and the other Securities Fraud Subclass members suffered damages in connection with the respective purchases of ICP tokens and are entitled to an award compensating them for such damages.

**FIFTH CAUSE OF ACTION**
**Section 20A of the Exchange Act**
**(On Behalf of the Class Against Defendants)**

158.     Plaintiffs incorporate the allegations above.

159.     Plaintiffs bring this claim under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, against Defendants on behalf of Class members who transacted in ICP tokens contemporaneously with Defendants' transactions in ICP tokens.

160.     Plaintiffs bring this claim on behalf of all Class members who purchased ICP tokens from May 10, 2021 to the present.

161.     Since May 10, 2021, Defendants have been in possession of material, non-public information about Dfinity and its insiders, as set forth above with respect to these Defendants' violation of Section 10(b) and Rule 10b-5, while these Defendants have been transacting in ICP tokens. Defendants have thus engaged in insider trading through which they have received at least hundreds of millions of dollars in profits.

162.     The material, non-public information about Dfinity and its insiders that Defendants have failed to disclose, during some or all of the time in which they have been transacting in ICP tokens since May 10, 2021, includes the details of any applicable lock-up and vesting schedules for Dfinity and Dfinity insiders; that the Foundation was not subject to any vesting schedule; that any applicable vesting periods would allow Dfinity and Dfinity insiders (including current and former team members) to transfer tens of millions of the newly issued ICP tokens to crypto-asset exchanges; that Dfinity and its insiders intended to deposit tens of millions of these tokens on crypto-asset exchanges; that Dfinity transferred ICP to the ICA for the apparent purpose of

having the ICA sell that ICP at and immediately following launch; that Dfinity and its insiders apparently intended to profit massively from the offering; that Dfinity and its insiders controlled substantially all of the ICP that was tradeable as of the date of the launch; that Dfinity had entered into nonpublic agreements to purchase ICP from its employees pursuant to the "Cash-in-Lieu-of-Tokens Program"; that Dfinity and its insiders reserved the right to liquidate their tokens far more than necessary to pay expenses; and that Dfinity and its insiders apparently dumped massive amounts of ICP tokens on the market beginning on May 10, 2021.

163.    Defendants had a duty to disclose such information because disclosure was necessary to make their previous statements not materially misleading. These Defendants further had a duty to disclose because, like a corporation and its officers, they owed Plaintiffs and others who purchased ICP tokens a fiduciary duty. Indeed, just like a share in a corporation's stock, ICP tokens entitled holders to vote on decisions relating to the network and fluctuate in value based on the network's success.

164.    Defendants' sales of ICP tokens while in possession of such material non-public information violated the Exchange Act and the applicable rules and regulations thereunder precluding such insider trading.

165.    Plaintiffs and the other Class members, all of whom have purchased their ICP tokens since May 10, 2021, have made those purchases contemporaneously with Defendants' transactions in ICP tokens since that time, such that all of these purchases and transactions have occurred contemporaneously with these Defendants' transactions in ICP tokens during the time period in which they have been in possession of material, non-public information.

166.    Defendants are required to account for all of their sales of ICP tokens and to disgorge their profits and ill-gotten gains as a result of their trading of ICP tokens contemporaneously with Plaintiffs' and the other Class members' trading in those tokens.

**SIXTH CAUSE OF ACTION**
**Section 20(a) of the Exchange Act**
**For Violation of Section 20A of the Exchange Act**
**(On Behalf of the Class Against Williams)**

167.    Plaintiffs incorporate the allegations above.

168.    Plaintiffs bring this claim against Defendant Williams for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

169.    Plaintiffs bring this claim on behalf of all Class members who purchased ICP tokens from May 10, 2021 to the present.

170.    Section 20(a) states in relevant part: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable … unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *Id*.

171.    Williams, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, in connection with the May 2021 offering of ICP tokens, had the power and authority to direct the management and activities of Dfinity and its employees, and to cause Dfinity to engage in the wrongful conduct complained of herein.

