1 CRAVATH, SWAINE & MOORE LLP
Gary A. Bornstein (*pro hac vice*)
2 gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
3 yeven@cravath.com
825 Eighth Avenue
4 New York, New York 10019-7475
Telephone: (212) 474-1000
5 Facsimile: (212) 474-3700

6 MORGAN, LEWIS & BOCKIUS LLP
Richard S. Taffet (*pro hac vice*)
7 richard.taffet@morganlewis.com
101 Park Avenue
8 New York, NY 10178-0060
Telephone: (212) 309-6000
9 Facsimile: (212) 309-6001

MORGAN, LEWIS & BOCKIUS LLP
Willard K. Tom (*pro hac vice*)
willard.tom@morganlewis.com
1111 Pennsylvania Avenue NW
Washington, DC 20004-2541
Telephone: (202) 739-3000
Facsimile: (202) 739 3001

MORGAN, LEWIS & BOCKIUS LLP
Donn P. Pickett (SBN 72257)
donn.pickett@morganlewis.com
Geoffrey T. Holtz (SBN 191370)
geoffrey.holtz@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1126
Telephone: (415) 442-1000
Facsimile: (415) 442-1001

10 Attorneys for Defendant
QUALCOMM INCORPORATED

11

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14

15

16

17 FEDERAL TRADE COMMISSION,

18            Plaintiff,

19     vs.

20

21 QUALCOMM INCORPORATED, a Delaware

22 corporation,

23

24            Defendant.

Case No. 5:17-cv-00220-LHK

**DEFENDANT QUALCOMM
INCORPORATED'S MOTION TO
DISMISS AND MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT, FILED PER COURT ORDER**

Date:        June 15, 2017
Time:        1:30 p.m.
Courtroom:   8, 4th Floor
Judge:       Hon. Lucy H. Koh

25

26

27

28

**NOTICE OF MOTION AND MOTION**

TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 15, 2017, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 8, United States Courthouse, 280 South 1st Street, San Jose, California 95113, Defendant Qualcomm Incorporated will and hereby does move the Court for an order dismissing Plaintiff Federal Trade Commission's ("FTC") Complaint for Equitable Relief (ECF No. 1; the "Complaint").

This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) and is based on the following ground: the Complaint fails to state a claim for relief under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

This motion is based on this Notice of Motion and the Memorandum of Points and Authorities in Support filed concurrently herewith, the pleadings and documents on file in this case, and other such argument as may be presented by counsel at the hearing on this motion.

**ISSUE TO BE DECIDED**

Whether the Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) because, even if the allegations in the Complaint are taken as true, it fails to state a claim under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

Preliminary Statement ....................................................................................................... 1

Factual Background ........................................................................................................... 4

Legal Standard .................................................................................................................. 6

Argument ........................................................................................................................... 7

I.     THE FTC FAILS TO STATE A CLAIM OF UNLAWFUL
       MONOPOLIZATION. ............................................................................................. 7

       A.     The FTC's "Tax" Theory Does Not State a Claim of Unlawful
              Monopolization. ........................................................................................... 8

              1.     Qualcomm's Practice of Not Selling Chips to Infringers Does Not
                     Exclude Competing Chip Suppliers. ................................................... 8

                     a.     The FTC has not pled facts showing that Qualcomm's
                            licensing terms are "elevated". .............................................. 9

                     b.     The FTC has not pled facts supporting a claim that
                            Qualcomm's royalties have foreclosed other modem chip
                            suppliers. ............................................................................... 11

              2.     Qualcomm's strategic funds and other similar incentive payments
                     do not exclude competing chip suppliers. ......................................... 13

              3.     Qualcomm's practice of licensing its patents only at the handset
                     level is not exclusionary. .................................................................. 14

       B.     The FTC's "Exclusive Dealing" Theory Does Not State a Claim of
              Unlawful Monopolization. .......................................................................... 17

II.    THE FTC FAILS TO STATE A CLAIM OF UNREASONABLE RESTRAINT
       OF TRADE. ........................................................................................................... 21

III.   THE FTC FAILS TO STATE A CLAIM OF "UNFAIR METHODS OF
       COMPETITION" UNDER SECTION 5(a) OF THE FTC ACT. ...................... 22

Conclusion ...................................................................................................................... 25

1

2

3

4

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*, No. 08-01035, 2008
    WL 4830740 (N.D. Cal. Nov. 6, 2008) ..................................................................................18

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991
    (9th Cir. 2010) .................................................................................................. passim

*Apple Inc. v. Samsung Elecs. Co.*, 920 F. Supp. 2d 1116 (N.D. Cal. 2013) ...................................15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................4, 6, 7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..............................................................4, 6, 7, 10

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ...................2, 13

*Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2007) ...........................................14

*E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128 (2d Cir. 1984) .....................................23, 24

*Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d 827 (N.D. Cal. 2015) ..................................19

*Emrich v. Touche Ross & Co.*, 846 F.2d 1190 (9th Cir. 1988) ........................................................7

*Feitelson v. Google Inc.*, 80 F.Supp. 3d 1019 (N.D. Cal. 2015) .........................................14, 19, 22

*In re Beltone Elecs. Corp.*, 100 F.T.C. 68 (1982) ........................................................................19

*In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322 (Fed. Cir. 2000) ....................................15

*JM Computer Servs., Inc. v. Schlumberger Technologier, Inc.*, No. C 95-20349
    JW, 1996 WL 241607 (N.D. Cal. May 3, 1996) .....................................................................22

*John Doe 1 v. Abbott Labs.*, 571 F.3d 930 (9th Cir. 2009) ............................................................13

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160 (4th Cir. 2014) .....................19

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ......................................21

*Matter of Gen. Foods Corp.*, 103 F.T.C. 204 (1984) ...............................................................23, 24

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d
    1124 (9th Cir. 2015) ..................................................................................................7, 21

*Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997) ...........................................18

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

Motion to Dismiss—Case No. 5:17-CV-00220-LHK

*Pacific Bell Telephone Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009)......................... passim

*Phillips v. Bureau of Prisons*, 591 F.2d 966 (D.C. Cir. 1979) ..........................................7

*Rambus v. FTC*, 522 F.3d 456 (D.C. Cir. 2008) ..............................................3, 11, 15

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-CV-05847-WHO,
    2013 WL 5694452 (N.D. Cal. Oct. 18, 2013) ...........................................................19

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-CV-05847-WHO,
    2014 WL 524076 (N.D. Cal. Feb. 6, 2014)..........................................................14, 20

*Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215 (8th Cir. 1987) ..................................18

*Somers v. Apple*, 729 F.3d 953 (9th Cir. 2013) ....................................................6, 10, 16

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)..................................19, 20

*United States v. Colgate & Co.*, 250 U.S. 300 (1919) ................................................15

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ..............................................7

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ................................7

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398
    (2004) ............................................................................................................... passim

**Statutes & Rules**

15 U.S.C. § 1 ...................................................................................................21

15 U.S.C. § 2 ....................................................................................................7

15 U.S.C. § 45 ...............................................................................................7, 22

**Other Authorities**

2 Areeda & Hovenkamp, Antitrust Law (3d ed. 2007)....................................22

3 Areeda & Hovenkamp, Antitrust Law (2d ed. Supp. 2006)........................14

1 ABA Section of Antitrust Law, Antitrust Law Developments (6th ed. 2007)............................7

Federal Trade Commission, Statement of Enforcement Principles Regarding
    "Unfair Methods of Competition" Under Section 5 of the Federal Trade
    Commission Act, 80 Fed. Reg. 57056-01 (Sept. 21, 2015) ......................................23

**Preliminary Statement**

After investigating Qualcomm for over two years, reviewing millions of documents and taking testimony from Qualcomm and third parties, the FTC filed a Complaint that does not plead facts supporting the basic elements of an antitrust claim and does not allege a plausible antitrust theory.  Most strikingly, the Complaint does not contain any factual allegations of anticompetitive harm to Qualcomm's rivals in the supply of modem chips.  Moreover, the Complaint's theories of harm to competition are foreclosed by governing law and are implausible on their face.  Each of these fundamental flaws is independently sufficient to warrant dismissal.

