CRAVATH, SWAINE & MOORE LLP
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
825 Eighth Avenue
New York, New York 10019-7475
Telephone:  (212) 474-1000
Facsimile:   (212) 474-3700

MORGAN, LEWIS & BOCKIUS LLP
Richard S. Taffet (*pro hac vice*)
richard.taffet@morganlewis.com
101 Park Avenue
New York, NY  10178-0060
Telephone:  (212) 309-6000
Facsimile:   (212) 309-6001

MORGAN, LEWIS & BOCKIUS LLP
Willard K. Tom (*pro hac vice*)
willard.tom@morganlewis.com
1111 Pennsylvania Avenue NW
Washington, DC 20004-2541
Telephone:  (202) 739-3000
Facsimile:   (202) 739 3001

MORGAN, LEWIS & BOCKIUS LLP
Donn P. Pickett (SBN 72257)
donn.pickett@morganlewis.com
Geoffrey T. Holtz (SBN 191370)
geoffrey.holtz@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA  94105-1126
Telephone:  (415) 442-1000
Facsimile:   (415) 442-1001

Attorneys for Defendant
QUALCOMM INCORPORATED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 5:17-cv-00220-LHK |
| Plaintiff, | **DEFENDANT QUALCOMM INCORPORATED'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS, FILED PER COURT ORDER** |
| vs. | |
| QUALCOMM INCORPORATED, a Delaware corporation, | Date:  June 15, 2017 |
| | Time:  1:30 p.m. |
| Defendant. | Courtroom:  8, 4th Floor |
| | Judge:  Hon. Lucy H. Koh |

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Citation Forms ........................................................................................................ v

Preliminary Statement ............................................................................................ 1

Argument ................................................................................................................ 3

I.     THE FTC FAILED TO PLEAD FACTS SHOWING ANTICOMPETITIVE
       HARM ........................................................................................................... 3

II.    THE FTC HAS NOT STATED A CLAIM FOR UNLAWFUL
       MONOPOLIZATION ...................................................................................... 5

       A.     The FTC's "Raising Rivals' Costs" Theory of Exclusion Fails. ........................ 5

              1.     Chip-neutral royalties do not distort competition among chip
                     suppliers. ................................................................................... 5

              2.     The Complaint does not allege facts showing an increase in rivals'
                     costs. ......................................................................................... 7

              3.     *linkLine* forecloses the FTC's claim as a matter of law. ........................... 8

       B.     Qualcomm's Strategic Funds Do Not "Facilitate" Exclusion. ............................. 11

       C.     Qualcomm's Practice of Licensing at the Handset Level Only Does Not
              Exclude Rival Chip Suppliers. .................................................................... 12

       D.     The FTC Has Not Pled Substantial Foreclosure Resulting from
              Qualcomm's Agreements with Apple. .......................................................... 14

III.   THE FTC HAS NOT STATED A CLAIM FOR UNREASONABLE
       RESTRAINT OF TRADE. ............................................................................... 16

IV.    THE FTC HAS NOT STATED AN "UNFAIR METHODS OF COMPETITION"
       CLAIM UNDER SECTION 5 OF THE FTC ACT. ................................................ 17

Conclusion .............................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ...................................10

*Apple v. Samsung Elecs. Co.*, No. 11-cv-01846, 2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) ..............................................................................................................13

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ....................................11

*Atlantic Refining Co. v. FTC*, 381 U.S. 357 (1965)......................................................................17

*Boise Cascade Corp. v. FTC*, 637 F.2d 573 (9th Cir. 1980).........................................................17

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ................................................12

*Broadcom Corp. v. Qualcomm Inc.*, No. 05-cv-467 (C.D. Cal. May 18, 2005)...............................3

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)............................9

*Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244 (D. Utah 1999) .....................................5, 6

*Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008)......................................5

*Church & Dwight Inc. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876 (N.D. Cal. 2012) ......................1

*Digene Corp. v. Third Wave Techs., Inc.*, 323 F. App'x 902 (Fed. Cir. 2009)...............................7

*E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128 (2d Cir. 1984) ..........................................17

*E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435 (4th Cir. 2011)............................15

*Eastman v. Quest Diagnostics, Inc.*, No. 15-cv-415, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016) ...........................................................................................................15

*Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997) ...............................................................7

*Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171 (N.D. Cal. 2012).......................16

*FTC v. Texaco, Inc.*, 393 U.S. 223 (1968) .................................................................................17

*Funai Elec. Co. v. LSI Corp.*, No. 06-cv-01210-BLF, 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017) ....................................................................................................13

*Glen Mfg. v. Perfect Fit Indus.*, 299 F. Supp. 278 (S.D.N.Y. 1969)...............................................6

*John Doe 1 v. Abbott Labs.*, 571 F.3d 930 (9th Cir. 2009).......................................................9, 10

*Lotes Co. v. Hon Hai Precision Indus. Co.*, No. 12-cv-7465, 2013 WL 2099227 (S.D.N.Y. May 14, 2013)......................................................................................13

*Matter of Gen. Foods Corp.*, 103 F.T.C. 204 (1984) .................................................................17

*McNaboe v. Safeway Inc.*, No. 13-CV-04174-SI, 2016 WL 80553 (N.D. Cal. Jan. 7, 2016) ...................................................................................................................14

*McWane v. FTC*, 783 F.3d 814 (11th Cir. 2015) .............................................................7, 15

*Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993 (W.D. Wash. 2012) ...............11

*Nat'l Elec. Contractors Ass'n, Inc. v. Nat'l Constructors Ass'n,* 678 F.2d 492 (4th Cir. 1982) ...........................................................................................................10

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ................................... passim

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358 (7th Cir. 1987) ...........................................................................................................7, 9

*Qualcomm Inc. v. Broadcom Corp.*, No. 05-cv-1392 (S.D. Cal. July 11, 2005) .............................3

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008) .................................................................13

*Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788 (N.D. Tx. 2008) .......................13

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-5847 (N.D. Cal. Oct. 18, 2013) .........................................................................................................15

*Somers v. Apple*, 729 F.3d 953 (9th Cir. 2013) .............................................................3, 6

*Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) .............................................14, 15

*Tele Atlas N.V. v. NAVTEQ Corp.*, 397 F. Supp. 2d 1184 (N.D. Cal. 2005) ..............................16

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ...........................................12

*United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965) ........................................7

*United Shoe Mach. Corp. v. United States*, 258 U.S. 451 (1922) ...............................................6

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ...........................................1, 14

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995) .........................................5, 6

*United States v. Microsoft Corp.*, 59 F.R.D. 318 (D.D.C. 1995) .................................................6

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) ...........................................12

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) .........................................................................................................9, 11

*Viacom Int'l Inc. v. Tele-Commc'ns, Inc.*, No. 93 CIV 6658, 1994 WL 561377 (S.D.N.Y. Oct. 12, 1994) .................................................................................................7

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969)...............................................6

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)......................................................12

**Other Authorities**

Frank H. Easterbrook, *When Is It Worthwhile to Use Courts to Search for Exclusionary Conduct?*, 2003 COLUM. BUS. L. REV. 345 (2003)...........................................7

Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 YALE L.J. 209, 224 (1986)............................8

Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* (4th ed. 2011) ...............................................................................................................................7

FTC Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act, 80 Fed. Reg. 57,056 (Sept. 21, 2015). ..................................................................................................................................17

1

## CITATION FORMS

2   "¶__": Federal Trade Commission's Complaint for Equitable Relief, ECF No. 1 (the "Complaint").

