# Exhibit 1

2024 WL 3845444
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida,
Miami Division.

Daniel HARPER, et al., on behalf of himself
and all others similarly situated, Plaintiffs,
v.
Shaquille O'NEAL, Astrals LLC, Astrals Holding,
LLC, and Astrals Operations LLC, Defendants.

Case Number: 23-21912-CIV-MORENO
|
Signed August 16, 2024

**Attorneys and Law Firms**

Adam M. Moskowitz, Joseph M. Kaye, The Moskowitz Law Firm, Miami, FL, Desiree Erin Fernandez, Jose Manuel Ferrer, Mark Migdal & Hayden, Miami, FL, Michelle Genet Bernstein, Polsinelli, Miami, FL, for Plaintiff Daniel Harper.

Adam M. Moskowitz, The Moskowitz Law Firm, Miami, FL, for Plaintiffs Timo Walter, Daniel Koch, Shaun Divecha, Mickey Scott, Viraf Sam Chapgar.

Alan H. Rolnick, Joseph William Donato III, Rivero Mestre LLP, Coral Gables, FL, Sylmarie Trujillo, Coral Gables, FL, Christopher Edson Knight, Brian Douglas Elias, Esther Elisa Galicia, Fowler White Burnett, P.A., Miami, FL, Alexandra Lyn Tifford, Miami, FL, Jorge Alejandro Mestre, Rivero Mestre LLP, Miami, FL, Daniel L. Sachs, Pro Hac Vice, Rachel O. Wolkinson, Pro Hac Vice, Stephen A. Best, Pro Hac Vice, Brown Rudnick LLP, Washington, DC, Jonathan D. White, Pro Hac Vice, Brown Rudnick LLP, New York, NY, for Defendant Shaquille O'Neal.

Alan H. Rolnick, Rivero Mestre LLP, Coral Gables, FL, Alexandra Lyn Tifford, Miami, FL, Christopher Edson Knight, Brian Douglas Elias, Esther Elisa Galicia, Fowler White Burnett, P.A., Miami, FL, for Defendants Astrals LLC, Astrals Holding, LLC, Astrals Operations LLC.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

FEDERICO A. MORENO, UNITED STATES DISTRICT JUDGE

 ***1**  Plaintiffs filed a class action suit against Defendants Shaquille O'Neal, Astrals LLC, Astrals Holding, LLC, and Astrals Operations LLC for various securities violations, including the offer and sale of unregistered securities. The alleged unregistered securities sold to Plaintiffs are the Astrals and Galaxy tokens created for the Astrals project. One of the main promotors of the Astrals Entities was former National Basketball Association player Shaquille O'Neal.

The case centers around the Astrals Project, a multi-faceted business venture. The Astrals Project is a collection of 10,000 non-fungible token (NFT) 3D avatars, which Plaintiffs allege is aimed to promote investment in a virtual world in which users could socialize, play, and interact with other users. NFTs are unique cryptographic tokens that exist on a blockchain and cannot be replicated. NFTs can represent digital or real-world items, like art and real estate. Like art or real estate, NFTs can be tied to some amount of monetary value, and investors may bet on the value increasing and thus can be sold for a profit. A blockchain is a digital database that supports cryptocurrencies. The Solana platform is the relevant blockchain platform here. The Solana platform is a decentralized, programmable smart-contract blockchain. The virtual world, which the parties coin as the "Astralverse," was to be a story-driven, virtual reality role-playing game, where consumers could use their Astrals NFTs as virtual avatars. Plaintiffs purchased Astrals products with Solana cryptocurrency. A single Solana was worth approximately $90 when Astrals launched in March.

Another critical pillar of the Astrals Project was the creation of a decentralized autonomous organization (DAO) for "incubating innovative projects." The Galaxy token is the governance token of the DAO. Galaxy tokens differ from the Astrals NFTs as they give holders the right to participate in the decision-making process of a blockchain-based organization or network.

NBA legend Shaquille O'Neal is alleged as a driving force behind the Astrals Project. Plaintiffs claim that O'Neal knew or should have known of potential concerns about regulatory issues concerning the sale of unregistered crypto securities, but nevertheless extensively promoted the Astrals Project to his large following on a multitude of social media platforms. Plaintiffs further contend that the Astrals Project was personally developed by Defendant O'Neal. The

Complaint states that O'Neal's son Myles was the head of "Investor Relations" and that Defendants viewed and marketed the Astrals Project as an investment opportunity. Plaintiffs further allege that the value of Astrals Financial Products was entirely linked to Defendant O'Neal's celebrity status and many investors of Astrals were induced to invest because of O'Neal's direct involvement in the project. In backing that up, Plaintiffs include a slurry of alleged actions by O'Neal. *See* ¶¶ 38-47. Defendant O'Neal acted as the face of Astrals, often "tweeting" promotional content, such as giving away three Astrals NFTs to his "Twitter" followers or giving Astrals investors an opportunity to win free tickets to his Disc jockey performances. During those DJ performances, O'Neal would perform in front of massive backdrops of Astrals avatars. O'Neal would often tweet with the hashtag "#ASTRALS." O'Neal would also speak directly to the community through the Astrals' Discord channel about his support of and plans for the project, such as achieving a floor price of 30 Solana. He supposedly urged investors to "[h]op on the wave before its too late." *See* ¶ 43.

