# Exhibit 1

2024 WL 4555629
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

COREY HARDIN and CHASE
WILLIAMS, individually and on behalf
of all others similarly situated, Plaintiffs,
v.
TRON FOUNDATION, JUSTIN SUN, and
ZHIQIANG (LUCIEN) CHEN, Defendants.

20-CV-2804 (VSB)
|
Filed 10/23/2024

**Attorneys and Law Firms**

Appearances:

Mitchell D. Nobel, Cantor Fitzgerald, New York, New York, Counsel for Plaintiffs

Jordan Ari Goldstein, Philippe Zuard Selendy, Selendy & Gay PLLC, New York, New York, Counsel for Plaintiffs

Michael Dicke, Dean S. Kristy, Casey Thomas O'Neill, Fenwick & West LLP, San Francisco, California, Counsel for Defendants TRON Foundation and Justin Sun

## OPINION & ORDER

Vernon S. Broderick United States District Judge

*1 Lead Plaintiffs Corey Hardin and Chase Williams, individually and on behalf of all others similarly situated, bring this putative class action against Defendants TRON Foundation, Justin Sun, and Zhiqiang (Lucien) Chen, alleging that Defendants violated the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77a, *et seq.*, by promoting, offering, and selling unregistered securities through an initial coin offering of the digital asset TRX. Before me is Defendants TRON Foundation's and Justin Sun's motion to dismiss Plaintiffs' Amended Class Action Complaint ("Amended Complaint") under Federal Rule of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6), or in the alternative, pursuant to the doctrine of forum non conveniens. (Doc. 55.) For the following reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## I. Factual Background [1]

Defendant TRON Foundation ("TRON" or "Tron Foundation") "is a blockchain-focused software development company that is developing and promoting the TRON blockchain protocol." (Am. Compl. ¶ 21.) [2] TRON has offices in California, Singapore, and Beijing. (*Id.*) Defendant Justin Sun is a co-founder and Chief Executive Officer ("CEO") of TRON. (*Id.* ¶¶ 22, 68.) Defendant Zhiqiang (Lucien) Chen is a co-founder and former Chief Technology Officer of TRON. (*Id.* ¶ 23.)

From August 24, 2017 through the filing of the Amended Complaint, TRON promoted, offered, and sold TRX tokens, a type of digital token. (*Id.* ¶¶ 1–2.) A digital token is a type of digital asset that exists on a "blockchain," which is a decentralized digital ledger that records transactions. (*Id.* ¶ 2.) These assets are sometimes referred to as "crypto-assets." (*Id.*) Various types of crypto-assets can reside on blockchains, including crypto-assets such as Bitcoin and Ethereum, which are decentralized digital commodities. (*Id.*) "Other tokens are more speculative, are referred to as 'security tokens,' and like a traditional security, essentially represent one's investment in a project that is to be undertaken with the funds raised through the sale of the tokens." (*Id.* ¶ 4.)

*2 In June 2017, prior to its launch, TRON published the first "TRON whitepaper." (*Id.* ¶ 59.) Issuers traditionally release a whitepaper to advertise the sale of tokens and describe the project and terms of the initial coin offering. (*Id.* ¶ 54.) The whitepaper described the TRON protocol as "the blockchain's entertainment system of free content, in which TRX, TRON's coin, is circulated" and an attempt to "heal the Internet." (*Id.* ¶ 59.) TRON described TRX as part of a "decentralized content entertainment ecosystem." (*Id.* ¶ 82.) It also indicated that its platform was "currently up and running" with a roadmap for ten years of prospective development. (*Id.*)

TRON created 100 billion tokens at its launch, approximately 35 percent of which TRON retained. (*Id.* ¶¶ 60–61.) TRON sold an additional 15 percent as a "private offering." (*Id.* ¶ 61.) TRON sold the remaining 40 percent during TRX's initial coin offering ("ICO"). [3] (*Id.* ¶ 62.) The ICO raised approximately $70 million. (*Id.*)

Several crypto-asset exchanges promoted the TRON ICO. (*Id.* ¶ 63.) TRX was then available for sale on various

exchanges and through links to other exchanges on TRON's website. (*Id*. ¶¶ 64, 66.) TRON's website included a page dedicated to TRX, listing TRX's global market performance, the number of holders, and its "Global Rank." (*Id*. ¶ 66.) TRON's website included links to dozens of exchanges where individuals could purchase TRX tokens—at the time of the filing of the Amended Complaint—it listed "over 75 exchanges on which TRX [was] available." (*Id*.) "TRON also published updated whitepapers that continued to explain why investors in TRX tokens should expect profits and touted the quality of its management team." (*Id*.) TRON and Defendant Sun also promoted and solicited customers to purchase TRX on their social media accounts. (*Id*. ¶ 67.) In 2017 and 2018, Defendants touted TRX at conferences in New York City and San Francisco. (*Id*. ¶ 70.)

TRON stated in its whitepapers that "TRX is not a security" and that "owning TRX does not mean that its owner has been afforded with the proprietary right, controlling right, and/ or policy-making right regarding the TRON platform." (*Id*. ¶ 72.) It also stated that " 'TRX does not belong to any of the following categories: (a) currency of any type; (b) securities; (c) stock rights of a legal entity; (d) stocks, bonds, bills, warrants, certificates, investment contract, or other instruments affording similar rights." (*Id*.) Consistent with these representations, TRON never registered TRX as a security with the Securities Exchange Commission ("SEC"). (*Id*.)

On April 3, 2019, the SEC published a "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework"). (*Id*. ¶ 108.) Its stated purpose was to analyze "whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions." (*Id*.) The Framework stated: "If you are considering an Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale, or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply." (*Id*. ¶ 109.) The Framework then cited the Supreme Court's decision in *SEC. v. W.J. Howey Co.*, 328 U.S. 293 (1946), as guidance for determining whether federal securities laws apply. (*Id*. ¶ 109.)

**\*3** Starting on March 29, 2018, lead Plaintiff Corey Hardin, a resident of Nevada, purchased TRX numerous times from Nevada on the Binance platform. (*Id*. ¶ 18; *id*. Ex. A, at 4) He then continued to buy and sell TRX on Binance through March 21, 2020. (*Id*., Ex. A, at 27.) Lead Plaintiff Chase Williams, a resident of Texas, purchased TRX from Texas on Binance and sold TRX on Binance on May 8, 2019. (*Id*. ¶ 20; *id*. Ex. C, at 4.) Neither Hardin nor Williams purchased TRX during the ICO. (*Id*., Exs. A, C.) The putative class members include all persons who purchased TRX tokens, first sold on or about August 24, 2017, in a domestic transaction and were injured thereby. (*Id*. ¶ 151.) Plaintiffs allege the price of TRX has dropped more than 95 percent from its 2018 high. (*Id*. ¶¶ 145–46.) The tokens are now worth less than what Plaintiffs paid for them. (*Id*.)