172.    As the founder and Chief Scientist at the Foundation, and the CEO of Dfinity USA, Williams had and exercised the power and influence to cause the insider trading of ICP tokens after the May 2021 offering of ICP tokens, with the power to direct or cause the direction of the management and policies of Dfinity. In addition, Williams was indisputably aware of such trading, as demonstrated by his *Medium*, *Reddit*, and *Twitter* posts described above.

173.    Williams had sufficient influence to have caused Dfinity to trade the ICP tokens after the May 2021 offering of ICO tokens, and, on information and belief, he himself participated in Dfinity's trading.

174.    As a direct and proximate result of Williams's wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their contemporaneous purchase and sale of ICP tokens and are entitled to an award compensating them for such damages.

## **PRAYER FOR RELIEF**

On behalf of themselves and the Class and Securities Fraud Subclass, Plaintiffs request relief as follows:

(a)    That the Court enter orders determining that this action may be maintained as a class action, that Plaintiffs be named as Class Representative of the Class and Securities Fraud Subclass, that the undersigned be named as Lead Class Counsel of the Class and Securities Fraud Subclass, and that notice of this action be given to Class and Securities Fraud Subclass members;

(b)    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal laws set forth above;

(c)    That the Court award Plaintiffs and the other Class and Securities Fraud Subclass members damages and/or rescissory damages in an amount to be determined at trial;

(d)    That the Court award Plaintiffs and the other Class members who traded contemporaneously with Defendants' insider trading these Defendants' ill-gotten gains from such trading;

(e)    That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiffs and the other Class and Securities Fraud Subclass members are entitled;

(f)    That the Court award Plaintiffs and the other Class and Securities Fraud Subclass members pre- and post- judgment interest (including pursuant to applicable statutory rates of interest);

(g)    That the Court award Plaintiffs and the other Class and Securities Fraud Subclass members their reasonable attorneys' fees and costs of suit; and

(h)    That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

**JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury for all claims.


Dated:    January 29, 2024                    Respectfully submitted,

                                             SELENDY GAY ELSBERG PLLC

                                             */s/  Jordan Goldstein*

                                             Jordan Goldstein (*pro hac vice*)
                                             Oscar Shine (*pro hac vice*)
                                             1290 Avenue of the Americas
                                             New York, NY 10104
                                             Tel: 212-390-9000
                                             Fax: 212-390-9399
                                             jgoldstein@selendygay.com
                                             oshine@selendygay.com

                                             ERICKSON KRAMER OSBORNE LLP
                                             Elizabeth A. Kramer (SBN 293129)
                                             Kevin M. Osborne (SBN 261367)
                                             44 Tehama St.
                                             San Francisco, CA 94105
                                             Tel: 415-635-0631
                                             Fax: 415-599-8088
                                             elizabeth@eko.law
                                             kevin@eko.law

                                             *Attorneys for Lead Plaintiff Henry Rodriguez,*
                                             *Plaintiff Daniel Valenti, and the Proposed Class*

1

## **E-FILING ATTESTATION**

2

I, Elizabeth A. Kramer, am the ECF User whose ID and password are being used to file

3

this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the

4

signatories identified above has concurred in this filing.

5

6
                                        */s/ Elizabeth A. Kramer*
                                        Elizabeth A. Kramer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## EXHIBIT A

*Valenti, et al. v. Dfinity USA Research LLC, et al.*, No. 21-cv-6118-JD (N.D. Cal.)