The FTC asserts two theories under which Qualcomm's conduct allegedly harms competition: (1) a "tax" theory; and (2) an exclusive dealing theory.  The FTC's "tax" theory is predicated primarily on Qualcomm's unwillingness to sell its modem chips to firms that infringe its patents.  The FTC contends that this practice allows Qualcomm to use its purportedly "dominant position" in the sale of certain types of modem chips to force its customers (cellular handset makers) to pay allegedly "elevated" royalties for the use of Qualcomm's patented technologies.  Although the FTC concedes that the same royalties are payable on *all* handsets, regardless of whether the handset uses a modem chip from Qualcomm or from a competitor, the FTC contends that the "elevated" royalties are a so-called "tax" specifically and only on the purchase of modem chips from Qualcomm's rivals.  The alleged effects of this purported "tax" are to diminish demand for competitors' chips and reduce competitors' margins.[1]  But the chip-neutral nature of Qualcomm's royalties—the fact that the royalties do not change based on the source of the modem chip—means that they do not and cannot create any incentive or disincentive for the handset maker to purchase any particular firm's modem chip.  From a customer's perspective, the playing field between Qualcomm and its rivals is level for each modem chip sale.  Whether the royalties are "elevated" or not, customers face no discriminatory penalty (or "tax") for the purchase of competitors' modem chips.

The absence of any allegation of a discriminatory penalty on the purchase of rivals' chips

---

[1] Federal Trade Commission's Complaint for Equitable Relief, ECF No. 1 (the "Complaint") ¶¶ 87-95.  Citations in the form of ¶ __ refer to the Complaint.

1    means that the FTC's so-called "tax" theory boils down to a claim that Qualcomm charges "too

2    much" for royalties and "too little" for chips, thereby "squeezing" the margin that Qualcomm's

3    chip-making rivals can make on their own chip sales.  This is a "price squeeze" claim of the type

4    squarely rejected by the Supreme Court in *Pacific Bell Telephone Co. v. linkLine*

5    *Communications, Inc.*, 555 U.S. 438 (2009).  As the Court made clear in *linkLine*, a vertically

6    integrated firm such as Qualcomm has no independent duty under the Sherman Act to ensure that

7    the price it charges for upstream inputs (here, royalties) is low enough, and the price it charges for

8    downstream products (here, modem chips) is high enough, so as to leave a "fair" or "adequate"

9    profit margin for its downstream competitors (here, other chip suppliers).  A plaintiff complaining

10   of squeezed margins must identify some other recognized violation of the antitrust laws, such as

11   predatory pricing or the breach of an antitrust duty to deal with competitors.  The FTC does not

12   attempt to plead either type of violation, let alone plead facts sufficient to meet the high bars set

13   for such claims by the Supreme Court in *Brooke Group Ltd. v. Brown & Williamson Tobacco*

14   *Corp.*, 509 U.S. 209 (1993) (predatory pricing) and *Verizon Communications Inc. v. Law Offices*

15   *of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) (duty to deal).  Re-labeling a squeeze claim as a

16   "tax" cannot transform it into a viable basis for antitrust liability.  *linkLine*, 555 U.S. at 457.

17        The Complaint therefore fails to allege plausibly that Qualcomm's royalties cause any

18   exclusion of rival suppliers.  Indeed, the Complaint does not allege a single instance in which a

19   competing chip supplier failed to make a sale, changed its pricing, or suffered any other

20   consequence because of Qualcomm's patent royalties.  Rather than point to such facts, the FTC's

21   challenge to Qualcomm's practice of not selling to infringers rests entirely on its speculative

22   "tax" theory of harm; and the theory itself is foreclosed by black-letter law.

23        In an attempt to support its so-called "tax" theory, the FTC points to two additional

24   business practices.  Neither supports a claim of anticompetitive harm:

25   •   The Complaint alleges that Qualcomm makes incentive payments to certain customers

26        to maintain higher royalties that "exacerbate" the effect of the so-called "tax".[2]  But

27

28   _____

[2] ¶¶ 102-06.

1    the Complaint does not allege that these payments result in predatory pricing or have

2    conditions that substantially foreclose competitors from making sales.  Indeed, the

3    Complaint does not allege that these incentive payments are anything other than

4    unconditional above-cost discounts, which as a matter of law are procompetitive, not

5    exclusionary.

6    •    The Complaint also alleges that Qualcomm's practice of licensing the manufacture

7    and sale of handsets, rather than the manufacture and sale of handset components such

8    as modem chips, violates Qualcomm's commitments to cellular standard-setting

9    organizations ("SSOs") that Qualcomm would license its standard-essential patents on

10    fair, reasonable, and non-discriminatory ("FRAND") terms.  But even if licensing only

11    at the handset level were a FRAND violation (which it is not), a FRAND violation is

12    not itself an antitrust violation.  *See Rambus v. FTC*, 522 F.3d 456, 463-64 (D.C. Cir.

13    2008).  As the court held in *Rambus*, the challenged conduct must still cause

14    exclusion, and the Complaint here alleges no facts plausibly indicating such harm.  *Id.*

15    Specifically, the Complaint does not allege that Qualcomm has ever sought to interfere

16    with a competitor's business by asserting its standard-essential (or any other) patents

17    against a competitor; that rival chip suppliers are unable to compete without a license

18    from Qualcomm; or that the lack of a license has actually excluded any competitor

19    from making sales in any relevant market.  Instead, the Complaint alleges only that a

20    license from Qualcomm would "provide substantial benefits" to chip makers.[3]  But

21    Qualcomm has no duty under the antitrust laws to assist its competitors.  *Trinko*, 540

22    U.S. 398.

23        The FTC's second theory—that Qualcomm's now-expired agreements with Apple

24    constituted unlawful exclusive dealing[4]—also fails to state a cognizable claim.  To state a claim

25    based on exclusive dealing, the FTC must allege foreclosure of rivals that is sufficient in

26

27    _____

     [3] ¶ 113.

28    [4] ¶¶ 116-30.

1   magnitude and scope to deprive them of the opportunity to compete for efficient scale. But the

2   Complaint does not allege facts indicating that the Apple agreements foreclosed a substantial

3   portion of competition in any market; in fact, the Complaint does not allege anything at all about

4   what portion of a purported market was allegedly foreclosed. Nor does it identify any competitor

5   that was excluded. To the contrary, the Complaint concedes that Intel was able to garner a

6   significant share of Apple's modem chip business during the term of the challenged agreements.

7   The FTC's failure to allege any anticompetitive effect from this supposedly exclusive dealing

8   arrangement with just one customer is fatal to the FTC's second theory.

9        With no facts supporting a plausible theory of harm to competition, the FTC's Complaint

10   fails to meet the pleading standards of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and

11   *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and must be dismissed.

12   **Factual Background**[5]

13        Qualcomm has invented multiple technologies that are fundamental to today's cellular

14   communications. (¶¶ 17; 54-56.) Rather than keep these fundamental inventions exclusively for

15   its own use, Qualcomm has contributed the inventions to cellular and other SSOs, and continues

16   to be a significant contributor of fundamental technology enabling the development of cellular

17   standards. (¶¶ 54-56.) SSOs have chosen to incorporate thousands of patented Qualcomm

18   inventions into their standards, including second-generation CDMA standards, third-generation

19   standards (both UMTS and CDMA2000) and fourth-generation LTE standards. (¶¶ 54-56.)

20   These patented technologies are practiced by all cellular phones and other mobile consumer

21   products (collectively, "handsets") that comply with those standards. (¶¶ 2, 21, 54-57.) The

22   patents protecting such standardized technologies are therefore known as standard-essential

23   patents ("SEPs"); SEPs are distinct from patents covering the thousands of Qualcomm

24   technologies that are not part of any standard, and are therefore known as non-standard-essential

25   patents ("non-SEPs"). Many of Qualcomm's non-SEPs are also practiced by cellular handsets.

26   For its SEPs (but not its other patents), Qualcomm has committed to the relevant SSOs that it will

27    

28   [5] Qualcomm strongly disagrees with many allegations in the Complaint but accepts the factual allegations as true solely for purposes of this Motion.

make licenses available for the manufacture and sale of handsets on fair, reasonable and non-discriminatory ("FRAND") terms.  (¶ 57.)

Qualcomm has two primary business units: Qualcomm Technology Licensing ("QTL") and Qualcomm CDMA Technologies ("QCT").  (¶ 17.)  The QTL business unit licenses the makers of cellular handsets (referred to in the Complaint as original equipment manufacturers ("OEMs")) to make and sell handsets that practice Qualcomm's patented technologies, in return for the payment of royalties and other consideration.  (¶¶ 58, 143.)  Qualcomm grants exhaustive licenses to its patented technologies—including SEPs and non-SEPs—at the handset level; and Qualcomm neither asserts its patents against, nor seeks royalties from, the makers of any handset components.  (¶¶ 59, 113, 114.)