3

4   "AAI Br. _": Amicus Brief of the American Antitrust Institute in Support of the FTC, ECF No. 94.[1]

5   "ACT Br. _": Brief of *Amicus Curiae* ACT | The App Association in Support of the FTC Respecting Defendant's Motion to Dismiss, ECF No. 95.

6

7   "Intel Br. _": Brief of *Amicus Curiae* Intel Corporation in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss, ECF No. 92.

8   "Mot._": Defendant Qualcomm Incorporated's Motion to Dismiss and Memorandum and Points and Authorities in Support, ECF No. 69 (the "Motion").

9

10   "Opp._": Federal Trade Commission's Opposition to Qualcomm's Motion to Dismiss, ECF No. 85 (the "Opposition").

11   "Samsung Br. _": Brief of *Amici Curiae* Samsung Electronics Co. Ltd. and Samsung Semiconductor, Inc. in Opposition to Qualcomm Incorporated's Motion to Dismiss, ECF No. 90.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[1] In accordance with the Court's Order Granting Motions for Leave To File Amicus Briefs; Granting Qualcomm Five Additional Pages in its Reply Brief, ECF No. 96, Qualcomm has used no more than 15 pages to respond to the FTC's Opposition and used additional pages solely to respond to portions of the *amicus* briefs. Rather than segregate the *amicus*-related arguments in a separate section, however, Qualcomm has included them in the relevant substantive sections of this Reply to place them in appropriate context.

**Preliminary Statement**

The FTC cannot state an antitrust claim merely by alleging that Qualcomm charges "elevated" royalties to OEMs.  What the FTC must do—but has not done—is allege facts showing that those royalties injure competition among suppliers of modem chips.  Instead, the first paragraph of the FTC's Opposition announces, as if it were an established canon of antitrust law, that the antitrust laws prohibit what it calls a "tax" on the purchase of rivals' products.  It then contends that the "key question" here is whether such an arrangement can be "shield[ed]" from review by labeling it a patent royalty.  (Opp. 1:2-8.)  But no such canon exists, and the key question is not a semantic one about taxes and royalties.  It is the substance that matters.  The FTC must plead facts showing that Qualcomm's royalties have an *anticompetitive effect* in a relevant market for modem chips, *i.e.*, that they have "the effect of significantly reducing usage of rivals' products", *United States v. Microsoft Corp.*, 253 F.3d 34, 65 (D.C. Cir. 2001)—which the FTC has utterly failed to do.  Absent such anticompetitive harm, Qualcomm's royalties—even if the FTC believes they are too high—do not violate the antitrust laws.  The FTC's rhetorical "tax" label cannot overcome this fundamental defect.[2]

As Qualcomm demonstrated in its opening brief, the FTC failed to allege facts showing that Qualcomm's royalties have an anticompetitive effect in the alleged chip markets.  The FTC does not allege a single instance in which Qualcomm's royalties affected an OEM's purchasing decision or reduced usage of a rival's modem chip.  The FTC and its *amici* seek to cure that deficiency by asserting new facts that do not appear in the Complaint.  But these newly asserted facts cannot fill the pleading hole; the Complaint merely alleges a speculative theory about how harm *might* hypothetically occur, without any allegation of harm that actually *has* occurred.

And the FTC's theory is flawed.  Because the royalties OEMs pay to use Qualcomm's patents do not vary based on the OEMs' selection of chip supplier (as the FTC concedes), the royalties do not put a thumb on the scale when OEMs decide which chips to purchase.  The royalties thus do not influence OEMs to buy more of Qualcomm's chips or to buy fewer of rivals'

---

[2] *See Church & Dwight Inc. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 905-06 (N.D. Cal.), *vacated in part on other grounds*, 2012 WL 1745592 (N.D. Cal. May 16, 2012) (rejecting "tax effect" theory in the absence of anticompetitive harm).

1    chips.  The FTC makes no plausible allegation that Qualcomm's royalties "depress[] OEMs'

2    demand for rivals' chips" (Opp. 13:17) while increasing demand for Qualcomm's chips.

3        The FTC nevertheless argues that these chip-neutral royalties hurt other chip suppliers,

4    based on a distorted "raising rivals' costs" theory—one in which rivals' costs are not actually

5    raised.  As the FTC admits, Qualcomm does not charge its rivals any royalties; thus there is *no*

6    effect on rivals' costs.[3]  Unable to plead that rivals' costs are actually raised, the FTC alleges that

7    Qualcomm "reduce[s] rivals' margins" (Opp. 2:18) by forcing its rivals to *lower the price* of their

8    chips (¶¶ 90, 94).  Starting from its view that Qualcomm's policy of selling modem chips only to

9    licensed OEMs allows it to charge "elevated" royalties, the FTC then proceeds to speculate

10   further—asserting without factual basis that Qualcomm's "elevated" royalties lead it to charge

11   less for its chips; that Qualcomm's lower chip prices force rivals to lower their chip prices; and

12   that as a result, rivals make less money.[4]  None of the cases the FTC cites comes close to

13   recognizing such a "lowering rivals' prices" theory as a basis for antitrust liability.  To the

14   contrary, the Supreme Court has held that "shifting" margin between two products, and thereby

15   causing rivals for one product to lower their prices and earn lower margins, is not an antitrust

16   violation.  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009).

17       The other practices on which the FTC focuses—strategic funds, not licensing at the

18   component level, and agreements with Apple—do not transform the FTC's flawed theory into a

19   viable antitrust claim.  The funds and refusal to license competitors are alleged only to facilitate

20   the supposed "tax".  Because the FTC has not alleged any anticompetitive effect from

21   Qualcomm's chip-neutral royalties, there is nothing unlawful to facilitate.  And the Complaint

22   falls woefully short of alleging facts showing that Qualcomm's agreements with Apple foreclosed

23   a substantial portion of any relevant market.  As a result, these conducts—even when taken

24   together—do not amount to a plausible theory of competitive harm; zero plus zero is still zero.

25       Finally, the four *amici curiae*[5] present new factual allegations that have no place in a

26   ───────────────

27   [3] Ironically, it is the FTC that suggests that Qualcomm must impose a *new* cost on its competitors
     by licensing them Qualcomm's SEPs; that approach *would* raise the costs of Qualcomm's rivals.

28   [4] To complete the guesswork, the FTC notes, "OEMs likely pass some portion of these higher
     prices on to consumers in the form of higher handset prices or reduced handset features".  (¶ 95.)

     [5] The *amici* are: Intel, a competing chip supplier; two Samsung entities that are a chip supplier

1    motion to dismiss, as well as new allegations of misconduct not raised by the FTC and not

2    supported by any allegation in the Complaint. Their attempt to add facts outside the Complaint

3    underscores the insufficiency of the facts alleged by the FTC. And their arguments, which

4    generally echo those of the FTC, fail for the same reasons.