**\*2** When the FTX cryptocurrency trading platform collapsed in November 2022, Plaintiffs allege that Defendants reassured them that the project would continue as planned with O'Neal's close involvement. *Id.* ¶ 11. In the wake of the FTX collapse, Defendant O'Neal himself, on the community message board Discord, sent out a graphics interchange format (gif) from *The Wolf of Wall Street* that read, "I'M NOT F\*\*\*ING LEAVING." *See* ¶ 49. Since that day, O'Neal has not posted on the Astrals' Discord account.

Plaintiffs allege that Defendant O'Neal fled the project and the value of the Astrals Financial Products plummeted. Plaintiffs, representing themselves and a putative global class of investors who purchased Astrals NFTs and/or Galaxy tokens from the Astrals Project, suffered financial losses and have filed suit under an array of securities laws. Specifically, Plaintiffs allege violations of Section 5, 12(a)(1), and 15 of the Securities Act of 1933. Unsurprisingly, Defendants disagree. Defendants argue that the Astrals Project does not involve a capital investment drive or an appeal to passive investors. Instead, the case arises from the sale of gamers of collectible video-game avatars that were "metaverse-ready" upon sale. Accordingly, Defendants argue that the Amended Complaint warrants dismissal by the Court for that reason among others.

The Court denies Defendants' Motion to Dismiss Count I as Plaintiffs have properly alleged that Defendant O'Neal is a "seller" under Section 12. However, the Court agrees with Defendants that the Section 12(a)(1) claims based on a purchase on or before May 23, 2022, are time-barred, but the claims regarding the Galaxy tokens are not time-barred. The Court also dismisses Count II against Defendant O'Neal only, as he is not a "control person" under Section 15. Next, the Court denies Defendants' Motion to Dismiss the Amended Complaint as Plaintiffs have sufficiently alleged that Astrals and Galaxy tokens are "securities" subject to federal securities laws.

## LEGAL STANDARD: RULE 12(b)(6) MOTION TO DISMISS

Defendants move to dismiss the Amended Complaint with prejudice. In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim the Court considers only the four corners of the complaint. A court must accept as true the facts as set forth in the complaint.

"To survive a motion to dismiss, plaintiffs must do more than merely state legal conclusions," instead plaintiffs must "allege some specific factual basis for those conclusions or face dismissal of their claims." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1263 (11th Cir. 2004). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiffs well-pleaded facts as true. *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 953 (11th Cir. 1986). This tenet, however, does not apply to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). Moreover, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 1950. Those "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). In short, the complaint must not merely allege misconduct, but must demonstrate that the pleader is entitled to relief. *See Iqbal*, 129 S. Ct. at 1950.

## LEGAL ANALYSIS

**\*3** Plaintiffs file two claims against Defendants. Count I is the offer and sale of unregistered securities in violation of Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e(a). Count II is a violation of Section 15 of the Securities Act. Plaintiff brings both claims individually and on behalf of the members of the classes against Defendants. Defendants dispute both claims. On Count I, Defendants argue that Defendant O'Neal is not a "seller" subject to liability under Section 12(a)(1), and that the 12(a)(1) claims are time-barred. On Count II, Defendants argue that Defendant O'Neal's purported "control" over Astrals Project is legally insufficient, which also warrants dismissal. Pertaining to both counts, Defendants argue that the claims fail as the Astrals and Galaxy tokens are not "securities" subject to federal securities law.

A. Count I – Violation of Section 5 & 12(a)(1) of the Securities Act

Section 12(a)(1) of the Securities Act is a statutory vehicle that holds violators of Section 5 of the Securities Act liable. 15 U.S.C. § 77l(a)(1); *see also* 15 U.S.C. § 77e. Section 5 makes it unlawful for any person (directly or indirectly) to:

> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale. 15 U.S.C. § 77e.

Section 12(a) writes that, "[a]ny person who—offers or sells a security in violation of section 77e of this title ... shall be liable ... to the person purchasing such security from him ..." *See* 15 U.S.C. § 77l(a)(1). To adequately state a *prima facie* claim under Section 12(a)(1) of the Securities Act, a plaintiff must allege: (1) the sale or offer to sell securities; (2) the absence of a registration statement covering the securities; and (3) the use of the mails or facilities of interstate commerce in connection with the sale or offer. *Raiford v. Buslease, Inc.*, 825 F.2d 351, 354 (11th Cir. 1987) (citing *Swenson v. Engelstad*, 626 F.2d 421, 424–25 (5th Cir. 1980)). Defendants dispute Plaintiffs' Section 12(a)(1) *prima facie* claim by arguing that Defendant O'Neal is not a "seller" subject to liability. Further, Defendants argue that Plaintiffs' Section 12 claims are time-barred.