**II. Procedural History**

Plaintiffs filed their initial complaint on April 3, 2020, (Doc. 1), alleging the following claims against Defendants: (1) violation of Sections 5 and 12(a)(1) of the Securities Act for the unregistered offer and sale of securities in the form of TRX; (2) violation of Sections 5 and 12(a)(1) of the Securities Act against Defendants Sun and Chen as "control persons" of TRON; (3) violation of 815 Ill. Comp. Stat. Ann. 5/13 for the unregistered offer and sale of securities in the form of TRX; (4) violation of 815 Ill. Comp. Stat. Ann. 5/13 against Defendants Sun and Chen as "control persons" of TRON; (5) violation of Tex. Rev. Civ. Stat. art. 581-33 for the unregistered offer and sale of securities in the form of TRX; and (6) violation of Tex. Rev. Civ. Stat. art. 581-33 against Sun and Chen as "control persons" of TRON. (*Id*.) On June 8, 2020, Plaintiffs Corey Hardin, David Muhammad, and Chase Williams filed their Motion for Appointment as Lead Plaintiffs. (Doc. 18). I granted the Motion for Appointment as Lead Plaintiffs on June 30, 2020. (Doc. 25). On August 25, 2020, Plaintiff Alexander Clifford was terminated from the action. (*See id.*; Doc. 29.)

On August 24, 2020, Plaintiffs filed their Amended Complaint, (Doc. 29), adding one hundred additional claims for violations of the Blue Sky securities laws of the District of Columbia, Puerto Rico, and every state—except Delaware and New York—against Defendant TRON and against Defendants Sun, and Chen as "control persons." Plaintiffs also added two claims under the Securities Act: (1) violation of Sections 5 and 12(a)(2) for the sale of securities in the form of TRX by means of a prospectus containing untrue statements or omissions of material facts against Defendant TRON, and (2) violation of Sections 5 and 12(a)(2) for the sale of securities in the form of TRX by means of a prospectus containing untrue statements or omissions of material facts against Sun and Chen as "control persons" of TRON. (*Id*.)

On December 15, 2020, TRON and Sun filed a motion to dismiss the Amended Complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6), or in the alternative, pursuant to the doctrine of forum non conveniens. (Doc. 54.) On that same day, Defendants TRON and Sun also submitted a memorandum of law, ("Def.'s Mem."), [4] several supporting declarations, (Docs. 57–59), and a Notice of Documents Incorporated by Reference and Request for Judicial Notice, (Doc. 56). Defendants do not move to dismiss on the grounds that TRX is in fact a security, but rather on the Amended Complaint's other alleged flaws. (Def.'s Mem. 1.) Defendants TRON and Sun filed a notice of supplemental authority on February 6, 2023. (Doc. 102; *see also* Doc. 103.) Plaintiffs filed their own notice of supplemental authority on March 27, 2023. (Doc. 104; *see also* Doc. 105.) Each party filed additional notices of supplemental authority after the Second Circuit issued its decision in Williams v. Binance, 96 F.4th 129, 132 (2d Cir. 2024). (Docs. 106–08.)

**\*4** Defendant Chen has not appeared nor filed an answer in this action. On February 10, 2021, a certificate of default was entered against Defendant Chen. (Doc. 65.) On February 16, 2021, Plaintiffs filed their opposition to Defendants' motion to dismiss, ("Pl.'s Opp."), [5] along with several supporting declarations, (Docs. 67–70). On April 2, 2021, Defendants TRON and Sun filed their reply. ("Def.'s Reply.") [6] On May 12, 2021, Plaintiff Muhammad filed a Notice of Voluntary Dismissal pursuant to Federal Rule of Civil Procedure 41(a), voluntarily dismissing all his claims against all Defendants without prejudice. (Doc. 78.) Plaintiffs Hardin and Williams remain the lead plaintiffs in this action. (*Id*.)

On August 31, 2022, Kyle Roche, one of the named partners at Roche Freedman LLP, co-counsel for Plaintiffs, filed a motion to withdraw, explaining that he was "no longer involved in [Roche Freedman LLP's] class action practice." (Doc. 88.) In response to the motion, Defendants filed a letter requesting that I "remove the Roche Freedman firm (not just Mr. Roche) as co-counsel for plaintiffs in this case." (Doc. 89.) Defendants explained that Mr. Roche was captured on video "(1) discussing his financial interest in a third-party cryptocurrency company; (2) discussing his misuse of class action litigation as a 'strategic instrument' or 'tool' to benefit that personal financial interest and harm cryptocurrency competitors, which is 'a completely different way than being a lawyer'; and (3) making other derogatory comments about both class members and jurors." (*Id*.) Roche Freedman LLP objected to the request, attempting to distance itself from Mr. Roche's "inappropriate comments." (Doc. 92.) Selendy Gay Elsberg, co-lead counsel for Plaintiffs, subsequently requested that I terminate Roche Freedman LLP from the case. (Doc. 93.) After reviewing the submissions, I scheduled a conference in this matter, at which Roche Freedman LLP indicated that it would move to withdraw. (Docs. 94, 97.) I granted Roche Freedman LLP's motion to withdraw on October 24, 2023. (Doc. 99.)

### III. Legal Standards

#### A. Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility ... depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. Kassner, 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Iqbal, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

**\*5** A complaint is "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." Cohen v. Rosicki,

*Rosicki & Assocs., P.C.*, 897 F.3d 75, 80 (2d Cir. 2018) (citation omitted).

"Rule 12(b)(6) provides the most appropriate legal basis for a motion to dismiss on statute of limitations grounds." *La Russo v. St. George's Univ. Sch. of Med*, 936 F. Supp. 2d 288, 297 (S.D.N.Y. 2013). "A court accordingly may dismiss a claim on statute of limitations grounds at the pleadings stage if the complaint clearly shows the claim is out of time." *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) (internal quotation marks omitted).

### B. *Rule 12(b)(1)*

"Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted), *aff'd*, 561 U.S. 247 (2010); *see also United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question") (internal quotation marks omitted). While a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (internal quotation marks omitted); *Ernst v. Gateway Plaza Mgmt. Corp.*, No. 11-CV-1169, 2012 WL 1438347, at *2 (S.D.N.Y. Mar. 14, 2012) ("In deciding jurisdictional issues, the court may rely on affidavits and other evidence outside the pleadings.").

### C. *Rule 12(b)(2)*

"On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing personal jurisdiction." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 349 (S.D.N.Y. 2014) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012)). Before any evidentiary hearing, however, "a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). At this preliminary stage, the plaintiff only needs to make a "prima facie showing" of jurisdiction, which "may be established solely by allegations." *Id*. In deciding on such a motion, the court can look beyond the pleadings at affidavits and other supporting materials. *See Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). The allegations in the complaint "must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc.*, 702 F.3d at 727. Moreover, "all pleadings and affidavits are to be construed in the light most favorable to the plaintiff," *Dorchester Fin. Sec., Inc.*, 722 F.3d at 84 (internal quotation marks omitted), and "the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party," *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993) (quoting *Taylor v. Phelan*, 912 F.2d 429, 431 (10th Cir. 1990) (per curiam)). The court, however, "will not draw argumentative inferences in the plaintiff's favor; nor must [a court] accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks omitted).