Chart of securities fraud allegations in Plaintiffs' Second Amended Class Action Complaint ("SAC"). *See* Order, ECF No. 136 (Dec. 15, 2023).

| Stmt. No. | SAC ¶¶ | Speaker, Date & Medium | False & Misleading Statement or Omission | Reasons Why False & Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|---|
| 1 | 64(b), 133(d) | Speaker: Dominic Williams ("Williams"), on behalf of Dfinity Foundation (the "Foundation") and Dfinity USA Research LLC ("Dfinity USA," together with the Foundation, "Dfinity")<br><br>Date: June 11, 2021<br><br>Medium: article posted on medium.com | "[T]he Foundation did NOT sell ICP tokens from its endowment at or soon after Genesis launch." | On May 10, 2021, Dfinity directly transferred approximately 2 million ICP tokens to Coinbase accounts, and approximately 1.1 million tokens across Huobi, OKEx, and Binance accounts. Between May 11 and June 14, 2021, Dfinity directly transferred nearly 400,000 ICP tokens to accounts on Coinbase, Huobi, OKEx, and Binance. SAC ¶ 58(a), (c).<br><br>Dfinity transferred approximately 34.1 million ICP tokens to approximately three dozen accounts apparently belonging to Dfinity, its team members or other Dfinity insiders, with approximately three-quarters of these transfers taking place within three hours of Coinbase's listing of ICP on May 10, 2021. Between May 10 and June 26, 2021, 10.7 million ICP tokens (with an aggregate value of approximately $1.6 billion at the time of the transfers) were transferred from those insider accounts to exchange-based accounts. SAC ¶ 59<br><br>Defendants indirectly sold ICP tokens through the Internet Computer Association ("ICA"), which, like Dfinity, is also controlled by Defendant Williams. According to a group of Dfinity employees, around May 3, 2021, Williams, the Foundation's other "council" member Gian Bochsler, and Dfinity's Vice President of Finance Paul Meeusen met as an "emergency committee" to strategize the Foundation's sale of ICP at launch. The sales were initially managed by | As the founder and Chief Scientist of the Foundation and CEO of Dfinity USA, Williams necessarily had knowledge of Dfinity's decisions regarding the issuance and sale of billions of dollars in ICP, as well as any lock-up or vesting restrictions applicable to ICP tokens. At the very least, it is reasonable to infer that Williams know what lock-up and vesting restrictions, if any, applied to his own ICP tokens. SAC ¶ 142.<br><br>From 2017 through May 10, 2021, Williams repeatedly described the lockup and vesting restrictions on ICP tokens distributed to different groups of holders, SAC ¶¶ 33–38, 53, demonstrating his and Dfinity's knowledge about how ICP tokens were actually distributed. |
| 2 | 55, 64(a), 133(e) | Speaker: Williams, on behalf of Dfinity<br><br>Date: June 11, 2021<br><br>Medium: post on reddit.com | "[T]he foundation, founders and directors weren't even able to sell initially because of regulatory lockups." | | |
| 3 | 55, 133(b), 148(a) | Speaker: Williams, on behalf of Dfinity<br><br>Date: May 18, 2021 | "For regulatory reasons, the foundation and key early team members were locked up at launch for a week (it's the | | |