Qualcomm's other main business unit, QCT, designs and sells to OEMs certain handset components, including modem chips.[6]  (¶¶ 17, 20, 21.)  Modem chips perform a subset of the functions necessary to allow a handset to communicate with a cellular network.  (¶ 20.)  The Complaint alleges that Qualcomm is "dominant" in the supply of modem chips for handsets that comply with CDMA standards and in the supply of "premium" modem chips for handsets that comply with LTE standards.  (¶ 31.)  It does not allege that Qualcomm is or has been "dominant" in the supply of other modem chips, such as modem chips for handsets that comply with UMTS standards or "non-premium" modem chips for handsets that comply with LTE standards.

The royalties that the QTL business unit receives are separate from the price of any modem chip or other component an OEM chooses to purchase from QCT.  (¶ 88.)  The royalties are compensation for the use of Qualcomm's broader patented technologies, rather than compensation for merely the use of QCT's modem chips or other singular components in the handset.  (¶¶ 88, 143.)  OEMs need a license to Qualcomm's technologies because all handsets practice Qualcomm's SEPs, as well as many of its non-SEPs, regardless of whether the handsets include any components from Qualcomm.  (¶¶ 2, 57-58, 94.)  Notably, the Complaint does not

---

[6] The Complaint generally refers to these products as "baseband processors" but notes that they may also be referred to as "chips", "chipsets" or "modems".  (¶ 20.)  While these terms are not in fact interchangeable, for purposes of this Motion Qualcomm will, for simplicity, use the term "modem chips".

1  allege that Qualcomm charges a higher royalty for handsets that incorporate its competitors'

2  components than it does for handsets that incorporate Qualcomm components.  (*See* ¶¶ 63, 94.)

3       QCT does not sell modem chips to OEMs that do not have a license to Qualcomm's SEPs.

4  (¶ 68.)  By definition, unlicensed OEMs making standard-compliant handsets infringe

5  Qualcomm's SEPs.  (¶¶ 21-24, 70.)  If QCT did not have this practice, it would be facilitating

6  infringement of Qualcomm's patents, and Qualcomm would risk claims that its knowing sale of

7  chips to an unlicensed OEM had exhausted its patent rights or provided the purchaser with an

8  implied license to Qualcomm's patents.  (¶ 66.)  Because Qualcomm receives compensation for

9  its patents exclusively through royalties rather than through the price of its chips (¶ 88), a finding

10  of exhaustion or implied license would enable an unlicensed OEM to practice at least some of

11  Qualcomm's SEPs and non-SEPs for free, and thereby harm Qualcomm's ability to earn a return

12  on its R&D investments in developing cellular technologies (¶ 143).

13                                    **Legal Standard**

14       "To survive a motion to dismiss, a complaint must contain sufficient factual material,

15  accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678

16  (quoting *Twombly*, 550 U.S. at 570).  A complaint may be dismissed if it "either (1) lacks a

17  cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory".

18  *Somers v. Apple*, 729 F.3d 953, 959 (9th Cir. 2013).  "[A] plaintiff's obligation to provide the

19  grounds of his entitle[ment] to relief requires more than labels and conclusions", as courts "are

20  not bound to accept as true a legal conclusion couched as a factual allegation" and "[f]actual

21  allegations must be enough to raise a right to relief above the speculative level".  *Twombly*,

22  550 U.S. at 555 (internal quotation marks and citation omitted).  In "abrogat[ing] the usual notice

23  pleading rule", *Somers*, 729 F.3d at 959, the Supreme Court recognized that antitrust cases

24  involve particularly complex discovery, *Twombly*, 550 U.S. at 558-59.  Thus, "insistence on

25  specificity of facts is warranted before permitting a case to proceed into costly and protracted

26  discovery in an antitrust case".  *Somers*, 729 F.3d at 966.

27       Moreover, when considering a motion to dismiss an antitrust case, a court must determine

28  whether a claim is plausible "under basic economic principles".  *Id.* at 964.  A complaint that

1   pleads facts that are "merely consistent with a defendant's liability . . . stops short of the line

2   between possibility and plausibility of entitlement to relief". *Iqbal*, 556 U.S. at 678 (internal

3   quotation marks omitted) (quoting *Twombly*, 555 U.S. at 557). The Complaint here offers at most

4   a "possibility" theory, and thus fails to meet the *Twombly* standard.[7]

5   <u>**Argument**</u>

6        The Complaint challenges practices that are fundamental to the structure of Qualcomm's

7   business, but fails to plead facts demonstrating that any of these practices, alone or in

8   combination, violates the antitrust laws by causing harm to competition in the supply of modem

9   chips. This failure, after more than two years of pre-Complaint investigation, reflects the fact that

10   the FTC not only has not, but *cannot*, plead facts stating a plausible claim of competitive harm.

11   I.     THE FTC FAILS TO STATE A CLAIM OF UNLAWFUL MONOPOLIZATION.

12        To sustain a claim of monopolization under Section 2 of the Sherman Act,[8] the FTC must

13   plausibly plead "(1) the possession of monopoly power in the relevant market, and (2) the willful

14   acquisition or maintenance of that power as distinguished from growth or development as a

15   consequence of superior product, business acumen, or historic accident". *United States v.*

16   *Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *see also Name.Space, Inc. v. Internet Corp. for*

17   *Assigned Names & Numbers*, 795 F.3d 1124, 1131 (9th Cir. 2015). The second prong requires

18   that conduct be "exclusionary", and "to be condemned as exclusionary, a monopolist's act must

19   have 'anticompetitive effect'. That is, it must harm the competitive *process . . . .*" *United States*

20   *v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (emphasis in original). The Complaint

21

---

22   [7] *See also* Federal Trade Commission, Dissenting Statement of Commissioner Maureen K. Ohlhausen, *In the Matter of Qualcomm, Inc.*, https://www.ftc.gov/system/files/documents/cases/

23   170117qualcomm_mko_dissenting_statement_17-1-17a.pdf (the "Ohlhausen Dissent"). Acting Chairman Ohlhausen's dissenting statement is appropriately considered on a motion to dismiss.

24   *See Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir. 1988) ("the court may properly look . . . to matters of general public record" on a motion to dismiss (internal quotation marks

25   omitted) (quoting *Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C. Cir. 1979))).

26   [8] Although the FTC has brought this action pursuant to its authority under Section 5 of the FTC Act, 15 U.S.C. § 45, the substantive standards applicable to the FTC's monopolization claim

27   (¶ 147.a) are governed by Section 2 of the Sherman Act. 15 U.S.C. § 2; *see also* 1 ABA Section of Antitrust Law, *Antitrust Law Developments* 647 (6th ed. 2007) ("[A]lthough the Commission

28   may not directly enforce the Sherman Act, it may prohibit as an 'unfair method of competition' under Section 5 of the FTC Act conduct that violates the Sherman Act.").

articulates two theories of anticompetitive harm:  (1) a so-called "tax" theory based on certain

features of Qualcomm's licensing business; and (2) an exclusive dealing theory based on

Qualcomm's agreements with a single customer, Apple.  The FTC has not successfully pled a

monopolization claim under either theory because it has not alleged facts that, if proven, would

support a finding that Qualcomm's conduct excludes other modem chip suppliers from a relevant

market.

A.    The FTC's "Tax" Theory Does Not State a Claim of Unlawful Monopolization.

The Complaint's "tax" theory focuses on three practices:  (1) not selling chips to OEMs

that infringe Qualcomm's patents, (2) offering discounts to certain unspecified OEMs, and

(3) licensing only at the handset level and not the component level.  None of these practices,

alone or in combination, causes the anticompetitive exclusion of rival modem chip suppliers.

1.    *Qualcomm's Practice of Not Selling Chips to Infringers Does Not Exclude
Competing Chip Suppliers.*

The Complaint recognizes that all cellular handsets necessarily practice Qualcomm's

cellular SEPs, and that if an OEM is unlicensed, its handsets necessarily infringe those patents.