5                                   **Argument**

6    I.    THE FTC FAILED TO PLEAD FACTS SHOWING ANTICOMPETITIVE HARM.

7           In its Opposition, the FTC focuses on its novel "raising rivals' costs" *theory* (which is

8    itself deeply flawed, as discussed below). But the Complaint does not plead sufficient *facts* to

9    support a claim of exclusion of rival chip suppliers. Specifically, it does not allege even a *single*

10   time in which Qualcomm's royalties affected an OEM's choice of chips. Nor does it allege a

11   *single* instance where Qualcomm's royalties disadvantaged a rival chip supplier—be it through

12   lost sales, reduced investments, or any other detriment. The FTC does assert that market exits

13   "reflect the natural consequences of Qualcomm's conduct" (¶ 139), but it fails to allege facts

14   showing any link between Qualcomm's conduct and those exits.[6] If Qualcomm's years-long

15   conduct had actually injured competition, the FTC should be able to plead relevant facts. It does

16   not, and thus fails to state a claim. *Somers v. Apple*, 729 F.3d 953, 959 (9th Cir. 2013) (to state a

17   claim, a complaint must "plead[] facts, as opposed to conclusory allegations").

18          The FTC does not contest these omissions. Instead, it tries to supplement the Complaint

19   by alleging new facts that are not in the Complaint. For example, in laying out the facts

20   *according to the Complaint*, Qualcomm noted in its opening brief that it neither licenses nor

21   asserts its SEPs at the component level. In its Opposition, the FTC states that this is "obviously

22   false", citing litigation between Qualcomm and Broadcom a dozen years ago.[7] (Opp. 6:15-16.)

23   _____

24   and a licensee; ACT | The App Association ("ACT"), an association sponsored by Apple and
     Intel, among others; and the American Antitrust Institute ("AAI"), a group sponsored primarily
     by law firms, including several that filed consumer actions against Qualcomm.

25   [6] Contrary to the FTC's assertion of exit, two of the *amici* claim that they have "invested billions"
26   and are "ready, willing, and able" to sell competitive chips. (Intel Br. 1; Samsung Br. 1, 9.)

     [7] The FTC neglects to mention that Broadcom initiated that patent litigation, not Qualcomm.
27   *Compare* ECF 1, Compl. *Broadcom Corp. v. Qualcomm Inc.*, No. 05-cv-467 (C.D. Cal. May 18,
     2005), *with* ECF 1, Compl. *Qualcomm Inc. v. Broadcom Corp.*, No. 05-cv-1392 (S.D. Cal. July
28   11, 2005). The FTC's resort to a litigation initiated *against* Qualcomm 12 years ago only
     confirms that Qualcomm does not use its patents as weapons against its competitors.

Reply Memorandum in Support of Motion to Dismiss
Case No. 5:17-CV-00220-LHK

Putting aside its irrelevance to competition in the pleaded markets *today*, that litigation is not mentioned in the Complaint, let alone cited as a basis for competitive harm.  If the FTC believes that this litigation is pertinent to its theory of harm, it should have alleged its existence *in the Complaint*; it may not now defend its Complaint on the basis of facts not alleged therein.[8]

Similarly, the Complaint uses multiple formulations to describe Qualcomm's royalty terms, primarily referring to them as "elevated".  (¶¶ 3.a, 4, 6, 7, 143.)  But it never uses the term "above FRAND"; it never alleges that the 5% "historical" rate is above FRAND; and it never identifies a single licensee whose specific rate is allegedly above FRAND.  This led a dissenting FTC Commissioner to note that "[r]ather than allege that Qualcomm charges above-FRAND royalties, the complaint dances around that essential element"[9]—and it led Qualcomm to point out this deficiency in its opening brief.  (Mot. 9:12-24.)  Yet in its Opposition, notwithstanding Commissioner Ohlhausen's criticism (which she continues to stand by today (Opp. ii. n.1)), the FTC argues that the Complaint is "replete" (Opp. 5:27) with allegations of "above-FRAND" royalties (Opp. 5:26, 15:22, 16:2, 18:16, 24:11-12 (repeating this term five times)).  That is not correct; the "above FRAND" allegation appears for the first time in the Opposition, where the FTC now seems to acknowledge that if Qualcomm's royalties are not above FRAND, then there is no "tax", but instead "royalties that reflect the value of its patents".[10]  (Opp. 1:10-12.)

The four *amici curiae* similarly raise new and improper factual allegations not pled in the Complaint.  For example, Intel asserts that Qualcomm threatened to terminate chipset supply to a

---

[8] In response to Qualcomm's argument that its royalties are not alleged to have varied over time or across licensees, the FTC asks the Court to infer allegations that are far broader than what is in the Complaint.  For example, because the Complaint did not allege any period during which Qualcomm *did not* have market power, the FTC asks the Court to infer that Qualcomm *always* had market power.  (Opp. 7:7-8.)  And based on allegations that "most leading OEMs" need CDMA chips (¶ 32) and that some unspecified OEMs need "premium LTE" chips (¶ 41), the FTC asks the Court to infer that *all* OEMs are dependent on these chips.  Neither fact was alleged, and the FTC cannot amend the Complaint by inference.

[9] Federal Trade Commission, Dissenting Statement of Commissioner Maureen K. Ohlhausen, In the Matter of Qualcomm, Inc., https://www.ftc.gov/system/files/documents/cases/170117qualcomm_mko_dissenting_statement_17-1-17a.pdf.

[10] The FTC repeatedly cites a 5G-related presentation that referred to proposed future "licensing on a non-FRAND basis".  (¶¶ 97-98.)  This snippet from a lengthy presentation regarding a possible *future* structure has been wrenched from context and does not support the assertion that Qualcomm "recognizes" that its *current* practice "distorts OEM negotiations".  (Compl. VI.F.)

customer in the early 2000s—a fact not alleged in the Complaint and that Intel concedes the

Court should not "rely on". (Intel Br. 4 n.1.) To the extent that the FTC believes that any of the

new allegations in its Opposition or the *amicus* briefs are needed to support its claim, it should

seek permission to amend. It should not be given the benefit of those new allegations.

Against this paucity of factual allegations, one undisputed fact stands tall—the chip-

neutral nature of Qualcomm's royalties. That fact is critical because it undercuts any theory that

Qualcomm's royalties cause the exclusion of competitors. If Qualcomm's royalties "diminish[]"

demand for chips (¶ 138) they do so equally for rivals' chips and for Qualcomm's chips. Thus,

the royalties do not negatively affect *competition* between rivals and Qualcomm.

## II.    THE FTC HAS NOT STATED A CLAIM FOR UNLAWFUL MONOPOLIZATION.

### A.    The FTC's "Raising Rivals' Costs" Theory of Exclusion Fails.

The FTC's primary challenge is to Qualcomm's refusal to sell modem chips to unlicensed

OEMs, which, as the FTC recognizes, manufacture and sell handsets that practice Qualcomm's

cellular SEPs. (¶¶ 21-24, 54-56, 70.) Qualcomm's unwillingness to cooperate with OEMs that

do not pay for the use of those SEPs is not anticompetitive. (*See* Mot. 6:3-12, 8:14-24.)