a. "Seller"

Both parties cite to *Pinter v. Dahl*, 486 U.S. 622, 638, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) for purposes of defining the term "seller." The Supreme Court in *Pinter* clarified that liability for a Section 12(a)(1) violation is not just limited to a "person who transfers title to, or other interest in, that property," but also to a "person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 642-43, 647. *Pinter* writes that "[t]he solicitation of a buyer is perhaps the most critical stage of the selling transaction" as it is the stage at which an investor is most likely to be injured. *Id.* at 646, 108 S.Ct. 2063. The Supreme Court reasons so because "solicitors are well positioned to control the flow of information to a potential purchaser, and, in fact, such persons are the participants in the selling transaction who most often disseminate material information to investors." *Id.* Accordingly, understanding what "solicitation" means is key.

Solicitation is something that goes beyond the mere execution of an order. *See Ryder Int'l Corp. v. First Am. Nat. Bank*, 943 F.2d 1521, 1531 (11th Cir. 1991) (citing *Pinter v. Dahl*, 486 U.S. 622, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)). It is an active act (from a person working for another) urging or persuading a consumer to buy or purchase something. *Id.* "Mere conclusory allegations that a defendant solicited the sale of stock and was motivated by financial gain to do so are insufficient to state a claim under Section 12." *In re CNL Hotels & Resorts, Inc.*, No. 04-cv-1231ORL-31KRS, 2005 U.S. Dist. LEXIS 51501, 2005 WL 2291729, at \*5 (M.D. Fla. Sept. 20, 2005).

**\*4** More recently, the Eleventh Circuit addressed the Supreme Court's *Pinter's* definition of "solicitation" in *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341 (11th Cir. 2022). In *Wildes*, the Eleventh Circuit clarified what "solicitation" means. First, the *Wildes* panel addressed that Congress did not limit solicitations to "personal" or "individualized" ones; in fact, the Act suggests the opposite. *Id.* at 1346: Section 12 of the Act makes a person who solicits the purchase of an unregistered security liable for using "any means" of "communication in interstate commerce." *Id.*; *see also* 15 U.S.C. § 77e(a)(1). Further, the court specifically found that Securities Act precedent does not restrict solicitations under the Act to targeted ones. *Id.* The Eleventh Circuit wrote that it is generally understood that solicitation included communications made through diffuse, publicly available means—at the time, newspaper and radio advertisements. Thus, it is consistent with the longstanding interpretation of the term to also include broadly disseminated communications as "conveying solicitations."

The Eleventh Circuit reasoned that its clarification on solicitation was necessary to keep up with technological advances. Now, sellers can reach a global audience through podcasts, social media posts, or online videos and web links. Failure in "keeping up with the times" would result in sellers dodging liability simply through a "choice of communication." *See id.* Therefore, the Court, consistent with precedent holds that Plaintiffs successfully allege "solicitation" and therefore have met the standard of the second category of "seller" under Section 12(a)(1).

Defendants argue that the Amended Complaint fails to allege that Defendant O'Neal "successfully solicited" Astrals and Galaxy tokens to Plaintiffs, let alone that he did so to further his or the Astrals Project's financial interests. Further, Defendants argue that Defendant O'Neal did not directly sell or persuade Plaintiffs to buy Astrals products. However, as cited above, the *Wildes* panel specifically clarified that solicitation need not be "personal" or "targeted" to trigger liability. *See Wildes*, 25 F.4th at 1346. The Complaint alleges that O'Neal, in a video, claimed that the Astrals team would not stop until the price of Astrals NFTs reached thirty $SOL and urg[ed] investors to "[h]op on the wave before it's [sic] too late." [ECF No. 24] ¶ 43. Defendant O'Neal acted like the *Wildes* promotors that urged people to people to buy BitConnect coins in online videos. *Wildes*, 25 F.4th at 1346. O'Neal also personally invited fans to an Astrals Discord channel, where he interacted directly with them on a daily basis, reassuring investors that the project would grow. [ECF No. 24] ¶ 9. Lastly, Defendant O'Neal's own financial interests were in mind. The Complaint states that Defendant O'Neal was one of the founders of the Astrals Project. *See* [ECF No. 24] ¶ 34. Further, the Astrals Project was his brainchild that he personally developed, and his son was named head of "Investor Relations." *Id.* Therefore, Plaintiffs have met the definition of a seller and thus alleged enough to state a Section 12 claim against Defendants.

### b. Time-Barred

Defendants argue that both Astrals and Galaxy tokens claims are time-barred. The Court agrees in part. Some of the Astrals token claims are time-barred, but the Galaxy tokens claim is not.