### IV. Discussion

#### A. *Jurisdiction*

#### 1. Personal Jurisdiction Over Defendants TRON and Sun

**\*6** "To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has certain minimum contacts with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *Id.* at 674 (internal quotation marks omitted). "For purposes of this initial [minimum contacts] inquiry,

a distinction is made between 'specific' jurisdiction and 'general' jurisdiction." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018) (quoting *Met. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)). "Specific jurisdiction exists when a court exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contact with the forum, and general jurisdiction is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 269 (2d Cir. 2023) (internal quotation marks omitted).

Here, Plaintiff alleges that TRON and Sun are subject to specific jurisdiction in New York. To determine whether specific jurisdiction exists, courts must assess the "defendant's contacts with the forum state under a totality of the circumstances test." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). "The crucial question is whether the defendant has purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws, such that the defendant should reasonably anticipate being haled into court there.' " *Id.* (internal quotation marks and citations omitted). The Court must also ensure that exercising jurisdiction over the defendant "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). A plaintiff need not show that the "claim came about because of the defendant's in-state conduct." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021). Rather, the suit must "arise out of or relate to the defendant's contacts with the forum." *Id.* (citation omitted). There is no requirement that the defendant reside in the forum for the Court to exercise personal jurisdiction over him. See *id.* at 365 (holding that the nonresident defendant was subject to personal jurisdiction because it had "purposefully avail[ed]" itself of that forum through advertising means meant to target residents of the forum).

The Securities Act authorizes nationwide service of process, meaning courts may consider "contacts with the United States as a whole" when determining whether they may exercise jurisdiction over defendants. 15 U.S.C. § 77v(a); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 349–350 (S.D.N.Y. 2019) (analyzing defendants' contacts with the United States as a whole when determining personal jurisdiction for claims arising under the Securities Act). Although the Second Circuit has not yet decided what contacts are relevant to determining whether defendants possess sufficient minimum contacts under statutes, like the Securities Act, which permit nationwide service of process, see *Owen v. Elastos Found.*, No. 19-CV-5462, 2021 WL 5868171, at *7 (S.D.N.Y. Dec. 9, 2021), it has observed that several other courts of appeals "have endorsed the position that, when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole," *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014)).

Defendants argue that I lack personal jurisdiction over TRON and Sun because TRON was incorporated under the laws of Singapore and Sun is believed to be domiciled in China. (Def.'s Mem. 32.) However, I find that Plaintiffs make a prima facie showing that TRON and Sun had sufficient contacts with the United States so as to have "purposefully availed" themselves of conducting activities in the United States. *Best Van Lines, Inc.*, 490 F.3d at 242. The facts in the Amended Complaint establish that TRON and Sun directed their efforts relating to the TRX launch at the United States through their targeted advertisements, attendance at conferences, and solicitation to United States consumers and investors. These efforts are central to Defendants' contacts with the forum. See *Balestra*, 380 F. Supp. 3d at 350–51 (basing jurisdictional analysis on Defendants' efforts to promote the sale of cryptocurrency in the U.S. market).

*7 First, Defendants promoted the sale of TRX tokens in the United States market through social media and advertising efforts. On July 20, 2018, Sun tweeted: "#TRON #TRX is available now for $USD at @Changelly_team Instant Exchange. Users can use the credit card to purchase $TRX directly through it." (Am. Compl. ¶ 67.) On September 18, 2018, TRON Foundation tweeted: "You can now buy $TRX directly with USD on @BittrexExchange," accompanied by a news article that reads: "Bittrex instigates both Litecoin (LTC) and Tron (TRX) into the USD market.... This is a significant milestone for Tron (TRX) in particular, as this is the first time that Tron has been paired with the USD in the United States." (*Id.*) On June 22, 2019, Sun tweeted: "#TRX

is widely used now, here is a summary which $TRX can be bought with: -$USD...” (*Id.*) On December 15, 2019, Sun tweeted: “We will make $TRX available for all [American flag emoji] users! More options are on the way! #TRON #TRX....” (*Id.*) On March 6, 2020, Sun tweeted: “Trading now! If your friends ask you where is the best exchange to buy $TRX in United States and Europe, the best answer is @krakenfx! #TRON #TRX $TRX”. (*Id.*)

Second, Defendant Sun attended and spoke at conferences in the United States in 2017 and 2018, including in New York City and San Francisco. (*Id.* ¶ 70.) Sun touted TRON and TRX at these conferences. (*Id.*) A video and transcript of Sun's interview at the 2019 Consensus conference in New York City are available on YouTube and on CoinDesk's website. (Roche Decl. Ex. 8.) [7] Other representatives from TRON also attended these conferences. (*Id.*) On November 9, 2018, TRON Foundation tweeted a photograph of TRON employees alongside the caption: “Our team was delighted to meet the $TRX community in New York during a meetup co-hosted with @team_tronics!” (Roche Decl. Ex. 1.) On December 22, 2018, TRON Foundation tweeted a photograph of the New York City skyline alongside the caption: “Are you located in New York or visiting for the holidays? Join the TRON team, industry leaders, and engineers to a social networking event to talk more about the blockchain ecosystem and how you can be a part of building it....” (*Id.* Ex. 2.) According to a news article, Sun was also present in the United States around the time of the ICO. (Am. Compl. ¶ 70.)

Third, TRON opened an office in California and has continued to list TRX on domestic exchanges. (*Id.* ¶¶ 27, 67.) Plaintiffs allege in the Amended Complaint that TRON's solicitation to list TRX on domestic exchanges required outreach efforts and coordination with the exchanges to support the listings. (*Id.* ¶¶ 136–44.) TRON also operates a U.S.-based website to further promote TRX tokens on the U.S. market and to lead potential customers and investors to domestic exchanges where they could purchase TRX. (Roche Decl. Ex. 5–6.) TRON Foundation's Twitter account also lists its location as San Francisco. (*Id.* Ex. 1.)

All in all, Defendants' participation in conferences, efforts to advertise and promote TRX on the U.S. market, solicitation to domestic exchanges, and establishment of an office in the United States demonstrate that both TRON and Sun "purposefully avail[ed themselves] of the privilege of conducting [business] activities" related to TRX in the United States. *See Best Van Lines, Inc.*, 490 F.3d at 242 (quoting *Burger King*, 471 U.S. at 475). Because Defendants engaged in substantial suit-related conduct in the United States, I find that they have sufficient contacts with the United States for specific jurisdiction. *See Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."). The fact that Sun resides in China and TRON was formed in Singapore cannot overcome the fact that Sun and TRON "purposefully avail[ed]" themselves of the forum through their intentionally-created contacts with the United States and, more specifically, with New York. *See Ford Motor Co.*, 592 U.S. at 362.

**\*8** Once a plaintiff has demonstrated the requisite minimum contacts between the defendant and the forum state, a court is required to continue to the "reasonableness" stage of the personal-jurisdiction inquiry. Whether the exercise of specific jurisdiction is reasonable in a particular case depends on, among other things, "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Salomon Smith Barney, Inc. v. McDonnell*, 201 F.R.D. 297, 305 (S.D.N.Y. 2001) (citing *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1028 (2d Cir.1997)).