| Stmt. No. | SAC ¶¶ | Speaker, Date & Medium | False & Misleading Statement or Omission | Reasons Why False & Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|---|
| | | Medium: post on Twitter (now known as X) | reverse of what people think)." | Meeusen and Dfinity's Head of Finance, but they were subsequently replaced by, as Boschler informed the employees, a "professional trader." The same day, the Foundation transferred 20 million ICP tokens to the ICA | Williams publicly stated that ICP tokens issued to Dfinity "founders and personnel" would be subject to "vesting incentive packages where tokens are released slowly over |
| 4 | 64(b), 133(g) | Speaker: Williams, on behalf of Dfinity<br><br>Date: June 11, 2021<br><br>Medium: article posted on medium.com | "[A] significant portion of the irresponsible token divesting stemmed from former employees." | so it could sell them on the Foundation's behalf. Throughout May 2021, ICA-affiliated "neurons," the name given to accounts holding ICP tokens—including Neurons 3005 and 3006—transferred substantial numbers of ICP tokens to crypto-asset exchanges. SAC ¶ 60.<br><br>Transfers by Dfinity and its insiders to exchange-based accounts—which constituted approximately three-quarters of *all* such ICP transfers in May and June 2021—were apparently made so that Dfinity and its insiders could immediately sell the tokens at these inflated prices. For example, transferring these tokens to Coinbase and other exchanges would have made little sense if the purpose of the transfer was anything other than to facilitate immediate sales (given that ICP holders could earn rewards, including newly minted ICP tokens, by storing their tokens on Dfinity's native blockchain). SAC ¶ 61. | years," SAC ¶ 34, and he insisted that he would voluntarily subject himself to an eight-year lockup period, SAC ¶ 37, 52, but never disclosed that the Dfinity and its insiders would in fact be free to sell ICP immediately following Genesis Launch on May 10, 2021.<br><br>Having previously stated that Dfinity was "not a traditional cryptocurrency pump and dump," SAC ¶ 38, Williams and Dfinity had an incentive to conceal their direct and indirect dumping of ICP tokens on the |
| 5 | 64(b), 133(f) | Speaker: Williams, on behalf of Dfinity<br><br>Date: June 11, 2021<br><br>Medium: article posted on medium.com | In discussing who was responsible for selling ICP, Williams accused "seed" donors of "divesting their ICP tokens." | "Seed" donors could not have sold substantial numbers of ICP tokens in the weeks following the May 10, 2021 ICO because their tokens were subject to lock-up restrictions. SAC ¶ 53.<br><br>As described above in connection with Statement Nos. 1-4, the vast majority of sales of ICP in the weeks following the May 10, 2021 ICO were made by Dfinity, its team members, and other insiders including the ICA. | market on and after May 10, 2021.<br><br>Because the value of ICP tokens reflected the success of Dfinity's network, SAC ¶¶ 47, 73, disclosing massive sales by the network's key players likely would have caused ICP's price to plummet even faster |
| 6 | 63, 133(c) | Speaker: Williams, on behalf of Dfinity<br><br>Date: May 26, 2021 | In response to a Twitter user asking for a summary of token allocation and lock-up periods, Williams stated: "Foundation didn't vest itself | This statement gave investors the misleading impression that the Foundation was not selling large numbers of ICP tokens when, in reality and as described above in connection with Statement Nos. 1-4, the Foundation was directly and indirectly doing so. | than it did. Lower prices would have meant lower profits from |

| Stmt. No. | SAC ¶¶ | Speaker, Date & Medium | False & Misleading Statement or Omission | Reasons Why False & Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|---|
| | | <u>Medium</u>: Twitter (now known as X) | but plans on putting most of its ICP into neurons. It is doing this carefully to make sure foundation+team members don't control the network." | | Defendants' sales of ICP and lower values for the remaining ICP tokens in Defendants' portfolios. |
| 7 | 53, 133(a) | <u>Speaker</u>: Williams, on behalf of Dfinity<br><br><u>Date</u>: May 10, 2021<br><br><u>Medium</u>: article posted on medium.com | "It is very important that the flow of liquid ICP tokens around the network is released on a schedule for the safety and security of ICP holders, the network, and its users while the underlying technology is being fettled and its ecosystem is being established." | This statement gave investors the misleading impression that Dfinity's and its insiders' ICP tokens were subject to lock-up and vesting requirements. In order to make this statement not misleading, in connection with the May 2021 offering, Defendants were obligated to (but did not) disclose that (i) the Foundation was not subject to any vesting schedule (not disclosed until May 26, 2021); (ii) any applicable vesting periods would nevertheless allow Dfinity insiders (including Dfinity USA and Dfinity's current and former team members) to immediately sell substantial amounts of ICP on crypto-asset exchanges like Coinbase; (iii) Dfinity had in fact transferred ICP to the ICA, for purposes of dumping ICP; and (iv) Dfinity and its insiders intended to deposit tens of millions of these tokens on such exchanges. | |