(¶¶ 21-24, 54-56, 70.)  Such infringers do not pay for their use of technologies that Qualcomm

invested considerable resources to develop, and Qualcomm does not assist them in their

infringement by selling them modem chips.  The Complaint condemns this unwillingness to sell

to infringers (which it pejoratively calls a "no license no chips policy") as the first step in a means

to monopolize certain alleged markets for modem chips.  This is so, according to the FTC,

because:  (1) OEMs need certain Qualcomm modem chips so badly that to get those chips, they

agree to pay "elevated" royalties for Qualcomm's patents; and (2) these royalties operate as a

"tax" that diminishes demand for non-Qualcomm chips, and thereby excludes competing chip

suppliers.

The Complaint fails to plead facts to support either of these assertions, or that

Qualcomm's practice has caused *actual* competitive harm in any modem chip market.  At most,

the FTC's conjecture as to how anticompetitive harm potentially *might* occur rests on a "price

squeeze" theory that was rejected by the Supreme Court in *linkLine*, and which is not plausible

1    under basic economic principles.

2              a.    The FTC has not pled facts showing that Qualcomm's licensing
3                    terms are "elevated".

4        The first step of the FTC's theory is that the royalties OEMs pay on handset sales are

5    "elevated" because they include "an added increment that OEMs pay Qualcomm to avoid

6    disruption of processor supply".  (¶ 86.)  Put differently, the FTC alleges that the royalties OEMs

7    pay to Qualcomm reflect "not only the value of its patents, but also its monopoly power in

8    baseband processors".  (¶ 143.)  This is a necessary building block to the FTC's claim; absent

9    "elevated" royalties, Qualcomm's royalties would, by the FTC's own allegations, reflect

10   procompetitive, fair compensation for use of Qualcomm's patented inventions rather than an

11   "added increment" or "tax" arising from alleged chip market power.  (*Id.*)

12       But the FTC does not plead any facts purporting to show what Qualcomm's royalties

13   should be or by how much they are purportedly "elevated".  Nor does the FTC allege that

14   Qualcomm's royalty rates are *actually* unreasonable or above a FRAND level.[9]  Instead, the FTC

15   speculates that Qualcomm's alleged "dominance" in chips provides the opportunity for it to

16   increase its royalties because OEMs cannot seek judicial determinations of FRAND royalty

17   rates.[10]  Absent, however, is any allegation that, *in fact*, the royalties that OEMs have agreed to

18   pay for Qualcomm's SEPs are higher than what would result from a judicial determination.  Nor

19   does it plead facts regarding how Qualcomm's practice actually affected the royalty rates agreed

20   to by any licensee in the real world.  Without such alleged facts, the key premise of the FTC's

21   theory—that royalties are "elevated"—is without support.  In lieu of facts, the Complaint presents

22   the FTC's theoretical view of how patent licensing negotiations should ideally be conducted.  The

23   Complaint's bare-bones pleading of a hypothetical negotiation process cannot survive a motion to

24   dismiss.

25       Moreover, the FTC's unsupported theory conflicts with the few facts actually alleged.  For

26   _____

27   [9] "Rather than allege that Qualcomm charges above-FRAND royalties, the complaint dances
     around that essential element".  *See* Ohlhausen Dissent, at 1.

28   [10] ¶¶ 4, 78.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

example, if Qualcomm's royalty rates are "elevated" because of its purported market power in chips, then one would expect those rates to vary depending on when and whether Qualcomm had such power. But the Complaint acknowledges that "Qualcomm has historically offered licenses to OEMs at a base royalty rate of about 5% of the net selling price" of a cellular handset (¶ 58), and it does not allege that this single "historically offered" rate has varied in any way related to Qualcomm's market power. For example, the Complaint does not allege that Qualcomm increased its rate after purportedly acquiring power in any chip market. *See Somers*, 729 F.3d at 964 ("overcharge" theory was contradicted by the fact that Apple sold songs at the same price before it allegedly gained market power). Nor does the Complaint allege that Qualcomm charges a higher royalty on handsets that contain CDMA and "premium" LTE modem chips (where it allegedly has market power), and a lower royalty on handsets that contain UMTS and "non-premium" LTE modem chips (where no market power is alleged). Likewise, the Complaint does not allege that Qualcomm charges a lower royalty to OEMs that do not purchase modem chips from Qualcomm, and therefore are not subject to the "dominance" Qualcomm allegedly has over the supply of certain chips. Qualcomm's historical 5% rate cannot include "an added increment" reflecting Qualcomm's alleged market power if Qualcomm obtained that same rate regardless of whether an OEM used chips over which Qualcomm had such power. These pleading deficiencies defeat a central premise of the FTC's theory. *See Twombly*, 555 U.S. at 568 (recognizing implausibility of claim where "the complaint itself" contained allegations inconsistent with the claimed anticompetitive scheme).

Even more fundamentally, the FTC's theory of "elevated" royalties is contradicted by other allegations in the Complaint. As the Complaint acknowledges, Qualcomm's royalties for its cellular SEPs are constrained by its FRAND commitments, and potential licensees can "resort to remedies available from courts in the event of a disagreement" over license terms. (¶ 51.) According to the Complaint, OEMs are reluctant to challenge Qualcomm's proposed royalty rates because of concern regarding loss of access to Qualcomm's modem chips. But the Complaint also alleges that some unspecified OEMs *do* push back against Qualcomm's desired royalty terms. (¶¶ 102-104.) For these unspecified OEMs, Qualcomm is alleged to have agreed to

1  discounts—called "strategic" or "market development" funds—to "close the gap" between the

2  parties' negotiating positions.  (*Id.*)  But it cannot simultaneously be true that Qualcomm can

3  "coerce" elevated licensing terms (¶ 86), and yet at the same time must "buy licensees off" by

4  offering discounts on its chips in order to secure those same licensing terms (¶¶ 102-05).

5  Qualcomm either has the power to compel OEMs to accept its license terms or it does not.  If

6  Qualcomm uses strategic funds to "close the gap", this indicates that OEMs *can and do* challenge

7  Qualcomm's royalty terms, and that OEMs cannot be and are not "coerced" into accepting

8  "elevated" royalty rates.  This contradiction undermines the FTC's "tax" theory.

9
         b.      The FTC has not pled facts supporting a claim that Qualcomm's
10               royalties have foreclosed other modem chip suppliers.

11      Even if the FTC had alleged facts sufficient to show that Qualcomm's royalties are

12  "elevated" as compared to some undefined benchmark, such an allegation would not state a

13  violation of the antitrust laws.  "Elevated" royalties are not themselves unlawful.  *See, e.g.*,

14  *Rambus*, 522 F.3d at 464 ("an otherwise lawful monopolist's use of deception simply to obtain

15  higher prices normally has no particular tendency to exclude rivals and thus to diminish

16  competition").  To survive dismissal, the FTC must allege *anticompetitive* effects—namely

17  exclusion of competitors.  But the FTC has not pled facts demonstrating such exclusion.  At best,

18  the FTC states a "price squeeze" theory that fails under the Supreme Court's decision in *linkLine*.

19      The FTC contends that Qualcomm's royalties operate as a "tax" that "increases the all-in

20  cost to an OEM of using a competitor's baseband processor" (¶ 89), and thereby "diminishes

21  OEMs' demand for those processors" (¶ 90).  But the only way the alleged increase in "all-in

22  cost" can have an exclusionary effect on competitors is if it increases the "all-in cost" of using

23  competitors' modem chips by *more* than it increases the "all-in cost" of using Qualcomm's

24  modem chips, thereby creating a disincentive for OEMs to buy from Qualcomm's competitors.

25  The FTC does not allege any such disparity.  To the contrary, it affirmatively acknowledges that

26  OEMs pay the same royalties when they buy Qualcomm chips as when they buy non-Qualcomm

27  chips.  (¶ 63 (alleging that Qualcomm's practices "raise the all-in prices that OEMs must pay on

28  *both* Qualcomm baseband processors *and* those supplied by Qualcomm's competitors" (emphasis

1  added)), ¶ 94 ("OEMs must pay [the royalty] regardless of whether they use baseband processors

2  supplied by Qualcomm or a Qualcomm competitor").)  Thus, the Complaint alleges facts that

3  contradict the FTC's theory.  The Complaint does not allege facts indicating how Qualcomm's

4  royalties could cause OEMs to prefer Qualcomm's modem chips over a competitor's modem

5  chips.  There is therefore no basis to infer that Qualcomm's conduct created any disadvantage for

6  rival chip suppliers in their efforts to win business from OEMs.  Put simply, because there is no

7  difference in royalty rates, there is no "tax" on competitors' products, and there is no foreclosure

8  of competition.[11]

9         Having failed to allege any disparity caused by Qualcomm's licensing rates in the

10  incentives faced by OEMs when selecting modem chips, the FTC's "tax" claim is, at best, a

11  "price squeeze" claim of the sort the Supreme Court squarely rejected as an independent basis of

12  antitrust liability in *linkLine*.  The Complaint asserts that a "reduction in Qualcomm's royalties

13  would have a substantial impact on competitors' margins and abilities and incentives to invest

14  and innovate".  (¶ 92.)  In other words, the FTC asserts that if Qualcomm's royalties were lower,

15  competitors would be able to raise their chip prices, earn more money, and use that money to

16  invest and innovate.  (¶¶ 87, 93.)