####        1.    *Chip-neutral royalties do not distort competition among chip suppliers.*

The FTC concedes that Qualcomm does not charge discriminatory royalties. (*See* Opp.

2:1-3, 12:24-14:6; ¶¶ 63, 94.) The royalties an OEM pays on a phone that uses a Qualcomm chip

are the same as the royalties an OEM pays on a comparably priced phone that uses a competing

chip. Thus, when OEMs choose among chip suppliers, Qualcomm's royalties do not push the

OEMs in one direction or another. This undisputed fact should end the inquiry; absent any effect

on OEMs' choice of chips, Qualcomm's royalties do not harm the competitive process. *See*

*Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) ("[a]nticompetitive

conduct is behavior that tends to impair the opportunities of rivals").

The neutrality of the royalties is a critical distinction from the "per processor" licenses at

issue in the *Microsoft* cases,[11] which the FTC cites as support for its proposed rule that "using

---

[11] *United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995); *Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244 (D. Utah 1999).

market power to tax rivals' sales is exclusionary".[12]  (Opp. 12:10-11.)  In those cases, when a manufacturer used MS-DOS, it made one payment to Microsoft—the full MS-DOS price.  But when a manufacturer used a rival's operating system ("OS") instead, it made two payments—one for MS-DOS (even though it did not use it) and one for the competitor's OS.  *Caldera*, 87 F. Supp. 2d at 1250.  Thus, Microsoft necessarily made it more expensive for manufacturers to sell a PC with a non-Microsoft OS than one that used MS-DOS.  *Microsoft*, 159 F.R.D. 318, 323 (D.D.C. 1995), *rev'd*, 56 F.3d 1448.  This structure harmed the competitive process; it created a strong incentive to buy MS-DOS and not rival OSs, for reasons unrelated to the quality or price of the products.  Here, the situation is different.  Whereas Microsoft charged for unneeded, unused software, an OEM always uses Qualcomm's patented technologies, regardless of whose chip it purchases, and thus always makes one chip-neutral royalty payment.  And the OEM always makes a single payment for a chip, either to Qualcomm or a rival, but not both.  Qualcomm's royalties do not affect the relative attractiveness of its chips, meaning that chip choices are driven solely by the relative quality and price of the chips offered by Qualcomm and its rivals.

As a result, a central premise of the FTC's theory does not hold up:  to the extent the FTC alleges Qualcomm's royalties "reduce demand" specifically for *rivals'* modem chips (as distinct from Qualcomm's) (*e.g.*, ¶ 63), that allegation is facially implausible.  *See Somers*, 729 F.3d at 964 (an antitrust claim must be plausible "in light of basic economic principles").  Whereas Microsoft's pricing structure "deterred [manufacturers] from licensing and promoting operating systems developed by Microsoft's rivals" (Opp. 10:18-19), the FTC does not plausibly allege that Qualcomm's royalties "deter[]" OEMs from buying competitors' modem chips.[13]

---

[12] The patent misuse cases the FTC cites for this proposition (Opp. 9:24-10:10) are irrelevant.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969); *Glen Mfg. v. Perfect Fit Indus.*, 299 F. Supp. 278 (S.D.N.Y. 1969).  The FTC does not allege that cellular devices using competitors' modem chips do not practice Qualcomm's patents.  *United Shoe Mach. Corp. v. United States*, 258 U.S. 451 (1922), is even more off point; it involved "drastic" contractual restrictions with the "practical effect" of *prohibiting* the use of a competitor's product.  *Id.* at 457.

[13] To the extent the FTC alleges that overall demand—for both rivals' and Qualcomm's chips—is lower than it would have been had Qualcomm charged lower royalties, that does not exclude rival chip suppliers.  The FTC has not cited a single authority finding a cognizable claim predicated on diminution of *overall* market demand, as opposed to demand for competitors' products.

2.    *The Complaint does not allege facts showing an increase in rivals' costs.*

The FTC contends that Qualcomm's chip-neutral royalties nevertheless impair competition among modem chip suppliers by raising rivals' costs. That *conclusion* is not supported by plausible allegations of *fact*.

As a preliminary matter, a mere characterization of a practice as having the effect of raising rivals' costs does not obviate the FTC's need to plead anticompetitive effects.[14] More fundamentally, *Qualcomm does not raise any costs* incurred by its rivals. In each of the "raising rivals' costs" cases on which the FTC relies, the challenged conduct caused rivals to incur greater expenses (*i.e.*, bear higher costs) than they otherwise would have incurred. For example, in *Premier*, 814 F.2d 358, a trade association of electrical contractors agreed with a union to impose a 1% charge on competing contractors—thus directly raising those rivals' costs. In *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997), the defendant hospital was accused of "increas[ing] the operating cost of [its] competitors by imposing on them the cost of caring for indigent patients". And in *McWane v. FTC*, 783 F.3d 814, 822 (11th Cir. 2015), the defendant's conduct caused its rival to bear "increased logistical costs and higher labor costs".[15] There is no such increase in rivals' costs alleged here. The FTC does not allege that Qualcomm imposes any costs on rivals, nor does it identify any increase in expenses that rival chip suppliers must bear.

_____

[14] Judge Easterbrook, who authored *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358 (7th Cir. 1987), the principal case on which the FTC relies, has made precisely this point: absent a showing of anticompetitive effects through reduced output, "raising rivals' costs . . . can be mistaken for any other element of doing business". Frank H. Easterbrook, *When Is It Worthwhile To Use Courts To Search for Exclusionary Conduct?*, 2003 COLUM. BUS. L. REV. 345, 346-47 (2003). Indeed, Judge Easterbrook has recommended that "we leave raising rivals' costs to the academy". *Id.* at 357; *see also, e.g.*, Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law*, § 6.04 (4th ed. Supp. 2014) ("'raising rivals' costs' can never operate as a complete test for exclusionary conduct"); *Digene Corp. v. Third Wave Techs., Inc.*, 323 F. App'x 902, 912 (Fed. Cir. 2009) (raising rivals' cost, without exclusion, does not amount to anticompetitive effect); *Viacom Int'l Inc. v. Tele-Commc'ns, Inc.*, No. 93 CIV 6658, 1994 WL 561377, at *5 (S.D.N.Y. Oct. 12, 1994) ("[plaintiff] is not able to cite to any court that has held a defendant liable, or has held that a defendant could be liable, simply for raising its rival's costs").

[15] Likewise, *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), which the FTC cites in arguing that "facially neutral" terms can harm competition (Opp. 12:26-13:4), addressed whether a group of employers could lawfully "demand that [a] union impose on other employers wages that were *significantly higher* than those paid by the requesting employers, or a system of computing wages that, because of differences in methods of production, would be *more costly* to one set of employers than to another". *Id.* at 668 (emphasis added). No such increased costs to competitors are alleged here.