### i. Astrals Products

Section 13 of the Securities Act governs the timeliness of claims brought under Section 12(a)(1). *See* 15 U.S.C. § 77m. Section 13 states that if the action is to enforce a liability created under Section 12(a)(1), it must be brought within one year after the violation upon which it is based. *See id.* A "statute of limitations defense may be raised on a motion to dismiss where it is clear from the face of the complaint that the statutory period has expired." *Mesones v. Estevez*, 2021 WL 3721324, at \*5 n.2 (11th Cir. 2021). Defendants argue that Plaintiffs' claims based on Astrals Products are time-barred, which compels dismissal by the Court. Specifically, because Plaintiffs allege that they bought Astrals products between March 10, 2022, and April 3, 2023, any claim based on a purchase on or before May 23, 2022 (Complaint was filed on May 23, 2023) is untimely. Plaintiffs argue that they have listed numerous Astrals purchases after May 23, 2022, and further, it is not apparent from the face of the Complaint when, if ever, Plaintiffs took delivery of the products they purchased between March 9, 2022, and May 22, 2022.

**\*5** Generally, statutes of limitations encourage plaintiffs to pursue claims diligently and are customarily subject to equitable tolling. *See Young v. United States*, 535 U.S. 43, 49, 122 S. Ct. 1036, 152 L. Ed. 2d 79 (2002) (citations and internal quotation marks omitted). Equitable tolling "pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued his rights diligently but some

extraordinary circumstance prevents him from bringing a timely action." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10, 134 S. Ct. 1224, 188 L. Ed. 2d 200 (2014). The Eleventh Circuit in *Fedance v. Harris*, 1 F.4th 1278, 1285 (11th Cir. 2021) deduced that equitable tolling is presumed available in Section 13 claims. However, here, Plaintiffs have not argued that there was any extraordinary circumstance that prevented them from bringing a timely action. Further, nothing in the record suggests that Defendants took any steps to keep Plaintiffs from suing in time. Thus, while equitable tolling is applicable, Plaintiffs have not shown an extraordinary circumstance or facts in the record to suggest that the Court should toll the Section 13 statute of limitations.

Plaintiffs also do not meaningfully dispute Defendants' statute of limitations arguments. Plaintiffs only bring up the fact that it is not apparent whether they actually took delivery of any of the Astrals Financial Products they purchased between March 9, 2022, and May 22, 2022. Plaintiffs cite to *McLernon v. Source Intern.*, Inc., 701 F. Supp. 1422, 1427 (E.D. Wis. 1988). *McLernon* cited Eleventh Circuit case *Raiford v. Buslease, Inc.*, 825 F.2d 351, 355 (11th Cir. 1987), but *Raiford* did not actually hold that "sold" for purposes of Section 12(a)(1) is defined as the completion of the "last integral act of sale." Consistent with 15 U.S.C. § 77m, the Court must look at the date of the violation (to offer or sell a security in violation of Section 5). Thus, the claims that are based on an Astrals token purchase on or before May 23, 2022, are untimely. The Court finds that those claims are time-barred. But the claims that are based on Astrals token purchases made after May 23, 2022, may move forward.

### ii. Galaxy Tokens

Defendants also argue that Plaintiffs' claim regarding Galaxy tokens are time-barred. The Court, at this stage of the proceeding, finds that the Galaxy token claim is not time barred. As Defendants point out, Plaintiff Divecha stated under oath that "[b]etween March 10, 2022 and June 15, 2022, I purchased and/or sold the securities that are the subject of the Complaint." Viewing the facts in the light most favorable to Plaintiffs, the violations may have occurred within the statute of limitations. Thus, the Court looks to Defendants' second argument on whether the Amended Complaint "relates back" to the original complaint.

Defendants argue that even if the Court finds that the Galaxy token claim is not facially time-barred, it does not relate back to the filing date of the original complaint, and thus still should be barred. An amendment to a pleading can "relate[ ] back to the date of the original pleading" under certain circumstances, including where "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]" Fed. R. Civ. P. 15(c)(1)(A)-(B). When new claims asserted in an amended complaint " 'involve[ ] separate and distinct conduct,' such that the plaintiff would have to prove 'completely different facts' than required to recover on the claims in the original complaint, the new claims do not relate back." *Caron v. NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1368 (11th Cir. 2018) (quoting *Moore v. Baker*, 989 F.2d 1129, 1132 (11th Cir. 1993)) (alterations in original). On the other hand, where the claims brought in an amended complaint are "closely related" to the claims asserted in an original complaint, we have held that the amendment related back to the filing date of the original complaint. *See Arce v. Garcia*, 434 F.3d 1254, 1264 n.24 (11th Cir. 2006).

**\*6** The analysis of Rule 15(c) relation back changes depending on whether a defendant or plaintiff is added. For example, when an amendment seeks to change a party against whom a claim is asserted, (as opposed to changing merely the allegations set forth in the pleading), the relation back rule is more stringent. *See Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1131 (11th Cir. 2004); *see also* Fed. R. Civ. P. 15(c)(3). Here, Plaintiffs' Amended Complaint adds Plaintiff Divecha. Rule 15(c)(3) does not expressly contemplate an amendment that adds a plaintiff. Courts have addressed this issue in a variety of ways, but the common thread of essential requirements are notice and prejudice, as outlined in Rule 15(c)(1)(C). *See Makro Cap. of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1259 (11th Cir. 2008) (citing *Cliff.*, 363 F.3d at 1131-33).