Applying these factors here, I conclude that an exercise of jurisdiction over TRON and Sun is entirely reasonable. Because this is a case brought under federal law, the judicial system has a strong interest in resolving it here. Additionally, although Plaintiffs reside out of state, they have an interest in obtaining an efficient resolution of this dispute. Moreover, providing a forum to adjudicate securities-law violations that occur here furthers the substantive social policy of providing accountability against those that engage in commerce in the United States and injure those whom they deal with here. The only factor weighing against the reasonableness of exercising personal jurisdiction over TRON and Sun is the burden that the exercise of jurisdiction imposes on them to litigate the case here, as they are located abroad. I find, however, that on balance this factor does not outweigh the other factors pertinent to my reasonableness analysis. *See S.E.C. v. Straub*, 921 F. Supp. 2d 244, 259 (S.D.N.Y. 2013)

("Like each and every court in this Circuit to have applied the reasonableness standard after determining that a given defendant has the requisite minimum contacts, this Court finds that this is not the rare case where the reasonableness analysis defeats the exercise of personal jurisdiction."). Therefore, Defendants' motion to dismiss for lack of personal jurisdiction is DENIED.

### 2. Forum Non Conveniens

The doctrine of forum non conveniens permits a court to dismiss an action "even if the court is a permissible venue with proper jurisdiction over the claim." *Carey v. Bayerische Hypo-und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004). A district court should dismiss a complaint where, on balance, the resolution of the matter in an adequate alternative forum would be more convenient for the parties and courts and more just. See *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991) ("The central purpose of a forum non conveniens inquiry is to determine where trial will be most convenient and will serve the ends of justice."). District courts have broad discretion in applying this principle, and typically conduct a three-step analysis in the exercise of that discretion: (1) "the degree of deference properly accorded the plaintiff's choice of forum"; (2) "whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute"; and (3) the balance of "the private and public interests implicated in the choice of forum." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005).

Defendants assert that if personal jurisdiction exists over Defendants, I should nonetheless dismiss the case under the doctrine of forum non conveniens. (Def.'s Mem. 37–40.) I disagree. My analysis begins with "the assumption that the plaintiff's choice of forum will stand." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001). The main factor weighing against this deference is that New York is not Plaintiffs' home forum. Although lead Plaintiffs reside in Nevada and Texas, (Am. Compl. ¶¶ 18, 20), several other factors weigh in favor of Plaintiffs' choice of forum. First, as assessed *supra*, the dispute has numerous connections to New York. Defendants targeted not only the United States market and potential consumers, but specifically those in New York. (*See id.* ¶ 70 (Defendant Sun and other TRON representatives attended and spoke at conferences touting TRX and TRON in New York City in 2017 and 2018); Roche Decl. Ex. 8 (YouTube video of Sun's interview at the 2019 Consensus conference in New York City); *id.* Ex. 1 (TRON Foundation's tweet of a photograph of TRON employees alongside the caption: "Our team was delighted to meet the $TRX community in New York during a meetup co-hosted with @team_tronics!"); *id.* Ex. 2 (TRON Foundation's tweet of the New York City skyline alongside the caption: "Are you located in New York or visiting for the holidays? Join the TRON team, industry leaders, and engineers to a social networking event to talk more about the blockchain ecosystem and how you can be a part of building it...").)) Although not based in New York, Lead Plaintiffs purchased TRX tokens after being subjected to these targeted efforts —visiting TRON's website, reviewing the whitepapers, and reading TRON's social media posts. (Hardin Decl. ¶ 4; Williams Decl. ¶ 4.)[8] Moreover, Defendants have not "made a showing that holding trial in New York would be so difficult and inconvenient that any party would be deprived [its] day in court." *Mexico Infrastructure Fin., LLC v. Corp. of Hamilton*, No. 17-CV-6424, 2019 WL 1206690, at *6 (S.D.N.Y. Mar. 14, 2019) (internal citations and quotation marks omitted).

**\*9** The second step of the forum non conveniens analysis evaluates "whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute." *Norex*, 416 F.3d at 153. To determine this, courts consider whether the defendant is amenable to process there, whether the plaintiff is able to have the claims adjudicated fairly, and whether the plaintiff can litigate his claims safely and with peace of mind. See *Base Metal Trading Ltd. v. Russian Aluminum*, 98 F. App'x 47, 49–50 (2d Cir. 2004). "Only where the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all should a district court deny forum non conveniens dismissal on the ground that the alternative forum is inadequate." *Id.* at 50 (citations, emphasis, and quotation marks omitted). Defendants propose Singapore as an alternative forum because TRON was incorporated under the laws of Singapore. (Def.'s Mem. 39; Nair Decl.)[9] Defendants offer in support a declaration from Suresh Sukumaran Nair, an advocate and solicitor licensed in Singapore. (Nair Decl.) Nair asserts that TRON is amenable to service of process in Singapore, (*id.* ¶¶ 15–18), that Singapore has a long history of adjudicating commercial claims including those in a representative capacity, (*id.* ¶¶ 4–6, 19–24), and "that Singapore courts have experience in applying foreign law," (*id.* ¶ 7). I find the alternative forum's

adequacy sufficient, in that it is not "so clearly inadequate or unsatisfactory" that it would be "no remedy at all" to litigate Plaintiffs' claims there. *Base Metal Trading Ltd.*, 98 F. App'x at 49–50.

The third step considers the balance of "private and public interests implicated in the choice of forum." *Norex*, 416 F.3d at 153. In assessing the private interests, courts consider "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; ... and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Iragorri*, 274 F.3d at 73–74. These factors do not weigh in favor of an alternative forum. Defendants allege that "the heart of the case relates to events that occurred or were executed overseas, thousands of miles from New York, where nothing giving rise to plaintiffs' claim is alleged to have occurred." (Def.'s Mem. 38.) Defendants also allege that all witnesses and evidence are located outside of New York, and all TRON or third-party witnesses and evidence are located in East Asia or elsewhere abroad. (*Id.* at 39.) However, TRON's establishment of an office in the United States, hiring and recruiting personnel from the United States, and listing a United States address as a base location militate against dismissal of the case under the doctrine of forum non conveniens. (*See* Roche Decl. Ex. 2–4.) Moreover, Lead Plaintiffs and other members of the putative class all reside in the United States. (Am. Compl. ¶¶ 18, 20, 151–53.) Singapore, the alternative forum, may be convenient for a subset of TRON's witnesses and perhaps a portion of its evidence, but it makes much less sense for Defendant Sun, a Chinese citizen, and Plaintiffs, United States citizens, in a case where significant activity was centered in New York.