17         *linkLine* forecloses such a claim.  In *linkLine*, 555 U.S. 438, the plaintiff purchased digital

18  subscriber line ("DSL") network access from AT&T and also competed with AT&T in the

19  downstream market for retail DSL internet services.  The plaintiff alleged that AT&T was

20  increasing the price of DSL network access for the plaintiff in the upstream input market, and

21  then charging lower prices for retail DSL subscriptions to consumers downstream.  This led the

22  plaintiff to charge lower retail prices to stay competitive, meaning that the plaintiff earned

23  slimmer margins.  The Supreme Court declined to recognize this "price squeeze" theory as an

24  independent basis for liability, holding that a vertically integrated monopolist "is certainly not

25  required to price . . . in a manner that preserves its rivals' profit margins".  *Id.* at 452.  Thus,

26

27  [11] The FTC appears to consider the chip-neutral nature of Qualcomm's royalties to be
    anticompetitive, but a chip-neutral licensing practice is self-evidently procompetitive in that it
    creates a level playing field for competing chip makers.  Were Qualcomm to charge higher
28  royalties on handsets that use its competitors' chips, competitors would surely complain.

1   under *linkLine*, Qualcomm has no obligation to ensure that the royalty rates charged to OEMs

2   leave "room" to preserve chip suppliers' margins.  An allegation of price squeeze does not

3   support an antitrust claim in the absence of pleading some other independent antitrust violation—

4   either a predatory pricing claim that meets the requirements set forth in *Brooke Group*, 509 U.S.

5   209, or a claim of breach of an antitrust duty to deal that meets the requirements set forth in

6   *Trinko*, 540 U.S. 398.  *See linkLine*, 555 U.S. at 457.  Because the FTC does not attempt to plead

7   either violation, and does not provide facts that would support either violation, it does not state a

8   monopolization claim.  *Id.*; *see also John Doe 1 v. Abbott Labs*., 571 F.3d 930, 935 (9th Cir.

9   2009) (no monopolization claim for a monopolist drug manufacturer raising the price on an input

10  used by competitors).

11      In sum, merely invoking the word "tax" does not alter the substantive antitrust analysis

12  required to evaluate whether the FTC has stated a plausible claim.  Even if a "tax effect" is

13  claimed, the FTC must still plead facts that, if proven, would show that Qualcomm's conduct

14  "substantially foreclosed competition".  The FTC has not done so.  It has not pled facts

15  supporting its claim that Qualcomm's practice of not selling modem chips to infringing OEMs

16  resulted in exclusion.  And its theory of how such exclusion could *potentially* occur is both

17  logically and legally flawed.

18          2.      *Qualcomm's strategic funds and other similar incentive payments do not*
                    *exclude competing chip suppliers.*
19

20      The FTC also alleges that Qualcomm "has exacerbated the exclusionary effect of its tax"

21  by making incentive payments—*i.e.*, discounts—that reduce the "all-in cost" of purchasing

22  Qualcomm's modem chips.  (¶¶ 102-03; *see also* ¶ 89.)  This allegation fails because, as noted

23  above, the FTC has not properly pled any exclusionary effect caused by the so-called "tax", and

24  thus there is nothing to "exacerbate".  The allegation also fails on its own terms.  Specifically, the

25  FTC does not allege that the discounts are conditional, or that they result in below-cost pricing,

26  and it is widely recognized that unconditional above-cost discounts are procompetitive and reflect

27  vigorous competition, not the exercise of market power.  *See Brooke Group*, 509 U.S. at 223 ("As

28  a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the

1    lower cost structure of the alleged predator, and so represents competition on the merits, or is

2    beyond the practical ability of a judicial tribunal to control without courting intolerable risks of

3    chilling legitimate price-cutting."); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 895

4    (9th Cir. 2007) ("'[t]he great majority of discounting practices are procompetitive' and 'reflect

5    hard bargaining'" (quoting 3 Areeda & Hovenkamp, *Antitrust Law* § 749b, at 324 (2d ed. Supp.

6    2006))).

7        Putting aside this shortcoming, the challenge to the discounts also fails because the

8    Complaint does not allege how many such discounts Qualcomm has provided or what portion of

9    the alleged relevant markets is affected thereby.  Absent such factual allegations as to the degree

10   of purported foreclosure, there is no basis on which to infer competitive harm.  *Cf. Feitelson v.*

11   *Google Inc.*, 80 F.Supp. 3d 1019, 1031-32 (N.D. Cal. 2015) (dismissing claim due to failure to

12   allege facts that quantified the extent to which the relevant market was foreclosed); *Rheumatology*

13   *Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-CV-05847-WHO, 2014 WL 524076 at *11 (N.D.

14   Cal. Feb. 6, 2014) (dismissing claim because "[w]ithout showing any changes in shares" as a

15   result of the challenged conduct, the court could not determine whether any market foreclosure

16   had occurred).

17       In addition, as discussed above, Qualcomm either has the power to compel OEMs to

18   accept "elevated" license terms, or it does not have that power and thus must offer incentives to

19   achieve those terms.  Both conditions cannot be true at the same time.  For this reason as well, the

20   alleged incentive payments cannot "exacerbate" the "tax".  (*See supra* Part I.A.1.a.)  As the

21   FTC's strategic fund allegations are entirely inconsistent with the core premise of the "tax"

22   theory, they do not support the FTC's claim.

23           3.    *Qualcomm's practice of licensing its patents only at the handset level is not*
24                 *exclusionary.*

25       The Complaint further alleges that Qualcomm's practice of licensing the manufacture and

26   sale of handsets and not the manufacture and sale of components such as modem chips (¶¶ 58, 59)

27   "bolsters" the so-called "tax" on competitors' sales.  (¶¶ 6, 115).  Again, these allegations fail

28   both because the tax theory fails, leaving nothing to "bolster", as well as on their own terms.

The accused conduct is a refusal to grant certain types of licenses. But "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Trinko*, 540 U.S. at 408 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). This principle holds true with respect to the licensing of patents. *See In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1328 (Fed. Cir. 2000) (patentee is "under no obligation to sell or license its patented parts and d[oes] not violate the antitrust laws by refusing to do so"). The FTC does not allege any exception to that principle.[12]

Rather than allege an antitrust duty to deal, the FTC contends that Qualcomm's practice violates its FRAND commitments to SSOs (¶ 112). Even if that were true (which it is not), alleging a FRAND violation is not enough to make out an antitrust claim without also alleging that the purported violation caused actual harm to competition. *Rambus v. FTC*, 522 F.3d 456, 466 (D.C. Cir. 2008) ("an otherwise lawful monopolist's end-run around price constraints, even when deceptive or fraudulent, does not alone present a harm to competition in the monopolized market"); *see also Apple Inc. v. Samsung Elecs. Co.*, 920 F. Supp. 2d 1116, 1142 (N.D. Cal. 2013) ("Regarding FRAND obligations, [defendant's] licensing behavior could only give rise to Sherman Act liability if it constituted anticompetitive behavior."). The Complaint does not satisfy this requirement because it does not allege facts from which it can plausibly be inferred that Qualcomm's conduct caused any harm to competition in the allegedly affected markets. For example, the Complaint does not allege that Qualcomm has ever sought to interfere with a competitor's CDMA or premium LTE business by asserting its cellular SEPs (or any other patents) against the competitor. The Complaint does not allege that rival chip suppliers are unable to compete in these alleged markets without a license to Qualcomm's cellular SEPs. The Complaint also does not allege that the lack of a license to Qualcomm's cellular SEPs has ever

---

[12] The duty to deal must arise under the antitrust laws rather than under some other body of law. *See linkLine*, 555 U.S. at 445-46. In *linkLine*, AT&T had an obligation under Federal Communications Commission regulations to sell DSL network access to its competitors. Because that obligation was not an "*antitrust* duty to deal", however, the Supreme Court found that it was not sufficient to support the plaintiff's claim. *Id.* (emphasis added).