1   This is simply not a case in which rivals' costs are raised.

2          Nor does this case pose the risk of competitive harm that the "raising rivals' costs" theory

3   addresses.  Under that theory, when a defendant raises its rival's cost structure, it raises the price

4   at which its rival can profitably sell, thereby enabling the defendant to raise its own price.  *See*

5   Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion:  Raising Rivals' Costs*

6   *To Achieve Power Over Price*, 96 YALE L.J. 209, 224 (1986) ("[c]ourts [should] inquire whether

7   the [defendant] places its competitors *at such a cost disadvantage* that the [defendant] can then

8   exercise monopoly power *by raising its price*" (emphasis added)).  But the FTC does not claim

9   that Qualcomm has put other modem chip suppliers at a "cost disadvantage" that forced them to

10  increase chip prices; to the contrary, the FTC's theory is that Qualcomm has caused its

11  competitors to charge *lower* prices than they otherwise would charge.  (*See, e.g.*, ¶ 90 (Qualcomm

12  "reduces competitors' sales and margins"), ¶ 94 (if Qualcomm increased its chip prices, then so

13  could competitors, leading them to earn higher margins).)  Put differently, instead of alleging a

14  theory of "raising rivals' costs", the FTC actually alleges a theory of "lowering rivals' prices".

15  This is not a cognizable theory, and the FTC does not cite a single case endorsing it.

16              3.      linkLine *forecloses the FTC's claim as a matter of law.*

17          The FTC's raising rivals' costs theory also fails because the claim that a monopolist raised

18  the price of one input (*e.g.*, patented technology) and caused a non-predatory reduction in the

19  price of another input (*e.g.*, chips), thereby reducing margins for sellers of the second input, was

20  definitively rejected in *linkLine*, 555 U.S. 438.  The FTC asserts that *linkLine* did not approve the

21  use of monopoly power to impose a "tax" on the purchase of rivals' products (Opp. 14:17-20),

22  but that is a purely semantic argument.  The substantive harm to competition alleged in *linkLine* is

23  the same as what the FTC alleges here.  In *linkLine*, as here, the defendant (AT&T) was alleged to

24  have raised the price for access to its essential upstream DSL infrastructure (here, essential

25  patents), and reduced the prices on its own downstream retail DSL service (here, modem chips),

26  forcing rivals to reduce their prices and margins.  (*Compare* 555 U.S. at 449, *with* ¶ 94.)  In

27  *linkLine*, as here, AT&T was alleged to have increased the price of infrastructure access by using

28  monopoly power.  *Id.* at 442.  And in *linkLine*, as here, AT&T's pricing structure increased the

"all-in" price paid by customers for DSL service. *Id.* at 449, 451. All of this could easily have been labeled a "tax" that consumers paid when buying DSL service from AT&T's competitors.

The same fundamental flaw that existed in *linkLine* exists here. The FTC's theory is that margins are reduced because instead of charging monopoly prices for its chips, Qualcomm charges "elevated" royalties and prices its chips competitively, thereby forcing rivals to lower the prices they charge for their chips. (*See, e.g.*, ¶ 94 ("[i]f Qualcomm used its dominance solely to raise the nominal prices of its own processors, those price increases . . . would attract entry and competitive pricing from baseband processor competitors").) That was the same harm alleged in *linkLine*. *See* 555 U.S. at 449 (AT&T's pricing alleged to "lower [rivals'] revenues (because they will have to match the dominant firm's low retail price)"). *linkLine* forecloses such claims "[h]owever labeled". *John Doe 1 v. Abbott Labs.*, 571 F.3d 930, 935 (9th Cir. 2009). And for good reason: just as in *linkLine*, the FTC's theory is purely speculative, because even if Qualcomm charged lower royalties, Qualcomm could still charge the same price it does today for chips, and rivals would continue to earn the same margins they earn today. After all, the FTC does not allege that current chip prices are insufficient to cover costs. And as *linkLine* makes clear, there is no legal basis to require Qualcomm to increase the price of its chips—which is what would be needed to allow rivals to increase their margins.

The FTC's and the *amici*'s efforts to avoid *linkLine* fall flat. *First*, the FTC turns to the Seventh Circuit's decision in *Premier*, which pre-dated not only *linkLine*, but also the two seminal Supreme Court opinions on which *linkLine* relied.[16] To the extent *Premier* conflicts with *linkLine*, it is no longer good law. But *Premier* is inapposite. *Premier* dealt with an agreement between an association of contractors and a union, whereby the union would require all contractors (whether members of the association or not) to pay the association a charge of 1% of their labor costs, supposedly to defray the costs borne by the association in negotiating a collective bargaining agreement ("CBA") with the union. This was *per se* unlawful price fixing, 814 F.2d at 369, 371, and thus there was no requirement to show anticompetitive effect, as the

---

[16] *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).

1   FTC must show here.  Moreover, in *Premier*, the 1% charge did distort the competitive process.

2   The challenged agreement allowed rival contractors to bear a single negotiation charge (the 1%

3   charge) if they opted in to the association's CBA, but forced them to bear two charges (the 1%

4   *plus* the actual costs of negotiating independently with the union) if they chose not to enter into

5   the association's CBA.[17]  *Premier* is thus akin to the *Microsoft* "per-processor" arrangement; a

6   deal independent of the association was necessarily more expensive than one involving the

7   association.  It is nothing like the chip-neutral agreements employed by Qualcomm.

8   　　　*Second*, the FTC misstates Qualcomm's argument by claiming that Qualcomm reads

9   *linkLine* to "create[] a rule of *per se* legality for any conduct that diminishes rivals' margins, so

10   long as the monopolist's own prices remain above cost".  (Opp. 15:5-7.)  No such rule is

11   necessary to conclude that *linkLine* forecloses the FTC's claim.  Under *linkLine*, when a

12   defendant that does not have an antitrust duty to deal—and there is no such duty here (*see

13   infra*)—is alleged to use monopoly power to charge a supra-competitive price on one product

14   (such as IPR) and then charge lower above-cost prices on another product (such as modem chips),

15   thereby forcing its rivals to lower their prices, there is no antitrust violation.  555 U.S. at 452; *see

16   also, e.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1187 (9th Cir. 2016)

17   (*linkLine* forecloses a claim that the defendant "engages in unlawful conduct by simultaneously

18   charging a low (but above-cost) price for its repair bundles and raising the wholesale price of

19   replacement parts to make it difficult or impossible for competitors" to compete); *Abbott Labs.*,

20   571 F.3d at 935.  Contrary to the FTC's contention, this straightforward application of *linkLine*

21   does not "overrule[] nearly a century of . . . Sherman Act precedent".  (Opp. 15:9-10.)  Nor does

22   it disturb—or even relate to—tying or exclusive dealing law.[18]  (*Id.*)  And although the FTC does

23

---

24   [17] *See Nat'l Elec. Contractors Ass'n, Inc. v. Nat'l Constructors Ass'n,* 678 F.2d 492, 495-97 (4th
    Cir. 1982) (discussing the same 1% agreement).

25

26   [18] Intel claims that Qualcomm's practice "resembles" tying (Intel Br. 11:5-10), but there is good
    reason that Intel does not go further and claim that tying law applies: Qualcomm does not require
    customers to buy something from it that they could buy from someone else.  In a classic tie, the
27   defendant has market power in one product (*e.g.*, shampoo) and requires customers who buy that
    product also to buy from the defendant another product (*e.g.*, conditioner) that they might
28   otherwise choose to buy from the defendant's competitor.  Here, Qualcomm is not alleged to
    force chip customers to license *its* SEPs as opposed to *someone else's* SEPs.