Here, the Court holds that Plaintiffs' Galaxy token claim relate back. Defendants argue that the Galaxy claim is new, and the facts are distinctly unrelated. However, Plaintiffs' response points the Court to the opening paragraph of the original complaint which states that Defendants are being sued for the "offer and sale of unregistered securities, including *tokens* and NFTs in connection with The Astrals Project." (emphasis added). *See* [ECF No. 1]. The initial

complaint also stated that Defendant O'Neal "pushed the investment opportunity through various NFT incentives, such as the "Shaq Signature Pass," which was "an exclusive series of NTFs that [could] be used to sign your Astral permanently with the signature of the legend himself [O'Neal] ... and they can be earned by participating actively in the community or bidding for them in Magic Eden auctions using $GLXY[.]"". *Id.* ¶ 21. The Amended Complaint differs greatly from the amended complaint in *Makro Capital of Am. Inc.*, where the Eleventh Circuit held that the amended complaint did not meet the requirements of Rule 15(c)(1)(C) to relate back. 543 F.3d at 1255. There, the plaintiff's initial complaint against the defendant was for failure to provide a full accounting, imposition of a constructive trust, fraud, misrepresentation, and spoliation of evidence. *Id.* at 1256. After the initial complaint was denied, the plaintiff filed an amended complaint, but this time as a false claims *qui tam* action brought on behalf of the United States. *Id.* The *Makro* panel found persuasive that the complaints widely diverged and that there was an "intrinsic distinction" between the *non-qui tam* action brought against the United States and the *qui tam* suit brought on behalf of the United States against its former co-defendant. *Id.* at 1259. Thus, even though the claims derived out of the same common facts, the defendants were not put on notice, nor did they have requisite knowledge. Here, the addition of Plaintiff Divecha's Galaxy claim does not fundamentally shift the nature of the complaints. Further, the claim is predicated on the same conduct and transactions of selling unregistered Astrals Financial Products. The Eleventh Circuit in *Bloom v. Alvereze* importantly sets out that knowledge is calculated not by knowledge of the underlying events, but knowledge of the action at hand. 498 F. App'x 867, 873 (11th Cir. 2012). As set out in the opening paragraph in the initial complaint, Defendants here could have reasonably expected that the Galaxy token claim would have been brought against them. Lastly, the Court finds that Defendants would not be prejudiced with the addition of the Galaxy claim. As articulated above, the addition of this claim does not subject Defendants to maintaining a newly added prickly defense. The claim regarding the Galaxy tokens will remain in this case.

B. <u>Count II – Violation of Section 15 of the Securities Act</u>

**\*7** Defendants argue that Plaintiffs fail to allege that Defendant O'Neal is a control person—a necessary element of a Section 15 Securities Act violation. The Court agrees.

### *1. "Control Person"*

"Control person liability is secondary only and cannot exist in the absence of a primary violation." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1276 (11th Cir. 2016) (citing *Southland Sec. Corp. v. Inspire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004)). For control-person liability, a plaintiff must allege: "(1) a primary violation of federal securities laws," and "(2) that the defendant exercised actual power or control over the primary violator." *Id.* (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000)).

At this stage, Plaintiffs have alleged a primary violation of federal securities laws. Thus, the Court looks to whether Defendant O'Neal is claimed to have exercised actual power or control over the primary violator. In most instances where the Eleventh Circuit has addressed secondary control liability, it stopped short as the complaint failed to allege a primary liability—the first hurdle for control person liability. *See, e.g., Ballesteros v. Galectin Therapeutics, Inc. (In re Galectin Therapeutics, Inc.)*, 843 F.3d 1257, 1276 (11th Cir. 2016); *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783 (11th Cir. 2010); *Rosenberg v. Gould*, 554 F.3d 962 (11th Cir. 2009). However, the Eleventh Circuit in *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715 (11th Cir. 2008) faced the question of "whether, and to what extent, the proportionate liability provisions of Section 21D(g) of the Securities Act of 1933, 15 U.S.C. § 78u-4(f), enacted as part of the Private Securities Litigation Reform Act of 1995, amended the joint and several liability provisions of Section 20(a), 15 U.S.C. § 78t(a)." *Id.* at 725. In addressing that question, the *Laperriere* panel shed light into "control person liability."

The Securities and Exchange Commission promulgated a more specific definition of control under the Act, defining "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." *Id.* (citing 17 C.F.R. § 230.405

(West 2007)). The *Laperriere* panel was careful to note that other circuits "do not attempt to formulate a precise definition of "control" applicable to all cases" and instead only look to provide "some guidance, leaving a determination as to whether control exists dependent on the particular factual circumstances of each case." *Id.* at 723. The *Laperriere* panel cited to *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996), where the Eleventh Circuit adopted an Eighth Circuit test which requires additionally that the defendant "had the power to control the specific corporate policy that resulted in the primary violation." See *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985). In a recent footnote, the *In re Galectin Therapeutics, Inc. Sec. Litig.* panel cited a pair of Ninth Circuit cases that defined a "controlling person" as one that participates in the day-to-day affairs of the corporation and the power to control corporate actions. 843 F.3d at 1276 (citing *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994) (quoting *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396-97 (9th Cir. 1993))). Both parties acknowledged the *Kaplan* case. With this background in mind, we look to the facts of our case.