The public factors also do not weigh in favor of dismissal. Defendants assert that the public factors—which include "[a]dministrative difficulties" which arise "when litigation is piled up in congested centers instead of being handled at its origin"—favor an alternative forum. (Def.'s Mem. 40 (citation omitted).) Defendants state that this "Court's docket is one of the busiest in the country" and the "origin" of this litigation is outside the United States. (*Id.*) However, Defendants do not suggest that litigation in Singapore would proceed more expeditiously and, as discussed, the dispute is connected to the United States and Defendants' actions and efforts in New York. This connection—in addition to the fact that Plaintiffs allege violations of the United States securities laws and that Plaintiffs' putative class members reside in the United States—is sufficient to outweigh any concerns regarding this Court's busy docket. For these reasons, Defendants' motion to dismiss on the grounds of forum non conveniens is DENIED.

### B. *Statute of Limitations*

#### 1. Plaintiffs' Section 12(a)(1) Claim

**\*10** Section 12(a)(1) claims are subject to a one-year statute of limitations from the date of the violation. *See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 539 (S.D.N.Y. 2020); 15 U.S.C. § 77(m). Section 12(a)(1)'s cause of action is to "sell" or "solicit" unregistered securities. 15 U.S.C. § 77e(a). The Second Circuit has interpreted the statute's plain text to mean that the one-year statute of limitations begins to run from the plaintiff's purchase of the unregistered security. *See Binance*, 96 F.4th at 141 (reversing the dismissal of the plaintiffs' claims arising from purchases made during the year before they filed this lawsuit); *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, No. 20-CV-2807, 2021 WL 1518328, at \*8 (S.D.N.Y. Apr. 16, 2021) (finding the one-year statute of limitations period begins to run from the date of the plaintiff's final purchase of the token); *Desyatnikov v. Credit Suisse Grp., Inc.*, No. 10-CV-1870, 2012 WL 1019990, at \*5 (E.D.N.Y. Mar. 26, 2012) (holding that the action was time-barred because the plaintiff filed the complaint nearly two years after the date of purchase); *Teitelbaum v. Lay Siok Lin*, No. 07-CV-3971, 2010 WL 11527279, at \*11 (E.D.N.Y. Aug. 3, 2010) (holding that the action was time-barred because the plaintiff filed the complaint over one year after "the sale or delivery" of the unregistered securities); *S.E.C. v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 358 (S.D.N.Y. 2020) ("the Court finds that, in the context of that scheme, the resale of Grams into the secondary public market would be an integral part of the sale of securities ...").

Defendants first argue that Plaintiffs' actions under Section 12(a)(1) are time-barred because they filed the initial complaint after the one-year statute of limitations period had run. (Def.'s Mem. 12.) Defendants state the cause of action culminated during the ICO, which extended from on or about August 24, 2017 to September 2, 2017. (Def.'s Mem. 13.) In contrast, Plaintiffs state that each Lead Plaintiff purchased

TRX within one year before the initial complaint's filing, making the Section 12(a)(1) claim timely. (Pl.'s Opp. 4.) Here, Plaintiff Hardin's last documented purchase of TRX occurred on March 21, 2020, (Am. Compl., Ex. A), and Plaintiff Williams's occurred on May 8, 2019, (Am. Compl., Ex. C). Plaintiffs filed their initial complaint on April 3, 2020, less than one year after both Plaintiffs' final purchases of TRX. (Doc. 1.) I therefore find Plaintiffs' Section 12(a)(1) claims timely.

### 2. Plaintiffs' Section 12(a)(2) Claim

Section 12(a)(2) of the Securities Act is also subject to a one-year statute of limitations, but this subsection incorporates a discovery rule that makes a claim timely if it is "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77(m); *LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003). To claim a statute of limitations extension based on the discovery rule, Plaintiffs must show that they discovered "critical facts" related to the untrue statement or omission, not that they simply realized strategic legal arguments. *In re Bibox,* 2021 WL 1518328, at *9. "Ignorance of legal rights does not delay the accrual of a claim under a discovery rule." *Id.*

A violation of Section 12(a)(2) involves a sale of securities by means of a prospectus containing untrue statements and omissions of material facts. *See* 15 U.S.C. § 77*l*(a)(2). Plaintiffs rely on the series of TRON whitepapers issued in the summer of 2017 to serve as the "prospectus[es]" under Section 12(a)(2). (Am. Compl., ¶¶ 71, 105–6, 173–74.) To assert timeliness, Plaintiffs claim that the statute of limitations did not begin to run until the SEC published its April 3, 2019 Framework because Plaintiffs only then could have discovered Defendants' untrue statements and/or omissions. [10] (Pl.'s Opp. 9–10.) In other words, they could not have known that TRX was a security until they read the Framework. (*Id.*) This argument fails because the Framework did not reveal any new "critical facts." *In re Bibox,* 2021 WL 1518328, at *9. Instead, the Framework contained "the SEC's nonbinding interpretation of *Howey*" and its potential application to cryptocurrency. *Id.* "While [the SEC's] interpretation [that the token is a security under the *Howey* test] may assist the plaintiff in crafting a legal argument that [TRX] is indeed a security and subject to regulation under federal securities law, that guidance did not extend the statute of limitations period for his claims." *See id.* at *10. I therefore do not find that the Framework publication extended the limitations period for Plaintiffs' Section 12(a)(2) claims.

**\*11**  In any event, other fact-based publications analyzing TRX's potential classification as a security existed before the Framework's publication that would have allowed a "reasonable diligent plaintiff" to have discovered the "facts of the violation." *Merck & Co. v. Reynolds*, 559 U.S. 633, 644 (2010). For example, Coin Central published an article in January 2018 that TRON had plagiarized its whitepaper, thereby making untrue assertions about TRX's development status and value and omitting critical details. [11] (O'Neill Decl. Ex. 3.) [12] This news article was published following several reports in 2017 from the SEC explaining that certain cryptocurrencies were potentially unregistered securities. (*Id.*, Exs. 4–6.) The SEC's nonbinding interpretation of a legal standard, released after the publication of other more fact-based sources indicating TRX's potential classification as a security, does not satisfy the discovery rule to extend the limitations period to April 3, 2019. For these reasons, I find that Defendants' motion to dismiss Plaintiffs' Section 12(a)(2) claims against Defendants is GRANTED.

### C. *Plaintiffs' Standing as Secondary Market Purchasers*

### 1. Section 12(a)(1) Standing

Section 5 of the Securities Act [13] "does not limit liability to initial distribution," but applies to subsequent transactions as well. *See* *S.E.C. v. Phan*, 500 F.3d 895, 902 (9th Cir. 2007) (internal citations omitted). The Supreme Court held in *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995), that the word "prospectus" in Section 12(a)(2) of the Securities Act applied to "documents related to public offerings by an issuer or its controlling shareholder," thus barring Section 12(a)(2)'s application to secondary market purchasers that do not involve a prospectus. *Id.* at 569. However, Section 12(a)(1) does not include any reference to a prospectus, but rather provides that "[a]ny person who ... offers or sells a security in violation of section [5] of this title ... shall be liable, subject to subsection (b), to the person purchasing such security from him." 15 U.S.C. § 77*l*(a).