1   actually prevented any competitor from making chip sales.  To the contrary, the Complaint

2   acknowledges that Intel, MediaTek and Samsung continue to compete against Qualcomm in the

3   sale of modem chips without having a license.  (¶¶ 34, 35, 45, 112, 139.)

4        Instead, all the FTC alleges is that "[a] license to Qualcomm's cellular SEPs would

5   provide substantial benefits to other baseband processor suppliers and their customers" by

6   enabling rival chip suppliers to "offer OEMs baseband processors that convey the rights to

7   Qualcomm's cellular SEPs".  (¶ 113.)  In other words, the Complaint merely alleges that

8   Qualcomm does not *assist* its rivals by affirmatively granting them a license that would provide

9   them with "substantial benefits".  (*Id.*)  But, as noted, Qualcomm has no antitrust duty to assist

10  competitors, and withholding undefined and unquantified "benefits" from competitors is not

11  unlawful exclusion.  *See Trinko*, 540 U.S. at 408; *Allied Orthopedic Appliances, Inc. v. Tyco*

12  *Health Care Grp. LP*, 592 F.3d 991, 1002 (9th Cir. 2010) ("a monopolist has no duty to help its

13  competitors survive or expand when introducing an improved product design").

14       Moreover, the Complaint alleges additional facts that affirmatively *negate* any inference

15  that Qualcomm's supposed breach of FRAND commitments caused any anticompetitive effect.

16  Specifically, the Complaint asserts that chip suppliers are ideally situated to enforce Qualcomm's

17  FRAND commitments, and could easily do so if they believed Qualcomm was violating its

18  FRAND commitments in a way that harmed their competitiveness.  It alleges (incorrectly) that

19  Qualcomm's FRAND commitments require it to license its patents to chip makers (¶ 108), and

20  that any potential licensee can "resort to remedies available from courts" to enforce those

21  commitments (¶ 51).  It also alleges that Qualcomm does not have any leverage over competing

22  chip suppliers that would prevent them from seeking such enforcement against Qualcomm

23  (¶ 114).  Assuming for present purposes the truth of these allegations, nothing would prevent

24  competitors from bringing an action against Qualcomm for a FRAND license, if one was truly

25  required.  Yet there is no allegation in the Complaint that any component supplier has ever

26  pursued such an action.  The natural inference from these allegations is that competing chip

27  suppliers do not believe they need a license from Qualcomm, or do not believe that Qualcomm

28  has any obligation to grant them such a license (or both).  Either way, the Complaint does not

1    allege facts indicating a FRAND violation resulting in exclusion. *Somers*, 729 F.3d at 965

2    (holding that a theory must "rise beyond mere conceivability or possibility" when an alternative,

3    more likely explanation is available).[13]

4           Finally, the FTC's allegation that Qualcomm's unwillingness to license the manufacture

5    and sale of modem chips "bolsters its ability to maintain elevated royalties" (¶ 6) is internally

6    inconsistent for yet another reason.  The FTC apparently assumes that (i) OEMs that purchased

7    chips from licensed chip suppliers would need to license fewer patents directly from Qualcomm,

8    and (ii) that by licensing fewer patents directly from Qualcomm, such OEMs would be less

9    susceptible to paying "elevated" royalties.[14]  But under the FTC's primary theory, the allegedly

10   "elevated" royalties charged by Qualcomm reflect Qualcomm's purported dominance in certain

11   *chip* markets, and have nothing to do with the size or scope of Qualcomm's *patent* portfolio.

12   Thus, under the FTC's own theory, a reduction in the number of patents licensed at the handset

13   level would have no effect on Qualcomm's purported power to obtain "elevated" royalties.

14          B.      The FTC's "Exclusive Dealing" Theory Does Not State a Claim of Unlawful
15                  Monopolization.

16          The Complaint's exclusive dealing theory, which is based on a set of now-expired

17   agreements with a single customer, Apple, also fails, because here too the FTC does not allege the

18   requisite anticompetitive effects to support a claim under the antitrust laws.  In fact, the

19   Complaint fails to identify any competitor foreclosed by the agreements and concedes that at least

20   one competitor gained substantial business with Apple during the term of the agreements.

21          The Complaint's allegations are particularly thin here.  In one instance Qualcomm

22   allegedly gave a rebate to Apple with a condition that has nothing to do with the purchase of

23   _____

24   [13] In contrast to the Complaint's emphasis on the allegedly "anomalous" nature of Qualcomm's
     unwillingness to sell chips to infringers, the Complaint does not allege that Qualcomm is alone in
25   licensing its cellular SEPs only at the handset level.  Indeed, the FTC does not allege that any
     other cellular SEP holder grants the kind of licenses it contends Qualcomm is obligated to grant.
26   This further undercuts the plausibility of the contention that chip-level licenses are necessary for
     modem chip suppliers to compete effectively or that they are required by commitments to SSOs.

27   [14] The Complaint does not allege that OEMs purchasing licensed chips from Qualcomm's
     competitors would not need a license from Qualcomm *at all*, *i.e.*, that the sale of a licensed chip
28   would exhaust all of Qualcomm's patent rights.

1    modem chips.[15]  In two other agreements Qualcomm allegedly gave Apple "conditional rebates"

2    on chip purchases.  (¶¶ 121-24.)  Based solely on these allegations, the Complaint asserts that

3    these agreements amounted to "*de facto* exclusive deals".  (¶ 125.)   These allegations are

4    woefully deficient to establish exclusivity.  Conditional pricing arrangements do not

5    automatically constitute *de facto* exclusive dealing.  *See Allied Orthopedic Appliances*, 592 F.3d

6    at 996-97 (plaintiff failed to show why customers could not forego the discount and purchase

7    from a competitor).  But even if the agreements were a sufficient basis to allege exclusivity

8    (which they are not), the Complaint fails to allege facts essential to make exclusivity unlawful: it

9    does not indicate what portion of the purported market was allegedly foreclosed by the Apple

10   agreements, or which competitors were purportedly excluded from that market.  Thus, the FTC

11   has not sufficiently pled anticompetitive effects resulting from the Apple agreements.

12         Under the antitrust laws, "there are well-recognized economic benefits to exclusive

13   dealing arrangements".[16]  *Id.* at 996 (internal quotation marks omitted) (quoting *Omega Envtl.,*

14   *Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997)).  Thus, an allegation of *de facto*

15   exclusive dealing is not enough to sustain a monopolization claim.  *See Abbyy USA Software*

16   *House, Inc. v. Nuance Commc'ns Inc*., No. 08-01035, 2008 WL 4830740, at *2 (N.D. Cal.

17   Nov. 6, 2008) ("Virtually every contract forecloses the market or excludes other sellers from

18   some portion of the market.").  Rather, an exclusive dealing arrangement leads to unlawful

19   monopolization only if "its effect is to 'foreclose competition in a substantial share of the line of

20   commerce affected'".  *Allied Orthopedic Appliances*, 592 F.3d at 996 (quoting *Omega Envtl.*,

21   127 F.3d at 1162).  "Establishing that a substantial share of the relevant market is foreclosed is

22   necessary because, for the monopolist's conduct to adversely affect competition, 'the

23

---

24   [15] The FTC does not allege that payments under the 2007 agreement described in ¶ 120 were
     conditioned on Apple not purchasing chips from Qualcomm's competitors (or were in *any* way
     related to chip sales) or that the 2007 agreement excluded any rival from making sales to Apple.

25

26   [16] Exclusive deals, for example, can offer some measure of protection to incentivize companies
     like Qualcomm to undertake relationship-specific investments that would otherwise have been too
     risky.  *See, e.g., Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1234 n.17 (8th Cir. 1987) (where a
27   supplier has made significant marketing investments for the benefit of a customer, terms to
     protect the investment such as an exclusive dealing provision can help prevent rivals from free-
28   riding on the supplier's investment into promoting the customer's products).

1   opportunities for other traders to enter into or remain in that market must be significantly

2   limited.'" *Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 834 (N.D. Cal. 2015)

3   (quoting *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014)).