Reply Memorandum in Support of Motion to Dismiss
Case No. 5:17-CV-00220-LHK

not acknowledge it, *linkLine* presented a "raising rivals' costs" theory much more squarely than the FTC does here; indeed, the Supreme Court described the case as one in which rivals "will have to pay more for the inputs they need". 555 U.S. at 442; *see id.* at 449 ("[t]his will raise competitors' costs"). As noted above, the FTC does not even get that far.

*Third*, certain *amici* seek to distinguish *linkLine* by contending that, unlike AT&T, Qualcomm is under an "antitrust duty to deal" arising from its FRAND commitments. That is wrong. FRAND commitments are contractual obligations undertaken by a patent holder rather than a duty imposed by the antitrust laws. *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 999 (W.D. Wash. 2012) ("through Motorola's letters to [certain SSOs], Motorola has entered into binding contractual commitments to license its essential patents on RAND terms"). Even if FRAND commitments arise because of concerns about potential misuse of SEPs, that does not distinguish this case from *linkLine* or from *Trinko*. In *linkLine*, AT&T was obligated to allow access to its infrastructure pursuant to an FCC regulation intended to "spur competition" and then by an express condition imposed in AT&T's merger with Bell South. 555 U.S. at 442-43. Likewise, in *Trinko*, Verizon was obligated to allow access to its network pursuant to a statute intended "to introduce competition". 540 U.S. at 402. Nevertheless, in both cases the Supreme Court found there was no *antitrust* duty to deal. To the contrary, in *linkLine*, the Supreme Court found that AT&T could stop providing access to the upstream infrastructure *completely* and (although this would violate its obligations to the FCC) that *still* would not have been an antitrust violation. *linkLine*, 555 U.S. at 451. Here too, the antitrust laws do not require Qualcomm to license its intellectual property (or sell its chips) to anyone on any terms; a FRAND commitment is an enforceable obligation, but it is not an obligation created by the antitrust laws.[19]

B.    Qualcomm's Strategic Funds Do Not "Facilitate" Exclusion.

The FTC's allegations regarding unspecified (by size or number) discounts provided to

---

[19] Certain *amici* cite *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), and argue that a FRAND commitment is an antitrust duty because it is a voluntary commitment. (AAI Br. 6-7). This is baseless. In *Aspen*, which is "at or near the outer boundary of § 2 liability", *Trinko*, 540 U.S. at 879, the defendant's "unilateral *termination* of a voluntary (and presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end". *Id.* at 880 (emphasis added and removed). The FTC has not alleged that Qualcomm terminated an existing course of conduct or has forsaken short-term profits.

1    unidentified OEMs as "strategic funds" undermine the core premise of the Complaint—that

2    OEMs need Qualcomm's chips so badly that they "accept[] royalty and other license terms that

3    they would not otherwise accept". (¶ 86.) Those unspecified discounts are allegedly paid when

4    "OEMs *resist* license terms", as a way to "close the gap" between the terms each party is seeking.

5    (¶ 104 (emphasis added).) If OEMs can resist Qualcomm's licensing terms with enough force to

6    secure such payments, then Qualcomm does not have the power necessary to coerce "elevated"

7    royalties, as the FTC alleges. The alleged discounts show that licensees can and do push back

8    against Qualcomm.

9         The FTC contends in response that "carrots and sticks" can sometimes be used together

10   (*see* Opp. 16:21-23), but it does not explain why Qualcomm would provide discounts if it could

11   use its supposed power over chips to get its desired license terms. The cases the FTC cites do not

12   help, because the defendants in those cases did not have to make concessions to secure their

13   desired terms.[20] Qualcomm's customers' ability to "resist" is unique to this case, and is fatal to

14   the claim that those customers were coerced into paying "elevated" royalties.[21]

15        C.    Qualcomm's Practice of Licensing at the Handset Level Only Does Not Exclude
                Rival Chip Suppliers.
16

17        In its challenge to Qualcomm's practice of licensing only at the handset level, the FTC

18   misstates the law. Relying entirely on one case, *Broadcom Corp. v. Qualcomm*, 501 F.3d 297 (3d

19   Cir. 2007), the FTC contends that "FRAND commitments can create an antitrust duty to deal".

20   (Opp. 17:24.) There are two problems with that assertion. *First*, it ignores a crucial element of

21   *Broadcom*: the court there addressed whether intentionally *deceptive* conduct before an SSO

22   _____
     [20] In *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012), Eaton "wielded its monopoly
     power . . . to enter into restrictive long-term agreements", *id*. at 277, but there was no mention of
     customers securing concessions through resistance. In *United States v. Dentsply Int'l, Inc.*, 399
23   F.3d 181 (3d Cir. 2005), Dentsply imposed rules that restricted dental dealers from carrying
     competing lines of artificial teeth, but it did *not* offer those dealers any rebates. And in *United
24   States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999), Microsoft maintained restrictions "in
     the face of [] strident opposition", and granted discounts only "as compensation for the work
25   required" to comply with the restrictions, not to win over resisting OEMs. 84 F. Supp. 2d at 62.

26   [21] Because the funds act as unconditional above-cost discounts, they are affirmatively pro-
     competitive. The FTC argues that the funds are "conditioned" on the execution of a license
27   agreement (Opp. 17:8-9), but that kind of signing condition does not make them "conditional
     rebates". The FTC does *not* allege that the payments are subject to *performance* conditions, such
28   as purchasing over a specified threshold of chips to qualify for the discount. Thus, they do not
     skew purchasing decisions in Qualcomm's favor and have no exclusionary effect.

1    could support an antitrust claim.  *See* 501 F.3d at 314 (addressing "a patent holder's intentionally

2    false promise").  Here, the FTC has not alleged that Qualcomm engaged in any such deception.[22]

3    *Second*, the *Broadcom* decision relied heavily on the FTC's order in *Rambus*, which was later

4    overturned; the D.C. Circuit held that even *deceptive* conduct relating to a FRAND commitment

5    does not establish an antitrust violation.  *Rambus Inc. v. FTC*, 522 F.3d 456, 466 (D.C. Cir. 2008)

6    ("an otherwise lawful monopolist's end-run around price constraints, even when deceptive or

7    fraudulent, does not alone present a harm to competition in the monopolized market").  A

8    FRAND violation, even when properly alleged, is not, by itself, an antitrust violation.

9           Instead, the FTC must plead both deception and anticompetitive harm resulting from not

10   licensing at the chip level.  It has not done so.  The Complaint does not allege deception of any

11   SSO.  It does *not* allege that rival chip suppliers must have a Qualcomm patent license to compete

12   effectively.  Nor does it allege that Qualcomm has asserted its patents against its rivals to impede

13   their business.  Instead, the FTC argues that not licensing at the chip level allows Qualcomm to

14   "maintain" the so-called "tax".  (¶ 6; *see also* Opp. 18:15-20.)  Thus, the FTC's claim depends

15   entirely on the viability of its "tax" theory—which, for the reasons stated above, fails.