**\*8** First, the "founder" allegations. The Amended Complaint clearly alleges that Defendant O'Neal founded the Astrals Project, assembled a management team, and his efforts were essential to the creation of Astrals. However, it does not hold true that the mere fact someone is a "founder" equates to having control. The Plaintiffs hinge their response on that premise. It seems like Plaintiffs hint at the fact that Defendant O'Neal, through his status, had the potential to direct management and policies of the Astrals Project. But Plaintiffs do not allege how or in what way that he did. There are no allegations that state, for example, that Defendant O'Neal participated in the day-to-day affairs of the corporation or had the power to control corporate actions.

While *Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*, 104 F. Supp. 3d 441, 576 (S.D.N.Y. 2015) is outside of our circuit, it seems correct to find that officer or director status alone does not constitute control. Here, it is not even alleged that Defendant O'Neal held officer or director status within the Astrals group. The appellants in front of the *Brown* panel seemed to have a stronger argument than here (which the Eleventh Circuit did not find persuasive). *See* 84 F.3d at 397. There, the Eleventh Circuit found that even though Mendal was the chairman of the board of directors, there was no evidence that he had the power to control the board, and thus was not a controlling person. *Id.* Here, not only did Defendant O'Neal not have the "chairman status" of the *Brown* appellant, but Plaintiffs' allegations were also conclusory in nature and insufficient in pinning Defendant O'Neal as a control person. Accordingly, the Court dismisses Count II against Defendant O'Neal.

C. Count I & II – "Securities" under Section 2(a)(1) of the Securities Act

Defendants argue that both the Astrals and Galaxy tokens are not "securities" subject to federal securities laws. Section 2(a)(1) of the Securities Act defines the term "security" as many things. *See* 15 U.S.C. § 77b(a)(1). The definitions of securities pertinent to this case are "notes" and "investment contracts." The Court finds that for the purposes of Defendants' Motion to Dismiss, Plaintiffs have sufficiently alleged that the Astrals and Galaxy tokens are "securities" subject to federal securities laws.

A note is defined as "[a] written promise by one party (the *maker*) to pay money to another party (the *payee*) or to bearer. Black's Law Dictionary (11th ed. 2019). Plaintiffs do not make an argument to classify the Astrals or Galaxy tokens as a "note." The Court takes that silence as a concession. Thus, whether the Astrals and Galaxy tokens are "securities" under Section 2(a)(1) of the Securities Act depends on whether the tokens can be classified as an "investment contract."

The Supreme Court established the *Howey* test to determine whether a particular scheme constitutes an "investment contract," within the meaning of Section 2(a)(1). The Supreme Court in *Howey* defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The Eleventh Circuit articulated the *Howey* test as so: "(1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely form the efforts of others." *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1198 (11th Cir. 1999). The definition of investment contract is flexible rather than static—one that is capable of adaption to meet the countless and variable schemes devised by those

who seek the use of the money of others on the promise of profits. *See Howey*, 328 U.S. at 298, 66 S.Ct. 1100.

In recent years, a few district courts have ruled on whether digital assets may be seen as investment contracts. Plaintiffs cite to *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020), *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020), *SEC v. Terraform Labs Pte. Ltd., et al.*, No 1:23-cv-01346-JSR, ECF No. 51 (S.D.N.Y. July 31, 2023), and a settlement against BlockFi Lending LLC. While the cases cited to may provide a bit of help as to a *Howey* analysis, they are out-of-district and thus not controlling. Further, the Court is not determining the broad question of whether an NFT is a *per se* investment contract. The Court is only determining whether Astrals products may be considered an investment contract for the purposes of this Motion to Dismiss.

### 1. Investment of Money

The first element requires the Court to find out whether a person made an investment of money. An investment of money means that there is, at least, a general "arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses." *Hodges v. Monkey Cap., Ltd. Liab. Co.*, No. 17-81370-CV-MIDDLEBROOKS, 2018 WL 9686569, 2018 U.S. Dist. LEXIS 229669 (S.D. Fla. Aug. 14, 2018) (citing *SEC v. Friendly*, 49 F. Supp. 2d 1363, 1368-69 (S.D. Fla. 1999)). Here, it is alleged that Plaintiffs invested money into Astrals Financial Products. That is enough to satisfy the "investment of money" prong at this stage. While it is true that in *Phillips v. Kaplus*, 764 F.2d 807 (11th Cir. 1985) the *panel* declined to find the interest as an investment, it was because the interest was received as compensation "for getting Mr. Horowitz [a potential investor in the enterprise] and his associates into the deal." *See id.* at 816–17. Here, Plaintiffs' purchases of Astrals products are different than the 5% interest as compensation for the *Phillips* plaintiffs' part in the transaction. Thus, Plaintiffs did in fact invest money and therefore met the first prong of the *Howey* test.