Courts in this Circuit have recognized that, unlike Section 12(a)(2), Section 12(a)(1) applies to the unlawful sale of an unregistered security in an initial offering and in any subsequent sales. See *S.E.C. v. Caledonian Bank Ltd.,* 145 F. Supp. 3d 290, 306 (S.D.N.Y. 2015) (finding that Section 5 liability covers the reselling of unregistered securities following an initial offering); *S.E.C. v. Universal Exp., Inc.,* 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) ("Registration of a security is transaction-specific, in that the requirement of registration applies to each act of offering or sale; proper registration of a security at one stage does not necessarily suffice to register subsequent offers or sales of that security" (internal quotation marks omitted)); *S.E.C. v. Cavanagh,* 155 F.3d 129, 133 (2d Cir. 1998) ("Each sale of a security, then, must either be made pursuant to a registration statement or fall under a registration exemption." (citation omitted)); *Levitt v. J.P. Morgan Sec. Inc.,* 9 F. Supp. 3d 259, 273 (E.D.N.Y. 2014) ("[O]nce a security has been sold pursuant to a registration statement, subsequent sales are not themselves sales for which a registration statement is in effect. Each sale of a security, then, must either be made pursuant to a registration statement or fall under a registration exemption." (quoting *Cavanagh,* 155 F.3d at 133)).

**\*12** Defendants do not point to—nor have I otherwise located—any cases supporting their argument that Plaintiffs do not have standing to bring a Section 12(a)(1) claim for a transaction on the secondary market. The cases Defendants cite interpret only Section 12(a)(2) and the reasoning that aftermarket purchasers cannot claim Section 12(a)(2) violations, discussed *infra* in further detail. (Def.'s Mem. 18–20.) The logic that prohibits secondary market purchasers from bringing a claim under Section 12(a)(2) because they did not participate in the initial coin offering does not extend to Section 12(a)(1) claims, and I decline to extend it here. For these reasons, I find that Plaintiffs have standing to assert their claims that Defendants violated Section 12(a)(1) of the Securities Act.

### 2. Section 12(a)(2) Standing

In addition to finding that Plaintiffs' Section 12(a)(2) claims are untimely, *see supra* Section IV.B.2, I also note that Plaintiffs lack standing as secondary market purchasers to claim a violation of Section 12(a)(2). "To recover under Section 12(a)(2), a plaintiff must allege that he purchased shares from an issuer 'who offers or sells a security ... by means of a prospectus.' " *In re Wachovia Equity Sec. Litig.,* 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011) (quoting 15 U.S.C. § 77*l*(a)(2). As explained by one district court:

> In *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995), the Supreme Court interpreted the 'prospectus' requirement to mean that Section 12(a)(2) does not apply to a private contract for a secondary market sale of securities ... Based on *Gustafson*, the Second Circuit subsequently held that a Section 12(a)(2) action 'cannot be maintained by a plaintiff who acquires securities through a private transaction, whether primary or secondary.' "

*Id.* (quoting *Yung v. Lee,* 432 F.3d 142, 149 (2d Cir. 2005)); *see also In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005) ("[B]ecause the plaintiffs have not alleged that they purchased their shares in the [initial public offering], they have failed to allege that they have standing to bring a claim under § 12(a)(2).").

Plaintiffs here do not contest that they did not purchase TRX tokens during the ICO. Lead Plaintiffs Hardin and Williams purchased them on the Binance exchange several months later. (Am. Compl. Exs. A, C.) Under Second Circuit law, liability under Section 12(a)(2) hinges on the existence of a prospectus and therefore applies only to transactions made during an initial public offering and not aftermarket transactions. Accordingly, I conclude that, even if Plaintiffs' Section 12(a)(2) claims were timely, because Plaintiffs were aftermarket purchasers of TRX, they do not have standing to claim a Section 12(a)(2) violation.

### 3. Standing Over State Law Claims

"Where ... a named class action plaintiff brings state law claims that may not be brought by the named plaintiff, but may be brought by putative class members, courts typically address only the state law claims of the named plaintiff at the motion to dismiss stage and do not address the standing and merits arguments with respect to the additional state law claims unless and until the motion to dismiss is denied and a motion for class certification is granted pursuant to Rule 23, Fed. R. Civ. P." *In re Bibox,* 2021 WL 1518328, at \*4. "As long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims

subject to different state laws is a question of predominance under Rule 23(b)(3)." *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 93 (2d Cir. 2018); *see also* Binance, 96 F.4th at 145.

Plaintiffs allege primary liability against Defendant TRON and additional liability against Defendant Sun as a control person under the state Blue Sky securities laws of nearly every state, the District of Columbia, and Puerto Rico. (Am. Compl. ¶¶ 187–1038.) Plaintiffs state that they bring those claims "on behalf of Class members to whom TRX tokens were offered or sold" in each state and territory. (*Id.*) Lead Plaintiff Hardin is a resident of Nevada and purchased TRX in Nevada, and Lead Plaintiff Williams is a resident of Texas and purchased TRX in Texas. (*Id.* ¶¶ 18, 20.) Neither Plaintiff alleges that he purchased TRX in any of the other states or territories cited in the Amended Complaint.

**\*13** I must then first assess Lead Plaintiffs' Nevada and Texas state law claims since they are residents of those states. The Nevada and Texas statutes make it unlawful for a person to offer to sell or sell an unregistered security in those states. Nev. Rev. Stat. §§ 90.460–90; Texas Civ. St. Art. §§ 581-7, 581-33. Defendants argue that both statutes contain a privity requirement equivalent to the federal law requirement for Section 12(a)(1) claims, discussed *supra*. (Def.'s Mem. 30–31.) Since I find that, as secondary market purchasers, Plaintiffs can satisfy that standard, as noted *supra* in Section IV.C.1, I find the same here.

Defendants also contend that the Nevada state law claim is barred by the two-year statute of limitations. (Def.'s Mem. 31) (citing Nev. Rev. Stat. § 90.670.) This argument fails because Plaintiff Hardin purchased TRX as late as March 21, 2020, less than one month before Plaintiffs filed the initial complaint and less than six months before they filed the Amended Complaint. (Am. Compl. Ex. A, at 27). For the same reasons that I find Plaintiffs' Section 12(a)(1) claims are timely, *see supra* Section IV.B.1, I find that Plaintiffs' Nevada state law claims are timely.

Plaintiffs' Nevada and Texas state law claims must therefore survive dismissal. Since neither Plaintiff claims to have purchased TRX in any other state or territory, I do not address the standing and merits arguments regarding the remaining ninety-six state law claims and find that those are more well-suited for a Rule 23 motion for class certification. *See* Langan, 897 F.3d at 93; *In re Bibox*, at \*4; Binance, 96 F.4th at 145.

### D. *Defendant TRON as a Statutory Seller*

Either an entity or an individual can qualify as a "statutory seller" for liability under Section 12 of the Securities Act. *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 218 (S.D.N.Y. 2021). An entity may be liable under Section 12 of the Securities Act if it "successfully solicits the purchase of securities, so long as [it] is motivated at least in part by a desire to serve [its] own financial interests or those of the securities owner." *Balestra*, 380 F. Supp. 3d at 357 (quoting *Pinter v. Dahl*, 486 U.S. 622, 643 (1988)). "Liability does not require that the defendant actually passed title of the security; rather, an entity or individual who 'engaged in steps necessary to the distribution' of the unregistered security is liable." *Id.* (quoting *S.E.C. v. Tecumseh Holdings Corp.*, No. 03-CV-5490, 2009 WL 4975263, at \*3 (S.D.N.Y. Dec. 22, 2009)).