4   While there is no precise "substantiality" test, the Supreme Court has explained with respect to

5   exclusive dealing:

6           To determine substantiality in a given case, it is necessary to weigh
            the probable effect of the contract on the relevant area of effective
7           competition, taking into account the relative strength of the parties,
            the proportionate volume of commerce involved in relation to the
8           total volume of commerce in the relevant market area, and the
            probable immediate and future effects which pre-emption of that
9           share of the market might have on effective competition therein.

10  *Id.* at 835 (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961)).  The

11  FTC's own exclusive dealing jurisprudence recognizes that "a proper analysis of exclusive

12  dealing arrangements should take into account market definition, the amount of foreclosure in the

13  relevant markets, the duration of the contracts, the extent to which entry is deterred, and the

14  reasonable justifications, if any, for the exclusivity."  *In re Beltone Elecs. Corp.*, 100 F.T.C. 68,

15  92 (1982).  The FTC does not make any *factual* allegations that, taken as true, would meet these

16  legal standards and support a finding of substantial foreclosure resulting from Qualcomm's

17  agreements with Apple.

18          *First*, the FTC does not allege what portion of the purported market Apple occupies or

19  what portion was foreclosed.  *Cf. Feitelson*, 80 F. Supp. 3d at 1032 (absent allegations indicating

20  "the actual portion of general Internet search that consists of handheld search . . . the Court is

21  unable to infer that the [agreements], which cover only a portion of the handheld search market,

22  substantially foreclose competition in the market for general Internet search"); *Rheumatology*

23  *Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-CV-05847-WHO, 2013 WL 5694452, at *11 (N.D.

24  Cal. Oct. 18, 2013) ("courts typically look (at least initially) to the percentage share of the

25  relevant market foreclosed by the challenged agreement to determine whether the agreement is

26  unreasonable").  Instead, the FTC merely asserts that Apple was "particularly important" (¶¶ 3.d,

27  8, 129)—without any allegation of its relative size, of how many other "important" premium LTE

28  chip customers there are and the portion of the alleged market they occupy, or of the ability of

1    Qualcomm's competitors to provide similar benefits to those allegedly provided by Qualcomm to

2    Apple.  *See, e.g.*, *Rheumatology*, 2014 WL 524076, at \*10 (dismissal of an exclusive dealing

3    claim was based on the plaintiff's failure to allege "what market participants there are; how the

4    agreement affected . . . any . . . market participant's share; whether there are other purchasers in

5    the relevant market to which market participants may turn . . .; or how competition has been

6    harmed" (internal quotation marks omitted)).[17]  Nor does the Complaint allege that premium LTE

7    chips are used *only* in what it calls "premium-tier" handsets, which further obscures how much of

8    the alleged market for such chips is supposedly foreclosed.  In short, the Complaint does not

9    allege sufficient facts to show "the probable effect of the contract[s] on the relevant area of

10   effective competition".  *Tampa Elec.*, 365 U.S. at 329.

11       *Second*, the Complaint does not identify any competitor that was purportedly excluded

12   from the alleged market, nor does it allege that any of Qualcomm's competitors was even *capable*

13   of supplying Apple's "demanding technical requirements" (¶ 129.c) prior to Intel's securing the

14   business in September 2016.  If no other supplier could serve the demand, then no other supplier

15   was foreclosed.  This is a critical point here, given the FTC's focus on a purported market that

16   comprises only modem chips that contain the most "advanced" features, *i.e.*, features that only

17   one or a small number of chip suppliers could offer at any given time.

18       *Third*, the Complaint acknowledges that Intel began supplying premium LTE modem

19   chips to Apple *while the challenged agreements were in effect.*  (*See* ¶ 45 (Intel "began to supply

20   a portion of Apple's baseband processor requirements for the iPhone 7"), ¶ 126 (Qualcomm was

21   no longer Apple's exclusive supplier as of September 2016); *see also* ¶¶ 8, 122-23 (describing the

22   agreements as extending "through 2016").)  By itself, this definitively refutes any notion that the

23   agreements foreclosed *all* competitor sales to Apple—which makes the absence of allegations

24   about what portion of the purported market was foreclosed all the more glaring.  When coupled

25   with other allegations in the Complaint, this admission also refutes the notion that *any* sales to

---

[17] The allegation that Apple "sells large volumes of premium handsets" (¶ 129.a) adds nothing. The FTC has not attempted to define a market for "premium handsets", and the Complaint does not allege the *relative* size of Apple's premium handset sales compared to other firms' premium handset sales.

1   Apple were foreclosed.  Because the challenged condition in the Apple agreements was based on

2   Apple's making *all* of its modem chip purchases from Qualcomm (¶¶ 122-23), once Apple began

3   sourcing some of its chips from Intel, any chips that it continued to buy from Qualcomm could

4   not have been because of the alleged "exclusivity" condition, which would already not have been

5   met.

6   II.    THE FTC FAILS TO STATE A CLAIM OF UNREASONABLE RESTRAINT OF
            TRADE.
7

8          To establish an unlawful restraint of trade under Section 1 of the Sherman Act, the FTC

9   must demonstrate "(1) 'a contract, combination or conspiracy among two or more persons or

10  distinct business entities'; (2) which is intended to restrain or harm trade; [and] (3) 'which

11  actually injures competition' . . . ."  *Name.Space*, 795 F.3d at 1129.[18]  Only "unreasonable"

12  restraints of trade are unlawful.  *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877,

13  885 (2007).  The FTC's restraint of trade claim is based on substantively similar theories to its

14  monopolization claim, and fails for largely the same reasons.

15         As an initial matter, the majority of the Complaint addresses conduct that does not

16  implicate a "contract, combination . . . or conspiracy".  15 U.S.C. § 1.  Qualcomm's

17  unwillingness to sell modem chips to infringers of its cellular SEPs is a unilateral decision *not* to

18  enter into a contract.  Likewise, Qualcomm's practice of licensing only at the handset level is a

19  unilateral decision *not* to enter into certain agreements.  As such, only the FTC's allegations

20  regarding Qualcomm's strategic funds and agreements with Apple could even arguably implicate

21  the first element of a restraint of trade claim.  Those allegations fail because the Complaint does

22  not identify any competitive harm caused by those agreements in any relevant market.

23         For the strategic funds, the Complaint does not plausibly plead harm in any relevant

24  market because the FTC has not pled any potential foreclosure (much less the extent of such

25  foreclosure) arising from those discounts.  It also has not alleged below-cost pricing.  Nor has the

26

27  _____

    [18] As with its monopolization claim, the FTC has sued pursuant to its authority under Section 5 of
28  the FTC Act, but the substantive standards governing its restraint of trade claim are governed by
    the Sherman Act, 15 U.S.C. § 1.

1    FTC pled that payments under the strategic funds are conditioned on exclusivity or on achieving

2    any volume or market share thresholds.  In fact, the FTC has not alleged any facts to distinguish

3    Qualcomm's strategic funds from ordinary, pro-competitive unconditional discounts, and thus has

4    not stated a claim for an "unreasonable" restraint of trade.  (*See also supra* Part I.A.2.)[19]

5              The FTC's restraint of trade claim based on Qualcomm's agreements with Apple likewise

6    does not allege the requisite anticompetitive effect.  Even assuming that the agreements with

7    Apple required exclusivity, a vertical exclusive dealing arrangement violates the Sherman Act

8    only if its effect is to "foreclose competition in a substantial share of the line of commerce

9    affected".  *Allied Orthopedic Appliances*, 592 F.3d at 996.  As described above, the FTC does not

10   plausibly allege that Qualcomm's agreements with Apple resulted in such foreclosure in any well-

11   defined market.  Just as the Complaint therefore fails to state a monopolization claim, it fails to

12   state a claim of unreasonable restraint of trade.  (*See supra* Part I.B); *see also, e.g.*, *Feitelson*,

13   80 F. Supp. 3d at 1030 (with respect to Section 1, "'[s]ubstantial share' has been quantified as

14   foreclosure of 40% to 50% of the relevant market.").[20]

15
     III.   THE FTC FAILS TO STATE A CLAIM OF "UNFAIR METHODS OF
16          COMPETITION" UNDER SECTION 5(A) OF THE FTC ACT.