16          In addition, the FTC's argument as to *how* Qualcomm's licensing structure helps

17   "maintain" the purported "tax" does not hold up.  The FTC alleges that other chip suppliers "do

18   not depend" on Qualcomm's modem chips and thus would enforce Qualcomm's FRAND

19   obligations, including through the courts.  (¶¶ 6, 114.)  But even though the Complaint alleges

20   that Qualcomm has been violating FRAND obligations to rivals for many years, it does not allege

21   that rival chip suppliers have brought FRAND claims to enforce those alleged obligations.  The

22   FTC asks the Court to draw speculative inferences as to why that may be (Opp. 19:8-11), but it is

23

24   ───────────────
     [22] The cases the *amici* use to suggest that the "Complaint fits comfortably within the well-
     established case law linking FRAND violations to the antitrust laws" (Samsung Br. 6-7; *see* Intel
25   Br. 17-19) also involved deceptive conduct and are inapposite.  *See Funai Elec. Co. v. LSI Corp.*,
     No. 06-cv-01210-BLF, 2017 WL 1133513, at *1 (N.D. Cal. Mar. 27, 2017) (defendants "lied to
26   two different" SSOs); *Lotes Co. v. Hon Hai Precision Indus. Co.*, No. 12-cv-7465, 2013 WL
     2099227, at *5 (S.D.N.Y. May 14, 2013) ("misrepresentations made . . . during the standard-
27   setting process" and "deception"); *Apple v. Samsung Elecs. Co.*, No. 11-cv-01846, 2011 WL
     4948567, at *1 (N.D. Cal. Oct. 18, 2011) ("defrauding the standards setting organization");
28   *Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 796 (N.D. Tex. 2008) ("false
     promises" to SSOs).

1    implausible to infer that Qualcomm's rivals have for many years suffered competitive injury from

2    not being licensed, have done nothing to enforce their purported FRAND right to a license, yet

3    will suddenly do so going forward.  The FTC is entitled to *reasonable* inferences, nothing more.

4        The Complaint also does not explain how the licensing of chip suppliers would allow

5    OEMs not to pay royalties to Qualcomm.  The FTC states that "[i]f Qualcomm licensed its rivals,

6    OEMs could purchase licensed chips" (Opp. 18:18-19), but that would not excuse OEMs from

7    taking a license from Qualcomm for other patents covering other aspects of a cellular device.  The

8    FTC does not (and could not in good faith) allege that Qualcomm lacks such patents, nor can that

9    be inferred from the Complaint, which says nothing about the scope of products covered by

10   Qualcomm's patents.  *See McNaboe v. Safeway Inc.*, No. 13-cv-04174-SI, 2016 WL 80553, at *2

11   (N.D. Cal. Jan. 7, 2016) ("It is improper for a court to assume the plaintiff can prove facts that it

12   has not alleged.").[23]  In any event, under the FTC's theory, Qualcomm's ability to force OEMs to

13   pay a "tax" comes from its alleged power in chips, not in patents; thus, licensing competitors

14   would not diminish Qualcomm's alleged power over OEMs.

15       D.    The FTC Has Not Pled Substantial Foreclosure Resulting from Qualcomm's
             Agreements with Apple.
16

17       The FTC acknowledges that exclusive dealing contracts are not unlawful absent (among

18   other things) "[s]ubstantial foreclosure" of a relevant market.  (Opp. 19:23-27.)  And the FTC

19   does not dispute in its Opposition that it has failed to allege what portion of any alleged market it

20   believes that Qualcomm's agreements with Apple foreclosed.  To defend that failure, the FTC

21   asserts that it can plead substantial foreclosure "qualitatively", without alleging *any* information

22   about market share or about the number and strength of alternative buyers that are not foreclosed.

23   (Opp. 19:25-27.)  The FTC is wrong, as confirmed by the very cases on which it relies.

24       "Following *Tampa Electric* [*Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)], courts

25   considering antitrust challenges to exclusive contracts have taken care to identify the share of the

26   market foreclosed."  *Microsoft*, 253 F.3d at 69.  "The market share foreclosed is important

27

28   _____

[23] Samsung asserts that based on its view of Qualcomm's patent portfolio, it "does not believe a separate license would be necessary" (Samsung Br. 11 n.10), but such speculation in an *amicus* brief is no substitute for a factual allegation in a Complaint.

because, for the contract to adversely affect competition, 'the opportunity for other traders to enter into or remain in that market must be significantly limited'". *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 451 (4th Cir. 2011) (quoting *Tampa Elec.*, 365 U.S. at 328). The FTC is correct that substantial foreclosure is not "simply" a numerical test (Opp. 20:14-15), but it is necessary as a "'jumping-off point for further analysis'". *McWane*, 783 F.3d at 835. Thus, other factors may also be relevant, but "courts typically look (at least initially) to the percentage share of the relevant market foreclosed by the challenged agreement". *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-5847, at *11 (N.D. Cal. Oct. 18, 2013). Although some courts permit a lower number in Section 2 cases, "a foreclosure percentage of at least 40% has been a threshold for liability in exclusive dealing cases". *McWane*, 783 F.3d at 837.[24]

The FTC has not alleged the portion of the market foreclosed by the Apple agreements, as required for substantial foreclosure. Allegations that Apple is a "particularly important" customer (¶ 129) that "sells large volumes" of handsets (¶ 129.a) are not sufficient under *Tampa Electric*. *See* 365 U.S. at 329 ("a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence"). The FTC does not say anything about the size or importance of the rest of the market—for example, whether there are other customers that, individually or in the aggregate, are "important" and sell "large volumes" of handsets.[25] Nor does the FTC allege that Apple is the only OEM that can "confer[] benefits on a nascent supplier". (¶ 129.) Thus, even if the Complaint adequately alleged that sales to *Apple* were foreclosed, it does not allege that a substantial share of the relevant *market* was foreclosed. *Cf. Eastman v. Quest Diagnostics, Inc.*, No. 15-cv-415, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016) (dismissing claim because plaintiffs "fail[ed] to describe the prior market shares of [relevant firms], the number of other competitors in the plan/outpatient market, or the circumstances of

---

[24] Against the weight of this authority, the FTC cites three times to a footnote from the Fourth Circuit to argue that alleging a "specific percentage" of foreclosure is not required. (Opp. 19:25-28, 20:10-17 (citing *Kolon*, 637 F.3d at 452 & n.12).) *Kolon*, of course, is not controlling in this Circuit. But even if it were, in that footnote the court noted the plaintiff's "extensive factual allegations" and allowed the plaintiff some leeway regarding share because it "likely ha[d] insufficient information to calculate a precise number". 637 F.3d at 452 n.12. The FTC cannot claim the same information deficit; it had over two years of pre-complaint investigation.

[25] Samsung, for example, claims that it too is one of the world's leading manufacturers of mobile handsets. (Samsung Br. 1:5-6.)

1    health plans other than Aetna and Blue Shield operating in Northern California").