### 2. Common Enterprise

**\*9** Prong two of the *Howey* test requires that an investment of money is made to a *common enterprise*. *See ETS Payphones, Inc.*, 408 F.3d at 732 (emphasis added). While generally there are two types of commonalities (horizontal or vertical) that satisfy the *Howey* test's common enterprise element, the Eleventh Circuit only follows the "broad vertical commonality" test. *Id.* That test requires the movant to "show that investors are dependent upon the expertise or efforts of the investment promoter for their returns." *Id.* The Complaint alleges that the two pillars to Astrals are "(A) a decentralized autonomous organization (DAO) for incubating innovative projects and (B) a story-driven, play-to-earn role-playing game." [ECF No. 24] ¶ 5. If the Astrals group's main purpose was only "pillar B," then Defendants would be correct in arguing that there is no common enterprise when applying the broad vertical commonality test. However, apart from the story-driven game, the creation of the Astrals metaverse depended on initial funding from the tokens. While there seems to be an aspect of control that Plaintiffs were set to have in the gameplay, it is still clear that the success or failure of the overall investment lies in the hands of Defendants. The Astrals whitepaper is clear in stating that Solana Labs developed the minting website, and MEKKA LAB built the "next-gen staking platform" for the distribution of the governance token and DAO framework for the project incubation. Further, Defendant Astrals, LLC owns the name and intellectual property involved in the entire project. While the community and investors own a specific NFT within the project (and can increase that specific NFT's value through gameplay), the investors and players have no control over the success of the investment into the Astrals metaverse. While it is a closer call than *Rensel*, where an individual investor could exert no control over the success of his or her investment, Plaintiffs' fortunes were still directly tied to the success of the Astrals metaverse and the Astrals group overall. *See Rensel v. Centra Tech, Inc.*, 17-24500-CIV, 2018 WL 4410126, at \*5 (S.D. Fla. June 25, 2018). Thus, at this stage, the Court finds that Plaintiffs have met the "common enterprise" prong of the *Howey* test.

### 3. Reasonable Expectation of Profit

There is also disagreement on whether Plaintiffs have met the "expectation of profits" element of the *Howey* test.

As Defendants note, the Eleventh Circuit in *SEC v. ETS Payphones, Inc.* articulated the *Howey* test in four elements instead of three. 408 F.3d 727, 732 (11th Cir. 2005). The court broke up the third element into "expectation of profits" and "the expectation of profits to be derived solely from the efforts of others." *Id.* The panel explained that it did so solely for the purposes of that appeal. *Id.* Both parties here argue on "expectation of profits" and the "efforts of others." So, the Court analyzes both separately as well.

In order to satisfy the third prong of *Howey*, investments must be substantively passive and depend on the "entrepreneurial or managerial efforts of others." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S. Ct. 2051, 44 L. Ed. 2d 621 (1975). The key determination is whether it is the promoters' efforts, not that of the investors, that form the "essential managerial efforts which affect the failure or success of the enterprise." *Unique Fin. Concepts*, 196 F.3d at 1201 (citing *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir. 1973)). This part of the third prong of the *Howey* test seems similar to the Eleventh Circuit's favored vertical commonalities test that determines whether there is a common enterprise.

There seems to be no dispute in the fact that Plaintiffs engaged (or looked to engage) in some level of effort to increase their Astrals value. Defendants point the Court to the whitepaper's "NFTs" tab, where it discusses increasing the value of an individual Astrals NFT by "levelling up, improving mutable characteristics, and purchasing add-ons." Further, the whitepaper references several other games in which the Astrals NFTs could be used. However, the question is not whether the investors put in effort, but whose effort (promoter or investor) forms the "essential managerial efforts which affect the failure or success of the enterprise." *Unique Fin. Concepts*, 196 F.3d at 1201. This reasoning is confirmed by the *Fedance* panel. *See* 1 F.4th at 1288-89. There, the Eleventh Circuit found that the three-part *Howey* test was met. *See id.* In its reasoning for the third element, the panel stated that even though the FLiK token was "a cryptographic token used by the FLiK application" and that FLiK Tokens would "allow token holders to rent or purchase projects" and "grant token holders access to premium features and subscriptions," "any supposed future utility of the tokens on FLiK's 'end-to-end entertainment' ecosystem is beside the point." *Id.* at 1288. This was because "[cryptographic] tokens sold before a network launch are securities, because investors purchasing those tokens ... rely[ ] primarily on the technical and managerial efforts of others to affect the failure or success of the enterprise." *Id.* Further, the panel stated that "[p]lenty of items that can be consumed or used—from cosmetics, to boats, to Scotch whisky—have been the subject of transactions determined to be securities because they had the attributes of an investment. *Id.* at 1288-89.