Defendants claim that TRON cannot be liable for a violation under Section 12 because TRON is not a "statutory seller." (Def.'s Mem. 20.) Defendants argue that Plaintiffs must have had direct contact with TRON, and they cannot show that because they purchased the TRX tokens on the Binance exchange, rather than directly from TRON itself. (*Id.* at 20–21.) Defendants' argument that Plaintiffs must have purchased TRX tokens from TRON is meritless. *Balestra* establishes that a defendant need not pass title of the security, but rather engage in "steps necessary to the distribution" of the unregistered security. 380 F. Supp. at 357. Here, TRON published numerous whitepapers promoting TRX, (Am. Compl. ¶¶ 5, 27, 54, 59, 66, 82), and TRON issued press releases advertising TRX to potential consumers and investors, (*id.* ¶¶ 80–81, 131). The official TRON Foundation Twitter account posted promotions and other efforts to solicit purchases of TRX. (*Id.* ¶ 67.) TRON also advertised TRX on its website, touting its value and performance and posting links to exchanges where potential customers could purchase TRX. (*Id.*) Plaintiffs' allegations about TRON's actions to promote and solicit TRX tokens are sufficient to demonstrate that TRON engaged in "steps necessary to the distribution" of TRX to survive a motion to dismiss for a Section 12 violation. *Balestra*, 380 F. Supp. at 357; *see also In re WorldCom, Inc. Secs. Litig.*, 294 F.Supp.2d 392,

423 (S.D.N.Y. 2003) (deeming allegation that a defendant engaged in marketing efforts, such as participation in "road show" meetings, sufficient to qualify defendant as a statutory seller for a Section 12 claim).

### E. *Control Person Liability as to Defendant Sun*

**\*14** An individual who "controls any person liable under [§ 12 of the Act] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 77*o*(a). "In order to state a claim for control person liability under section 15 of the Securities Act, a plaintiff must allege (a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." *Balestra*, 380 F. Supp. 3d at 359 (internal citation omitted). As I already found, Plaintiffs plausibly alleged "a primary violation" of Section 12(a)(1) through their claims that Defendant TRON engaged in the sale of unregistered securities. As to the second element to state a claim for control person liability, "the Second Circuit defines 'control' as 'the power to direct or cause the direction of the management and policies of the primary violators, whether through the ownership of voting securities, by contract, or otherwise.' " *Id*. (quoting *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011)).

Plaintiffs allege control person liability against Defendant Sun for a violation of Section 12(a)(1) and additional liability as to the one hundred Blue Sky state law claims. (Am. Compl. ¶¶ 180–1038.) Defendant Sun is a co-founder and serves as CEO of TRON. (*Id.* ¶¶ 22, 68.) Plaintiffs allege that, in these roles, Sun negotiated partnerships between TRON and other companies. (*Id.* ¶ 94.) TRON also touted Sun's involvement in the company in its press releases and on social media, listing his biography and qualifications. (*Id.* ¶ 131.) Moreover, Sun was heavily involved in launching the TRX ICO through his many TRX promotions on social media and at local conferences. (*Id.* ¶¶ 27–28, 67, 70, 79, 92.) The whitepaper highlighted Sun as an "integral part[ ] of the success of TRX." (*Id.* ¶130.) Sun's involvement in founding the company, serving as its CEO, negotiating its partnerships, playing a vital role in its development, and launching the TRX ICO is sufficient to establish that Sun "possessed the power to direct or cause the direction of the management and policies" of TRON, and Plaintiffs can assert additional liability as to Defendant Sun as a control person. *See Balestra*, 380 F. Supp. 3d at 359.

### F. *Application of the United States Securities Laws*

The United States securities laws apply to "purchases and sales of securities in the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010). This means either (1) "transactions in securities listed on domestic exchanges" or (2) "domestic transactions in other securities." *Id.* at 267. In other words, the plaintiff must show the "transactions at issue were either listed on domestic exchanges, or that the purchase or sale occurred in the United States." *Rubenstein v. Cosmos Holdings, Inc.*, No. 19-CV-6976, 2020 WL 3893347, at \*10 (S.D.N.Y. July 10, 2020) (citations omitted).

"[A] securities transaction occurs when the parties incur irrevocable liability." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012). "[T]o sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange, we hold that a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." *Id.* at 68. Conclusory allegations that a transaction "took place in the United States" are insufficient, but allegations "that title was transferred within the United States, including, but not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money" are sufficient. *Id.* at 70. A transaction can occur in "more than one location." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 156 (2d Cir. 2017). "For example, if the buyer 'incur[s] irrevocable liability ... to take and pay for a security' in New York and the 'seller incur[s] irrevocable liability ... to deliver a security' in New Jersey, the transaction occurs in both New York and New Jersey." *Id.* (quoting *Absolute Activist*, 677 F.3d at 68.)

**\*15** Defendants allege the federal securities law cannot apply to the transactions at issue because Plaintiffs purchased TRX on Binance, a Malta-based company, and they cannot satisfy either prong of *Morrison*, 561 U.S. 247 (2010). (Def.'s Mem. 28–31.) Defendants are mistaken and ignore

certain allegations in the Amended Complaint. First, with regard to the second prong of *Morrison*, Lead Plaintiffs placed their trades in Nevada and Texas. (Am. Compl. ¶¶ 18, 20.) Plaintiffs then continued to buy and sell TRX in the United States. (*Id.* Exs. A, C.) Although details of the sales are not in the pleadings, the Amended Complaint adequately alleges that Plaintiffs held, and still may hold, some of these TRX tokens. (*Id.* ¶¶ 145–46.) These factual allegations exceed conclusory allegations, such as that the transaction "took place in the United States," relied on by courts that have dismissed claims under the second prong of *Morrison*, including many of the cases Defendants cite in their motion. 🚩*Absolute Activist*, 677 F.3d at 70. The allegations here encompass "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money," *id.*, which are sufficient to satisfy *Morrison*. 🚩*Fed. Hous. Fin. Agency*, 873 F.3d at 156. Even if the parties discover that Binance is in fact not a domestic exchange, *see infra*, the transaction occurred in both the United States and Malta under this Circuit's case law. *See id.*; 🚩*Absolute Activist*, 677 F.3d at 68. I therefore find the allegations sufficient at this stage in the proceedings to reasonably infer that the transaction was domestic. *See also* 🚩*In re Poseidon Concepts Sec. Litig.*, No. 13-CV-1213, 2016 WL 3017395, at *12 (S.D.N.Y. May 24, 2016) (holding that because Plaintiff purchased stock in Florida through a local office, the purchase qualified as a "domestic transaction in other securities" under 🚩*Morrison*, 561 U.S. 247 (2010)); 🚩*Fed. Hous. Fin. Agency*, 873 F.3d at 156 (holding that a transaction occurred both where the plaintiffs accepted the purchase and where defendants released the purchase).