17             Section 5 of the FTC Act prohibits "unfair methods of competition".  15 U.S.C. § 45(a).

18   Although the FTC may enforce the Sherman Act by bringing an action under Section 5, the

19   viability of a "standalone" Section 5 claim to reach conduct not otherwise prohibited by the

20   antitrust laws is subject to substantial debate.[21]  Cases recognizing such a claim have held that the

---

21   [19] In addition, the FTC has not identified a single specific strategic fund agreement or other
22   incentive payment that it claims violates the statute.  This alone necessitates dismissal.  *Cf. JM
     Computer Servs., Inc. v. Schlumberger Technologier, Inc.*, No. C 95-20349 JW, 1996 WL
23   241607, at *3 (N.D. Cal. May 3, 1996) (failing to "identify the other participant(s) in the
     agreement . . . is a sufficient basis for dismissing [Sherman Act Section] 1 claims").

24   [20] Courts have generally "assume[d] that at the pleading stage, the degree of market foreclosure
25   required to make out an exclusive dealing claim does not differ under § 1 and § 2".  *See, e.g.,
     Feitelson*, 80 F. Supp. 3d at 1030 n.8.

26   [21] *See, e.g.*, 2 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* § 302h2 (3d ed. 2007)
27   ("[T]here is a fundamental difficulty in distinguishing an antitrust offense under FTC Act §5 from
     that under the Sherman Act or the Clayton Act.  Apart from possible historical anachronisms in
28   the application of those statutes, the Sherman and Clayton Acts are broad enough to cover any
     anticompetitive agreement or monopolistic situation that ought to be attacked whether completely

1   FTC must show at least some "indicia of oppressiveness", such as "(1) evidence of

2   anticompetitive intent or purpose on the part of the producer charged, or (2) the absence of an

3   independent legitimate business reason for its conduct". *E.I. du Pont de Nemours & Co. v. FTC*,

4   729 F.2d 128, 139 (2d Cir. 1984). The FTC itself has acknowledged that conduct does not violate

5   Section 5 unless it "cause[s], or [is] likely to cause, harm to competition or the competitive

6   process, taking into account any associated cognizable efficiencies and business justifications."

7   Federal Trade Commission, Statement of Enforcement Principles Regarding "Unfair Methods of

8   Competition" Under Section 5 of the Federal Trade Commission Act, 80 Fed. Reg. 57,056,

9   57,056 (Sept. 21, 2015). The FTC also cannot use Section 5 to reach conduct that is affirmatively

10  *permitted* or encouraged by the antitrust laws. *See Matter of Gen. Foods Corp.*, 103 F.T.C. 204

11  (1984) ("While Section 5 may empower the Commission to pursue those activities which offend

12  the 'basic policies' of the antitrust laws, we do not believe that power should be used to reshape

13  those policies when they have been clearly expressed and circumscribed.").[22]  Because the FTC

14  has failed to plead any "indicia of oppressiveness" or any plausible harm to the competitive

15  process with respect to either the "tax" theory or the exclusive dealing theory, the FTC has not

16  pled a Section 5 claim.

17       *First*, for the reasons explained above, the Complaint does not allege any facts supporting

18  its theory that Qualcomm's unwillingness to sell modem chips to infringers harms competition.[23]

19  (*See supra* Part I.A.1.) Because OEMs do not pay higher royalties when using non-Qualcomm

20  modem chips, the so-called "tax" theory of harm is just as implausible when cast as a Section 5

---

22  full blown or not. Nothing prevents those statutes from working their own condemnation of
    practices violating their basic policies." (citation and internal quotation marks omitted)). For

23  purposes of this Motion only, Qualcomm assumes that the FTC has the authority to bring a
    standalone Section 5 claim to reach conduct not expressly prohibited by the Sherman Act.

24  Qualcomm does not concede that the FTC has such authority.

25  [22] *See also* Ohlhausen Dissent, at 2 ("It is no answer to an unsupported Sherman Act theory to
    bring an amorphous standalone Section 5 claim based on the same conduct.").

26

27  [23] To the contrary, rather than excluding other baseband processor suppliers from sales to OEMs,
    common sense dictates that the direct effect of Qualcomm's practice is to make it *easier* for

28  Qualcomm's competitors to sell to those OEMs that do not have a patent license from Qualcomm
    because they will not need to compete with Qualcomm for such sales.

1    claim as it is under the Sherman Act.  The facts alleged in the Complaint, as discussed above,

2    amount at most to a "price squeeze" claim of the sort rejected by the Supreme Court in *linkLine*.

3    Conduct that is expressly *not* prohibited by the Sherman Act—among other reasons, so as not to

4    chill even monopolists' incentives to offer discounts and compete on price—cannot violate

5    Section 5.  *See Matter of Gen. Foods Corp.*, 103 F.T.C. 204.  In any event, there are no "indicia

6    of oppressiveness" because there is a clear "independent legitimate business reason" for

7    Qualcomm's practice, *E.I. du Pont de Nemours*, 729 F.2d at 139; Qualcomm does not wish to

8    facilitate infringement of its patents and jeopardize its ability to recover its extensive investments

9    in R&D regarding fundamental cellular communication technologies (¶ 143).

10    Because the FTC's "tax" theory is without merit, the FTC's assertion that unspecified

11    strategic funds "exacerbate[]" the anticompetitive effect of the supposed "tax" (¶ 106) likewise

12    fails.  Further, the strategic funds are unconditional above-cost discounts, which are

13    procompetitive.  (*See supra* Parts I.A.1, I.A.2.)

14    As with strategic funds, the FTC alleges that the practice of not licensing the manufacture

15    and sale of modem chips is anticompetitive only because it supposedly facilitates the collection of

16    "elevated" royalties leading to the supposed "tax".  Because the FTC's "tax" theory fails, a

17    practice that purportedly bolsters the "tax" cannot violate Section 5.  And even if the FTC were

18    claiming that not licensing the manufacture and sale of modem chips, by itself, causes harm to

19    competition, that theory would fail because there are no factual allegations (i) that Qualcomm

20    ever asserted its patents against any chip maker, (ii) that chip makers need a license from

21    Qualcomm in order to compete, or (iii) that any chip maker was excluded from making a sale by

22    the lack of a license from Qualcomm.  (*See supra* Part I.A.3.)

23    *Second*, the FTC has not plausibly pled that the Apple agreements substantially foreclose

24    competition in any market.  Because of the long recognized "legitimate business reasons" for

25    entering into an exclusive deal (even assuming *arguendo* that the agreements are properly

26    characterized as exclusive), the absence of any allegation of substantial foreclosure is fatal to the

27    FTC's claim.  *See, e.g.*, *Allied Orthopedic Appliances*, 592 F.3d at 996.  (*See supra* Part I.B.)

28

1

<u>**Conclusion**</u>

2          For the reasons stated above, the Complaint should be dismissed for failure to state a

3    claim upon which relief can be granted.

4    Dated:  April 3, 2017

5                                              Respectfully submitted,

6                                              CRAVATH, SWAINE & MOORE LLP,

7

8                                              _____ /s/ *Gary A. Bornstein* _____
                                                       Gary A. Bornstein
9                                                        Yonatan Even

10                                             Worldwide Plaza
                                               825 Eighth Avenue
11                                             New York, NY 10019
                                               Tel: (212) 474-1000
12                                             Fax: (212) 474-3700
                                               gbornstein@cravath.com
13                                             yeven@cravath.com

14                                             Richard S. Taffet
                                               MORGAN, LEWIS & BOCKIUS LLP
15                                             101 Park Avenue
                                               New York, NY 10178-0060
16                                             Tel: (212) 309-6000
                                               Fax: (212) 309-6001
17                                             richard.taffet@morganlewis.com

18                                             Willard K. Tom
                                               MORGAN, LEWIS & BOCKIUS LLP
19                                             1111 Pennsylvania Ave. NW
                                               Washington, DC 20004-2541
20                                             Tel: (202) 739-3000
                                               Fax: (202) 739 3001
21                                             willard.tom@morganlewis.com

22                                             Donn P. Pickett
                                               Geoffrey T. Holtz
23                                             MORGAN, LEWIS & BOCKIUS LLP
                                               One Market, Spear Street Tower
24                                             San Francisco, CA 94105-1126
                                               Tel: (415) 442-1000
25                                             Fax: (415) 442-1001
                                               donn.pickett@morganlewis.com
26                                             geoffrey.holtz@morganlewis.com

27                                             *Attorneys for Qualcomm Incorporated*

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Motion to Dismiss—Case No. 5:17-CV-00220-LHK