2        The FTC asserts incorrectly that it need not allege any rival chip supplier that was actually

3    foreclosed from making sales to Apple—or was even capable of making sales to Apple.  The

4    cases the FTC cites (Opp. 22:3-11) do not support its position.  In those cases, the plaintiff had

5    failed to identify the *customers* who had contracted with the defendant.  The courts forgave this

6    omission because "the sources of proof are clearly within the defendant's control".  *Tele Atlas*

7    *N.V. v. NAVTEQ Corp.*, 397 F. Supp. 2d 1184, 1190 (N.D. Cal. 2005).  But the cases did not

8    address, much less approve, a failure to allege that any *rival* was actually foreclosed.  If there

9    were other firms able to supply Apple LTE chips with the most "advanced" features (¶¶ 40-42),

10   that is information the FTC should have available, and an allegation it should have made.[26]

11                                              * * * * *

12       In several places, the FTC asserts that Qualcomm's arguments regarding defects in

13   particular FTC theories can be ignored because the Court must consider the Complaint as a

14   whole.  (*E.g.*, Opp. 8:18-19, 18:22-26, 21:21-22.)  Although it is true that the combined effect

15   must be assessed, unlike *Free FreeHand Corp. v. Adobe Sys. Inc*., on which the FTC relies, this *is*

16   "a case where none of the alleged conduct was anticompetitive, even when combined".  852 F.

17   Supp. 2d 1171, 1184 (N.D. Cal. 2012).  The FTC's insufficient pleading of exclusion from an

18   untenable "lowering rivals' prices" theory, when mixed with insufficient pleading of substantial

19   foreclosure, do not alchemize into an antitrust violation.

20   III.    THE FTC HAS NOT STATED A CLAIM FOR UNREASONABLE RESTRAINT OF
             TRADE.

21       The FTC acknowledges that the same theories underlie its claims under both Section 1

22   and Section 2 of the Sherman Act.  (Opp. 23:17-20.)  Thus, the FTC's unreasonable restraint of

23   trade claim fails for the same reasons its monopolization claim fails.

24

25

26   ─────────────────────
     [26] Intel asserts that its "innovative chipsets met Apple's technical standards" for many years (Intel
     Br. 21:2-4), but the Complaint does not support that claim.  Intel's explanation for the fact that it
27   won Apple's business during the term of the supposed "exclusivity" agreement—*i.e.*, that
     regulatory proceedings deterred Qualcomm from *future* misconduct (*see id.* at 21:20-22)—is rank
28   speculation, and the fact remains that the *existing* arrangement did not stop Intel from winning the
     business.

                                                              Reply Memorandum in Support of Motion to Dismiss
                                                              Case No. 5:17-CV-00220-LHK

1

IV.    THE FTC HAS NOT STATED AN "UNFAIR METHODS OF COMPETITION" CLAIM UNDER SECTION 5 OF THE FTC ACT.

2    The FTC's "standalone Section 5 claim" is based on the same factual allegations as its

3   Sherman Act claims.  (Opp. 24:11-13.)  For legal support, it turns to cases from the 1960s,

4   ignoring the fact that no court of appeals has accepted an expansive view of standalone Section 5

5   claims in the decades since.  *See, e.g.*, *Boise Cascade Corp. v. FTC*, 637 F.2d 573, 578-82 (9th

6   Cir. 1980) (overturning FTC order that was not based on substantial evidence of anticompetitive

7   effect).[27]  The FTC's 2015 enforcement principles stated that Section 5 is used only to challenge

8   conduct that causes or is likely to cause "harm to competition or the competitive process".[28]  As

9   noted above, the FTC's challenge under Section 2 fails because it does not allege facts showing

10  such harm.  Moreover, Section 5 cannot reach conduct that has specifically been found *not* to give

11  rise to a cognizable claim under Section 2;[29] the FTC cannot use Section 5 to revive price squeeze

12  claims foreclosed by *linkLine*.  In any event, the FTC's effort to analogize to the 1960s cases

13  fails.  In both *FTC v. Texaco, Inc.*, 393 U.S. 223 (1968), and *Atlantic Refining Co. v. FTC*, 381

14  U.S. 357 (1965), an oil company coerced service station dealers "to buy [a] recommended [tire]

15  brand", resulting in "nonsponsored brands . . . not compet[ing] on the even terms of price and

16  quality competition."  *Texaco, Inc.*, 393 U.S. at 230.  But as the FTC has conceded, Qualcomm's

17  royalties are chip-neutral, meaning that OEMs' purchasing decisions do occur on "even terms".

18    The AAI's attempt to bolster the FTC's Section 5 claim is also without merit.  The AAI

19  asserts that pleading anticompetitive effect is unnecessary because Section 5 was intended to stop

20  anticompetitive practices in their "incipiency".  (*See* AAI Br. 11:20-23.)  That argument has no

21  place here, where the FTC alleged that the challenged conduct has been ongoing for years.  The

22  AAI also contends a firm may violate Section 5 even "without regard to exclusion of its rivals".

23  (AAI Br. 12.)  For support, the AAI relies entirely on the FTC's own agency decisions.  It does

24

---

25  [27] The FTC's other authorities are agency decisions reflecting the *FTC's* own aggressive interpretation of the statute, which has often been rejected by the courts, as it was in a case the
26  FTC cites.  *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 137-40 (2d Cir. 1984).

27  [28] FTC Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act, 80 Fed. Reg. 57,056 (Sept. 21, 2015).

28  [29] *See Matter of Gen. Foods Corp.*, 103 F.T.C. 204 (1984) (Section 5 should not be used to "reshape" antitrust policies when they "have been clearly expressed and circumscribed").

1    not identify any court that has accepted that proposition, and the FTC does not urge it here.

2    <u>**Conclusion**</u>

3         For the reasons stated above and in Qualcomm's opening brief, the Complaint should be

4    dismissed for failure to state a claim upon which relief can be granted.

5    Dated:  June 2, 2017

6             Respectfully submitted,

7             CRAVATH, SWAINE & MOORE LLP,

8                   /s/ Gary A. Bornstein

9                   Gary A. Bornstein
                       Yonatan Even

10 

11             Worldwide Plaza
             825 Eighth Avenue

12             New York, NY 10019
             Tel: (212) 474-1000

13             Fax: (212) 474-3700
             gbornstein@cravath.com

14             yeven@cravath.com

15             Richard S. Taffet

16             MORGAN, LEWIS & BOCKIUS LLP
             101 Park Avenue

17             New York, NY 10178-0060
             Tel: (212) 309-6000

18             Fax: (212) 309-6001
             richard.taffet@morganlewis.com

19 

20             Willard K. Tom

21             MORGAN, LEWIS & BOCKIUS LLP
             1111 Pennsylvania Ave. NW

22             Washington, DC 20004-2541
             Tel: (202) 739-3000

23             Fax: (202) 739 3001
             willard.tom@morganlewis.com

24 

25 

26 

27 

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Donn P. Pickett
Geoffrey T. Holtz
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1126
Tel: (415) 442-1000
Fax: (415) 442-1001
donn.pickett@morganlewis.com
geoffrey.holtz@morganlewis.com

*Attorneys for Qualcomm Incorporated*

Reply Memorandum in Support of Motion to Dismiss
Case No. 5:17-CV-00220-LHK