**\*10** Here, Plaintiffs allege that Defendants controlled both the website and marketplace where Astrals products are bought or sold, and the ownership interest in all intellectual property and other ownership rights in the Astrals NFTs. Further, it was clear that Defendants were looking to develop and grow the entire operation, which could lead an objective investor to see a possibility of investment return. For example, Defendants announced that they partnered with Cypher Capital, a $100 million venture capital firm that has made more than 100 investments and manages upwards of 45 assets. Similarly, MH Ventures, a boutique full service early state Venture Capital firm announced its partnership with Astrals shortly after the mint date. In the whitepaper, it breaks down exactly what the sale of Astrals products would go to. It was clear that Defendants were reinvesting into the business and committing to growing the project for the long term. Lastly, the whitepaper explicitly states that "[w]ith the backers that we have, we expect that our project will be among some of the highest sought-after on the market. We expect to reach a trading volume of at least 200,000 SOL, of which 4000 SOL will go to the DAO (currently valued at $380,216 USD)." These allegations nudge Plaintiffs' claims across the line from conceivable to plausible.

Defendants also use the argument from *SEC v. Ripple Labs Inc.*, 682 F.Supp.3d 308 (S.D.N.Y. 2023) that if Plaintiffs potentially purchased Astrals products from a secondary market, there is no reasonable expectation of profit. The Court instead finds the reasoning from *SEC v. Terraform Labs Pte. Ltd., et al.*, No 1:23-cv-01346-JSR, ECF No. 51 (S.D.N.Y. July 31, 2023) persuasive on the secondary market argument. There, the Court rejected the reasoning in *Ripple Labs Inc.* and found that "*Howey* makes no such distinction between purchasers." *Id.* The Court agrees that whether a purchaser bought directly or instead in a secondary resale transaction has no impact on whether a reasonable individual would objectively view a defendant's actions and statements

as evincing a promise of profits based on their efforts. *See id.* Accordingly, the Court finds that Plaintiffs have successfully alleged that the failure or success of the enterprise hinges on Defendants' managerial efforts, and not their own.

Lastly, the Court must determine whether an investor is "attracted solely by the prospects of a return on his investment" as opposed to when "a purchaser is motivated by a desire to use or consume the item purchased." *Fedance v. Harris*, 1 F.4th 1278, 1288 (11th Cir. 2021) (citing *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53, 95 S. Ct. 2051, 44 L. Ed. 2d 621 (1975)) (internal quotation marks omitted). An investor must reasonably expect to derive profit from the essential managerial efforts. Thus, it is possible for the managerial efforts to be vital to the success of an enterprise but unreasonable for investors to expect to derive profit from it. The Eleventh Circuit specifically examines the motivations of the purchasers and the promotional materials associated with the offer and sale at issue. *Id.* (citing *Rice v. Branigar Org., Inc.*, 922 F.2d 788, 790 (11th Cir. 1991)). Courts "examine the substance—the economic realities of the transaction—rather than the names that may have been employed by the parties." *United Hous. Found.*, 421 U.S. at 851-52, 95 S.Ct. 2051.

The Court finds that at this stage, Plaintiffs have alleged through the Complaint a reasonable expectation of profits. Plaintiffs allege that Defendant O'Neal, in promoting Astrals products, would personally chat with investors and created investment incentives. Further, he would reassure daily that the project would grow and look to achieve a floor price of 30 SOL. While Defendants point out that it was Benito Reyes who posted that tweet and not Defendant O'Neal himself, it was still O'Neal boasting about the 30 SOL floor. Also, as stated above, the whitepaper stated that the products will be "among some of the highest sought-after on the market" and expect to reach a trading volume of "at least 200,000 SOL." The motivation of the purchasers is also shown in Plaintiffs' joint declarations. Many of them echoed the fact that Defendant O'Neal assured through promotions and chats that the project would take off. Plaintiffs also stated that the "consumptive use" aspect of Astrals was not yet in play, as the Astralverse still does not exist. As Plaintiffs allege, the NFT avatars sold cannot be used and are currently just digital pictures that investors can view. Plaintiffs learned about the plans to create a metaverse game and saw high growth potential and even looked to hold the Astrals Financial Products as long-term investments. These facts tips in favor of investment intent, rather than consumptive intent. Accordingly, the court concludes that Plaintiffs have plausibly alleged that they were led to reasonably expect profits from the Astrals purchases.

## CONCLUSION

**\*11** Accordingly, it is **ORDERED AND ADJUDGED** that the Motion to Dismiss is **GRANTED** as to Count I claims on purchases on or before May 23, 2022, as time barred but **DENIED** as to Defendant O'Neal as a "seller." The Court dismisses Count II finding that Defendant O'Neal is not a "control person" but denies the Motion to Dismiss holding that the allegations that Astrals or Galaxy Tokens are "securities." Defendants shall answer the claims remaining in the Complaint no later than **September 12, 2024**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 16th of August 2024.

**All Citations**

--- F.Supp.3d ----, 2024 WL 3845444

---

End of Document	© 2024 Thomson Reuters. No claim to original U.S. Government Works.