Defendants also argue that Plaintiffs cannot meet the first prong of *Morrison*—that application of federal securities laws requires the unregistered security be listed on a domestic exchange—because Binance is based in Malta. (Def.'s Mem. 29–30) (citing 🚩*Morrison*, 561 U.S. at 267.)) Plaintiffs assert that they "will establish through discovery that Binance is a domestic U.S. exchange," but that their claims nonetheless satisfy *Morrison* because the conduct directly affected a nationally listed security. (Pl.'s Opp. 27) (citing 🚩*Rubenstein*, 2020 WL 3893347, at *11 (finding that Plaintiff's allegations that Defendant is a domestic corporation sufficient when drawing inferences in Plaintiff's favor on a motion to dismiss); 🚩*S.E.C. v. Compania Internacional Financiera S.S.*, 2011 WL 3251813, at *6 (S.D.N.Y. July 29, 2011) (finding allegations that conduct affected a domestically listed security sufficient on a motion to dismiss)). Plaintiffs state in their Amended Complaint that "TRON entered into listing agreements with crypto-asset exchanges that targeted United States consumers with the intent of creating secondary trading markets for the purchase, sale, and trading of TRX in the United States." (Am. Compl. ¶ 137.) Plaintiffs then name several of those U.S.-based exchanges that listed TRX following the ICO, including Bittrex, BitMEX, Poloniex, and Kraken. (*Id.* ¶¶ 140–43.) Defendants cite a number of cases to demonstrate that the Second Circuit has rejected this "cross-listing" theory, (*see* Def.'s Reply 12), but those cases differ materially in that they involve foreign individuals purchasing foreign securities on foreign exchanges. *See* 🚩*City of Pontiac Policemen's & Firemen's Ret. Sys. & UBS AG*, 752 F.3d 173 (2d Cir. 2014); 🚩*In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450 (S.D.N.Y. 2013). Here, as discussed, Plaintiffs reside in Nevada and Texas, made their purchases from Nevada and Texas, held TRX tokens in Nevada and Texas, and continued to buy and sell on Binance from Nevada and Texas. (Am. Compl. ¶¶ 18, 20, 145–46.)

For these reasons, Plaintiffs' allegations that Binance is a domestic U.S. exchange, in addition to statements that the conduct affected a domestically listed security, are sufficient to satisfy the first prong of *Morrison* on a motion to dismiss and proceed to discovery, where the parties can more adequately explore and address these questions. *See* 🚩*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting [subject matter] jurisdiction.").

### V. **Conclusion**

**\*16** For the foregoing reasons, I find that Defendants' motion to dismiss is GRANTED in part and DENIED in part.

Defendants' motion is DENIED as to the Section 12(a)(1) claims against Defendants TRON and Sun and the remaining one hundred Blue Sky state law claims.

Defendants' motion to dismiss is GRANTED as to the Section 12(a)(2) claims against Defendants TRON and Sun.

Defendants are directed to submit an answer to Plaintiffs' Amended Complaint within twenty-one (21) days of the date that this Opinion & Order is filed.

The Clerk's office is directed to terminate the open motion at Document 54.

SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 4555629

---

### Footnotes

1  The facts set forth herein are taken from the allegations contained in Plaintiffs' Amended Complaint. (Doc. 29.) I also consider certain exhibits attached to declarations to the extent they are incorporated by reference or are integral to the Amended Complaint. See *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 80 (2d Cir. 2018) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." (citation omitted)). I assume these factual allegations to be true for purposes of this motion. See *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

2  "Am. Compl." or "Amended Complaint" refers to the Amended Class Action Complaint filed by Plaintiffs on August 24, 2020. (Doc. 29.)

3  The U.S. Securities and Exchange Commission ("SEC") has defined an "initial coin offering" or "ICO" as

> [A] recently developed form of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration (most commonly Bitcoin, Ether, or fiat currency). The [coins] are issued and distributed on a "blockchain" or cryptographically-secured ledger. [Coins] often are also listed and traded on online platforms, typically called virtual currency exchanges, and they usually trade for other digital assets or fiat currencies. Often, [coins] are listed and tradeable immediately after they are issued.

*In the Matter of Munchee Inc.*, Securities Act Release No. 10445, 2017 WL 10605969, at *2 n.1 (Dec. 11, 2017).

4  "Def.'s Mem." refers to Defendants' memorandum of law in support of the motion to dismiss the Amended Complaint. (Doc. 55.)

5  "Pl.'s Opp." refers to Plaintiffs' memorandum of law in support of their opposition to Defendants' motion to dismiss. (Doc. 66.)

6  "Def.'s Reply" refers to Defendants' reply memorandum of law in support of the motion to dismiss the Amended Complaint. (Doc. 73.)

7  "Roche Decl." refers to the declaration of Kyle W. Roche in opposition regarding Defendants' motion to dismiss. (Doc. 70.)

8  "Hardin Decl." refers to the Declaration of Corey Hardin in support of Plaintiffs' opposition to Defendants' motion to dismiss. (Doc. 67.) "Williams Decl." refers to the Declaration of Chase Williams in support of Plaintiffs' opposition to Defendants' motion to dismiss. (Doc. 69.)

| | |
|---|---|
| 9 | "Nair Decl." refers to the Declaration of Suresh S. Nair in support of Defendants' motion to dismiss. (Doc. 59.) |
| 10 | In a similar vein, Plaintiffs assert in their Amended Complaint that TRON made "fraudulent statements and omissions" that prohibited them from realizing that TRX were securities until the SEC published the Framework on April 3, 2019. (Am. Compl. ¶¶ 148–49.) Defendants address the fact that Plaintiffs failed to allege fraudulent concealment as a basis for tolling the statute of limitations for their Section 12(a)(2) claim, (Def.'s Mem. 16–18), but Plaintiffs do not address that argument in their opposition and in fact assert in their Amended Complaint that their Section 12(a)(2) claim "does not allege fraud." (Am. Compl. ¶ 175.) Because allegations of fraudulent concealment require "particular pleading requirements set forth in Federal Rule of Civil Procedure 9(b)," see Zirvi v. Flatley, 433 F. Supp. 3d 448, 462 (S.D.N.Y. 2020), and because Plaintiffs fail to meet those pleading requirements, I decline to address any potential argument that Defendants' fraudulent concealment tolled the statute of limitations. |
| 11 | A court may consider any matters that are subject to judicial notice, including publicly filed documents. See Kramer v. Time–Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991); Fullerton Ave. Land Dev. Ltd. v. Cianciulli, 48 F. App'x 813, 814 n.1 (2d Cir. 2002) (referencing the Second Circuit's "well-established rule that a district court may rely upon publicly filed records in deciding a motion to dismiss"). |
| 12 | "O'Neill Decl." refers to the Declaration of Casey O'Neill in support of Defendants' motion to dismiss. (Doc. 57.) |
| 13 | Section 5 of the Securities Act makes it unlawful to directly or indirectly "make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise" or to "carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a). |

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.